1               UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                    PECOS DIVISION

3  UNITED STATES OF AMERICA ) Docket No. PE 19-CR-774(1) DC
                         )
4  vs.                    ) Pecos, Texas
                         )
5  THOMAS ALAN ARTHUR      ) November 20, 2019

6

              TRANSCRIPT OF DETENTION HEARING
7        BEFORE THE HONORABLE DAVID B. FANNIN

8

9  APPEARANCES:

10  For the United States:   Ms. Monica R. Morrison
                        Assistant U.S. Attorney
11                    2500 North Highway 118,
                        Suite A-200
12                    Alpine, Texas

13

14  For the Defendant:      Mr. Mark W. Bennett
                        Bennett & Bennett
15                    917 Franklin Street, 4th Floor
                        Houston, Texas 77002
16

                        Mr. Lane A. Haygood
17                    Haygood Law Firm
                        522 North Grant Avenue
18                    Odessa, Texas 79765

19

20  Transcriber:           Ms. Lily Iva Reznik, CRR, RMR
                        501 West 5th Street, Suite 4153
21                    Austin, Texas 78701
                        (512)391-8792
22

23

24

25  Proceedings reported by electrical digital sound
    recording, transcript produced by computer.

**I N D E X**

|                  | Direct | Cross | Redirect | Recross |
|------------------|--------|-------|----------|---------|
| Witnesses:       |        |       |          |         |
| Jeremy Ewan      | 3      | 16    | 25       |         |

**E X H I B I T S**

|                  | Offered | Admitted |
|------------------|---------|----------|
| Government's     |         |          |
| (None)           |         |          |
| Defendant's      |         |          |
| (None)           |         |          |

1          (Proceedings commence at 9:57 a.m.)

2          THE CLERK:  The Court calls:  P-19-CR-774, <u>United</u>

3  <u>States of America vs. Mr. Thomas Alan Arthur.</u>

4          MS. MORRISON:  Monica Morrison present on behalf

5  of the United States.

6          MR. BENNETT:  Good morning, your Honor.

7          Mark Bennett and Lane Haygood on behalf of Mr.

8  Arthur.

9          THE COURT:  Morning.

10          We're here on a detention hearing.

11          Ms. Morrison, would you like to call your first

12  witness?

13          MS. MORRISON:  Yes, your Honor.  The government

14  calls Agent Jeremy Ewan to the stand.

15          THE CLERK:  Morning, Agent.

16          THE WITNESS:  Morning.

17          THE CLERK:  Do you swear to tell the truth, the

18  whole truth, and nothing but the truth, so help you God?

19          THE WITNESS:  Yes, ma'am.

20          THE CLERK:  Thank you.

21      JEREMY EWAN, called by the Government, duly sworn.

22                    <u>DIRECT EXAMINATION</u>

23  BY MS. MORRISON:

24  Q.  Could you please state your name for the record,

25  spelling your last name?

1  A.   Jeremy Ewan, E-W-A-N.

2  Q.   Agent Ewan, where are you currently employed?

3  A.   I am a Special Agent for the FBI here in Alpine,

4  Texas.

5  Q.   How long have been employed by the FBI?

6  A.   Just a little under two years for the FBI.

7  Q.   Prior to joining the FBI, where were you employed?

8  A.   I worked as a police officer and a criminal

9  investigator in the state of Montana for about eleven

10  years.

11  Q.   Could you describe how you became involved in the

12  investigation of this case?

13  A.   I was notified by a Texas Department of Public Safety

14  investigator of allegations of a man who ran what they

15  called a child porn fantasy website out of Terlingua,

16  Texas.

17  Q.   Have you been investigating this case since that

18  time?

19  A.   Yes, I have.

20  Q.   On November 7th of 2019, was a search warrant

21  executed on the residence of Thomas Arthur?

22  A.   Yes, it was.

23  Q.   I'd like to ask you some questions about what was

24  located during the search of that residence.

25           Were you present when the search was conducted?

1  A.   Yes, I was.

2  Q.   Were any firearms located during the search of that

3  residence?

4  A.   Yes, there were.

5  Q.   Could you describe generally how many firearms were

6  located during the search of the residence?

7  A.   I believe at last count, it was somewhere around 50.

8  Q.   Now, during the course of your investigation, did you

9  learn that Thomas Arthur had been selling firearms?

10  A.   Yes, I did.

11  Q.   What specifically did you learn?

12  A.   I learned that through an account on a website called

13  gunbroker.com, he sold firearms and ammunition.

14  Q.   How many firearms did he sell through gunbroker.com?

15  A.   I want to say it was in the neighborhood of a dozen

16  to 14 over the course of a year and a half, I think.

17  Q.   In addition to selling firearms, was Mr. Arthur

18  selling any other items through gunbroker.com?

