United States District Court
Western District of Texas
Pecos Division

| | |
|---|---|
| United States of America<br>v.<br>Thomas Alan Arthur | No. 4:19-CR-00774-DC-1 |

## Defendant's Trial Brief

### Judge Counts:

Thomas Alan Arthur, Defendant, submits this *Trial Brief* for the consideration of the Court.

### The Charged Conduct

Thomas Arthur is charged by the United States with Distribution or Possession with Intent to Distribute Obscene Visual Representations of the Sexual Abuse of Children, in violation of 18 U.S.C. § 1466A(a)(1) (Counts 1, 8, and 9); Importation of Transportation of Obscene Matters, in violation of 18 U.S.C. § 1462(a) (Counts 2-6), and Engaging in the Business of Selling or Transferring Obscene Matter, in violation of 18 U.S.C. § 1466 (Count 7). To these charges, Mr. Arthur pleads not guilty.

### Clarification of the Factual Background

Mr. Arthur disputes the facts as set forth by the Government. First, Mr. Arthur disputes that the website he ran, mrdouble.com, was "dedicated" to the publishing of writings "detail[ing] the sexual abuse of children, including the rape and torture of infants and toddlers." While stories with characteristics similar to that very broad description could be found on mrdouble.com, to say that the website was dedicated

to the publication of such stories is a gross mischaracterization; erotic or sexually charged stories concerning a number of topics, some passe, some taboo, could be found on the website. But the Government, constitutionally, can only seek to prosecute Mr. Arthur for material deemed to be actually obscene; thus, the Government overstates the nature of its case to make it seem as if, out of the thousands of stories on mrdouble.com, the ten challenged pieces of writing are somehow the corpus or even the categorical exemplars of such material.

In light of the stipulation in this case, however, whether the website was "dedicated" to the publication of a particular genre is not relevant.

Mr. Arthur disputes that the author pages contained "drawings depicting children engaged in sexually explicit conduct." First, none of the challenged drawings explicitly or impliedly show the subjects depicted in them as children. Furthermore, the drawings do not appear to be illustrations of any particular story. Absent such context, the Government may not, by its own *ipse dixit*, claim that such drawings depict "children" engaged in sexually explicit conduct, any more than it becomes obscenity for a teenage drama on TV to have actors over the age of majority playing fictional characters under the age of majority and engaging in sexually explicit conduct.

Mr. Arthur disputes the Government's characterization that his remote living situation allowed him to "operate the website in relative anonymity" and that such anonymity "helped facilitate his operation." As noted by the Government, mrdouble.com has existed since 1996; in the 24 years of it being available to anyone with a credit card and a web browser, no obscenity prosecution was ever sought against Mr. Arthur. As shown from the Government's investigation, obtaining the identity of the owner of the website was not difficult or obscured by Mr. Arthur in any way, shape, form, or fashion. Mr. Arthur did not place the website on the so-called "dark web," which are unindexed web pages that can only be viewed with a special browser and deep knowledge of the specific "onion" address of the web page. Mr. Arthur did not attempt to hide his identity through a number of shell corporations or a lawyer. To say that Mr. Arthur sought "anonymity" is to cast this case in a false light; Mr. Arthur did not seek anonymity by his remote location.

## Issues in Contention

As noted by the Government, three main issues are in contention: (1) whether the charged stories or drawings are obscene by the appropriate constitutional definition; (2) whether the first drawing depicts "sexually oriented material" as defined by the relevant statutes and

caselaw; and (3) whether any of the drawings in fact depict a minor. All other issues in the culpability phase are conclusively proven by Mr. Arthur's stipulation. *United States v. Caldwell*, 586 F.3d 338, 342 (5th Cir. 2009).

## OPENING STATEMENT

During his opening statement, Mr. Arthur may seek to admit exemplars of drawings or other art not held to be obscene. Mr. Arthur's opening will be confined to a summary of the facts the defense believes will be adduced at trial and a summary of the issues in the case.

