USA vs. Arthur - Motion Hearing - March 16, 2020

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                   PECOS DIVISION

3
UNITED STATES OF AMERICA,         ) Case No. 4:19-CR-774
4                                  )
       Plaintiff,                  ) COA No. 21-50607
5                                  )
     vs.                           ) Pecos, Texas
6                                  )
THOMAS ALAN ARTHUR,                )
7                                  ) March 16, 2020
       Defendant.                  )
8  _____ ) 9:51 a.m.

9
                **TRANSCRIPT OF MOTION HEARING**
10          **BEFORE THE HONORABLE DAVID COUNTS**
                **UNITED STATES DISTRICT JUDGE**
11

12  **APPEARANCES:**

13  **FOR THE GOVERNMENT:**
         MS. MONICA R. MORRISON, AUSA
14       Office of the United States Attorney
         Pecos/Alpine Division
15       2500 North Highway 18, Suite A200
         Alpine, Texas  79830
16

17  **FOR THE DEFENDANT:**
         MR. LANE ANDREW HAYGOOD
18       Haygood Law Firm
         522 North Grant
19       Odessa, Texas  79761

20
    **COURT REPORTER:**
21       MS. ANN M. RECORD, RMR, CRR, CMRS, CRI
         P.O. Box 2357
22       Midland, Texas  79702

23        Proceedings reported by machine shorthand reporter.
          Transcript produced by computer-aided transcription.
24

25

USA vs. Arthur - Motion Hearing - March 16, 2020

```
 1                            I N D E X

 2

 3                                                      PAGE

 4

 5   Proceedings                                          3

 6   Argument by Ms. Morrison                            37

 7

 8

 9   WITNESSES FOR THE GOVERNMENT:                      PAGE

10   JEREMY EWAN
         Direct Examination By Ms. Morrison             10
11       Cross-Examination By Mr. Haygood               27
         Redirect Examination By Ms. Morrison           34
12       Recross-Examination By Mr. Haygood             36

13

14   GOVERNMENT EXHIBITS:                               RCVD

15   GX 1    List of places Defendant lived             12
     GX 2    Email thread from message board            22
16   GX 3    Email from Defendant                       25

17

18

19

20

21

22

23

24

25
```

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Motion Hearing - March 16, 2020

1                    **P R O C E E D I N G S**

2              (At 9:51 a.m., proceedings commenced)

3              (Defendant present)

4              THE COURT:  The Court calls U.S. vs. Thomas Alan

5    Arthur, Pecos 19-CR-774 for a -- it looks like a motion by the

6    defense to revoke an order of detention.

7              MS. MORRISON:  Monica Morrison present on behalf of

8    the United States.

9              MR. HAYGOOD:  Lane Haygood here for the defendant.

10   Present and ready.

11             THE COURT:  Very good, Mr. Haygood and Ms. Morrison,

12   good to see you both.  Mr. Haygood, we don't get to see you

13   nearly as often as we used to.  It's good to see you.

14             MR. HAYGOOD:  Thank you, Judge.

15             THE COURT:  Just -- and you're Thomas Alan Arthur.

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Very good.

18             All right.  So here's what I have before me, just so

19   you-all know.  It's, of course, the defense motion, but I have

20   the criminal complaint that was filed -- and I've reviewed all

21   these documents.  The criminal complaint that was filed on

22   November 8, 2019, and it likes like signed by Special

23   Agent Ewan before Judge Fannin.  That complaint, the affidavit

24   supporting the complaint.  I've also got the indictment which

25   was returned on November 14, 2019 -- let me double-check --

USA vs. Arthur - Motion Hearing - March 16, 2020

1  November 14, 2019, by a federal grand jury sitting here in the

2  Pecos Division of the Western District of Texas, which is a --

3  it looks like a seven-count indictment.  There is a criminal

4  forfeiture added as well, demand for forfeiture.

5          I have before me also filed on November 20th the

6  order of detention pending trial signed by Judge Fannin.

7          I have the motion to revoke the order of detention

8  filed by defense on February 26, 2020.

9          And I have the Pretrial Services report as well

10  prepared by Officer Hinojos, Herbie Hinojos, prepared on

11  November 19, 2019.  Very good.

12          With that, then -- and I'll take all of those into

13  consideration, of course.

14          Mr. Haygood, what would you have to offer the Court?

15          MR. HAYGOOD:  Good morning, Your Honor.  First, my

16  co-counsel, Mr. Bennett, would like to apologize to the Court.

17  He had some car trouble coming in yesterday --

18          THE COURT:  I'm sorry.

19          MR. HAYGOOD:  -- wasn't able to make it.  So he asked

20  me to appear and argue this motion.

21          THE COURT:  Of course.

22          MR. HAYGOOD:  Document 21 in the record that we filed

23  is a transcript of the detention hearing that was held in front

24  of Judge Fannin back on November 20, 2019.

25          THE COURT:  Yes, sir.

USA vs. Arthur - Motion Hearing - March 16, 2020

1          MR. HAYGOOD:  We would also ask the Court to review

2 that as I think it is pertinent to the decision we're asking

3 the Court today.

4          THE COURT:  Yes, sir.

5          MR. HAYGOOD:  And with regard to our request to

6 review the detention order that was put in place by

7 Judge Fannin, there's a few things that have changed since that

8 order was handed down.

9          THE COURT:  Okay.

10          MR. HAYGOOD:  First, obviously, this has now been

11 designated as a complex case.  That was not something that was

12 made aware to Judge Fannin at the time.  Obviously, it hadn't

13 been designated as a complex case at that time.

14          As the Court is aware from the Pretrial Services

15 report, there was a bond recommended at the time, and I think

16 one of the major reasons why the -- why Judge Fannin came to

17 the decision he did was based upon this idea that my client had

18 access to so-called armor piercing ammunition.

19          Now, at the time, of course, both the government and

20 the defense did not have a whole lot of information on this.

21 It wasn't something that was really talked about throughout the

22 investigation or the materials that were provided.