19  A.   Yes.  He was selling ammunition.

20  Q.   In connection with the sales of those ammunition --

21  of that ammunition, did he make any claims about the

22  nature of the ammunition?

23  A.   Yes.  He advertised the ammunition -- some of the

24  ammunition that was being sold as armor-piercing rifle

25  ammunition.

1  Q.   Now, while you were conducting your investigation,

2  were you able to determine a dollar amount that the

3  defendant made through the sale of these firearms?

4  A.   I believe it was a little over $30,000.  I don't

5  remember the exact figure I found, though.

6  Q.   Now, did this cause concern -- well, let me strike

7  that.  I'll ask this a different way.

8       In light of the fact that you were aware that Mr.

9  Arthur was selling firearms, did this affect how the FBI

10  executed the search warrant on this residence?

11  A.   Absolutely.  It did.

12  Q.   Now, to your knowledge, does Mr. Arthur have a

13  federal firearms license that would allow him to sell

14  firearms?

15  A.   No.  He does not.

16  Q.   During the search of the defendant's residence, were

17  any electronic devices seized?

18  A.   Yes.  Multiple computers, numerous external hard

19  drives, portable storage devices and such.

20  Q.   Has the FBI been searching the items that -- the

21  electronic items that were seized from the defendant's

22  residence?

23  A.   Yes.  We are early in the process of reviewing those.

24  Q.   Have you found any items of significance during the

25  search of those devices?

1  A.   Yes.  We have observed several images of suspected

2  child pornography.

3  Q.   Now, let's talk about the suspected images of child

4  pornography.  Could you describe for the Court the

5  suspected images that have been located?

6  A.   We saw, I believe it was, three images of what

7  appeared to be a nude female, breasts and genitals and

8  buttocks.  I would guess the female was between 10 to 12

9  years old maybe.

10  Q.   Now, to your knowledge, have you been able to

11  identify the victim in these three images?

12  A.   The image had a file name on it that was consistent

13  with somebody who had previously been identified as a

14  juvenile when the photos were taken.

15  Q.   To make sure I understand and the Court understands,

16  these are images that have previously been identified and

17  been disseminated as child porn.

18  A.   I believe so.  Yes.  At least the file name.

19  Q.   Now, is there any question, based on what you

20  observed, that this individual in these three photographs

21  is underage?

22  A.   No.

23  Q.   Have you also located other items that you believe to

24  be suspected child pornography?

25  A.   Yes.  We've observed -- or I have observed many

1  photographs of nude females that appear to be early to

2  mid-teens, possibly older, possibly a little younger.

3  It's hard to tell.

4  Q.   Have you been able to identify these victims yet?

5  A.   Not yet.

6  Q.   Does the FBI intend to take additional steps to

7  identify these individuals?

8  A.   Yes, we do.

9  Q.   What steps do you intend to take to identify the

10  individuals in these photographs?

11  A.   The individuals in those photographs, we'll submit

12  the photographs to the National Center For Missing and

13  Exploited Children.  They maintain a lot of records on

14  known child pornography, and they do a lot of work to help

15  us identify who these victims might be.

16  Q.   With respect to the website that the defendant

17  operates, have you been able to identify any of the users

18  connected to that website?

19  A.   We've identified, I believe, at last count around 19.

20  Q.   Of the 19 that you have been able to identify, what

21  is significance of -- what is the significance of the nine

22  that you have been able to identify of the 19?

23  A.   Nine are registered sex offenders for sex offenses

24  against children, either physical sex abuse or child

25  pornography.

1  Q.   During the course of your investigation, did you

2  discover any other concerning instances where individuals

3  who are being investigated accessed this website?

4  A.   Yes.   There was one other individual who was a member

5  of the website who is currently awaiting trial in Utah for

6  sex abuse of a child and child pornography.

7  Q.   Has this particular website come up in connection

8  with other FBI investigations?

9  A.   Yes.   Numerous investigations.

10  Q.   Could you describe those investigations for the

11  Court?

12  A.   Unrelated investigations in the subjects for child

13  pornography while those -- while they were reviewing the

14  electronic devices of those subjects, they encountered

15  stories from this website.

16  Q.   Are you aware of other -- well, I'm going to back up

17  here a little bit.

18      Could you explain for the Court how this website

19  operates?

20  A.   It is a subscription-based website that features text

21  stories of -- most of the ones that I have seen describe

22  the sexual abuse of children by adults.   And then, users

23  can subscribe for a fee -- I forget the exact amount.   I

24  remember $90 per year being one of the fee structures.

25  And for that fee, they can access, I think what was

1   advertised, as more than 20,000 stories.