## SPOUSAL PRIVILEGE AND CONFIDENTIAL COMMUNICATIONS

With regard to the spousal testimony privilege, the Government cites repeatedly to *Trammel v. United States*, 445 U.S. 40 (1980) for the proposition that Mr. Arthur could not invoke this privilege on behalf of his wife, Sandra. First, the Government is incorrect to state that the spousal communications privilege "may **only** be asserted by the witness-spouse" (Doc. 71, pg. 5). This is a misstatement of the *Trammel* rule, which is that "the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying." *Trammel*, 445 U.S. at 53. Thus, if testifying adversely, the witness-spouse may refuse under the privilege; or she

may agree to testify if she wishes. But the privilege invoked here is only as regards "evidence of criminal acts and of communications in the presence of a third party." *Trammel*, 445 U.S. at 41. The "confidential communications" portion of the spousal privilege is undisturbed by *Trammel*'s rule. *United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980). This privilege may be asserted by the spouse who uttered the confidential communication. *See* Tex. R. Evid. 504(a)(2); Fed. R. Evid. 501. The Government states in its brief that it does not intend to offer any confidential communications, but even if she did, such communications would concern joint criminal activity (Doc. 71 at pages 6-7). Without more specificity, Mr. Arthur cannot state whether he would invoke the confidential communications privilege as described by the Government; thus, Defendant merely requests that the Court bear in mind the limits of the rule of *Trammel* in setting the outer boundaries of the spousal privilege.

## Audio Excerpts and Optional Completeness

With regard to any audio excerpts from any statement given by Mr. Arthur, Mr. Arthur reserves the right, under *United States v. Flentge*, F.App'x 490, 491 (8th Cir. 2005), to provide to the Court any clips it believes relevant or necessary to establish context or to prevent a false

impression in the mind of the jury. As of the writing of this brief, Mr. Arthur does not intend to offer any such evidence, but given the vagaries of trial and the shifting nature of trial strategy, such a request to produce such a portion may be made at the appropriate time.

## Constitutional Issues Regarding the First Amendment

Courts have always drawn a stark line between "child pornography" and text-only descriptions of child sexual abuse. *United States v. Whorley*, 550 F.3d 326, 335-36 (4th Cir. 2008) (holding that text-only depictions of child sexual abuse may be obscene but not child pornography). And in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 241 (2002), the Supreme Court held that a visual depiction that purports to be of a minor engaging in sexually-explicit conduct cannot be forbidden so long as it was "neither obscene nor involved actual children."

## Text-only and hand-drawn depictions of minors engaged in sexually explicit conduct present unique First Amendment challenges given the 21st-century decisions of the Supreme Court.

As Justice Gregory noted in his concurrence in *Whorley*, the novel *Lolita* by Vladimir Nabokov is reputed to be among the greatest works of English literature. *Whorley*, 550 F.3d at 349 (Gregory, J., concurring in part and dissenting in part). *Lolita* depicts the life of middle-aged

literature professor Humbert Humbert, who begins a pattern of sexual abuse of his stepdaughter Dolores (nicknamed the titular "Lolita"). The novel has received several award-winning film adaptations and is considered to be among, if not **the**, greatest work of English language literature of the 20th century. *See* Popova, Maria, The Greatest Books of All Time, as Voted by 125 Famous Authors, *The Atlantic*, Jan. 30, 2012. Retrieved January 12, 2021. By dint of his craft as a superlative author, Nabokov is able to contrast his unreliable narrator (Humbert) and Humbert's perceptions with the truth; while Humbert clearly describes his erotic feelings for, and conduct with, Lolita, the reader is totally bereft of a pre-teen girl's perspective on it. The beauty of Nabokov's command of the English language is deliberately contrasted with a depiction of a sordid crime; it is meant to provoke thought in the reader beyond the simple depiction of a taboo relationship between an old man and a young girl. As Justice Gregory noted, "the iconic books and movies . . . render unsustainable the claim that writings describing sexual acts between children and adults, generated by fantasy, have no demonstrated socially redeeming artistic value." *Whorley*, 550 F.3d at 349 (Gregory, J., concurring and dissenting in part).

This Court and most jurors would blanche at the thought of hauling a small-town librarian before a jury of her peers to defend stocking her shelves with a copy of *Lolita*; by that same light, Thomas Arthur should not face criminal prosecution for providing material that is, if not made with Nabokov's singular craft, different only in the relative crudeness of expression from the arguably greatest novel of the last century.

## FEDERAL LAW DOES NOT CONSTITUTIONALLY FORBID POSSESSION OF OBSCENE VISUAL IMAGES.

Federal law purports to forbid the simple possession of obscene *visual representations* of the sexual abuse of children, but this prohibition—18 U.S.C. § 1466A(b)—is void under the First Amendment.

Section 1466a(b) is void on its face, as it restricts a real and substantial amount of protected speech (possession of obscenity in the home, *see Stanley v. Georgia*, 394 U.S. 557 (1969) in relation to its arguably legitimate sweep (possession of obscenity outside the home). *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008) (describing standard for a facial challenge in the First Amendment context).