23          But as I looked up the definition of what armor

24 piercing ammunition is, according to the Bureau of Alcohol,

25 Tobacco, Firearms and Explosives, it relates to handgun

Case 4:19-cr-00774-DC   Document 144   Filed 09/14/21   Page 6 of 40

6

USA vs. Arthur - Motion Hearing - March 16, 2020

1   ammunition, whereas I think that the ammunition that was being

2   described at least during the previous hearing as armor

3   piercing was rifle ammunition.  So I don't know that it fits

4   the definition of armor piercing ammunition that the ATFE has

5   decided.

6          Regardless, I can understand the district court's

7   concern with the ammunition and everything that my client would

8   have access to, and I can represent to the Court that a large

9   portion of the firearms and ammunition have been removed from

10  the home.  Some of them are being held in trust at my office.

11  Certainly we would go through and clear out any of the other

12  firearms prior to my client being allowed to return to his

13  home.

14          But given the nature of this case and the allegations

15  that are made, I do think that it would -- it would certainly

16  assist the defense if we were able to review voluminous

17  discovery with our client in a situation where we can bring it

18  in a digital formal.  The government has produced to us almost

19  a thousand pages of unredacted discovery, close to a hundred

20  pages of redacted discovery, a number of other images and

21  material like that.  And certainly the requirement to print all

22  of that out in hard copy is -- well, it gets voluminous and it

23  gets expensive very quickly.

24          There is also some additional discovery that the

25  government has informed me today that is sensitive in nature

USA vs. Arthur - Motion Hearing - March 16, 2020

1   that they're going to let me review here in the office when we

2   conclude with this hearing.  Certainly the ability to meet with

3   experts to consult with them for my client to be able to be

4   gainfully employed to assist us in obtaining the funds

5   necessary for these experts, I can state to the Court that we

6   anticipate the need for computer forensics experts as well as

7   experts in the definition of obscenity.

8           As this Court is aware, one of the Miller factors in

9   the definition of obscenity is going to be applying

10  contemporary community standards.  I think that's something

11  that's going to require some expert testimony perhaps from

12  university professors or others who are familiar with those

13  standards.

14          And so the ability of our client to be able to be

15  gainfully employed to work towards delaying those funds will

16  obviate the needs for the defense to file an AP motion to ask

17  the government to assist in providing those experts to us.

18          With regard to the safety of the community and the

19  nature of the evidence that is against my client, as the Court

20  is aware, this is an obscenity prosecution.  Those often turn

21  on these very technical, legal definitions of what is and what

22  is not obscene.  To that end, I don't know that we can state

23  definitively that the allegations put anyone in any danger or

24  anything like that.

25          Certainly I can understand Judge Fannin's reticence

USA vs. Arthur - Motion Hearing - March 16, 2020

1  at the detention hearing that my client would continue to

2  operate the Web site which is at the heart of this case, and I

3  can understand that reticence, but that would be something that

4  would be very public and easy to monitor and watch on.  If any

5  change was made to that Web site or if there was any Internet

6  activity coming out of my client's residence conducting to that

7  server or anything like that, I mean, that's something that

8  can't really be hidden, can't really be obfuscated and

9  certainly it would be supremely ill-advised for my client to

10  take any action like that.  And I can promise that that would

11  lead to his immediate revocation of any release.

12         I do think that the Court can craft some set of

13  conditions to release that would ensure the safety of the

14  community and that my client would not engage in any prohibited

15  transactions or activities which the government may not wish

16  him to do during this time.

17         One, there has been a notice of forfeiture filed

18  against the residence that my client would be residing at.  So

19  it would be to everyone's benefit to allow my client out to

20  maintain that residence.  Certainly to be its caretaker in the

21  event of a conviction and subsequent forfeiture.

22         But mostly I don't see that this is one where there

23  would be any danger.  I mean, even at the previous detention

24  hearing, there was mention made that the ranch that my client

25  lives on is somewhat isolated.  There is not going to be other

USA vs. Arthur - Motion Hearing - March 16, 2020

1  members of the community coming around.

2            There was some mention made that it would be -- there

3  might be some difficulty for Pretrial Services or law

4  enforcement securing access to the property, but I think that

5  if the Court imposes a condition on my client to allow an

6  inspection or access to the property by law enforcement or the

7  Pretrial Services or the U.S. Probation Office at any time, my

8  client would certainly be amenable to that and facilitating

9  that.  But I do think that in terms of contact with the general

10 public, especially given the recent nature of everything that's

11 going on, I think that that's going to be minimized as well.

12           And that sort of leads me into the last part of it is

13 we're in kind of uncharted waters here with regard to public

14 policy and public health and hygiene and all of that.  If there

15 is going to be some sort of general quarantine orders or

16 restrictions on travel for people, then that would certainly

17 apply to my client as well and do more to keep him at home.

18 But more than that, it removes him from a vulnerable situation.

19 As we know holding facilities, jails, prisons, things like that

20 are not often the best places for vulnerable people to avoid

21 getting infections.

22           And so given, you know, my client's age and

23 everything that's going on, I think that perhaps as a matter of

24 public health, it would also be advantageous to have him

25 confined under house arrest or something like that versus being

Jeremy Ewan - Direct Examination - March 16, 2020

1  held here in the Pecos CJC.

2  Other than that, Your Honor, I believe that you can

3  review the record, review material before it, and come to the

4  decision that is appropriate.

5  THE COURT:  Thank you.  Thank you, Mr. Haygood.

6  Ms. Morrison.

7  MS. MORRISON:  Your Honor, the government would like

8  to offer additional evidence.  It is our position that there is

9  even more reason for the defendant to be detained now than

10  there was initially based on the continued investigation

11  following the execution of the search warrant.

12  And to that end, the government would call Special

13  Agent Jeremy Ewan to the stand.

14  THE COURT:  Agent Ewan, if you'd come on up.

15  (Witness sworn by the clerk at 10:03 a.m.)