2   Q.   How long has this website been operating?

3   A.   At least since 1999 was the earliest I saw.

4   Q.   Was there any indication that anyone besides Mr.

5   Arthur has operated this website?

6   A.   Not that I'm aware of.

7   Q.   During the course of your investigation, did you

8   learn whether or not individuals who submitted stories for

9   publication were compensated by Mr. Arthur?

10  A.   I saw some indication that they were either

11  compensated or given free access to a site in exchange for

12  publishing stories.

13  Q.   Now, you indicated that these stories dealt with

14  child sexual abuse.

15       Was there anything on the website that indicated

16  that any of these stories related solely to adult

17  pornography or adult erotica?

18  A.   It said that -- the website said that all erotic

19  stories are welcome, but of those stories I observed, all

20  of them involved children.

21  Q.   Were you able to search for stories addressing

22  particular topics?

23  A.   Yeah.  They had -- I forget.  I think they're

24  referred to as story codes, abbreviations that you could

25  search for, depending on your specific interest like an

1  age group of the child, or I remember incest being one,

2  pedophilia being one, that type of thing.

3  Q.   Was there anything on the website besides actual

4  stories?

5  A.   There was -- the authors on the web page have what

6  they call an author page that lists all of their stories,

7  and included on that author page can be like an image that

8  kind of -- that they use as their image on their home

9  page.  I observed the one that appeared to be a drawing of

10  a child, a nude female exposing her genitals and breasts.

11  Q.   What was that child doing on that drawing?

12  A.   She appeared to be masturbating in that drawing.

13  Q.   During the course of your investigation, did you

14  collect records from the defendant's banks?

15  A.   Yes, we did.

16  Q.   In the course of collecting those records, were you

17  able to determine an e-mail address associated with the

18  defendant?

19  A.   Yes, I was.  Mrdouble@mrdouble.com was one e-mail

20  address.  And then, there was another one that he used for

21  an online bank account; I believe it was Skeet 721, if I

22  remember correctly, at -- I forget the e-mail provider.

23  Q.   Was there anything of significance about the

24  beginning portion of the e-mail Skeet 721?

25  A.   That Skeet 721 was a user name that showed up as

1   exchanging suspected child pornography with a man who was

2   eventually convicted of child pornography in the early

3   2000s, although they were never able to identify who Skeet

4   721 one was during that investigation.

5   Q.   Are you familiar with the prosecution of Frank McCoy?

6   A.   Yes, I am.

7   Q.   Could you describe for the Court who Frank McCoy was?

8   A.   Frank McCoy was an author of stories -- some of the

9   stories posted to the Mr. Double website.  Some stories,

10  he posted on other websites, but they were stories that

11  primarily focused on the sexual abuse of children.

12  Q.   During the investigation of Mr. McCoy, was law

13  enforcement able to obtain items from Mr. McCoy's devices?

14  A.   Yes, they were.

15  Q.   Was there correspondence with Thomas Arthur during

16  the course of that investigation?

17  A.   There appeared to be.  Yes.

18  Q.   Have you had the opportunity to review the e-mail

19  exchanges between Frank McCoy and Thomas Arthur?

20  A.   Yes.

21  Q.   Are you aware -- let me ask you a different way.

22        Do you have knowledge of an e-mail exchange

23  between the two of them about an author named "Frosty"?

24  A.   Yes.

25  Q.   Could you describe for the Court the substance of

1  those e-mails?

2  A.   If I remember correctly, I believe "Frosty" was --

3  they had become aware that "Frosty" had been charged with

4  some sort of child pornography offense, and they were

5  discussing the circumstances of it, how he had been warned

6  not to keep child pornography on his devices and such.

7  Q.   Did the e-mails from Mr. Arthur to Mr. McCoy contain

8  a request about changing "Frosty's" user name?

9  A.   Yes.  It was a little bit confusing on the e-mail

10 thread and exactly who was replying to who, but they were

11 debating whether or not "Frosty's" user name needed to be

12 changed in all of the stories that were posted on Mr.

13 Double and other sites so that federal investigators could

14 not identify any new work he did.

15 Q.   During the course of your investigation, could you --

16 tell me and tell the Court what you learned about the

17 defendant's finances.

18 A.   It appeared that the defendant made essentially all

19 of his money off of the Mr. Double website or -- and to a

20 lesser extent, another adult pornography website that he

21 also ran.

22 Q.   Based on the course of your investigation, does the

23 defendant have access to any other resources aside from

24 the proceeds of this website?

25 A.   None that I'm aware of.

1  Q.   Could you tell me about where it is the defendant

2  lives?

3  A.   The defendant lives at a property off of Terlingua

4  Ranch Road, near Terlingua.

5  Q.   Where is that located?

6  A.   It's about -- his property, I believe, is about 60

7  miles south of Alpine, south Brewster County.