**Obscenity law should not be a patch upon child-pornography law to overcome *Ashcroft v. Free Speech Coalition.***

In the nearly two decades since *Ashcroft v. Free Speech Coalition* removed so-called "virtual" child pornography from the ambit of speech the Government could constitutionally forbid, a trend has emerged of using obscenity law to cover the perceived shortcoming in that decision by prosecutors. *See All Porn All the Time*, 31 N.Y.U. Rev. L. & Soc. Change 695, 697 (2007).

**Case-by-case determinations are the necessary consequence of the *Miller* test.**

One part of the traditional standard for determining whether a given obscenity statute passes constitutional muster, well familiar to this Court, is the prong of the *Miller* test which requires the application of "contemporary community standards." *See Miller v. California*, 413 U.S. 15, 24 (1973). These standards are ever evolving; what might have shocked the conscience of viewers in 1973 might be seen as passe in 2003 and downright old-fashioned and stuff in 2021. As famously noted by Justice Potter Stewart in his quip in his concurrence in *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Potter, J., concurring) "I shall not attempt further to define the kinds of material I understand to be embraced within [hardcore pornography]; and perhaps I could never

succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that." Commentators like Adler noted that obscenity prosecutions fell out of favor due to their "record of cultural failures." *All Porn All the Time*, 31 N.Y.U. Rev. L. & Soc. at 703-04. As Justice Brennan noted in *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 92-93 (1973), "one cannot say with certainty that material is obscene until at least five members of this Court . . . have pronounced it so," thus leaving the Supreme Court to be compelled to view the material before passing on its obscenity. Such extreme casuistry perforce prohibits people of reasonable caution from knowing whether a given work will be judged obscene. *See United States v. Ragsdale*, 426 F.3d 765, 779 (5th Cir. 2005) (the Court of Appeals was required to exercise "independent constitutional judgment" to determine whether certain video tapes were obscene, even after the jury made findings that they were, because "to allow jury verdicts to be all but conclusive in this area would be an 'abnegation of judicial supervision in this field [] inconsistent with [the courts'] duty to uphold the constitutional guarantees.'").

The use of obscenity laws to reach material which may be objectionable, but not constitutionally unprotected, under child

pornography laws is a new trend to "make up for limitations and defeats in the realms of child pornography law and the doctrine of 'harmful to minors.'" *See* Adler, *All Porn All the Time*, 31 N.Y.U. Rev. L. & Soc. at 708.

## PRUDENCE COUNSELS DISMISSAL OF THE CHARGES AGAINST MR. ARTHUR.

Which is all to say that given the decisions of this Court, of the jury to be summoned, and potentially of the Fifth Circuit, in the ultimate analysis, only the Supreme Court has the final say in whether given material is "obscene." Even past cases are of little use, as "contemporary community standards," by its very definition, changes from moment to moment and year to year. In such a minefield, where the government must tread no less carefully than potential defendants between what might be protected expression and what might be obscene, prudence, caution, and a dedication to the United States Constitution would argue in favor of a broader, rather than a narrower, interpretation of what the First Amendment protects. There is little doubt that the stories and pictures at issue in this case will not soon grace the coffee tables of ministers of faith, prominent jurists, schoolmarms, or even lowly attorneys. However, in matters of taste, *de*

*gustibus non dispuntandum est*. That is, one man's judgment as to what he finds distasteful is not, and cannot, be a guide for what the First Amendment does and does not protect.  Nor should twelve citizens' judgment, one district court judge's, a panel of a court of appeals, or anyone short of the United States Supreme Court have the final say in whether given material is "obscene." *Jacobellis v. Ohio*, 378 U.S. 184, 187-90 (1964). While their views will, to greater and lesser degrees, inform that ultimate decision, prudence counsels us to avoid the issue if possible.  Therefore, this Court should dismiss the prosecution on constitutional grounds prior to, or immediately after, the Government's presentation of evidence, in deference to the First Amendment of the United States Constitution and decades of obscenity caselaw.

Respectfully Submitted,

**Mark Bennett**
Attorney in Charge
TBN 00792970
**Bennett & Bennett**
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747
mb@ivi3.com

Lane A. Haygood
Texas State Bar Number:
24066670
Haygood Law Firm
522 N. Grant Ave.
Odessa, Texas 79761
Telephone: 432. 337.8514
Fax: .432.225.1062
lane@haygoodlawfirm.com

Attorneys for the Defendant,
Thomas Alan Arthur

## CERTIFICATE OF SERVICE

On the twelfth day of January, 2021, I electronically filed this motion

with the Clerk of the Court using the CM/ECF filing system which will

send notification of the filing of the motion to the United States

14

Attorney's Office and the assistant United States attorneys involved in the case.

_____

Mark W. Bennett