16  THE COURT:  Ms. Morrison, you may proceed.

17  MS. MORRISON:  Thank you.

18  **JEREMY EWAN,**

19  **GOVERNMENT'S WITNESS SWORN AT 10:03 a.m.**

20  **DIRECT EXAMINATION**

21  BY MS. MORRISON:

22  Q.   Could you please state your name for the record, spelling

23  your last name.

24  A.   My name is Jeremy Ewan, E-W-A-N, as in Nora.

25  Q.   Agent Ewan, where are you currently employed?

Jeremy Ewan - Direct Examination - March 16, 2020

1  A.    I am a special agent for the FBI in Alpine, Texas.

2  Q.    Since the execution of the search warrant in this

3  particular case, have you had the opportunity to review

4  materials that were seized in connection with the defendant's

5  electronic devices?

6  A.    Yes, I have.

7  Q.    Did you also have the opportunity to review materials that

8  were printed or downloaded from his Web site, mrdouble.com?

9  A.    Yes, I have.

10 Q.    In connection with that investigation, did you obtain

11 additional information about where the defendant has lived over

12 the course of his life?

13 A.    Yes, I have.

14 Q.    Was this information that was previously known to you when

15 you testified at the detention hearing in front of

16 Judge Fannin?

17 A.    No, it was not.

18 Q.    Special Agent Ewan, while defense is reviewing what we

19 intend to offer as Government's Exhibit 1, could you describe

20 for the Court how you obtained this information about

21 additional locations the defendant had lived in?

22 A.    Sure.  On one of the hard drives -- or, correction,

23 several of the hard drives that I reviewed, there were copies

24 of what appeared to be an old forum on his Web site.  And

25 Thomas Arthur posted under a user name on that forum.  In one

1  of the sections they were talking about where they had lived,

2  and he listed I believe it was more than 20 locations where he

3  had lived or visited in his life.

4  Q.   Prior to coming to court, did you have the opportunity to

5  print a copy of that posting out?

6  A.   Yes, I did.

7  Q.   I'm going to approach you with this.

8        I'm showing you what's previously been marked as

9  Government's Exhibit 1.  Agent Ewan, do you recognize

10  Government's Exhibit 1?

11  A.   Yes, I do.  I printed this out.

12  Q.   Could you describe for the Court what is on Government's

13  Exhibit 1?

14  A.   It is a list authored by Tom of all of the places he has

15  lived since birth.

16  Q.   Is that a fair and accurate representation of what

17  appeared on his Web site, mrdouble.com?

18  A.   Yes, it is.

19        MS. MORRISON:  Your Honor, at this time I move for

20  the admission of Government's Exhibit 1 into evidence.

21        MR. HAYGOOD:  No objection, Judge.

22        THE COURT:  Government's Exhibit 1 is admitted for

23  purposes of this hearing without objection.

24  Q.   (BY MS. MORRISON)  Agent Ewan, without specifically just

25  reading what's contained in Government's Exhibit 1, what did

1    you note about the locations where the defendant had lived?

2    A.   There were several of them that were outside the United

3    States, Germany and France specifically.

4    Q.   Did the defendant provide any sort of time frame in

5    connection with those locations where he had lived outside of

6    the United States?

7    A.   None that I found.

8    Q.   Do you recall when that particular post occurred?

9    A.   April 7, 2001.

10   Q.   Also in connection with that particular posting, was there

11   information about what states the defendant had visited?

12   A.   Yes.

13   Q.   What information did he provide about the states that he

14   had visited?

15   A.   He has visited every state except Alaska, he stated.

16   Q.   Now, based on your review of the posting, is it your

17   understanding that these are -- both the international and

18   stateside locations, these were locations he had visited

19   primarily as an adult?

20   A.   It didn't specify, and I think another one said his father

21   was in the Air Force.  So I would imagine some of them were

22   while he was a child.

23   Q.   Now, during the course of your review of the evidence in

24   connection with this case, did you also learn information about

25   whether or not the defendant speaks a foreign language?

Jeremy Ewan - Direct Examination - March 16, 2020

1  A.    Yes, he mentioned it several times that he spoke German.

2  Q.    Could you describe for the Court how you learned that

3  information?

4  A.    I don't remember the specific post, but he has mentioned

5  in several of them that he was comfortable speaking German and

6  some of his -- the phrasing he used in his writing was German

7  in nature.

8  Q.    Now, you've talked about the defendant posting on forums

9  associated with his Web site.  Did you also discover

10  information during the course of your investigation that

11  suggested the defendant himself had authored any of the stories

12  posted on his Web site?

13  A.    Yes, I did.

14  Q.    How did you determine that the defendant was, in fact,

15  writing some of the stories on his Web site?

16  A.    The same user name that appeared in the forum said on the

17  form that he had written stories under the user name Que,

18  Q-U-E.

19  Q.    Did the defendant also reference the fact that he had

20  written stories in some of the correspondence that you located

21  on his devices?

22  A.    Yes, he did.

23  Q.    Who was he corresponding with about having authored

24  stories?

25  A.    In at least one, he was corresponding with a woman

1  identified in an e-mail as Karen.  I believe it was Karen

2  Fletcher.

3  Q.   Have you been able to identify Karen Fletcher?

4  A.   Yes.  Karen Fletcher was someone who contributed stories

5  to his Web site and also ran her own Web site.

6  Q.   Was Karen Fletcher also prosecuted for obscenity?

7  A.   Yes, she was.

8  Q.   Now, in any of these correspondence -- e-mail

9  correspondence with Karen Fletcher, did the defendant identify

10 the inspiration for the stories that he authored?

11 A.   He did, yes.

12 Q.   Without providing the name of that particular individual

13 that he was writing about, did he make any comments about the

14 age of the individual in those e-mails to Karen Fletcher?

15 A.   Yes.  He mentioned in e-mail to Karen Fletcher that the

16 story he wrote about, he wrote it about a 12-year-old female

17 but the inspiration was actually an 8-year-old female.

18 Q.   Were you able to confirm that the inspiration for these

19 stories was, in fact, an actual person?