8  Q.   Could you describe the proximity to the Mexico-U.S.

9  border?

10  A.   I believe it's about 30 miles.

11  Q.   During the course of your investigation, what did you

12  learn about the defendant's contacts with foreign

13  countries?

14  A.   I learned that the defendant was born in Germany and

15  had lived in Germany at one time, but I don't believe had

16  traveled there at least within the past 20 years.

17  Q.   Now, how is it that he's operating his website?  And

18  I may not have phrased that more -- let me strike that and

19  ask that a different way.

20       During the course of your investigation, did you

21  learn that the defendant's website is hosted through a

22  virtual private server in another country?

23  A.   Yes.  I believe that is the arrangement.  You'll have

24  to excuse me.  I'm not a technical expert, so I think the

25  arrangement is called the virtual private server.  But, in

1  essence, he contracts with a company out of the

2  Netherlands to host at least a portion or all of the

3  website.

4  Q.   After the defendant was placed under arrest, was he

5  subsequently interviewed by another FBI agent and an agent

6  with the Department of Public Safety?

7  A.   Yes, he was.

8  Q.   During the course of that interview, what did the

9  defendant tell agents about his ability to operate his

10  website?

11  A.   He said that he designed the website himself, that he

12  was very technically savvy, that he has a computer

13  programmer background, and that's where a lot of the

14  technical skill came from.

15  Q.   Based on the information that he provided, is it your

16  understanding that the defendant could operate his website

17  from anywhere?

18  A.   Yes.  I believe the information he provided was that

19  you can access the server in the Netherlands remotely from

20  any computer here in the states through a password and

21  user name.

22  Q.   So the defendant would not need to access the devices

23  specifically seized by the FBI to resume operating this

24  website.

25  A.   I don't believe so.

1  Q.   While you were conducting your investigation, did you

2  contact the National Center For Missing and Exploited

3  Children?

4  A.   Yes.

5  Q.   Why did you contact the National Center For Missing

6  and Exploited Children?

7  A.   They receive -- they have a tip line where they

8  receive tips on the internet about allegations of child

9  sex abuse or child pornography, and I was seeing if there

10  were any allegations or tips submitted about this website.

11  Q.   Have there been any tips to make about this website?

12  A.   Yes.  There were more than 40, I believe, between

13  2000 and 2016.

14  Q.   I don't have any further questions.  I'm sure defense

15  counsel will have some.

16  A.   Thank you.

17       THE COURT:  Mr. Bennett, would you like to ask

18  some questions?

19       MR. BENNETT:  Yes.  Of course.  Thank you, your

20  Honor.

21                CROSS-EXAMINATION

22  BY MR. BENNETT:

23  Q.   Let's go from the bottom to the top.

24  A.   Yes, sir.

25  Q.   Okay?  So tips to NCMEC, you said over 40, over the

1  course of 16 years.

2  A.   Correct.

3  Q.   So that's two to three a year on average.

4  A.   Yes.

5  Q.   And these are just people who happen upon the website

6  and have some concern and call NCMEC.

7  A.   The majority of them.  Yes.

8  Q.   So busybodies perhaps.

9  A.   I don't know the nature of the people.

10  Q.   Exactly.  We don't know.  That people -- they don't

11  have -- the people making the complaints don't have any

12  more information than you have.

13  A.   Some -- I read in the complaint some of them had

14  spent some time on the website.  Some of the --

15  Q.   As you did --

16        MS. MORRISON:  Objection, your Honor.  I'm going

17  to ask that defense counsel let the witness finish

18  answering before he starts his next question.  Our

19  record's not going to be clear at this point.

20        THE COURT:  Sustained.

21  A.   Some of the allegations seemed to have come up from

22  new criminal investigations or people complaining about

23  specific people they knew of accessing the website.  But

24  yeah, I don't know the nature of all of the complaints.

25  Q.   (BY MR. BENNETT) Okay.  And in order to run the

1  website, the prosecutor made the point that he could

2  operate it from anywhere, but he would have to have an

3  internet connection to do it, correct?

4  A.   I believe so.  Yes.

5  Q.   So, for example, if this court were to order his

6  release on conditions and to forbid him from using the

7  internet, forbidding him from using the internet, first of

8  all, would prevent him from running this website.

9  A.   Yes.

10  Q.   And second, the FBI is monitoring the website so that

11  if there are changes made to the website, you would be

12  able to tell, right?

13  A.   I believe so.  Yes.

14  Q.   Okay.  So as a practical matter, if Mr. Arthur were

15  released on conditions that required him not to access the

16  internet and he were to violate that condition and were to

17  do something with Mr. Double, you'd be able to tell.

18  A.   I hope so.  Yes.

19  Q.   Okay.  The web-hosting company for this website is in

20  the Netherlands?