20 A.   Yes, it was.

21 Q.   Let's talk about that.  How were you able to identify the

22 actual inspiration of his stories?

23 A.   He named her in those e-mails with Karen Fletcher, but at

24 the time I wasn't sure that it corresponded with some photos

25 that I found on his devices also.

Jeremy Ewan - Direct Examination - March 16, 2020

1  Q.   Let's talk a little bit about those photos.  The photos
2  you found, describe the photos you found on his computer of
3  this person that you later learned was the inspiration for the
4  stories.
5  A.   There were several photos of two young girls, appeared to
6  be between the ages of about 3 and 7-ish.  They were actually
7  with Tom in several of the photos.  Another photo showed them
8  both in the bathtub.  And then later on some other photos that
9  were taken from a Myspace that showed an older girl, a teenager
10 in a bathing suit that looked an awful lot like one of the
11 kids, and through investigation determined that it was the same
12 one as in the photos and also the one that he told Karen
13 Fletcher about.
14 Q.   Did you reach out to the individual -- the female
15 individual that was depicted in the Myspace photo as well as
16 some of the photos of children?
17 A.   Yes, I did.
18 Q.   What did you learn when you spoke with this individual?
19         MR. HAYGOOD:  Objection, Your Honor, to hearsay.
20         THE COURT:  Overruled.
21 A.   She said that at the time when I initially asked her if
22 she knew Tom Arthur, she didn't know him by that name.  Then
23 she said that she did remember when she was very young her
24 mother lived with a man named Tom, but she did not know his
25 last name at that time.

1  Q.  (BY MS. MORRISON)  What else did she tell you about this

2  particular individual that she recalled?

3  A.  She said that he was a creeper and paid an inappropriate

4  amount of attention to her were her exact words.

5              Sorry.  Am I getting too close to the microphone?

6              THE COURT:  Yeah, it looks like the microphone is

7  having some issues.

8              (Discussion off the record)

9  Q.  (BY MS. MORRISON)  Now, after you spoke to her, were you

10  connected with other individuals?

11  A.  Yes.  She put me in contact with her mother and her father

12  because she said that they would know Tom's last name.

13  Q.  What happened when you spoke to her mother?

14  A.  Her mother --

15              MR. HAYGOOD:  Objection to hearsay as well, Your

16  Honor.

17              THE COURT:  Overruled.

18  A.  She confirmed that it was Tom Arthur.  She said that she

19  lived with Tom Arthur briefly after she was separated from her

20  husband at the time.

21  Q.  (BY MS. MORRISON)  And a husband that she's referring to

22  was the father of the inspiration for this particular story?

23  A.  Correct.

24  Q.  What else did this child's mother tell you about

25  Mr. Arthur?

1  A.    She told me that she lived with him briefly.  She
2  described it as not a -- intending to be a romantic
3  relationship but just a place to live while she looked for
4  long-term housing.  She said that one day Tom found out that
5  she was starting to be in a romantic relationship with
6  somebody.  So he physically assaulted her, and she left shortly
7  after that.
8  Q.    Could you describe how it is that he physically assaulted
9  her?
10  A.    I think she described it as beat the hell out of her, but
11  I don't recall if she went into further detail than that.
12  Q.    Did she also provide you other information about
13  Mr. Arthur that was concerning?
14  A.    She did.  She said several days later she returned to get
15  some of her belongings and she found some VHS tapes that had
16  her name written on them.  She reviewed them and saw that they
17  were videos of Tom Arthur having sexual intercourse with her,
18  and she did not recall that incident ever taking place.  She
19  thought she was drugged at the time and she did not consent to
20  it.
21  Q.    Now, after you had the opportunity to speak with the child
22  who was the inspiration's mother, did someone else reach out
23  and contact you?
24  A.    Yes, the child who was the inspiration had an older
25  stepsister, half sister who reached out to me as well.

Jeremy Ewan - Direct Examination - March 16, 2020

1  Q.    What did she tell you?

2  A.    She told me that between the ages of between 3 and 5 years

3  old, Tom sexually assaulted her on a couple of different

4  occasions.

5  Q.    Did she describe how that took place?

6  A.    Yes, she did.  She said that her father used to grow and

7  sell marijuana with Tom.  That she went to go visit her father

8  on the weekend while he was with Tom.  Her father left to go

9  deliver some of the marijuana and that Tom sexually assaulted

10  her while they were alone in the house.

11  Q.    How many times did she tell you this occurred?

12  A.    She said it happened in two consecutive years.

13  Q.    Did she report this to anyone?

14  A.    She told her mother when she became an adult, and she told

15  her therapist.

16  Q.    At some point was she taken to a medical professional?

17  A.    Yes, she was.  At the time after -- I should qualify this.

18  The information didn't come from her.  It came from her mother

19  when I spoke to her.

20  Q.    And to be clear, her mother is not the mother of the child

21  who was the inspiration for the story that we found.

22  A.    Different mother; correct.

23  Q.    What did you learn about contact with the medical

24  professional when you spoke to her mother?

25  A.    That mother, when the girl came back from visiting her

1  father one time, her genital area was red and swollen.  So her

2  mother was worried she was sexually abused.  So she took her to

3  the hospital to get examined.  According to her, the doctor

4  said that it was very possible that she was sexually abused,

5  but he couldn't determine for certain that it happened.

6  Q.   Now, going back to the individual who claimed that

7  Mr. Arthur assaulted her as a child, what did she tell you

8  about his contact with her younger half sisters?

9  A.   She said that -- this girl, after she moved out of the

10 house, her father remarried.  She came back to visit her father

11 later on and found the girl who was the inspiration and another

12 younger sister were living there, and that this girl was

13 concerned because Tom was spending a lot of time at the house

14 paying an inappropriate amount of attention to both the young

15 girls, and she was concerned that the same thing was going to

16 happen.

17 Q.   What did she do to try and stop that?

18 A.   She said she told Tom to stay away from the kids multiple

19 times and that she always tried to keep herself around them to

20 keep Tom away.