21  A.   Correct.

22  Q.   You're not a tech guy.  Is this unusual for a website

23  to be hosted in another country?

24  A.   I do not know.

25  Q.   Okay.  Mr. Arthur, you said, had lived in Germany.

1  It was for about a year, right?

2  A.   I believe so.  That's --

3  Q.   When he was very small, yes?

4  A.   I believe so.  Yes.

5  Q.   Okay.  And the prosecutor made a big deal about the

6  property being some 30 -- Terlingua being 30 miles from

7  Mexico, right?

8  A.   Correct.

9  Q.   Does Mr. Arthur speak Spanish?

10  A.   I do not know.

11  Q.   Does he have any ties that you know of to Mexico?

12  A.   No.

13  Q.   Okay.  Is the website up or down right now?

14  A.   At last I checked, it was down.

15  Q.   Okay.  So if it were to come back up, the FBI would

16  be able to tell that it came back up.

17  A.   Yes.

18  Q.   And you mentioned another adult pornography website

19  that Mr. Arthur had.

20  A.   Correct.

21  Q.   When you say adult pornography, you mean.

22  A.   All of --

23  Q.   Adult erotica.

24  A.   I believe so.  Yeah.  I don't know about the exact

25  definition.  It features adult nude females.

1   Q.   Not -- right.  Right.  Not content, not that it's

2   merely content for adults, but it's content involving

3   adults.

4   A.   Correct.

5   Q.   This Frank McCoy investigation that you talked about,

6   is that the Utah case that you'd mentioned?

7   A.   No, it is not.

8   Q.   Where is the Frank McCoy case?

9   A.   I am sorry.  I do not remember which court that was

10  out of.

11  Q.   When was that?

12  A.   I believe in the mid to late 2000s.

13  Q.   So a decade or more ago.

14  A.   I believe so.  Yes.

15  Q.   And the -- when the user name Skeet 721 came up, you

16  had said exchanging suspected child pornography and that

17  was in the early 2000s.

18  A.   Yes, it was.

19  Q.   Fifteen years ago.

20  A.   At least.  Yes.

21  Q.   Okay.  You didn't find any child pornography on Mr.

22  Double.

23  A.   No.  I did not.

24  Q.   There was a drawing which you contend is obscene.

25  A.   Yes.

1  Q.   But it's not child pornography.

2  A.   It is not a photograph or a video.  No.

3  Q.   On direct examination, you said that users were

4  either compensated or given access for writing stories.

5  A.   Yes.

6  Q.   In fact, did you find any evidence that they were

7  compensated in any other way than being given access?

8  A.   Just some discussion in the e-mails that were

9  mentioned earlier between Thomas Arthur and Mr. McCoy,

10  there was some mention of compensating the authors.

11  Q.   Okay.  And that was, again, back in mid to late 2000,

12  a decade or so ago.

13  A.   I believe so.  Yes.  I don't remember the date on

14  that.

15  Q.   Okay.  And you found when you joined the website as a

16  -- as anybody could join the website, you found that there

17  was an amount of texts that could be written that would

18  allow you to access the website without paying money,

19  right?

20  A.   Yes.

21  Q.   How much text was that?

22  A.   It said 25K.  From the context of it, I thought that

23  meant 25,000 words, but I could definitely be wrong about

24  that.

25  Q.   Okay.  Your understanding was, somebody could write

1   25,000 words and as an author, have access to the content

2   on the website, as well.

3   A.   That's how I understood it.

4   Q.   Okay.  And there are more than 20,000 stories on the

5   website?

6   A.   That's what the website claims.  Yes.

7   Q.   Okay.  That site does not involve child pornography.

8   A.   It involved a -- no.  I did not observe any child

9   pornography on it.  No.

10  Q.   Okay.  So let's talk about what the prosecutor led

11  with, which was child pornography.  Okay?

12          You said that there were many images of nude

13  females early to mid-teens.

14  A.   Yes.

15  Q.   Are you contending that all of those are child

16  pornography?

17  A.   No.  I'm not.

18  Q.   Okay.  You said that the file names were consist of

19  the -- of some of the -- three of the files.  You said the

20  file names were consistent with an identified juvenile.

21  A.   Yes.

22  Q.   You're explicitly not saying that those images are

23  known to be of that juvenile.

24  A.   The image appears to be of a child of the age of that

25  female.  But no, I do not know that they are that female.

1    No.

2    Q.   Where are those images found?

3    A.   I believe on either the computer -- one of the

4    computers that was at his desk or one of the hard drives

5    that was near it but I -- there were so many devices, I'm

6    not sure exactly what was found on what yet.

7    Q.   How many devices were there?

8    A.   I believe 10 hard drives, multiple computers.

9    Q.   Do you know when the device that have these three

10   images had last been accessed?