21 Q.   Now, beyond receiving information that Mr. Arthur had

22 sexually assaulted the half sister of the girl who was the

23 inspiration of his stories, did you locate any postings or

24 e-mails by Mr. Arthur that suggested he didn't have any

25 concerns about his predilection for sexual attraction towards

Jeremy Ewan - Direct Examination - March 16, 2020

1   children?

2   A.   There was a thread on one of the message boards where the

3   users were discussing whether or not they would change their

4   sexual attraction to children if they could, and I remember Tom

5   was on that, that he would not.

6   Q.   Agent Ewan, I've handed you what's previously been marked

7   as Government's Exhibit 2.  Do you recognize Government's

8   Exhibit 2?

9   A.   Yes, I do.  I printed this off.

10  Q.   How do you recognize it?

11  A.   This was the post on the message board that I referred to

12  just a second ago.

13          THE COURT:  I'm sorry, can you repeat that?

14          THE WITNESS:  It was a post on the message board that

15  I referred to just a second ago.

16  Q.   (BY MS. MORRISON)  Is it a fair and accurate

17  representation of that posting?

18  A.   Yes, that's what I saw on the message board, yes.

19          MS. MORRISON:  Your Honor, at this time I would move

20  for the admission of Government's Exhibit 2 into evidence.

21          THE COURT:  Mr. Haygood?

22          MR. HAYGOOD:  We just object, Your Honor, that I

23  think the Court needs the full thread to gauge the context of

24  what was said.  Taking my client's statement in isolation, it's

25  obvious he's responding to something else.  So I'd object under

1   the rule of optional completeness.

2         THE COURT:  Ms. Morrison, do we have the full thread?

3         MS. MORRISON:  Your Honor, I believe we have the full

4   thread.  I don't know that we're able to present it here in

5   court today.  I don't know when we can print it out.

6         THE COURT:  So I'll admit the Government's Exhibit 2

7   for this hearing, and I request just to submit to me and follow

8   up with the entire thread and so there would be no objection

9   then with that, I'll agree with the objection.

10        Go right ahead.

11  Q.  (BY MS. MORRISON)  Agent Ewan, based on the defendant's

12  response, does it appear that the defendant has any interest in

13  changing his sexual attraction toward children?

14  A.   No, and mostly he said that he would -- certainly, I will

15  never stop fantasizing and reminiscing, thinking back of the

16  experiences I had in my younger years.  Nor will I stop writing

17  about them, telling others about them, or reading about other

18  people's experiences.

19  Q.   Agent Ewan, you testified that you were able to identify

20  photographs of some of the children on his computer.  Were

21  there other images of children that you were not able to

22  identify?

23  A.   Yes, there were.

24  Q.   Could you describe for the Court the nature of those

25  images.

Jeremy Ewan - Direct Examination - March 16, 2020

1   A.   Well, there was more photos similar to the ones of the two

2   young girls I described earlier.  They were photos taken around

3   the house, family-type photos of children at play.  Their faces

4   are clearly visible in it, but I haven't been able to identify

5   those children.  And there were also other photos of children

6   that were taken at a beach where the children were in bathing

7   suits.  The children did not appear to be aware they were

8   having photos taken of them.

9   Q.   Now, approximately how many sets of photos were there

10   where it appeared that the children weren't aware they were

11   being photographed?

12   A.   I remember two sets.  There may have been more.

13   Q.   How were those sets grouped?

14   A.   One was a set of photos.  It was in a folder that was

15   labeled, I think, 2011 Miami vacation, something like that, and

16   then the other one was labeled as a Hawaii vacation.

17   Q.   Now, during the course of your investigation, did you

18   discover any correspondence or forum posting that indicated

19   that Mr. Arthur was actually seeking out children to observe

20   without their knowledge?

21   A.   Yes, there was a -- one of the message threads in that

22   forum, a really popular one, had I think last count probably

23   over a thousand posts by different users, was one where they

24   described seeing children in their day-to-day lives and how

25   they would attempt to see children in changing rooms or at the

Jeremy Ewan - Direct Examination - March 16, 2020

1 beach and they would describe those interactions with other

2 users on the board.

3 Q.   Did Mr. Arthur describe any of those himself?

4 A.   Yes, he did.   I remember one specifically where he talked

5 about seeing a girl who he said was either 11 or 12 years old

6 at a gas station in Alpine and that he wanted to nibble on her

7 breasts.

8 Q.   Did you locate any correspondence from Mr. Arthur to any

9 individual that suggested he also may have engaged in sexual

10 contact with adult women without their knowledge?

11 A.   Yes, I did.

12 Q.   Could you describe that for the Court.

13 A.   In an e-mail he sent to a man who, I believe, was another

14 author that I haven't been able to fully identify, Tom

15 mentioned that he had sexual intercourse with a woman while she

16 was unconscious -- with a former girlfriend while she was

17 unconscious on medication.

18 Q.   Agent Ewan, I've handed you what's previously been marked

19 as Government's Exhibit 3.   Do you recognize Government's

20 Exhibit 3?

21 A.   Yes, I do.   I printed this off.

22 Q.   Is Government's Exhibit 3 the e-mail you've described

23 wherein Mr. Arthur described the sexual contact with an

24 unconscious female?

25 A.   Yes, it is.

Jeremy Ewan - Direct Examination - March 16, 2020

1  Q.   That is a fair and accurate representation of the e-mail

2  that you observed?

3  A.   Yes, it is.

4          MS. MORRISON:  Your Honor, at this time I would move

5  for the admission of Government's Exhibit 3 into evidence.

6          THE COURT:  Mr. Haygood?

7          MR. HAYGOOD:  No objection, Judge.

8          THE COURT:  Government's Exhibit 3 is admitted for

9  this hearing without objection.

10 Q.   (BY MS. MORRISON)  Agent Ewan, is there any information

11 that you are aware of that suggests that mrdouble.com Web site

12 has shut down by either the U.S. or the Dutch government?