11   A.   I do not.  No.

12   Q.   Do you know who had had access to it?

13   A.   I do not.

14   Q.   Do you have any evidence other than it's on a

15   computer that was seized from Mr. Arthur and subject to --

16   pursuant to a search warrant, do you have any evidence

17   that Mr. Arthur knew those images were there?

18   A.   Other than just the stuff that showed that the

19   website was run off of that computer or there was

20   information from the website on that computer, so I don't

21   know that it was run off that computer.

22   Q.   Well, do you have that information that the website

23   was run from that computer?

24   A.   No.  But there were stories from the website on that

25   computer.

1   Q.   Okay.  Finally, the firearms.

2   A.   Yes.

3   Q.   You'll agree with me that you don't need a license to

4   sell firearms on Gun Broker.

5   A.   No.  You do not.

6   Q.   You can -- if I'm a private individual and I have

7   some guns to sell, I can advertise them on Gun Broker.

8   You as a private individual can bid on them and buy them,

9   and all I have to do is send it to a federal firearms

10  licensee in your state for you to fill out the papers,

11  right?

12  A.   Yes.

13  Q.   Okay.  Of the 50 firearms that you found in the

14  residence, were some of them antiques?

15  A.   Yes.

16  Q.   Were some of them nonfunctional?

17  A.   I have no idea if they functioned.

18  Q.   Would you say that -- would it be fair to say that

19  there were 29 antique firearms?

20  A.   That sounds like it could be in the ballpark, but I

21  just don't remember offhand how many.  So.

22  Q.   So when you were counting firearms, you were counting

23  things such as antique firearms.  And when Mr. Arthur

24  describes what he has, he may not be counting the same

25  thing.

1   A.   That's possible.  Yes.

2   Q.   Okay.  I'll pass the witness, your Honor.

3           THE COURT:  Redirect.

4                   RE-DIRECT EXAMINATION

5   BY MS. MORRISON:

6   Q.   Agent Ewan, did you actually subscribe to this

7   website?

8   A.   No.  I did not.

9   Q.   How were you able to access this website?

10  A.   One of the subscribers gave his consent for us to

11  take over his account and view what was on the website.

12  Q.   What was the status of that particular subscriber?

13  A.   That subscriber was, at the time he acquired the

14  subscription, on probation for child pornography offenses,

15  and he was not supposed to have access to the internet or

16  computers at that time.

17  Q.   Even with his access, were you able to access this

18  entire website?

19  A.   No, we were not.

20  Q.   Could you describe the part of the website that you

21  couldn't access?

22  A.   There was a forum for members to communicate.  I

23  believe it was called the Doublina, or something to that

24  effect, forum that the account we had did not have access

25  to.

1   Q.   Even at this point, have you been able to access that

2   forum?

3   A.   No.  I have not.

4   Q.   Do you have any idea what's contained in that forum?

5   A.   No.  I do not.

6   Q.   Now, when was the last time you checked to see if the

7   Mr. Double website was up and running?

8   A.   Last week.  I can't remember the day.

9   Q.   During the course of your investigation, did you

10  determine how much this website was making?

11  A.   In card sales that were deposited into their bank, it

12  was between 10 and $14,000 a month, but I do not know if

13  that was what the breakdown of how much was -- this

14  website we're talking about, ma'am, which was the adult

15  pornography website.

16  Q.   Were you present in court last week when the

17  defendant had his initial appearance?

18  A.   Yes, I was.

19  Q.   Do you remember the defendant being questioned about

20  how much he had in his checking account at that time?

21  A.   Yes.  I don't remember the exact figure, but I

22  believe it was in the neighborhood of $10,000.

23  Q.   I don't have any further questions.

24          THE COURT:  Mr. Bennett, would you like to ask

25  any additional questions?

1          MR. BENNETT:  No, your Honor.  Thank you very

2    much.  Thank you, Agent.

3          THE COURT:  Thank you, Agent.

4          THE WITNESS:  Thank you.

5          THE COURT:  Ms. Morrison, any -- would you like

6    to present any additional evidence?

7          MS. MORRISON:  No, your Honor.  Just argument.

8          THE COURT:  Mr. Bennett, would you like to

9    present any evidence?

10          MR. BENNETT:  Will the Court take judicial notice

11    of the Pretrial Services report, or should I proffer it?

12          THE COURT:  I take judicial notice.

13          MR. BENNETT:  Then there's nothing else, your

14    Honor.

15          THE COURT:  Ms. Morrison, would you like to

16    start?