13 A.   Nothing that I have seen that it's been shut down by a

14 government, no.

15 Q.   Is it your understanding that the only reason that the Web

16 site is currently inoperable is because the government has

17 possession of the defendant's devices?

18 A.   As I understand it, yes.

19 Q.   During your contact with Mr. Arthur, was he able to

20 provide you with passwords to the Web site?

21 A.   Yes, he was.

22 Q.   If the defendant were to be released, would there be

23 anything that would prohibit him from accessing that Web site

24 again?

25 A.   I suppose if he had access to a computer he could.

Jeremy Ewan - Direct Examination - March 16, 2020

1  Q.   Okay.  During the course of your investigation, did you

2  obtain information that suggested that the defendant was

3  personally acquainted with many of the authors who were posting

4  on his Web site?

5  A.   Yes, I did.

6  Q.   What led you to believe that he was personally acquainted

7  with many of these individuals?

8  A.   In a file he kept on there of some important phone numbers

9  to him, there was a phone number of a man who was a member of

10 the Web site.  I went and interviewed that man, and he told me

11 that he had been at a party at Thomas Arthur's house in

12 Terlingua where several of the other writers for the Web site

13 were there, and that he also told me that Tom knew a lot of the

14 authors personally.

15 Q.   Was this substantiated -- this claim substantiated by the

16 correspondence that you located on Mr. Arthur's devices?

17 A.   Yes, there was a lot of e-mail correspondence with

18 different writers for the Web site.

19 Q.   Could you describe for the Court Mr. Arthur's level of

20 computer knowledge, if you can.

21 A.   He seems to be much more sophisticated than I am with

22 computers, I can say that much.  He designed most of the Web

23 site by himself with very little help.  The -- the couple

24 things that I saw him through the investigation reaching out to

25 other people were for relatively minor help with developing a

1  search engine, that kind of thing.  From what I could tell, it

2  seemed like he did almost all of the work himself.

3  Q.   What information do you have about the defendant being

4  employed aside from in connection with the Web site any time in

5  the recent past?

6  A.   From what I can tell from our records and from talking

7  with his friend, he was a house painter before he started

8  working on the Web site full time; but he gave that up in the

9  late '90s, early 2000.

10 Q.   So since that time, his efforts have been devoted

11 exclusively to running the mrdouble.com Web site?

12 A.   As far as I know, yes.

13         MS. MORRISON:  I don't have any further questions,

14 Your Honor.

15         THE COURT:  Thank you.

16         Mr. Haygood, your witness.

17         MR. HAYGOOD:  Thank you, Judge.

18         THE COURT:  Yes, sir.

19                    **CROSS-EXAMINATION**

20 BY MR. HAYGOOD:

21 Q.   Good morning, Agent.

22 A.   Good morning.

23 Q.   I have a few questions for you here.

24         With regard to Government's Exhibit 1, the old

25 foreign post about where my client had lived, what was my

1  client's association with the military?

2  A.    I believe his father was in the military.

3  Q.    Okay.  So the Air Force, I believe you said.

4  A.    I think I remember that, yes.

5  Q.    So it wouldn't have been unusual for him to have traveled

6  to some of these countries if he was moving from posting to

7  posting with his father.

8  A.    No.

9  Q.    And what is the date on Government's Exhibit 1?

10  A.    April 7, 2001.

11  Q.    Okay.  And I believe you also said that my client has

12  referenced in the past an ability to speak German.

13  A.    Yes, sir.

14  Q.    Do you know the current status of whether Americans are

15  able to travel to Germany?

16  A.    I do not.  I can't imagine they are at the moment.

17  Q.    Okay.  Now, with regard to this information that you

18  learned when investigating Ms. Fletcher, you said that you

19  ended up speaking ultimately with two women who were young

20  girls at the time they knew my client.

21  A.    Correct.

22  Q.    How old are they now?

23  A.    They are adults.

24  Q.    Do you know how old they are?

25  A.    30s, I believe.  30s to 40s.

Jeremy Ewan - Cross-Examination - March 16, 2020

1  Q.   Okay.  So the time whenever he knew them as children would

2  have been decades ago.

3  A.   Yes, sir.

4  Q.   Okay.  And were there ever -- out of any of the

5  allegations that you heard about, ever any criminal charges

6  filed against my client as a result of anything that happened?

7  A.   No, there were not.

8  Q.   Okay.  What about the mother who said that my client

9  assaulted her, were there criminal charges filed as a result of

10 that?

11 A.   No, there were not.

12 Q.   Now, with regard to the Government's Exhibit 2, how long

13 ago were those postings made?

14 A.   According to the date on this, it was January 18, 2001.

15 Q.   And isn't it true that in Government's Exhibit 2, my

16 client uses the terms "fantasizing" or "reminiscing"?

17 A.   Yes, he did.

18 Q.   Okay.  And that's not an admission that he is planning to

19 act on that or take any further action; correct?

20 A.   Correct.

21 Q.   With regard to these two sets of photographs that you

22 recovered, were there any photos in those that you would

23 consider contraband or child pornography?

24 A.   No, there were not.

25 Q.   Okay.  You also stated there was a posting or something

1  made where my client mentioned that he would nibble on

2  someone's breast.  What was the time frame under which that was

3  made?

4  A.   I'm sorry, I don't remember offhand; but I think it would

5  have been early 2000s.

6  Q.   Okay.  So well over ten years ago.

7  A.   Yes.

8  Q.   Is there any indication that my client ever saw that

9  person again?

10  A.   Not that I'm aware of.

11  Q.   Okay.  And Government's Exhibit 3, I believe that e-mail

12  is from 1998; correct?

13  A.   Correct.

14  Q.   And within that e-mail my client also uses the words "for

15  sleeping fantasies"; correct?

16  A.   Correct.

17  Q.   Okay.  So in all of these foreign posts and e-mails where

18  my client is communicating with people, is it your opinion that

19  he is describing fantasies or thoughts that he has had, not

20  actual events?