17          MS. MORRISON:  Yes, your Honor.

18          It's the government's position that the defendant

19    cannot be safely released.  I understand that Pretrial

20    Services is recommending that he be placed on bond.  But

21    obviously through the testimony, it's been established

22    that this defendant can access this website and benefit

23    from his criminal enterprise anywhere.  It's concerning

24    that he's operated this website for such a significant

25    portion of time; that the individuals that are accessing

1  his website, many of them are convicted sex offenders and

2  essentially he's made this a haven for these individuals.

3       Beyond that, the defendant is now likely going to

4  be facing additional charges for the child pornography on

5  his devices.  I understand, at this point, we can't

6  conclusively demonstrate that he's the individual

7  accessing those devices, but when he's operating the

8  website, there are stories on the website.  It's a pretty

9  good indication that he's the one that's accessing those

10  images.  So I'd ask that the Court detain him not only to

11  assure his appearance but, also, to protect community.

12       THE COURT:  In the -- Count 1 of the indictment

13  carries with it a penalty range of five to 20 years; is

14  that correct?

15       MS. MORRISON:  That's correct, your Honor.

16       THE COURT:  Okay.  Mr. Bennett, would you like to

17  say anything?

18       MR. BENNETT:  Yes, your Honor.

19       It sounds as though the government is relying on

20  their perception of danger, rather than flight risk.  I

21  would like to deal with the flight risk, however.  Mr.

22  Arthur has lived in the community for 20 years.  He's 60

23  years old.  While he was born in Germany to a German

24  mother and a United States Air Force father, he has never

25  lived there, and he hasn't been there in at least 20

 1  years.

 2          As far as Mexico, there are no ties to Mexico.  I

 3  think that the innuendo that he might go to Mexico is

 4  nothing more than an innuendo.  As far as danger to the

 5  community, everything that the government thinks that Mr.

 6  Arthur has done was done on a computer.  So that even if

 7  it's all true and even if the stories on the website

 8  actually are prosecutable and are obscene, which is an

 9  interesting question which I hope that we get to in the

10  course of litigating the obscenity case, even if all of

11  that is true, he has to have access to the internet to do

12  those things.  And one thing that this court can easily do

13  is say:  You can't have access to the internet.

14          Well, in a case that involved, say, solicitation

15  of children, which this doesn't, but if it were a case

16  that involved solicitation of children, then the

17  government might reasonably say, well, wait a minute, we

18  can't tell if he keeps on committing this crime because he

19  could be reaching out to other children.

20          Well, in this case, the crime that they're

21  alleging is the running of the website, and they can

22  certainly tell if somebody's keeping that website running.

23          THE COURT:  Could he not use someone else's

24  computer to do this?

25          MR. BENNETT:  He would need -- he could use --

1   right.  So this is the thing.  If he could access somebody

2   -- if he violated the rules to access somebody else's

3   computer to keep the website going, the government would

4   be able to tell that the website was being maintained.

5   There's no allegation as far as -- well, in fact, the

6   government has said that nobody else worked on this

7   website.

8          So if the website pops back up, if people -- if

9   their story's being added to the website, if there's money

10  going in -- being taken out of the website, the government

11  will be able to tell.  That's -- I don't know if I'm

12  explaining it well, your Honor, that the nature of this

13  particular offense is that everything is done through this

14  website, and the government can see whether that website

15  is up or not.  And if the website is down, then Mr. Arthur

16  is not doing anything with the website.  And if the

17  website is up, then from the evidence that we've heard

18  here, Mr. Arthur's doing something with the website.

19         He's not -- it would be -- he would be

20  ill-advised to get the website up and running again

21  because the Court would be able to tell, and certainly

22  that would result in the revocation of his release.

23         THE COURT:  Address for me the -- you indicated

24  that the guns that were confiscated, some were antiques

25  and then, some were not; is that correct?

1          MR. BENNETT:  They were not confiscated.  The FBI

2     left them there.  My understanding -- and I haven't taken

3     inventory of them, but my understanding is that there were

4     some antique guns.  And I don't know whether in this

5     context, antique means not even firearms because, of

6     course, the U.S. Code defines firearms to exclude certain

7     antiques.

8          There were at least three firearms -- it's a

9     ranch and they have at least three functioning firearms

10    that were available for use around the ranch.

11         THE COURT:  And what about the armor-piercing

12    ammunition?

13         MR. BENNETT:  This is the first I heard about

14    that, your Honor.  I couldn't address that.  I know that

15    there's NATO green-tip armor, green-tip ammunition, which

16    is 5.56 millimeter ammunition and has little tiny green

17    tip at the tip of the bullet itself, and people talk about

18    this as armor-piercing ammunition.  I'm not sure what this

19    is -- whether this is what Mr. Arthur was offering for

20    sale or whether it was something else.  I wish I could

21    answer that.