21  A.   I believe both.

22  Q.   Okay.  Is there anything that would be illegal about

23  relating to someone a fantasy that you have even if the conduct

24  of that fantasy would itself be illegal?

25  A.   Depends on how it's relayed, I guess.  But just as far as

1  I know, in an e-mail to another person, I don't believe so, no.

2  Q.    Is the Mr. Double Web site currently down?

3  A.    Yes, it is.

4  Q.    Okay.  If it were back up, would you be able to know about

5  it?

6  A.    Yes, I would.

7  Q.    Okay.  And if -- is there anyone, to your knowledge, other

8  than my client who would have the ability to bring it back up?

9  A.    Unless his wife is more sophisticated than I'm aware of,

10  then I don't know of anybody else, no.

11  Q.    Okay.  So if my client were released on conditions of bond

12  and the Web site were to suddenly come back up, isn't it safe

13  to say that it would be pretty obvious that it would be my

14  client who did it?

15  A.    Yes.

16  Q.    And you would have the ability at that point in time to

17  seek revocation.

18  A.    Yes.

19  Q.    Okay.  In any of the e-mail correspondence with different

20  writers that you said you reviewed from my client, was there

21  anything specifically illegal that was talked about during

22  that?

23  A.    Having sexual intercourse with a female who is asleep is

24  illegal, yes.

25  Q.    Okay.  But anything that indicates that this would be a

1  worry for the Court that my client would continue to engage in

2  this type of behavior?

3  A.   In e-mail correspondence with other authors?

4  Q.   Yes.

5  A.   I don't recall anything offhand, no.

6  Q.   Okay.  What were the time frames of all that

7  correspondence?

8  A.   I -- there was e-mail correspondence up to, I think, 2016

9  was the most recent I saw.

10  Q.   Okay.  So in all of that time going back from the late

11  '90s through 2016, was my client ever charged with an offense

12  relating to any of the conduct that was discussed?

13  A.   No, he was not.

14  Q.   Okay.  Was he ever convicted of a crime during that time?

15  A.   No, I don't believe so.

16  Q.   Okay.  With regard to Ms. Fletcher, who you said was

17  prosecuted for obscenity, was she convicted?

18  A.   Yes, she was.

19  Q.   Which court handed the conviction down on that one?

20  A.   I believe our field office that investigated was

21  Pittsburgh.  So I think it was a court over there, but I do not

22  recall off the top of my head which one.

23  Q.   Do you recall about the date of that prosecution?

24  A.   I'm sorry, I don't recall that offhand.

25  Q.   Other than the information contained in Government's

Jeremy Ewan - Cross-Examination - March 16, 2020

1   Exhibits 1, 2, and 3, do you have any other information that my

2   client has ever committed an offense other than the ones the

3   government is alleging he committed as a part of this

4   prosecution?

5   A.   I'm sorry, could you repeat that one more time?  I want to

6   make sure I answer it correctly.

7   Q.   Okay.  So we have Government's Exhibits 1, 2, and 3, the

8   material that you have reviewed as a part of this case.

9   A.   Yes.

10  Q.   Apart from the offenses that you, the government, allege

11  my client committed in this case, do you have any information

12  that he's ever committed another offense?

13  A.   There is information that suggested he committed others,

14  but that investigation isn't complete at this time.

15  Q.   Okay.  Certainly he's never been prosecuted for any of

16  those.

17  A.   No.

18  Q.   And are any of them more recent than 2016?

19  A.   Not that I can recall.

20  Q.   Okay.

21         MR. HAYGOOD:  Pass the witness, Judge.

22         THE COURT:  Redirect?

23         MS. MORRISON:  Just briefly, Your Honor.

24

25

Jeremy Ewan - Redirect Examination - March 16, 2020

1                        **REDIRECT EXAMINATION**

2  BY MS. MORRISON:

3  Q.    Agent Ewan, defense counsel asked whether or not any

4  criminal charges were filed related to the mother or the young

5  girl who claimed she was sexually assaulted by Tom Arthur.

6  With respect to the young girl, is there a reason no criminal

7  charges were filed that you're aware of?

8  A.    The reason she told me is that she didn't tell her parents

9  until she was an adult.  She had a very difficult childhood,

10 she said.  Substance abuse, some mental health treatment, some

11 suicide attempts, that she attributed at least part of it to

12 the trauma she suffered.  But she said when she was an adult

13 and ready to kind of face these things, that when she told her

14 mom about it, her mom told her that Tom was dead.

15 Q.    So up until the time she spoke with her half sister that

16 you had contacted, she was unaware that Mr. Arthur was even

17 alive.

18 A.    Yes, she told me that she believed that he was dead until

19 she heard from us.

20 Q.    Now, defense counsel asked whether or not if you have

21 discovered additional possible criminal conduct based on any of

22 the e-mail exchanges that you located on the defendant's

23 computer, did you discover information that suggested the

24 defendant was trading child pornography?

25 A.    There was some e-mail correspondence where some Web sites

1  were mentioned that looking through FBI databases, those Web

2  sites were associated with child pornography investigations

3  from that area, yes.

4  Q.    Now, were you able to, in fact, click on those links to

5  determine whether or not they were child pornography?

6  A.    No, not this long after the fact.

7  Q.    Was that because the links had now expired?

8  A.    Yes.

9  Q.    But you are saying, based on review of FBI databases,

10  these were known sources of child pornography?

11  A.    Yes.

12  Q.    Given what you know about the defendant's savviness with

13  respect to computers, do you believe that it would be possible

14  for the defendant to create another Web site separate and apart

15  from mrdouble.com?

16  A.    Yes.

17  Q.    Why do you believe that?

18  A.    He has all the knowledge he needs to start a Web site, and

19  he also still maintains contact -- or up until his

20  incarceration remained in contact with other authors who still

21  have access to all of the old stories that they wrote and

22  whatever they downloaded from his old Web site.

23  Q.    Based on what you know about the Web site that you learned

24  prior to the execution of the search warrant and what you've

25  discovered since that point in time, can these stories be

USA vs. Arthur - Motion Hearing - March 16, 2020

1  downloaded?