22         THE COURT:  And this is a ranch, correct?

23         MR. BENNETT:  Yes, your Honor.

24         THE COURT:  So Mr. Arthur would not be living

25    close to children; is that right?

1          MR. BENNETT:  Correct.

2          THE COURT:  And nor close to a public park; is

3    that correct?

4          MR. BENNETT:  That is correct, your Honor.

5          I believe they have 300 acres?  They have 300

6    acres, so they have substantial space around them.

7    There's also -- there's the house and then, there's a

8    guest house on the property.  The firearms are going to

9    take a little bit of time to get out of the house.  And

10   so, I would ask that the Court allow Mr. Arthur to live in

11   the guest house while his wife takes care of removing it

12   -- it will be a day or two to get the guns out of the main

13   house.

14         THE COURT:  Would you like to say anything else?

15         MR. BENNETT:  No.  That's all, your Honor.  Thank

16   you very much.

17         THE COURT:  Would you like any rebuttal, Ms.

18   Morrison?

19         MS. MORRISON:  Your Honor, I would just clarify,

20   while I don't have specifics about the armor-piercing

21   ammunition, the defendant's specific advertisements claim

22   that it was armor-piercing, which is concerning given that

23   he has so many firearms and presumably knows about

24   firearms.

25         I think if the defendant is released on bond,

1   given how remote this property is, the defendant's lack of

2   inclination, at least in the past, to let anyone, even UPS

3   or Fed Ex, onto the property, I think it's going to be

4   difficult to guarantee that Pretrial release has access to

5   the property.

6          THE COURT:  I would note for the record that Mr.

7   Bennett is correct that the -- there is a recommendation

8   that there be a bond with many conditions to go along with

9   that bond.  Mr. Arthur was indicted on November the 14th

10  of this year in a seven-count indictment; therefore, the

11  grand jury has, therefore, found probable cause in this

12  matter.

13         The government has shown the strength of their

14  case by the testimony of FBI Agent Jeffrey (sic) Ewan.  I

15  am going to in this matter detain Mr. Arthur.  And I will

16  note for the record that the basis for this detention is

17  that the nature of the offense and this -- the fact that

18  Mr. Arthur is facing a significant amount of time, that

19  there is substantial weight of the government's case, and

20  there is at least -- there are at least weapons in this

21  matter that are -- that the Court finds suspect in terms

22  of the armor-piercing ammunition.  And I don't know the

23  nature of all the other weapons, although there were 50.

24         Therefore, I'm going to detain Mr. Arthur in this

25  matter.  And I find that there is no condition or

1   combination of conditions to assure -- to assure his

2   appearance in court or the safety of the community.

3         Mr. Bennett, of course, you may appeal this

4   decision to the district judge if that's your wish.  I

5   will let you know that the district judge will be

6   available in Alpine next week for any necessary hearings.

7   I don't think he'll be in Pecos.  Will the Judge be in

8   Pecos?

9         MS. MORRISON:  I don't think so, your Honor.

10        THE COURT:  The next time the district judge will

11  be in the Pecos Division will be on Monday of next week if

12  you wish to appeal this decision.

13        Is there anything else we need to talk about?

14        MS. MORRISON:  No, your Honor.

15        MR. BENNETT:  Yes, your Honor.

16        Mr. Arthur's currently being held in solitary in

17  the Brewster County jail?  No.

18        THE DEFENDANT:  Pecos.

19        MR. BENNETT:  In Pecos detention facility.

20        THE COURT:  Is that not for his protection?

21        MR. BENNETT:  It may appear to be for his

22  protection, but there are many studies showing that a

23  person being -- that solitary is a cruel way to hold

24  somebody.

25        THE COURT:  I am not going to undermine the

1  Marshal's decision in this matter, if that's what you're

2  going to ask me to do.  They're in a better position than

3  I am or you to determine the safety of Mr. Arthur.

4  Usually it's been my experience that people who are held

5  in detention -- solitary detention have either caused that

6  position to happen -- caused that to happen by fighting

7  with someone or doing some kind of -- making a problem for

8  themselves and others, or they do it because to protect

9  the individual.  Sometimes the nature of this case --

10 these kinds of cases, it causes some difficulty in the

11 jails for the individual.

12          And so, I'm not going to change the Marshal's

13 position on that.

14          MR. BENNETT:  I thought I'd bring it to the

15 Court's attention, your Honor.

16          THE COURT:  Thank you.

17          (Proceedings conclude at 10:36 a.m.)

18

19

20

21

22

23

24

25

1

2

3                        REPORTER'S CERTIFICATE

4

5     I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

6  WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

7  TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

8  TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

9  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10  TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11  THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13  */s/Lily I. Reznik*                     March 9, 2020

14  LILY I. REZNIK                          DATE

15

16

17

18

19

20

21

22

23

24

25