2  A.   Yes, he did allow his subscribers to download the stories,

3  the complete stories.

4          MS. MORRISON:  I don't have any further questions.

5          THE COURT:  Mr. Haygood, anything further?

6          MR. HAYGOOD:  I have brief recross, Your Honor.

7          THE COURT:  Yes, sir.

8                  **RECROSS-EXAMINATION**

9  BY MR. HAYGOOD:

10 Q.   Agent, did you recover any child pornography from my

11 client's devices?

12 A.   It's still being determined whether some of the images

13 recovered are or were child pornography, but nothing that has

14 been declared child pornography.

15 Q.   Okay.  And these Web sites that were mentioned in these

16 old e-mails, do you recall which Web sites they were?

17 A.   They were, I believe, some picture viewer Web sites, some

18 Yahoo News groups maybe.

19 Q.   So not necessarily Web sites that contained only

20 contraband material.

21 A.   I don't believe so, no.

22 Q.   So those links could have been to -- perfectly legitimate

23 to view material.

24 A.   Yes.

25          MR. HAYGOOD:  Okay.  No further questions, Judge.

USA vs. Arthur - Motion Hearing - March 16, 2020

1              THE COURT:  Thank you.

2              Redirect?

3              MS. MORRISON:  Nothing further, Your Honor.

4              THE COURT:  You may step down.  Thank you, Agent.

5              MS. MORRISON:  Your Honor, I'll be very brief.  I

6     think especially now that we've learned since the defendant's

7     incarceration and the execution of this search warrant, I think

8     he poses a danger to the community more so than he did before.

9     Certainly the criminal activity that we believe occurred

10    separate and apart from what we've charged, occurred at some

11    point in the past, but there is nothing to suggest that this

12    hadn't continued.

13             You heard Agent Ewan testify that the defendant had

14    images on his computer they have not been able to identify.  So

15    I would ask that the Court continue to detain the defendant.

16    Certainly the defendant may have the ability to work if he's

17    released, but he has not worked separate and apart from

18    accessing computers in over 20 years.

19             THE COURT:  Thank you.

20             Mr. Haygood, anything further?

21             MR. HAYGOOD:  Nothing further from the defense, Your

22    Honor.

23             THE COURT:  Very good.  Thank you.

24             So I'm going to take this under advisement.  I

25    appreciate the information.

USA vs. Arthur - Motion Hearing - March 16, 2020

1          The Court will review Document 21 in taking all this

2   under advisement, which is the transcript from the detention

3   hearing that Mr. Haygood mentioned.

4          I'll also ask the government to submit with a copy to

5   Mr. Haygood, of course, Government's Exhibit 2, the entire

6   thread.

7          Ms. Morrison, are you able to do that by tomorrow,

8   close of business?

9          MS. MORRISON:  Yes, Your Honor, Special Agent Ewan

10  has advised we can do that.

11         THE COURT:  Thank you.  So if you would,

12  Ms. Morrison, if you would submit that to Ms. Lerma as the rest

13  of Government's Exhibit 2 or we can do it as an addendum, 2A or

14  something like that, so that we know under optional

15  completeness we've got the entire thread.  Ms. Lerma will make

16  copies of these exhibits for me to review as well as that

17  exhibit.  And I think that's all I'm going to need.

18         With that, then, Mr. Haygood, anything further today?

19         MR. HAYGOOD:  No, Your Honor.

20         THE COURT:  Ms. Morrison?

21         MS. MORRISON:  Your Honor, if for some reason -- I

22  know what we provided to the Court, there aren't any references

23  that either would need to be redacted or sealed in Government's

24  Exhibit 2.  Should that be the case with the rest of the

25  thread, should I just advise Ms. Lerma that we might need to

USA vs. Arthur - Motion Hearing - March 16, 2020

 1 | seal that exhibit if there is potential contraband in the rest
 2 | of the thread?
 3 |         THE COURT:  Sure.  That will be fine.  And then make
 4 | sure Mr. Haygood is on that communication so that he can object
 5 | if he disagrees with that.  Then I can take it up -- I suspect
 6 | y'all aren't going to agree to everything, but you never know.
 7 |         MR. HAYGOOD:  I would think so, Judge.
 8 |         THE COURT:  Very good.
 9 |         Express to Mr. Bennett our disappointment that he's
10 | not going to be here, but we're always happy to have you,
11 | Mr. Haygood.
12 |         MR. HAYGOOD:  Thank you very much, Judge.
13 |         THE COURT:  Mr. Arthur, I'll remand you to the
14 | custody of the United States Marshals to await the --
15 |         Have we got a trial date yet?
16 |         MS. MORRISON:  We do, Your Honor.  It's in June.
17 |         MR. HAYGOOD:  I believe it is June 4th, Your Honor.
18 |         THE COURT:  Okay.
19 |         MR. HAYGOOD:  We anticipate that that will be a good
20 | date unless --
21 |         THE COURT:  Sure.
22 |         MR. HAYGOOD:  Given the uncertainty that we face
23 | right now, something changes as a result of that.
24 |         THE COURT:  Okay.  Very good.  Thank you.
25 |         Mr. Arthur, if you'll go with the marshals.  Thank

USA vs. Arthur - Motion Hearing - March 16, 2020

1    you.

2              (Proceedings concluded at 10:40 a.m.)

3                       * * * * * *

4                   **C E R T I F I C A T E**

5

6         I, ANN M. RECORD, Former United States Court Reporter

7    for the United States District Court in and for the Western

8    District of Texas, hereby certify that the above and foregoing

9    contains a true and correct transcript of the proceedings in

10   the above-entitled and numbered cause.

11        WITNESS MY HAND on this 14th day of September, 2021.

12

13

14              _____*/s/Ann M. Record*_____
                Ann M. Record, RMR, CRR, CMRS, CRI
15              Former United States Court Reporter
                P.O. Box 2357
16              Midland, Texas  79702

17

18

19

20

21

22

23

24

25