USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
 2                          PECOS DIVISION

 3
    UNITED STATES OF AMERICA,          ) Case No. 4:19-CR-774
 4                                     )
          Plaintiff,                   ) COA No. 21-50607
 5                                     )
       vs.                             ) Pecos, Texas
 6                                     )
    THOMAS ALAN ARTHUR,                )
 7                                     ) January 19, 2021
          Defendant.                   )
 8  _____ ) 11:34 a.m.

 9
                  TRANSCRIPT OF JURY TRIAL - VOL. 1
10             BEFORE THE HONORABLE DAVID COUNTS
                    UNITED STATES DISTRICT JUDGE
11

12  APPEARANCES:

13
    FOR THE GOVERNMENT:
14       MR. AUSTIN M. BERRY, TRIAL ATTORNEY
         Department of Justice, Child Exploitation
15       601 N. Loraine, Suite 398
         Midland, Texas  79701
16
         MS. MONICA R. MORRISON, AUSA
17       Office of the United States Attorney
         Pecos/Alpine Division
18       2500 North Highway 18, Suite A200
         Alpine, Texas  79830
19

20  FOR THE DEFENDANT:
         MR. LANE ANDREW HAYGOOD
21       Haygood Law Firm
         522 North Grant
22       Odessa, Texas  79761

23       MR. MARK BENNETT
         Bennett & Bennett
24       917 Franklin Street, Fourth Floor
         Houston, Texas  77002

25
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    **APPEARANCES:   (CONTINUED)**

2

3    **COURT REPORTER:**
          MS. ANN M. RECORD, RMR, CRR, CMRS, CRI
4         P.O. Box 2357
          Midland, Texas   79702
5

6

7          Proceedings reported by machine shorthand reporter.
          Transcript produced by computer-aided transcription.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1                           **I N D E X**

2

3                                                              **PAGE**

4    Final Pretrial Conference                                  4

5    Argument by Mr. Berry                                      76

6    Voir Dire Proceedings                                      90

7    Individual Voir Dire Proceedings                          191

8

9    **WITNESSES FOR THE GOVERNMENT:**                         **PAGE**

10   SANDRA ARTHUR
         Direct Examination By Mr. Berry                        15
11       Cross-Examination By Mr. Bennett                       20

12
     **WITNESSES FOR THE DEFENDANT:**                          **PAGE**
13
     DAVID LEY
14       Direct Examination By Mr. Haygood                      24
         Cross-Examination By Mr. Berry                         31
15       Redirect Examination By Mr. Haygood                    63
         Examination By The Court                               69
16       Recross-Examination By Mr. Berry                       72
         Futher Redirect Examination By Mr. Haygood             75
17

18   **GOVERNMENT EXHIBITS:**                                  **RCVD**

19    GX 1    Copy of book title and drawings                   76

20
     **DEFENSE EXHIBITS:**                                     **RCVD**
21
      DX 1    Resume of Dr. David Ley                           64
22    DX 2    Report by Dr. David Ley                           64

23

24

25

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              P R O C E E D I N G S

 2              (At 11:34 a.m., proceedings commenced)

 3              (Defendant present)

 4              THE COURT:  The Court calls U.S. vs. Thomas Alan

 5   Arthur in Pecos 19-CR-774 for our final pretrial conference

 6   just before selecting a jury.

 7              MR. BERRY:  Good morning, Your Honor.  Austin Berry

 8   on behalf of the United States along with Monica Morrison and

 9   Fidel Esparza.

10              MR. HAYGOOD:  Good morning, Your Honor.  Lane Haygood

11   and Mark Bennett for the defendant, Thomas Alan Arthur.

12              THE COURT:  Very good.

13              And, sir, you're Thomas Alan Arthur; is that right?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  All right.  Good to have you-all.

16   You-all go ahead and have a seat.

17              And just preliminarily, Mr. Berry, were any offers

18   made to the defense in the case other than to maybe plead

19   guilty to the indictment?

20              MS. MORRISON:  No.

21              MR. BERRY:  We always invite them to plead guilty to

22   everything we charge.

23              THE COURT:  Of course.  Nothing more?

24              MR. BERRY:  I don't believe there was anything else,

25   Judge.
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1         THE COURT:  So, Mr. Haygood and Mr. Bennett, then

2  obviously, any formal plea offers have been conveyed to

3  Mr. Arthur.

4         MR. HAYGOOD:  Yes, Your Honor.

5         THE COURT:  Okay.  Very good.

6         Mr. Arthur, you're ready to go to trial; right?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  All right.  Very good.  You look nice.

9  Nice blue shirt.  Very pretty.

10        THE DEFENDANT:  Thank you.

11        THE COURT:  It goes with your mask actually.  It

12  looks pretty good.

13        All right.  So a couple of things to begin with.

14  Let's talk about -- and Mr. Berry, I think, has tried one case

15  since when we started the -- restarted kind of the pandemic

16  trials.  Is that -- yeah, that's right.

17        MR. BERRY:  Yes, sir, in November.

18        THE COURT:  Okay.  And so we got a lot of plastic in

19  there.  I know Mr. Haygood and Mr. Bennett and Ms. Morrison, if

20  you-all have been in there -- we've actually added some plastic

21  since Mr. Berry was in there because we want -- so we call it

22  the plastic ranch kind of, at least that's what I've been

23  calling it.

24        So we can protect everybody and be careful and be

25  safe.  We've done now well over a dozen trials since early

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  September -- since sometime in September.  So we've not had any

2  issues.  And then we have -- but one thing you'll notice is

3  that as you're speaking, you're welcome to remove your face

4  covering.  Anybody who's a witness is kind of actually encased

5  now in Plexiglas, but it's not all Plexiglas.  Some of it is

6  just plastic.

7          But we'll be wiping chairs down and whatnot as we go,

8  witness chair.  And Ms. Lerma is real good about wiping all

9  that stuff down with Clorox wipes, if it helps.  We hope it

10  helps.  It doesn't hurt.  So other than she's telling me it's

11  tearing up the wood on the chairs, but we'll just figure that

12  out later.

13          So then when we are selecting a jury, I'll call on

14  each of you -- each side.  Mr. Haygood or Mr. Bennett, which

15  would you rather me call for stating who is at the counsel

16  table and who your witnesses would be?

17          MR. BENNETT:  That would be me, Your Honor.

18          THE COURT:  Okay.

19          MR. BENNETT:  What we've arranged is that I am still

20  lead counsel.  Mr. Arthur is going to handle most of the legal

21  issues.

22          THE COURT:  Mr. Arthur?

23          MR. BENNETT:  I'm sorry, Mr. Haygood is going to

24  handle the legal issues, not Mr. Arthur.

25          THE COURT:  Oh, okay.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          MR. BENNETT:  And so I'll introduce the team to the

2   jury and deal with the factual stuff.

3          THE COURT:  Okay.  Thank you.  I'll do that.  So be

4   prepared to do that.

5          Mr. Berry, where I normally ask the government to

6   read the indictment, I'm not going to ask you to do that.  I'm

7   going to summarize it for them so that I can vet them on the

8   indictment.  I just don't want us to be there all day when I

9   can tell them specific -- and several of those are the same.

10  We will read the charge.  After the preliminary instructions,

11  Ms. Lerma is going to read the charge as Mr. Arthur and

12  Mr. Bennett and Mr. Haygood will then make the entry of not

13  guilty before the jury so that we can sort of formally begin.

14         And, Mr. Arthur, you're in a wheelchair.  I wasn't

15  aware.  I don't remember that anyway.  Are you not able to

16  stand up at all or are you --

17         THE DEFENDANT:  I can stand up briefly.

18         THE COURT:  Briefly.  Okay.

19         THE DEFENDANT:  It's a little bit hard to get

20  standing up.

21         THE COURT:  Okay.  I understand.  All right.  So

22  we'll keep you in the chair then.  I won't have you stand

23  unless I somehow forget or something.  I certainly won't -- I'm

24  certain I won't.  But I just wasn't aware that you were.

25         A couple of other housekeeping matters.  When

 1  witnesses come in, you know, in Midland we have the good

 2  fortune of having the hallway to the east, and we can bring --

 3  we have a door.  I don't remember if you remember, Lane, the

 4  door behind the witness stand where the -- actually where those

 5  in custody are brought and taken.  And so we have those

 6  witnesses come and go there, and so they never traipse through

 7  where the jury is.  So we want to keep our distance.

 8          Here, we don't have that opportunity.  So we'll have

 9  them come along as far right as they can in the courtroom up

10  against the counsel table.  They don't need to go behind

11  counsel table, but they are going to need to come to the right

12  of the lectern and come around and come up behind the staff

13  here in front of the bench and then go around and sit down.

14  That way we keep them away from everybody.

15          And you'll see, once we select the jury, that jury is

16  going to be seated differently.  It's only going to take up,

17  you know, half of the well as opposed to taking up the entire

18  courtroom at this moment for jury selection.

19          When you approach, I'll ask you to put your face

20  covering back on.  Because when you're at the microphone, we

21  don't want you to have your face covering off, but there is

22  lots of plastic again.

23          So I'll have you approach the same way, back behind

24  the staff and in front of me, and then go back the other way so

25  that we're not traipsing through the jury in any way.  We're

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  working around them just for safety -- for safety's sake.

2         After I'm done asking questions -- and I've

3  incorporated quite a few of your questions.  After I'm done,

4  I'll have the attorneys approach.  And you notice we have a

5  Plexiglas over there as well, but we're also able to --

6  Ms. Record is able to take down what we're saying.

7         Just keep in mind that I'll have you put your face

8  coverings back on, and I'll put mine on then for sure.  But we

9  ought -- we've been safe with that Plexiglas.  But if you have

10  any additional questions you would like asked, then I would

11  like you to hand me that in writing then or if you want any

12  questions I've already asked to -- for me to expand upon, let

13  me know that as well.  But have specific jurors you want asked,

14  if you have that and why.  We need a justification.

15         We'll also talk at that point about who we want to do

16  individual voir dire with.  We'll go back into chambers into

17  the conference/library, I guess, room to do that, if there are

18  some.  So you'll want to keep detailed notes on that -- on

19  those, because I want to know who and why.  I don't want to

20  just call everybody -- we're not going to individually voir

21  dire everybody on the panel just because we have that

22  opportunity.

23         Let's see.  Then you'll get about ten minutes to make

24  your strikes and -- when we're done.  And then once Ms. Lerma

25  collates all that and calculates it, we will announce the jury.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1          The jury will then go out of the courtroom and I'll

 2   dismiss the rest of the panel.  And while the jury is taking a

 3   much-deserved break, we'll rearrange the chairs, and it gives

 4   us an opportunity to have a comfort break as well as

 5   Mr. Arthur, of course.

 6          We'll do all that.  Be set up and ready to go.

 7   Because once they come back in, I'm going to give preliminary

 8   instructions.  I'm going to ask the attorneys to go right into

 9   opening statements which will be ten minutes or less.  And I'll

10   give you a one-minute warning at ten minutes.  I'll tell you

11   when to stop.  That way it's fair for everybody.

12          And then we'll go right into trial.  I'll ask

13   Mr. Berry at that point who his first witness is.  It's helpful

14   if your witnesses are nearby just -- at least.  So we're not

15   waiting on them -- it feels sometimes like we're waiting for

16   them to come over from Pizza Hut or something.  It just takes a

17   while, I know.  So we'll be doing that.  So consider that as

18   well.

19          And when you're introducing everybody at your table

20   to the jury, please introduce anybody else who might show up

21   later.  I mean, if you have an investigator who is not there

22   with you but might be before the trial is over, at least then

23   they won't be wondering who is that person all of a sudden who

24   showed up on Thursday or something like that.

25          And everybody knows Ms. Martinez is the most

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  important person at the government's table.  So I'll make sure

2  she gets introduced.  But that way I can properly vet the panel

3  as to who they know and what they know about the case.

4           This is a little unique.  We may have actually some

5  people who are on the panel who know something, who have heard

6  something about the case.  It rarely happens anymore especially

7  out here, but it does happen some.  And I suspect in this case

8  it may, in fact, be the case.  So we'll go with that.

9           I believe there is a motion that I took under

10  advisement.  That was the defendant's Motion in Limine No. 1

11  which was argument or evidence that works in question or

12  similar works might cause abuse of children.  The government

13  has stated they don't intend to introduce any affirmative

14  evidence that a person who reads one of these stories would

15  invariably go act it out.

16           Is that right, Mr. Berry?

17           MR. BERRY:  Yes, Your Honor, the defendant's expert

18  has opined in that direction about whether or not such stories

19  might or might not increase; and so there is some equivocation

20  about that, of course, and I would intend to cross-examine him

21  vigorously about his opinions for both credibility and bias

22  purposes as necessary.  But otherwise, we don't intend to

23  present any evidence in the affirmative.

24           THE COURT:  Okay.  Very good.  So I'll grant that

25  motion.  I just hadn't yet.  I had taken it under advisement,

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  and so I'll grant that motion.  And you-all know as seasoned

2  attorneys, a Motion in Limine doesn't exclude evidence

3  necessarily.  It just means approach before we make any mention

4  of that, and we'll go from there.  A lot of the younger

5  attorneys think that that means it's never coming in, and they

6  seem to worry about that.

7          We have a Motion in Limine number -- Defendant's

8  Motion in Limine actually under No. 1 I think is the first

9  Motion in Limine, but the Court has granted 2 and 3 already.

10 There is a fourth which is the testimony of the defendant's

11 wife, I believe.  Do we have her here?  Is she here?

12          MR. BERRY:  She is in the courthouse, Your Honor.  So

13 if we want to take her up, we can certainly do that.

14          THE COURT:  I think we could take her up just

15 briefly.  I don't think it will take long.

16          MR. BERRY:  Okay.

17          THE COURT:  Why don't we put her on.

18          MR. BERRY:  Mr. Carlin represents her.

19          THE COURT:  Oh, okay.

20          MR. CARLIN:  I'll go retrieve her, Your Honor.

21          THE COURT:  Thank you, sir.

22          MR. BERRY:  She's down in the FPD's office.

23          THE COURT:  Okay.  While we're waiting on that, I

24 received your stipulations.  And the one that I got was not

25 signed or anything.  Is there one that has been signed already?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          MS. MORRISON:  Yes, Your Honor, it was attached to
2   the trial memorandum.
3          THE COURT:  Oh, I do have it then.  Sorry.
4          MR. BERRY:  Mr. Haygood is the only one who has not
5   signed it.
6          THE COURT:  You mind if I forge your name?
7          (Laughter)
8          MR. HAYGOOD:  I don't, Your Honor.  I obviously agree
9   with the stipulation.
10          THE COURT:  I'm teasing, of course.
11          Ms. Morrison or Mr. Berry, do you have the official,
12   like the authentic original?
13          MR. BERRY:  So not exactly because it was signed
14   remotely by each party.
15          THE COURT:  Okay.
16          MR. BERRY:  So it is -- whatever you have there is
17   what we're putting up as that burden as a sufficient copy from
18   our perspective, and I presume the defendant doesn't object to
19   a copy of that of our signatures.
20          MR. HAYGOOD:  No objection.
21          THE COURT:  Okay.  Very well.
22          MR. BERRY:  Otherwise, we can print out a blank one
23   and all sign it here together.
24          THE COURT:  Yeah, I was just thinking if you're going
25   to introduce it as an exhibit, I would suggest doing that.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          MR. BERRY:  Okay.  We can get a blank copy and we can
2   all have a little --
3          THE COURT:  I have a hard copy if it's the actual one
4   that's binding.
5          And then whenever you-all want to introduce it at
6   trial, you can do that.
7          (Sotto voce discussion)
8          THE COURT:  Yeah, make sure there are no errors in
9   that.
10          MR. BERRY:  Oh, the one you have probably does have
11  an error.
12          THE COURT:  Oh, okay.  Never mind.
13          (Sotto voce discussion)
14          MR. BERRY:  So we'll need to get a version of that,
15  which we can do on some other break.
16          THE COURT:  I would assume you're going to introduce
17  it and discuss it some.
18          MR. BERRY:  Yes, sir.
19          THE COURT:  Very good.  All right.
20          MR. BERRY:  It is marked as Exhibit 30 something.
21          THE COURT:  Hi, ma'am, if you would come on up.
22          MR. BERRY:  34.
23          THE COURT:  34?
24          MR. BERRY:  It's going to be Exhibit 34.
25          THE COURT:  Thank you.  If you'll come on over here,

Sandra Arthur - Direct Examination - January 19, 2021

 1  we'll have you sworn.

 2          (Witness sworn by the clerk at 11:48 a.m.)

 3          THE COURT:  Ma'am, you may go all the way around

 4  there and walk up around that ramp.  You can leave your stuff

 5  or take whatever you would like.  Sure.  Absolutely.

 6          All right.  Mr. Berry, you want to walk her through

 7  it, or do you want defense to?

 8          MR. BERRY:  I mean, I'm happy to ask questions.  The

 9  defense is the one that wants to take her on voir dire.  If

10  they want to ask her questions and I need to follow up, I'm

11  happy to do that.

12          THE COURT:  Let's do that.  Go right ahead,

13  Mr. Bennett.

14          MR. BENNETT:  Yes, Your Honor.  I think our position

15  is that until the predicate has been laid, she shouldn't be

16  permitted to testify to things that are arguably either her own

17  privilege or Mr. Arthur's privilege.  So if the --

18          THE COURT:  So back to Mr. Berry.

19          MR. BERRY:  Okay.

20          THE COURT:  Go right ahead.

21                      **SANDRA ARTHUR,**

22          **GOVERNMENT'S WITNESS SWORN AT 11:48 a.m.**

23                   **DIRECT EXAMINATION**

24  BY MR. BERRY:

25  Q.   Good morning, Ms. Arthur.  How are you?

Ann M. Record, RMR, CRR, CMRS, CRI

Sandra Arthur - Direct Examination - January 19, 2021

1   A.   I'm okay.

2           THE COURT:  If you feel comfortable, you're welcome

3   to take off your face covering just while you're testifying.

4           MR. BERRY:  It's up to you.  Entirely up to you.

5           THE COURT:  Totally up to you.  Thank you.

6   Q.   (BY MR. BERRY)  Okay.  Who are you?

7   A.   I'm Sandra Arthur.

8   Q.   Okay.  And what is your relation to the defendant?

9   A.   I'm his wife.

10  Q.   And how long have y'all been married?

11  A.   Approximately 17 years.  I think it's 16, actually.

12  Q.   Okay.  Have you taken steps recently to make some legal

13  changes to the marriage and make it a legal separation?

14  A.   Yes.

15  Q.   Okay.  What steps have you taken so far?

16  A.   I contacted the Legal Aid in Hawaii and filled out an

17  application.  They got back to me and asked the name of my

18  spouse, which I gave them.  And they sent me an e-mail to -- we

19  have a date, a virtual meeting this month when I get back.

20  Q.   When you get back to Hawaii?

21  A.   Yes.

22  Q.   Which is where you've been living; correct?

23  A.   Correct.

24  Q.   And how long have you been residing there since Mr. Arthur

25  was arrested in November of 2019?

Sandra Arthur - Direct Examination - January 19, 2021

1  A.    I left on June 30th, Texas.  So --

2  Q.    2020?

3  A.    2020, yeah.

4  Q.    Okay.  June 30, 2020, you go to Hawaii; correct?

5  A.    Correct.

6  Q.    And you're from there originally?

7  A.    Yes.

8  Q.    Born there?

9  A.    Yes, born and raised.

10 Q.    Okay.  And you have a lot of family there; is that

11 correct?

12 A.    Yes.

13 Q.    Okay.  When was the last time you communicated with

14 Mr. Arthur, if you can recall?

15 A.    With him directly, I don't really remember.  It was after

16 I got my lawyer.  But I have had contact with his attorney, was

17 trying to contact me a couple of weeks ago to do with some

18 financial legal issues.

19 Q.    Okay.  And were you able to make contact with him?

20 A.    With his lawyer?

21 Q.    Yeah.

22 A.    Yeah.  He e-mailed me.  I sent his e-mail to my lawyer,

23 and I don't know.  Nobody got back.  Then he e-mailed again me

24 and made some statements and then I responded to his

25 statements.

Sandra Arthur - Direct Examination - January 19, 2021

1  Q.   Okay.  And what was that about?

2  A.   It was about power of attorney and things that my husband

3  wanted me to send to his lawyer: his identification, his keys,

4  things like that.

5  Q.   Okay.  So you left for Hawaii in June and you haven't

6  talked to your husband directly since approximately when?

7  A.   When I got my lawyer.  That was around the time that the

8  last letter I received from Monica about testifying.

9  Q.   Would that have been in approximately September of 2020 or

10 before that or after that or do you know?

11 A.   I don't remember.

12 Q.   If you testified here in front of the grand jury in

13 October of 2020...

14 A.   Yeah, then I would say it was two weeks before that, I

15 believe.

16 Q.   Okay.  All right.  So the fall of 2020.

17          Why is it that you're pursuing legal separation?

18 A.   Because I believe -- I don't believe in divorce.  I

19 believe in -- I've looked up, and this is what people that

20 believe as I do do.  It gives them an avenue of some kind of

21 legal course.

22 Q.   Sure.  And my question's certainly vague enough to answer

23 it that way.  More specifically, why are you pursuing any kind

24 of divorce-type scenario?

25 A.   Because my marriage was not healthy.

Sandra Arthur - Direct Examination - January 19, 2021

1  Q.   What do you mean by that?

2  A.   It was an unhealthy marriage and there was violence and

3  there was just everything that happened.

4  Q.   Sure.  And I don't need you to recount all 17 years of the

5  marriage or go through that.  I just need to establish a little

6  bit about that.  Had you and Mr. Arthur had marital problems

7  even before his arrest in November of 2019?

8  A.   Yes.

9  Q.   Okay.  Had that been going on for some time?

10 A.   Yes.

11 Q.   Would you say years.

12 A.   Yes.

13 Q.   In fact, did you guys sleep in separate rooms sometimes?

14 A.   Yes.

15 Q.   Often?

16 A.   Yes.

17 Q.   Most of the time?

18 A.   Yes.  Towards the end.  There is -- 16 years so, you know,

19 it's a long time.

20 Q.   Right.

21       Are you -- have you had conversations with your

22 attorney about spousal privilege and what you can and can't

23 invoke in terms of not testifying?

24 A.   Yes.

25 Q.   Are you waiving that privilege now and today for purposes

Sandra Arthur - Cross-Examination - January 19, 2021

 1 ┃of this trial this week in order to testify?
 2 ┃A.   Yes.
 3 ┃          MR. BERRY:  Nothing further, Your Honor.
 4 ┃          THE COURT:  Mr. Bennett, your witness.
 5 ┃                    **CROSS-EXAMINATION**
 6 ┃BY MR. BENNETT:
 7 ┃Q.   Hi, Ms. Arthur.
 8 ┃A.   Hi.
 9 ┃Q.   Were you a participant with Mr. Arthur in any crimes that
10 ┃he committed?
11 ┃A.   I don't know how to answer that question.
12 ┃Q.   Yes, no, or I don't know.
13 ┃A.   No.  I would say no.
14 ┃Q.   Okay.
15 ┃          MR. BENNETT:  I'll pass the witness, Your Honor.
16 ┃          THE COURT:  Thank you.
17 ┃          Any redirect?
18 ┃          MR. BERRY:  No, sir.
19 ┃          THE COURT:  All right.  So ma'am, in your -- do you
20 ┃still go by Arthur as the last name?
21 ┃          THE WITNESS:  Yes.
22 ┃          THE COURT:  Okay.  Mrs. Arthur, so you're willing to
23 ┃testify; is that right?
24 ┃          THE WITNESS:  Yes, sir.
25 ┃          THE COURT:  Okay.  When you testify -- and I suppose

Sandra Arthur - Cross-Examination - January 19, 2021

1  you've talked to the attorneys at least for the government,

2  right, about what you're going to testify about.  That would be

3  normal.  They would be derelict in their duty not to do that.

4  So they typically would prepare a witness.  And by "prepare," I

5  don't mean that they tell you what to say, but they talk to you

6  about what's going to happen and what questions they're going

7  to ask.

8          And from the questions they've asked that you know

9  they're going to ask you, are you willing to answer those

10  questions?

11          THE WITNESS:  Yes.

12          THE COURT:  Do you have any concerns or issues?

13          THE WITNESS:  No.

14          THE COURT:  You've spoken with your lawyer,

15  Mr. Carlin, who's here.  He's a local lawyer with us here.

16  He's a very good attorney.  He's a seasoned lawyer.  But you've

17  spoken with him about all that; is that correct?

18          THE WITNESS:  Yes, we've spoken, and I'm comfortable.

19          THE COURT:  You're comfortable?

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  Thank you very much.

22          I'm going to allow her to be excused unless somebody

23  else has any questions?  No?  Okay.

24          You may be excused.  If you would, Mr. Carlin will

25  escort you back.

Sandra Arthur - Cross-Examination - January 19, 2021

1          If you would, Mr. Carlin.  Thank you, Mr. Carlin, for

2   doing that.

3          MR. CARLIN:  Yes, Your Honor.

4          THE COURT:  And I appreciate you matching your mask

5   with your outfit a little bit.  I mean, you got close.

6          MR. CARLIN:  I try.  I mean, I go to the Public

7   Defenders fashion coordination classes.

8          (Laughter)

9          THE COURT:  Mr. Bennett, any argument?  Or,

10  Mr. Haygood, I'm sorry, any argument?

11         MR. HAYGOOD:  No, Your Honor.  I think that she has

12  waived the spousal privilege, but we would -- if there are any

13  confidential communications that she would testify to, we can

14  object to that at the time when it becomes appropriate.

15         THE COURT:  Certainly.  There may be confidential

16  discussions, of course, if there are discussions about any

17  crimes which they were jointly participating in when the

18  conversation occurred.  Those aren't marital communications for

19  the purpose of marital privilege.  It wouldn't fall within the

20  protection of confidential marital communications.  I know she

21  answered Mr. Bennett's question.  I didn't really expect her to

22  answer that way, but I'm not really sure she understood.

23         MR. BERRY:  And my expectation, Your Honor, is to lay

24  that foundation obviously through the course of her testimony

25  about what did y'all do together and how did y'all work on the

Sandra Arthur - Cross-Examination - January 19, 2021

1   Web site together so the Court will be able to make those

2   rulings in context --

3           THE COURT:  Right.

4           MR. BERRY:  -- for what it is she is going to say if,

5   if anything, about what he said to her.

6           THE COURT:  And, of course, if any privilege exists,

7   it exists toward utterances, not acts.  But, again, I'm not

8   sure I got the full monty from her just because I don't think

9   she understood.  She tried.  I think she tried, and you tried

10  to help her.

11          MR. BENNETT:  And, Your Honor, I'm sorry, if I may be

12  heard.  The point is I think we agreed they haven't laid that

13  predicate yet.

14          THE COURT:  Sure.

15          MR. BENNETT:  And so as far as the Motion in Limine

16  goes, we can see that she has waived her privilege, and I think

17  they concede that they haven't laid the predicate for the

18  spousal communications.  And so I think we're all in

19  concurrence that before offering utterances of his, they're

20  going to lay that predicate.

21          THE COURT:  Of course.  And just so the jury

22  understands, if nothing else.  So the Motion in Limine then is

23  denied and, of course, subject to, of course, any objections

24  throughout the trial.

25          MR. BENNETT:  And in her testimony, she did raise

David Ley - Direct Examination - January 19, 2021

 1 something else which is other acts of Mr. Arthur.  I'm hoping

 2 that the government is able to -- when they put her on the

 3 stand before the jury -- avoid having her testify about other

 4 acts of Mr. Arthur which the government has specifically

 5 disavowed its intention to offer any such acts.

 6            THE COURT:  Sure.  Absolutely.

 7            MR. BENNETT:  She said that there was abuse in the

 8 marriage.  She didn't specify which way it went, but I think

 9 the jury would guess that.

10            THE COURT:  Right.  Understood.

11            MR. BENNETT:  Thank you, Your Honor.

12            THE COURT:  Thank you.

13            Let's see, we have the Daubert issue I would like to

14 take up.  Do we have Dr. Ley, Mr. Ley?

15            MR. HAYGOOD:  We do have Dr. Ley here, Your Honor.

16            THE COURT:  Sir, if you would come up to the stand

17 and we'll swear you.

18            THE WITNESS:  Yes, sir.

19            (Witness sworn by the clerk at 12:02 p.m.)

20            THE COURT:  You may proceed, Mr. Haygood.

21            MR. HAYGOOD:  Thank you, Your Honor.

22                         **DAVID LEY,**

23            **DEFENDANT'S WITNESS SWORN AT 12:02 P.M.**

24                     **DIRECT EXAMINATION**

25 BY MR. HAYGOOD:

David Ley - Direct Examination - January 19, 2021

1    Q.   Good morning, Doctor.  Can you please introduce yourself
2    to the Court?
3    A.   I'm Dr. David Ley.  I'm a clinical psychologist and sex
4    therapist from Albuquerque, New Mexico.
5    Q.   Okay.  And what is your current employment as a
6    psychologist and sex therapist?
7    A.   I have kind of a complicated employment situation.  I'm
8    the executive director of a very large community mental health
9    nonprofit in Albuquerque.  I also on the side am a writer and
10   sex therapist and do some forensic work around sexuality
11   issues.
12   Q.   Okay.  What is your educational background?
13   A.   I have a bachelor's in philosophy from the University of
14   Mississippi, a master's in psychology from the University of
15   New Mexico, and a Ph.D. from University of New Mexico in
16   clinical psychology.
17   Q.   Have you ever had the opportunity to be involved with the
18   legal system before as an expert witness?
19   A.   Yes, I've testified as an expert witness in probably
20   around a dozen cases over the past few years as an expert
21   witness.
22   Q.   Okay.  Have they been in federal court, state court, or
23   both?
24   A.   That's a good question.  I have to think about that.  This
25   might be my first appearance in federal court.  I believe all

1  of the other cases have been state court.

2  Q.   Okay.  And when you testify as an expert witness, do you

3  typically testify in favor of criminal defendants, or do you

4  sometimes testify in civil cases as well?

5  A.   It has been a mix.  I've predominantly, I think, testified

6  as an expert witness in civil cases, both for plaintiff and

7  defense.  I have been involved as an expert witness or

8  consultant in several criminal cases that did not ultimately go

9  to trial.

10  Q.   Okay.  And you were contacted by my co-counsel in this

11  case, Mr. Bennett, to provide us some expert assistance in this

12  case; correct?

13  A.   Correct.  Last year sometime.

14  Q.   And what did you do pursuant to our request?

15  A.   Discussed the case with Mr. Bennett and then traveled down

16  to Alpine, Texas, last year to review the evidence in the case.

17  Q.   And so you read the stories and looked at the images which

18  have been alleged to be obscene in this case.

19  A.   Correct.

20  Q.   And in terms of your review, what psychological or

21  therapeutic techniques, theories, or ideas did you apply in

22  conducting that review?

23  A.   Two things really.  One, I looked at the stories and

24  material in relation to my decades of experience treating

25  individuals around sexuality, including sex offenders.  So

David Ley - Direct Examination - January 19, 2021

1  looking at the material as it was similar to or different from

2  similar material that I have reviewed in the past and people

3  that I have treated.

4           Secondly, looked at the scientific literature

5  regarding analysis of issues related to child pornography,

6  written erotica as it related to interest in individuals

7  expressing sexual interest in children, pedophilia, and related

8  to contact sexual offending against children.

9  Q.    And these theories that you applied, the scientific

10  material that you reviewed, are they commonly accepted in the

11  fields of sex therapy and clinical psychology?

12  A.    Very much so, within those who research and treat

13  particularly issues related to sex offending and pedophilia.

14  The information that I relied on, the research that I've looked

15  at is very much a gold standard at this time in the field.

16  Q.    And are you by reason of your training and experience

17  capable of applying those theories and that learned material

18  that you have been reviewing to the case at hand?

19  A.    I believe so.  I've been doing it for many years.

20  Q.    Okay.  And so is anything you're doing sort of cutting

21  edge, on the bleeding edge of science or is this all fairly

22  settled regular, normal science?

23  A.    If I can offer a caveat there, none of this is very clear

24  black and white kind of issues.  There are lots of -- lots and

25  lots of very intense gray zones.  Lots of individual

David Ley - Direct Examination - January 19, 2021

1 differences in the information that I'm talking about here.

2           And so there is complexity and nuance in the

3 interpretation of that material, and those nuances and

4 interpretations may verify across different experts or

5 individuals who review the material.

6           However, the field at large acknowledges that those

7 gray zones exist and everybody is trying to figure out what

8 they mean.

9 Q.   And do you think that you will be able to assist the jury

10 in understanding what those gray zones are and how they apply

11 to this case?

12 A.   I believe so, yes, sir.

13 Q.   And do you believe that -- one of the issues that we will

14 have in this case obviously is whether the material which is

15 alleged to be obscene possesses any literary, artistic,

16 scientific, or political value.  In your review of the

17 material, do you believe that you will be able to educate the

18 jury on what types of potential literary, scientific, artistic,

19 or political value the challenged writings and images may have?

20 A.   Yes, sir.  As a sex therapist and a supervisor of sex

21 therapists, one of the things that I commonly do is train

22 therapists on how to understand the body of sexuality,

23 including sexuality of literature.  And one of the things that

24 I noted as I reviewed the charged materials was the

25 similarities that existed between those materials and a great

David Ley - Direct Examination - January 19, 2021

1   deal of erotic literature in our history.

2   Q.   And have you provided the defense and through us the court

3   with some of these examplars that you could testify to in front

4   of the jury about how these works might have potential value?

5   A.   Yes, sir, I did.

6   Q.   And those exemplars include both written works and visual

7   depictions.

8   A.   Yes, sir.

9   Q.   And you have, again, reviewed all the written works and

10   visual depictions at issue in this case.

11   A.   I've reviewed the five original charged stories and I've

12   reviewed three drawings and then the investigators also shared

13   with me I believe it was two or three additional stories that

14   had allegedly been written by Mr. Arthur.

15   Q.   Okay.  And so without invading the province of the jury to

16   ultimately decide whether the elements of the *Miller* test are

17   met, do you believe that your testimony would be helpful in

18   educating the jury as to the potential types of value or the

19   potential uses to which these exhibits -- or not exhibits --

20   the charged stories and images could have?

21   A.   Yes, sir.  Because as a society, we don't do very good sex

22   education or non-stigmatizing kind of discussion around

23   sexuality.  One of the things I'm able to do as a psychologist

24   and sex therapist is talk about the research and the -- around

25   the stuff with sexuality that we don't talk about.  So I can

David Ley - Direct Examination - January 19, 2021

1  put it in that larger scientific and clinical context.

2  Q.   Okay.  And how long do you believe that it would take you

3  in terms of testifying time for the jury to provide all of this

4  information?  Within an hour or would you need a day or even

5  several days?

6  A.   Oh, gosh.  That's --

7  Q.   I guess what I'm getting at here is:  Do you believe it

8  would consume an inordinate amount of time for you to be able

9  to speak to the jury on this?

10 A.   No, I don't think so.  I think personally with regards to

11 the matters at hand and the charged materials, I think that

12 could be accomplished almost certainly within less than a day;

13 however, cross-examination certainly would play into that.

14 Q.   And when it comes to cross-examination, are you capable of

15 being cross-examined on the material you've read or the

16 theories you've applied?

17 A.   I believe so, yes.

18 Q.   And could you express to the Court and the jury exactly

19 how those theories that you've been applying or the material

20 that you've been reading and relying on dovetails with the case

21 at hand?

22 A.   Yes, sir.

23            MR. HAYGOOD:  No further questions at this time,

24 Judge.

25            THE COURT:  Mr. Berry, your witness.

David Ley - Cross-Examination - January 19, 2021

| | |
|---|---|
| 1 | **CROSS-EXAMINATION** |
| 2 | BY MR. BERRY: |
| 3 | Q.   Good morning, Dr. Ley. |
| 4 | A.   Good morning. |
| 5 | Q.   Now, you've written three books; correct? |
| 6 | A.   Yes, sir. |
| 7 | Q.   Published three books.  Let's put it that way.  Maybe |
| 8 | you've written more. |
| 9 | A.   That's a good caveat.  Thank you. |
| 10 | Q.   Maybe you have some manuscripts waiting in the wings that |
| 11 | we don't know about, but you've published three; correct? |
| 12 | A.   Yes, sir. |
| 13 | Q.   What are the names of those three books? |
| 14 | A.   The first book was called *Insatiable Wives: Women Who* |
| 15 | *Stray and the Men Who Love Them*; the second book was called *The* |
| 16 | *Myth of Sex Addiction*; and the third book is called *Ethical* |
| 17 | *Porn for Dicks, A Man's Guide to Responsible Viewing Pleasure*. |
| 18 | Q.   Do you consider those literature? |
| 19 | A.   They are pop psychology explorations of socially relevant |
| 20 | sexual topics. |
| 21 | MR. BERRY:  Objection.  Nonresponsive. |
| 22 | THE COURT:  Yeah, can you answer the question, |
| 23 | please?  Is that literature? |
| 24 | A.   Yes. |
| 25 | THE COURT:  Oh, sustained the objection.  I'm sorry. |

David Ley - Cross-Examination - January 19, 2021

1  Q.   (BY MR. BERRY)  So the answer is, Yes, it is literature.

2  A.   A component of literature, yes, sir.

3  Q.   You agree that literature is generally regarded as prose,

4  fiction, drama, poetry, that sort of thing; correct?

5  A.   Yes, sir.

6  Q.   And that nonfiction books are not generally considered

7  literature?

8  A.   Yes, sir.

9  Q.   And those are all three nonfiction books.

10 A.   All three are nonfiction but contain fictional elements of

11 fantasies and such provided by people I interviewed.

12 Q.   If I go into a library, is your book in the fiction or the

13 nonfiction?

14 A.   Nonfiction.

15 Q.   Thank you.

16      Your book *Ethical Porn for Dicks*, the subtitle is:  A

17 layperson's guide to managing psychological issues -- or maybe

18 that's not the subtitle.  But you have described it as a

19 layperson's guide to managing psychological issues related to

20 the use of pornography.  Does that sound right?

21 A.   Perhaps that sounds familiar.  I don't know if those are

22 my words.

23 Q.   Okay.  If that was in the report that you issued to us,

24 would that be accurate?

25 A.   I believe so, yes, sir.

David Ley - Cross-Examination - January 19, 2021

1   Q.   Okay.  Did you write your report?

2   A.   Yes.

3   Q.   Or did someone else write it?

4   A.   I wrote it.

5   Q.   How many reports have you issued, by the way, in this

6   case?

7   A.   I think just two after the -- I think I made a slight

8   revision after some discussion with counsel a few weeks ago.

9   Q.   Speaking of, how did you communicate with counsel

10  typically about this case?

11  A.   Largely by phone.  I believe we had some e-mail

12  conversations mostly around scheduling.

13  Q.   Okay.  Did you ever leave a voice message for them?

14  A.   Possibly, but I don't recall.

15  Q.   Did you ever text with Mr. Bennett or Mr. Haygood or any

16  of their staff?

17  A.   The only text I had last was whenever I arrived in Pecos

18  last night.

19  Q.   And what was the nature of that text?

20  A.   Just letting them know that I had arrived.

21  Q.   Okay.  But e-mail and phone was the predominant form of

22  communication?

23  A.   Yes, sir.

24  Q.   Okay.

25             MR. BERRY:  I don't have these marked, Your Honor,

David Ley - Cross-Examination - January 19, 2021

 1  but I certainly can mark them.

 2  Q.   (BY MR. BERRY)  I'm showing you this right here.  What is

 3  this?

 4  A.   That's a printout of the cover of my third book.

 5  Q.   This is just a print copy I did of the cover of your book

 6  called *Ethical Porn for Dicks*; correct?

 7  A.   Yes, sir.

 8  Q.   Now, what is this black and white thing here?

 9  A.   It is a Brazilian petroglyph of a god of nature.

10  Q.   Is that one that you drew?

11  A.   Yes, sir, I drew the drawings that were in that book.

12  Q.   In fact, you drew all of them in here; correct?

13  A.   Yes, sir.

14  Q.   Including this one?

15  A.   Yes, sir.

16  Q.   Including this one?

17  A.   Yes, sir.

18  Q.   Including this one?

19  A.   Yes, sir.

20  Q.   And this one.

21  A.   Yes, sir.

22  Q.   Now, these are all -- everything in the book is basically

23  kind of -- I just picked out five, like the first five or so.

24  A.   Sure.

25  Q.   These are all -- for purposes of the record these are all

David Ley - Cross-Examination - January 19, 2021

1  black and white two dimensional drawings; correct?

2  A.   Yes, sir.

3  Q.   There is no color to them, there's no perspective,

4  anything like that; correct?

5  A.   Correct.  They're representations of petroglyphs from

6  around the world --

7             MR. BERRY:  Objection.  Nonresponsive.

8  A.   -- a thousand years.

9  Q.   (BY THE DEFENDANT)  Are they black and white drawings?

10             THE COURT:  Sustained.

11  A.   Yes, sir.

12  Q.   (BY MR. BERRY)  Are there any of them in color?

13  A.   No, sir.

14  Q.   Are there any of them in perspective?

15  A.   I would have to look at all of them to see.  I believe

16  some of them may have included some perspective, I'm not sure.

17  Q.   Okay.  But you're not sure.

18  A.   Not that I recall.

19  Q.   Okay.  Any of them have other kinds of shading to show

20  them other than a two dimensional form?

21  A.   All shading is by nature two dimensional.  I believe some

22  of them did include crosshatching.

23  Q.   Is it your experience, your drawings of these, is that

24  what makes you qualified as an art expert here today?

25  A.   I think that that is one part of it.  I believe I'm

David Ley - Cross-Examination - January 19, 2021

1  testifying on the role of art with erotic literature.

2  Q.   Your report says you are proficient with the literary,

3  scientific, and artistic nature of textual and nontextual works

4  especially those relating to human sexuality.

5        What makes you proficient and where do you document

6  that in your CV?

7  A.   Those components have been part of my clinical training,

8  part of my clinical supervision work and part of the -- some of

9  the publications that I've done related to the impact of

10  pornography.

11  Q.   You mentioned a bunch of trainings in your CV or your

12  report where you conducted lots of trainings, quote,

13  instructing mental health clinicians and the general public on

14  how to ethically and effectively address a wide range of sexual

15  issues.

16        Which training did you list that addresses literary,

17  artistic, or scientific value of stories and drawings?

18  A.   Gosh, trainings that I've done on modern sexuality for a

19  group called PEZI.  I forget what that actually stands for.

20  Q.   Is that listed in your CV?

21  A.   I believe so, yes.

22  Q.   Okay.  And you've done -- so you can come up with one

23  training?

24  A.   Oh, to clarify, I've done that training probably a hundred

25  times around the country to thousands of therapists, PEZI

David Ley - Cross-Examination - January 19, 2021

1 travels me around.

2 Q.    What does that pertain to?

3 A.    Pertains to training mental health therapists about how to

4 address sexuality issues in their clinical practice.  It

5 includes discussion about the history of sexuality of

6 literature and the role of erotic drawings and pornography in

7 treatment.

8 Q.    Does it address literature or art specifically in relation

9 to these types of stories and drawings that we're talking about

10 involving children?

11 A.    No, it -- we do -- the training does talk about addressing

12 attraction to children and sexual interests in children and

13 some discussion around child pornography in that perspective a

14 very broad kind of construct that includes almost all

15 child-oriented material.

16 Q.    Your report says that you reviewed a substantial number of

17 forms of media related to sexuality and that, quote, you have

18 testified and offered opinions regarding the nature of the

19 material to the courts.

20        Do you have a list of the cases in which you've

21 testified?

22 A.    Related to that or that I've testified to in general?

23 Q.    Both.

24 A.    I provided counsel a list of my forensic experience over

25 the past ten years.  The cases where I've testified to the

David Ley - Cross-Examination - January 19, 2021

1   courts regarding pornographic visual sexual materials, some of
2   them were here in Texas back when I was working for the
3   Fort Bend County Juvenile Probation System where -- and then
4   over the years as I worked with individuals who were being --
5   who were on probation, for instance, for sex offending.  When
6   they were apprehended, for instance, again with sexual
7   materials, I was sometimes asked to advise the Court about
8   whether those materials indicated kind of a relapse in their
9   sex offending.  I can't tell you Bates number or dockets of
10  those.
11  Q.   What was the field of expertise in which you have been
12  qualified as an expert in court?
13  A.   I have been qualified as an expert around sexuality issues
14  on at least one or two occasions.  I've been qualified as an
15  expert in psychology and issues around addiction before the
16  Ohio Supreme Court I think once or twice.  I was recently
17  qualified as an expert in psychology regarding recovered memory
18  in a case in Seattle.
19  Q.   Have you ever been qualified as an expert in literary,
20  artistic, or scientific value regarding stories such as these?
21  A.   No, sir, this is a unique case.
22  Q.   So you've been qualified in sexuality issues very broadly
23  one to two times; correct?
24  A.   I would have to go through my record and CV, but that
25  sounds about right.

David Ley - Cross-Examination - January 19, 2021

1   Q.   That's what you just said; correct?

2   A.   Yes, sir.

3   Q.   And you've been qualified in psychology, again, very

4   generally more specifically in areas of addiction.  And how

5   many times would you say that was?

6   A.   Two that I can specifically recall.

7   Q.   And then as you're struggling to recall, you do remember

8   being qualified in recovered memory, though; right?

9   A.   I'm not an attorney.  The judge just recently denied a

10  motion to exclude me as an expert on that matter.  I don't know

11  if that qualifies me as an expert yet.

12  Q.   All right.  Now, you told Mr. Haygood in response that you

13  testified about a dozen times.  So we've come up with about

14  four generously that you have described for me.  How else have

15  you been qualified in court?  Or have you testified as a fact

16  witness instead?  Because the math doesn't work for me.

17  A.   The -- I served as an expert witness to numerous cases

18  providing depositions and affidavits that ultimately didn't go

19  to trial.

20  Q.   We're talking about testifying in court.  I think you said

21  a dozen times.  We've come up with two times sexuality issues,

22  two times addiction.  One time that you've been not excluded as

23  a recovered memory expert, but it sounds like you haven't

24  testified there yet; is that correct?

25  A.   Correct.

David Ley - Cross-Examination - January 19, 2021

1  Q.   Okay.  So you haven't testified on that one.  So now we're

2  back down to four, maybe three times that you've been qualified

3  as an expert.  Can you give me any other times that you've been

4  qualified as an expert and what areas they would be?

5  A.   Again, as I said, I've testified in cases in Texas in

6  Fort Bend County as a forensic psychologist after having

7  completed evaluations of individuals.  I don't know if I was

8  testifying as a fact witness or expert witness in those cases.

9  Q.   Okay.  We'll move on from that.

10       Has any part of your testimony ever been excluded or

11  were you precluded from saying certain things by a court?

12  A.   No, sir, not that I recall.

13  Q.   You can't recall any time you've been excluded or

14  precluded?

15  A.   No, sir.

16  Q.   And you did mention a moment ago, you provided the

17  attorneys with a list of those cases; correct?

18  A.   Cases over about ten years that have been conducted, yes.

19  Q.   But you didn't include those in your report, did you?

20  A.   No, sir.

21  Q.   Okay.  That was purposeful, wasn't it?

22  A.   No, sir.

23  Q.   You're intentionally trying to hide what you're testifying

24  about here; isn't that correct?

25  A.   No, sir.

David Ley - Cross-Examination - January 19, 2021

1  Q.   Now you've never testified about whether a writing or a
2  drawing is obscene; isn't that correct?
3  A.   Correct.
4  Q.   You've never testified about whether it has serious
5  literary, artistic, or scientific value; isn't that correct?
6  A.   Correct.
7  Q.   Your degrees are in psychology; correct?
8  A.   Yes, sir.
9  Q.   You don't have a degree in art, do you?
10 A.   No, sir.
11 Q.   You don't have degree in literature, do you?
12 A.   No, sir.
13 Q.   You don't have a degree in political science; correct?
14 A.   No, sir.
15 Q.   You haven't published a single article in the area of art,
16 literature, or politics; isn't that correct?
17 A.   Correct.
18 Q.   You haven't given a single lecture in the area of art,
19 literature, or politics; isn't that correct?
20 A.   Correct.
21 Q.   You haven't made a single media appearance -- you make a
22 lot of media appearances; correct?  You haven't made a single
23 media appearance addressing art, literature, or politics; isn't
24 that correct?
25 A.   No, I'm not sure I would agree with that particularly many

David Ley - Cross-Examination - January 19, 2021

 1  of the media presentations or interviews that I have are fairly

 2  wide ranging and oftentimes include discussion of the history

 3  of eroticism in literature and art.

 4  Q.    So like Dr. Phil or Katie Couric, you might be called on

 5  to those shows, correct, as a psychologist?

 6  A.    Yes, sir.

 7  Q.    And then it might spin off into some other topics that are

 8  not necessarily your narrow field of expertise; correct?

 9  A.    Yes, sir.

10  Q.    Okay.  You've published numerous articles in the very

11  broad field of psychology, though; correct?

12  A.    Yes.

13  Q.    Most of those articles address the concept of pornography

14  addiction and specifically your opinion that porn is not the

15  problem.  Isn't that your main focus?

16  A.    When it comes to pornography addiction, yes, sir.

17  Q.    All right.  It's not porn's problem; it's the person's

18  problem.  Correct?

19  A.    That is my argument in layperson literature but not

20  academic literature.

21  Q.    And some of the articles address other issues such as Gay

22  Men's Cuckolding Fantasies; correct?

23  A.    That was one publication that I did, yes, sir.

24  Q.    LGBTQ mental health in rural areas; correct?

25  A.    Yes, sir.

David Ley - Cross-Examination - January 19, 2021

1  Q.   And in your CV, you cited 21 articles that you've

2  authored.   Does that sound about right?

3  A.   Yes, sir.

4  Q.   Okay.   How many of those 21 articles that you have

5  authored and put in your CV did you cite in support of your

6  conclusions in this case?

7  A.   I don't think I cited myself in any of that.

8  Q.   Right.   Because none of those articles have anything to do

9  with what you're testifying about here; isn't that correct?

10 A.   No, sir, I would argue that.   My testimony here relates to

11 human sexuality and human sexual fantasy, the diversity of

12 human sexual experience.   In many of my publications, as you

13 mentioned, the gay cuckolding fantasy, relate specifically to

14 the diversity of human sexual interests.

15 Q.   Yet it wasn't important enough for you to cite it in

16 support of your conclusions in this case; isn't that correct?

17 A.   I believe other literature in the field --

18        MR. BERRY:  Objection.  Nonresponsive.

19        THE COURT:  Sustained.

20        Please answer the question.

21 A.   Could you restate it?

22 Q.   (BY MR. BERRY)  Sure.  You might think that they relate to

23 your testimony, but you didn't think it was important enough

24 for you to cite them in support of any of your conclusions in

25 your report in this case; isn't that correct?

David Ley - Cross-Examination - January 19, 2021

1  A.    Yes, sir.

2  Q.    You cited 23 media events where you appeared to discuss

3  topics related to sex in some generic form.  With 23 media

4  events in your CV, how many of those did you cite in support of

5  your conclusions in this case?

6  A.    None.

7  Q.    You cited 25 presentations and lectures that you've given

8  in your CV.  How many of those 25 lectures and presentations

9  did you cite in support of your conclusions in this case?

10 A.    None.

11 Q.    You did cite academic research in your report; isn't that

12 correct?

13 A.    Yes, sir.

14 Q.    In fact, you cited 41 different academic journal articles

15 at the end of your report.

16 A.    Yes, sir.

17 Q.    How many of those 41 were authored by you?

18 A.    None.

19 Q.    So you wrote a 17-page report expressing your professional

20 opinion based exclusively on the search of other people and

21 none to do with anything you've done academically; correct?

22 A.    For the purposes of that report, yes, sir.

23 Q.    You used the word "may" a lot in your report.  Do you know

24 how many times?

25 A.    No, sir.

David Ley - Cross-Examination - January 19, 2021

 1  Q.   You said things like:  The psychological impact of those
 2  stories and material may be dramatically influenced by the
 3  environment and context in which the materials are presented.
 4          But they might not; right?
 5  A.   Yes, sir.
 6  Q.   Page 3 you say:  Separating these specific stories, for
 7  instance, from the entire Web site of the Mr. Double collection
 8  may present an inaccurate and incomplete view of the literary,
 9  scientific, and artistic value of these stories.
10          Do you remember saying that?
11  A.   Yes, sir.
12  Q.   They may not, though; right?
13  A.   They may not.  My reference there was in regards to the
14  *Miller* test and evaluating the words within the entirety.
15  Q.   Then you say again:  Thus, reading only the stories
16  included in the indictment may give a false impression of the
17  degree to which the entire collection of stories centers on
18  violence, aggression, murder, fetishism, and necrophilia.
19          Said it may give a false impression, but it might
20  not; right?
21  A.   Yes, sir.
22  Q.   Under Charged Story No. 1, The Baby Mangler, you used the
23  word "may" one, two, three, four, five -- five times and the
24  word "could" another time.  And you say things like:  This may
25  serve to invite consent and agreement from the reader.

1            But it might not; right?

2    A.    Yes, sir.

3    Q.    It may build excitement.  But it might not; right?

4    A.    Yes, sir.

5    Q.    It -- the readers of the story may experience decreased

6    risk of contact offending against children.  But they might

7    not; right?

8    A.    Yes.

9    Q.    The story may reveal fantasies of individuals with

10   sadistic and pedophilic interests.  But they might not.

11   A.    Yes.

12   Q.    The story may help to depict elements of psychological

13   functioning including cognitive distortions.  But it might not;

14   correct?

15   A.    Yes.

16   Q.    This could be a great value to social scientists and

17   public policy makers.  But it could not; correct?

18   A.    Yes.

19   Q.    Do you know how many times you said that, "may," in your

20   report?

21   A.    No, sir.

22   Q.    Would you be surprised if I told you it was over 40

23   times -- 45 times?  And every one of those, correct, we could

24   say:  It may, but it may not.  Isn't that right?

25   A.    That is how psychology and humanity work.

David Ley - Cross-Examination - January 19, 2021

1          MR. BERRY:  Objection.  Nonresponsive.

2   A.   Yes.

3          THE COURT:  Sustained.

4   Q.   (BY MR. BERRY)  You did the same thing in your book

5   *Ethical Porn for Dicks*.  You used "may" 48 times in that.  Did

6   you know that?

7   A.   I didn't.  That book is 150 pages compared to 17 pages.

8   So I would say I'm relatively using the word "may"

9   significantly less.

10  Q.   In the book significantly less; correct?

11  A.   Uh-huh.

12  Q.   As a proportion, you're using it a lot more in this

13  report; correct?

14  A.   Yes, sir.

15  Q.   And in the book, it was a layperson's guide; correct?

16  A.   Correct.

17  Q.   And this is supposed to be an expert report that's

18  supposed to help the trier of fact; isn't that correct?

19  A.   Yes, sir.

20  Q.   So when you say the stories that could be written by or

21  read by victims of sexual abuse, they could not be; correct?

22  A.   Could you restate that?  I'm not entirely sure.

23  Q.   Sure.  From your report you say, quote, the charged

24  stories could be written by or read by victims of sexual abuse

25  attempting to depict or better understand their own

1    experiences.
2            That's from your second report when you updated it.
3    Do you remember that?
4    A.   Yes.
5    Q.   So they could be written by or read by victims, but they
6    could not be; correct?
7    A.   Correct.  I don't know that we know very clearly who wrote
8    many of these stories.
9    Q.   We don't know, do we?  They could be written by child
10   molesters; correct?
11   A.   Yes.
12   Q.   They could be written by child molesters attempting to
13   depict their own experiences; correct?
14   A.   Yes.
15   Q.   All right.  You also say in your report:  At this point --
16   quote, At this point there is no scientific reason to believe
17   that texts or drawings such as those charged in this case have
18   a greater effect than analogous photographic and video
19   material, you're talking about child pornography; correct?
20   A.   Yes, sir.
21   Q.   And, quote -- continuing your quote:  And there is
22   reasonable evidence that the impact of these stories are likely
23   to be psychologically different, likely impact.
24            Impact on who?  Pedophiles, victim, who?
25   A.   The consumer or the reader.

David Ley - Cross-Examination - January 19, 2021

1  Q.   How do you measure impact?

2  A.   Research around that has measured it in different ways,

3  including self-reported sexual arousal, physiological arousal.

4  Q.   And then you say:  The stories -- or the impact of these

5  written stories are likely to be psychologically different than

6  child pornography, is what you were referring to.

7        How do you measure psychological difference?

8  A.   Again, as I said, various self-report measures,

9  physiological measures.  What's interesting particularly when

10 we look at people reading versus people watching material is

11 that different areas of the brain appear to be activated.  So,

12 for instance, watching visual material, the occipital cortex is

13 more energized.

14        When we read, many more different areas of our brain

15 are activated because we're having to kind of create in our

16 mind what the experience is like.

17 Q.   How much of that brain research did you do in this case

18 regarding these stories?

19 A.   None.

20 Q.   And you say there is reasonable evidence that the impact

21 of these stories would be likely different.  What makes

22 evidence reasonable or unreasonable?

23 A.   Impact of erotic literature has been evaluated much less

24 than impact of visual literature.

25 Q.   You also say in that same quote:  There is no scientific

David Ley - Cross-Examination - January 19, 2021

1  reason to believe that texts or drawings would have a greater
2  effect than -- I'm going to say child pornography.  You use
3  analogous the photograph or video material, no scientific
4  reason.  You agree that the absence of evidence is not
5  evidence; correct?
6  A.    Yes, sir.
7  Q.    So just saying that there is no scientific reason to
8  believe that they would have a greater impact is not the same
9  thing as saying they don't have a different impact; correct?
10  A.    Correct.
11  Q.    Why not say there is no logical reason?  Why use the word
12  "scientific" in that scenario?
13  A.    Specifically there I was thinking of some publications
14  that found different levels of predictive validity for people
15  who collected or consumed pedophilic literature versus those
16  who collected and consumed visual literature.  There was less
17  risk for reporting sexual interest in children and those who
18  read stories versus those who watched visual material.
19  Q.    I'm getting closer to the end here.
20        Your report says that the psychological impact of
21  these stories and material may be dramatically influenced by
22  the environment and context in which the materials are
23  presented.
24        Do you recall saying that in your report?
25  A.    Yes, sir.

1  Q.   How might the psychological impact be dramatically
2  influenced by the environment and context?
3  A.   One of the things researchers do sometimes is evaluate the
4  influence of priming.  So, for instance, if we had somebody --
5  and these studies have been -- read a quote out of the Bible
6  before then looking at erotic pictures or reading such an
7  erotic story, their moral judgment or rejection of the material
8  would be much stronger.
9  Q.   And that again would all be self-report stuff; correct?
10  A.   Yes, I believe all those were self-report.
11  Q.   And you didn't do any of that research yourself; correct?
12  A.   No, sir.
13  Q.   You haven't conducted any of the research in this area at
14  all; correct?
15  A.   No, sir.
16  Q.   Do you believe you should have been able to view the
17  stories in the context of the Web site?
18  A.   I believe that would have helped me understand what the
19  experience of the reader was.  For instance, what kind of
20  consents did they have to give, what kind of processes did they
21  have to follow in order to gain access to the material.
22  Q.   Did you request to be allowed to see the Web site so that
23  you could form your opinion?
24  A.   I requested to see whatever I was able to see.
25          MR. BERRY:  Objection.  Nonresponsive.

David Ley - Cross-Examination - January 19, 2021

```
 1  Q.    (BY MR. BERRY)  Did you or did you not --
 2             THE COURT:  Sustained.
 3             MR. BERRY:  Sorry, Judge.
 4             THE COURT:  It's all right.
 5  Q.    (BY MR. BERRY)  Did you or did you not request to see the
 6  Web site so that you could see these stories in the context
 7  you've described as important?
 8  A.    When I went down to Alpine, no, I don't believe I asked to
 9  see the Web site itself, no.
10  Q.    Your report says, quote, Any opinion of these materials
11  and items in isolation of the original online context within
12  which they were presented has some limations.
13             What are those limations, Doctor?
14  A.    Limited in terms of ability to extend judgment or
15  impression to the Web site in general and all of the material
16  that was there.
17  Q.    Which brings me to another point that I'm a little
18  confused on -- by your report.  You talk about how the *Miller*
19  test -- because you actually reference the *Miller* test.  You're
20  not a lawyer; correct?
21  A.    No, sir.
22  Q.    Okay.  So when you say the *Miller* test, you're saying --
23  you're talking about the *Miller* test and you say:  The full
24  literary value can't be determined without that context.
25             Do you think that the opinion that you need to offer
```

David Ley - Cross-Examination - January 19, 2021

1  here has to pertain to the entire Web site or the five
2  individual stories and three individual drawings?
3  A.   No, sir, I believe my job is simply to offer an opinion on
4  the material I've been given to inform the jury who ultimately
5  makes the decision about the application of that material to
6  the legal decision at hand.
7  Q.   Okay.  So then help me understand why it matters whether
8  the stories are reviewed in the context of the Web site for you
9  to be able to make an informed decision about these individual
10 stories?
11 A.   As a psychologist, I'm trained to offer my limitations so
12 that anybody taking my information or opinion can evaluate them
13 within those limitations.  Knowing the intent -- I won't say
14 intent -- knowing the language in the *Miller* test, I would be
15 cautious of the jury applying my opinion about five stories and
16 three drawings to the Web site overall.
17 Q.   Okay.  But you understand that the Web site is not
18 indicted; correct?
19 A.   Yes, sir.
20 Q.   Okay.  What's he been charged with?  Has he been charged
21 with running the Web site or something else or do you know?
22 A.   I'm not sure I've seen the actual original indictment --
23 no.  I take that back.  Yes, I did.
24 Q.   So what's the relevance of you viewing these stories
25 within the context of the Web site so that you can draw an

David Ley - Cross-Examination - January 19, 2021

 1  opinion about the serious literary, artistic, or scientific

 2  value of Story 1 for example?

 3  A.   I'm aware of the history around obscenity and First

 4  Amendment claims with past decisions that materials couldn't be

 5  evaluated in isolation from the overall.  So, for instance,

 6  choosing one page out of the book *Tropic of Cancer*.

 7  Q.   Right.  So do you think Story 1 is taken out of context

 8  and taken from a larger book or body of work that should be

 9  considered in its totality?

10  A.   I think that that is unclear to me whether the Web site is

11  equivalent to a book, for instance, of all of those stories.

12  Q.   Or is it a library where it's one story, one book within

13  that library?

14  A.   I think that's an interesting interpretation.

15  Q.   Okay.  What is yours?

16  A.   I'm not an attorney.

17  Q.   I'm aware of that.

18          MR. BERRY:  Objection.  Nonresponsive.

19          THE COURT:  Sustained.

20  Q.   (BY MR. BERRY)  What is your opinion about whether this

21  story -- Story 1, is it taken out of context such that it needs

22  to be reviewed with other materials or are you saying that the

23  Web site is the library or are you saying the Web site itself

24  is the book and we've just taken a chapter or a paragraph out

25  of it?

David Ley - Cross-Examination - January 19, 2021

1  A.   Again, as we said a moment ago, I think that how the

2  stories are presented would influence that.  So, for instance,

3  if the viewer encountered these stories in isolation from every

4  other story on the Web site, then I would agree with your

5  opinion -- or your suggestion that the story could be evaluated

6  by itself.

7          However, if the stories were presented so that the

8  viewer, for instance, could pick and choose from different

9  ones, then that might lead us to need to evaluate each

10  individual story within the context of all the stories on the

11  Web site.

12  Q.   So you're saying the value of Story 1 changes depending

13  upon which stories are to the left and right of it?

14  A.   Potentially, if they are in a list and the viewer chooses

15  that story compared to other stories that are presented with

16  it.

17  Q.   So why would that make a difference to you?  Help me

18  understand, help the Court understand why it is that the value

19  of Story 1 can be of a certain value.  And obviously it's not

20  numeric.  I'll give that.  It's qualitative, not quantitative.

21  So you're going to give a value -- you're going to assign a

22  value to Story 1, and then you're going to say but that might

23  change depending upon whether the story before it was about

24  what?

25  A.   Oh, I think I can clarify.  Clinically and scientifically

1   it's going to mean a great deal to me in understanding a

2   person's sexuality, their desires, and their fantasies if they

3   choose this story versus choosing other stories if others are

4   presented with them.  So, for instance, if there were other

5   stories presented that didn't include nonconsensual behavior

6   and they choose this story that is going to have significant

7   scientific value to me whereas if a person is simply reading

8   this story without the ability to choose consensual material,

9   that helps me less scientifically and clinically in

10  understanding that person's psychological or sexual needs.

11  Q.    You're talking about as a clinical psychologist knowing

12  whether your patient had the choice to read this story or some

13  other story; correct?

14  A.    Yes.

15  Q.    Okay.  So there is value to you in evaluating the person

16  as to whether they chose Story A or Story B, C, D, or E;

17  correct?

18  A.    Yes.

19  Q.    How does that change the serious literary, artistic, or

20  scientific value of the work itself?

21  A.    Because it helps me understand potentially the way in

22  which the person integrates that -- that material into their

23  own fantasy or thinking.

24  Q.    So, again, it's helpful to you as a psychologist in terms

25  of the value of the story changes for you depending upon the

David Ley - Cross-Examination - January 19, 2021

1   choice your patient made.

2   A.    Yes, sir.

3   Q.    So the story itself, does it have static value?

4   A.    Yes, static and relative value.

5   Q.    So it has both; right?

6   A.    Yes, sir.

7   Q.    So what would change your opinion about the value of

8   Story 1, for example?  You say it has serious value.  What, if

9   anything, could change your opinion about whether it has

10  serious literary, artistic, or scientific value?

11  A.    One of the questions that came up for me reading that

12  story in particular was how derivative it was related to other

13  publications; for instance, I think the book *American Psycho* by

14  Bret Easton Ellis.  You know, were I evaluating that story, it

15  would be interesting to know if the author had read those works

16  and was deliberately referencing them.

17  Q.    So if you can't interview the author, does it change the

18  value of the story?

19  A.    It impacts potentially the value of the story.

20  Q.    How?

21  A.    Reduces the level of context.

22  Q.    And so what does that do to the value?

23  A.    Potentially limits it.

24  Q.    In what way?

25  A.    Reduces our ability to evaluate the story in broader

David Ley - Cross-Examination - January 19, 2021

1   social context.

2   Q.   Does it lower the value?

3   A.   Potentially reduces it, yes.

4   Q.   Your report says:  "...the full literary, scientific, and

5   artistic value of the stories and materials included in the

6   indictment cannot be determined without consideration of the

7   larger context within which they were found."

8          Do you recall saying that?

9   A.   Yes, sir.

10  Q.   So if they cannot be determined, how can you offer an

11  opinion here today?

12  A.   I can offer an opinion about the elements of scientific

13  and literary value that I identified in the stories.

14  Q.   But you just said they cannot be determined without

15  consideration of the larger context in which they were found.

16  Not it would be better or I can make a better determination,

17  not my opinion would be changed slightly, my opinion would be

18  stronger, my opinion would be more firm.  You said:  It cannot

19  be determined without consideration of the larger context.  And

20  you said you didn't review the context.

21  A.   Can I ask you to read back my quote again?

22  Q.   Sure.

23  A.   There's a word in there that I think is important.

24  Q.   You bet.  "The full literary, scientific, and artistic

25  value of the stories and materials included in the indictment

David Ley - Cross-Examination - January 19, 2021

1  cannot be determined without consideration of the larger

2  context within which they were found."

3  A.   Yes, sir, the full literary value.  So the full value

4  cannot be determined, but I'm not saying we cannot determine

5  any value.

6  Q.   You also say:  "Separating these specific stories, for

7  instance, from the entire Web site of the Mr. Double

8  collection, may present an inaccurate and incomplete view of

9  the literary, scientific, and artistic value of the stories."

10            Do you remember saying that?

11 A.   Yes, sir.

12 Q.   So these are stories -- as you said a little bit ago,

13 these stories might have a different value than if placed next

14 to a bunch of other stories; correct?

15 A.   Yes, sir.

16 Q.   So the stories are relative.  There's going to be serious

17 value today and not serious value tomorrow depending on where

18 it is sitting.

19 A.   Full value, yes, sir.

20 Q.   So if the story is sitting in a children's library, does

21 it change the value?

22 A.   Yes, that would be inappropriate.

23 Q.   It would be inappropriate.  That's not my question.  My

24 question is:  Does the value of the story change if it's

25 sitting in the middle of a children's library?

David Ley - Cross-Examination - January 19, 2021

1  A.    Yes.

2  Q.    How?

3  A.    It would have a very different scientific impact sitting

4  in a library.

5  Q.    In what way?

6  A.    It would have much greater potential for negative impact

7  on a reader who happened upon it.

8  Q.    And, again, you said it may present.  There is that "may"

9  again.  So it means it may not; right?

10 A.    Yes.

11 Q.    In fact, it may present an accurate and complete view of

12 the value of these stories; isn't that correct?

13 A.    It may.

14 Q.    But it may not.

15 A.    It may not.

16 Q.    So the value of these stories is inaccurate and incomplete

17 in your view because they were separated from the Web site;

18 correct?

19 A.    Yes, sir.

20 Q.    And you say:  "...reading only the stories included in the

21 indictment may give a false impression of the degree to which

22 the entire collection of stories centers on violence,

23 aggression, murder, fetishism, or necrophilia."

24         "...reading only the stories included in the

25 indictment may give a false impression..."  So it might give a

1  false impression, but it might not.

2  A.   Yes, sir.  My impression particularly comparing the

3  stories that were indicted to the additional stories that were

4  written by Mr. Arthur allegedly and that were provided to me by

5  the investigators were that they were -- those two stories were

6  very different from the indicted stories.

7  Q.   Did it give you a false impression because that's all you

8  read?

9  A.   It raised the question for me as to --

10         MR. BERRY:  Objection.  Nonresponsive.

11  A.   Yes --

12         THE COURT:  Sustained.

13  A.   -- it gave me a false impression because it raised the

14  question for me as to whether there were as many stories around

15  those fetishistic violent elements present on the Web site or

16  not.

17  Q.   (BY MR. BERRY)  How many of the stories on the Web site

18  have all those story centers, those themes, as you referred to

19  them?

20  A.   I have no idea.

21  Q.   None; right?

22  A.   None.

23  Q.   You haven't reviewed the Web site; correct?

24  A.   Correct.

25  Q.   Context matters, though; right?

David Ley - Cross-Examination - January 19, 2021

1  A.   Yes, sir.

2  Q.   Context changes the value?

3  A.   Context would change the value for the viewer, the reader,

4  and the evaluator, yes.

5  Q.   And presumably the scientist who is reviewing it; right?

6  A.   Very much so.

7  Q.   How many of these stories from the Mr. Double Web site

8  have you used in your own clinical practice?

9  A.   None.

10  Q.   You haven't prescribed any of these stories to any of your

11  patients to read?

12  A.   No, sir.

13  Q.   Are you aware of a single psychologist who has done so?

14  A.   Let me think.  No.  I am aware of many clinicians who do

15  recommend that their patients read erotic literature without

16  prescribing any certain kind.

17  Q.   Do you know of any psychologist who has prescribed reading

18  about the rape and torture of infants and toddlers from the

19  Mr. Double Web site?

20  A.   No, sir.

21          MR. BERRY:  Nothing further, Your Honor.

22          THE COURT:  Redirect?

23          MR. HAYGOOD:  Yes, Your Honor.  May I approach and

24  mark some exhibits for the Court, Your Honor?

25          THE COURT:  Of course.

David Ley - Redirect Examination - January 19, 2021

1          MR. HAYGOOD:  Your Honor, we don't have any

2   defendant's exhibit sticks.  May I put D1 and D2 on these

3   documents?

4          THE COURT:  Yes, sir, that's fine.

5          MR. HAYGOOD:  And then may I approach the witness,

6   Your Honor?

7          THE COURT:  Yes, sir.

8                    **REDIRECT EXAMINATION**

9   BY MR. HAYGOOD:

10  Q.   Doctor, do you recognize these two documents that I've

11  just handed you?

12  A.   Yes, sir, my --

13         MR. BERRY:  Did you hand them to me?

14  A.   -- I think my most recently updated curriculum vitae and

15  the update of the report.

16         MR. HAYGOOD:  May I approach opposing counsel, Your

17  Honor?

18         THE COURT:  Of course.

19         (Sotto voce discussion)

20  Q.   (BY MR. HAYGOOD)  Doctor, are these a fair and accurate

21  depiction of your curriculum vitae in Defendant's 1 and a fair

22  and accurate copy of the report you provided to Mr. Bennett and

23  myself in Defendant's 2?

24  A.   Yes, sir.

25  Q.   Have they been altered or changed in any way save for me

David Ley - Redirect Examination - January 19, 2021

1  putting D1 and D2 at the top?

2  A.   Not that I noticed.

3         MR. HAYGOOD:  I would offer Exhibits D1 and D2 for

4  purposes of this hearing, Your Honor.

5         THE COURT:  Mr. Berry.

6         MR. BERRY:  No objection.

7         THE COURT:  Then D1 and D2 are admitted for this

8  hearing only without objection.

9         MR. HAYGOOD:  May I approach and tender them to you,

10 Your Honor?

11        THE COURT:  Yes, sir.

12        MR. HAYGOOD:  May I proceed, Your Honor?

13        THE COURT:  Yes, sir.

14 Q.   (BY MR. HAYGOOD)  With regard to your training and

15 expertise as a clinical psychologist and sex therapist, would

16 you say that you are an expert in the potential scientific,

17 artistic, or literary value of an artistic work?

18 A.   Yes, sir.

19 Q.   And do you find that in your practice, not only as an

20 academic but as a treating clinical psychologist, that you have

21 had the opportunity to explore the value of this type of work

22 with your patients?

23 A.   Yes, sir, actually quite often.

24 Q.   And are you familiar with the academic literature

25 surrounding the literary, artistic, or scientific value of

David Ley - Redirect Examination - January 19, 2021

1  erotic works?

2  A.   Yes, sir.

3  Q.   And whenever you came down to view the materials that have

4  been charged in this case, were you given the opportunity to

5  view them in terms of the entire Web site?

6  A.   No, sir, the charged drawings that I read were -- and

7  the -- I'm sorry -- the charged stories that I read and the

8  drawings were presented in hard copy, I believe, although the

9  drawings may have been on the computer.  The FBI investigators

10 said we've got, I believe, thousands of other stories; but as

11 they showed them to me, they were all just, you know, files on

12 a computer screen.

13 Q.   And since the government has put together a reconstruction

14 of the Web site, have you had the opportunity to view that?

15 A.   No, sir.

16 Q.   Has that only been in the past few weeks that that's been

17 made available to the defense?

18 A.   I'm unaware of that.

19 Q.   Okay.  One of the questions that you were asked regards

20 each work as standing alone.  Does your opinion as to its

21 potential range of values change if you consider the works

22 standing alone or in terms of its greater context?

23 A.   Yes, the -- my opinion of how valuable they would be

24 scientifically would be impacted by how they were presented or

25 categorized.

David Ley - Redirect Examination - January 19, 2021

1  Q.   Okay.  And specifically regarding the work, training, and

2  experience that you've listed in your curriculum vitae, is

3  there other work, training, and experience you have that would

4  inform your judgment as to potential value for these works

5  beyond what is listed in there?

6  A.   Yes, I confess that I do a lot of media, I do a lot of

7  presentations, I do a lot of training particularly to sex

8  therapists that I just haven't put in my curriculum vitae

9  because it's hard to keep up.

10 Q.   What about your individual treatment of patients?

11 A.   Very much so, yeah.  I mean, I've been treating

12 individuals dealing with, you know, sexual attraction to

13 children, history of sex offending, sexual behavior problems

14 since roughly 1995.

15 Q.   And with regard to the specific material at issue in this

16 case, would you say this is a common type of case or is this

17 case somewhat unique?

18 A.   This is quite a unique case.  I'm not aware of any

19 obscenity cases filed against text materials since the *Ashcroft*

20 2003, 2004 case.

21 Q.   Okay.  And one of the questions that you received on

22 cross-examination relates to your use of the word "may."

23 Whenever you use "may" or whenever you reach a conclusion that

24 is qualified with "may," are you opining to a reasonable degree

25 of psychological and therapeutic certainty?

1  A.   Yes, and I'm trying to reflect the fact that psychological

2  science is inherently somewhat relative because humans are

3  quite individual.

4  Q.   Okay.  And is that the same degree of certainty that you

5  would rely on in making clinical or therapeutic decisions were

6  you treating a patient?

7  A.   Yes, quite well said, yes.

8  Q.   And is that generally considered reliable in the fields of

9  clinical psychology and sex therapy?

10  A.   Not only considered reliable, it's highly required and

11  recommended.  As I mentioned, it's a component of the

12  psychologist code of ethics to always indicate the limitations

13  of our opinions.

14  Q.   Now, the government has designated in response to a bill

15  of particulars approximately 35 additional stories that they

16  believe show the appropriate context of the Web site.  We've

17  made a request that you be available to review those stories.

18  If the Court grants that, are you available to review all 35 of

19  those stories?

20  A.   I can certainly do my best.

21  Q.   Okay.  And do you think that that would give you a greater

22  context for understanding the potential value that these

23  stories may have?

24  A.   I think it grants an incremental increase.  My

25  understanding is that the Web site itself held thousands of

1  stories.  It -- sorry to be a psychologist for a minute, but it
2  raises questions to me as to the mind of the person choosing
3  those stories versus the thousands of others.
4  Q.   And do you think that your technical or specialized
5  knowledge as a licensed clinical psychologist and as a licensed
6  sex therapist, do you believe that skill and knowledge that you
7  possess would assist the jury in determining the fact of
8  consequence in this case specifically whether the challenged
9  works have any artistic, scientific, literary, or political
10 value?
11 A.   Yes, it would.  I mean, I am trained and experienced about
12 talking about sexuality and reducing shame and stigma around it
13 in a society where we're taught not to talk about sex.  It
14 makes it difficult to separate our emotional arousal to the
15 material from a rational evaluation of it.
16 Q.   So even if your ultimate opinion isn't to do the jury's
17 job for them and say definitively these works do have this
18 particular type of value or do not have this particular type of
19 value, do you believe that your testimony could assist the jury
20 in learning of the universe or the range of potential types of
21 artistic, literary, scientific, or political value that these
22 works could have?
23 A.   In such settings, I think my job is always to help the
24 fact finders make the decision with the most access to
25 information possible.

David Ley - Examination by the Court - January 19, 2021

1   Q.   And the information that you could give them, could that

2   be done to a reasonable degree of psychological or therapeutic

3   certainty?

4   A.   Yes, sir.

5             MR. HAYGOOD:  Pass the witness, Judge.

6             THE COURT:  Mr. Berry?

7             MR. BERRY:  No further questions, Your Honor.  We'll

8   be happy to argue at the appropriate time.

9             THE COURT:  I have a few questions.

10                   **EXAMINATION BY THE COURT**

11  BY THE COURT:

12  Q.   So, Dr. Ley --

13  A.   Yes, sir.

14  Q.   -- so do all stories and drawings have literary value?

15  A.   You know, I've wrestled with that question, Your Honor,

16  and I really wondered about that.  As a student of the human

17  mind, stories and drawings are a production of the secret

18  thoughts that are in the minds of people around us that we

19  don't get to see because they're inside the mind.

20             As a psychologist, as a scientist, stories and

21  drawings, fiction, even film is a depiction of what is inside

22  the mind of this other person.  And as a psychologist and a

23  scientist, it holds tremendous value to me because it helps me

24  to understand that person more.

25  Q.   So yes.

David Ley - Examination by the Court - January 19, 2021

1  A.   So yes.

2  Q.   Does every story or drawing have artistic value?

3  A.   Yes.  You know, counsel pointed out that my drawings in

4  that book were two dimensional.  Petroglyphs are very, very

5  primitive drawings because they were drawn by primitive people.

6  Do they hold value -- artistic value compared to a van Gogh?

7  They do.  And we have to evaluate -- if van Gogh had produced

8  two dimensional, you know, stick figure drawings, nobody would

9  view them as valuable.  But within the context of, you know, a

10 primitive tribe carving into rocks, those drawings hold

11 significant value.

12 Q.   What about political value, drawings -- all drawings and

13 all stories?

14 A.   At a broad level, I would say, yes, sir, although there

15 I'm using politics as a stand-in for social context.  The --

16 you know, the political cartoons in Hustler magazine held

17 political value because they were poking fun at politicians.

18 Q.   Well, but my question is:  Do all drawings and writings

19 have political value?

20 A.   I would say that's a bit of a stretch.

21 Q.   Have you ever written or lectured on the serious literary

22 value of stories or drawings depicting children engaging in

23 sexually explicit conduct?

24 A.   Let me see.  Yes, to a degree because I have lectured and

25 trained people on -- for instance, the -- Anaïs Nin was a

1  writer of erotica in the 1940s and '50s.  She was a paramour of

2  the author of *Tropic of Cancer*.  Her literature includes

3  stories of sex with children.  And I have lectured and talked

4  about the complexity of understanding those stories as they

5  were written 60 or 70 years ago in today's time.

6        Many of our patients, for instance, when we -- when

7  therapists recommending reading erotica literature, I often

8  encourage therapists to prepare the patient for encountering

9  materials such as that involving children because it has a

10 different emotional impact today than it did back then.

11 Q.   So how do you determine if something does not have

12 literary value?  How do you determine that?  What is the

13 decision point on deciding this story or this drawing did not

14 have literary value or artistic value?

15       I mean, if everything -- you just spoke a moment ago,

16 everything seems to have some literary value, and probably I

17 think your answer was, yes, everything has some artistic value,

18 I guess maybe eye of the beholder, but what would your thought

19 be on that?

20 A.   You know, I'm stronger in saying that all such material

21 has some scientific value, okay?  When it comes to literary

22 value, though, I think, we do really need to look at, for

23 instance, is it original or is it simply derivative, is it

24 simply copying ideas that have been put forth by other people.

25       The book *120 Days of Sodom* was written by Marquis de

David Ley - Recross-Examination - January 19, 2021

1  Sade when he was in prison in Bastille in 1785, and a couple of

2  years ago it was sold at auction in 2017 to the National Museum

3  of France, who identified it as a national treasure.  This is a

4  material that includes graphic, horrific, sadistic, murder,

5  rape of children and innocence.

6       But at the time it was original.  At the time it was

7  a challenge -- a literary challenge to the erotic suppression

8  and morality of the day.  If that work was published today --

9  and it's still available in libraries today because it holds

10  scientific value -- or it holds literary value as being

11  original and written by a very notable figure.

12       The stories on this Web site, I would say they hold

13  less literary value than that work because they don't appear to

14  be particularly original, they're not written by a notable

15  figure, and they're written in a very different social context

16  where that material is not particularly unique.

17       THE COURT:  Any questions y'all want to ask from

18  mine?

19       MR. HAYGOOD:  I don't have any follow-up.

20       THE COURT:  Mr. Berry, follow-up?

21       MR. BERRY:  A brief follow-up on one of the Court's

22  questions.

23                    **RECROSS-EXAMINATION**

24  BY MR. BERRY:

25  Q.   Dr. Ley, Judge Counts was asking you if you've ever

David Ley - Recross-Examination - January 19, 2021

1  written or lectured about this child sex story and drawing

2  stuff; and you said that you had lectured on something to do

3  with this; correct?

4  A.   Yes, sir.

5  Q.   Okay.  Can you show me where in Defendant's Exhibits 1 or

6  2 you cited that at all?

7           THE COURT:  Do you need to see the exhibits?

8           THE WITNESS:  If you don't mind, yes, to see what's

9  on there.

10  A.   And many of these trainings are eight hours long and

11  include trainings about, you know, a wide variety of materials.

12  Let me see.  Oh, for instance, I mean, I talked about some of

13  those issues in a keynote that I gave at the continuum

14  conference in Canada because there were a number of issues and

15  questions that came up around adolescents accessing materials

16  with child sexuality.  Integrating porn and love, similar kind

17  of questions and issues came up there at the October 2016

18  modern sexual diversity.  We talked about that --

19  Q.   (BY MR. BERRY)  Just to be clear, the Judge's question was

20  about when you've written or lectured on stories such as these

21  related to the sexual abuse of children, stories, fictional

22  stories and drawings depicting the sexual abuse of children and

23  sexually explicit contact or stories about the rape and torture

24  of infants and toddlers.  Have you lectured on that?

25  A.   Questions and issues around them have come up in lectures

Ann M. Record, RMR, CRR, CMRS, CRI

1 that I have presented, yes, sir.

2 Q.   Okay.  So you give a keynote, you give some presentation,

3 and somebody asks a question in the audience?

4 A.   Yes, that's one.  However, again, I mean, I think I would

5 say in the -- the keynote, Responsible use of pornography in

6 adolescence.  As I recall, I specifically talked about is there

7 a difference between watching visual violent pornography versus

8 reading stories of it.  And there isn't a clear answer to that

9 because it varies by the adolescent in that case.

10 Q.   So just to be clear, once again, an equivocation, correct,

11 you don't actually have an opinion about those two items,

12 right, violent visual versus violent writings; correct?

13 A.   I have an opinion that it is a psychological question.

14 Q.   Okay.  And then more importantly, it had nothing to do

15 with child sex stories.  You were talking about violence

16 generally and violence visually and written; correct?

17 A.   No, sir, I was using a broad kind of concept and I include

18 violence.  Sexual abuse of children is a violent act.

19 Q.   And you didn't cite that or refer that in any way in the

20 17-page report in this case; correct?

21 A.   Not true, sir.  Actually, when I -- I think in the first

22 page of the report when I mentioned that I trained therapists

23 on how to ethically and effectively address a wide range of

24 sexual issues, I was including that in there.

25 Q.   A wide range of sexual issues.

David Ley - Further Redirect Examination - January 19, 2021

1 A.   Yes, sir.

2          MR. BERRY:  Nothing further, Your Honor.

3          THE COURT:  Mr. Haygood.

4          MR. HAYGOOD:  Yes, Your Honor, I do have some

5 follow-up to that.

6                **FURTHER REDIRECT EXAMINATION**

7 BY MR. HAYGOOD:

8 Q.   Dr. Ley, how common is it in your field to cite your own

9 work?

10 A.   It is somewhat frowned upon, in fact.  I mean, I -- when

11 people -- as a reviewer for various journals, you can usually

12 figure out who an author is if -- even in a blind review if

13 they cite themself a whole lot.  So, in fact, generally, people

14 are encouraged to cite a lot of other material so that it's not

15 just their pet theory.

16 Q.   Okay.  And did that sort of background go into your choice

17 of which works to cite in your report?

18 A.   Yes, sir, and I was actually really, really careful and

19 thoughtful here to present references from lots of other folks,

20 including clinicians and researchers who disagreed with me, to

21 show that my opinions were taking into consideration the entire

22 breadth of the scientific and academic literature.

23 Q.   And was that done with an eye looking towards the decision

24 that the Court will have to make as a gatekeeper to show that

25 the theories you're advancing are generally accepted within the

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  relevant scientific community and not just your own pet
 2  theories?
 3  A.   Yes, sir, very much so.
 4           MR. HAYGOOD:  Pass the witness, Judge.
 5           MR. BERRY:  Nothing further, Your Honor.
 6           THE COURT:  All right.  You may step down.  Thank you
 7  so much.
 8           THE WITNESS:  Thank you, sir.
 9           THE COURT:  Carry these exhibits back.
10           THE WITNESS:  Yes, sir, my pleasure.
11           THE COURT:  Thank you very much.
12           MR. BERRY:  Your Honor, could I offer Government's
13  Exhibit 1, which is the cover of his book?
14           THE COURT:  Yes, sir.
15           Any objection?
16           MR. HAYGOOD:  No objection, Judge.
17           THE COURT:  Okay.  Government's Exhibit 1 is admitted
18  without objection.
19           Argument, please.  Briefly.
20           MR. BERRY:  Yes.  Since it's my motion, I'll take it,
21  Judge.
22           THE COURT:  Thank you.
23           MR. BERRY:  As the Court is well aware, the standard
24  under 702 is that the witness must be qualified by knowledge,
25  skill, experience, training, or education.  And if they're

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  qualified, then they can give an opinion that will help the

2  trier of fact understand the evidence or determine a fact in

3  issue.  There are a couple of other things, and I will get to

4  them.

5           I think first and foremost it is crystal clear that

6  this witness has absolutely zero qualifications when it comes

7  to literature and art, and they haven't even referenced

8  politics except in Mr. Haygood's questioning.  But the report

9  doesn't reference any kind of expertise in politics at all.

10          To the extent that there is any qualifications

11  regarding science in the social science of psychology, the

12  knowledge that he's trying to convey to the jury will not help

13  the jury at all because he said "may" 45 times.  He equivocated

14  so much that there is nothing that will assist the jury here

15  because I'm going to do the same thing with him there, say, May

16  or it may not.  May or it may not.  There is absolutely nothing

17  that he says that is even remotely helpful to the jury.

18          The next thing under 702 is the testimony has to be

19  based on sufficient facts or data.  His report says that he

20  only reviewed the five stores and three drawings and a couple

21  that were written by Mr. Arthur himself and didn't do so in the

22  context of the Web site which he finds to be super important to

23  assessing the value.

24          And as you heard my questioning of Dr. Ley, the

25  relative value of the story changes so dramatically from one

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  context to another that it seems what he's actually doing was

2  evaluating how it helps him as a psychologist in treating a

3  person to know what they read, when they read it, what their

4  choices were, that sort of thing.  But the question is:  Does

5  this story have value?  And he can't seem to pass judgment on

6  that.  He can't seem to give a clear answer as to what he

7  thinks about that.

8          And then in response to your questions, it made it

9  clear that everything has value.  Nothing -- I think the only

10 thing I even deigned to say didn't have value was something to

11 do with politics.  He said maybe that doesn't.

12          THE COURT:  Well, that's because I suggested it,

13 actually.

14          MR. BERRY:  Well, to the extent that you led him,

15 then I won't object; and I think that that is, you know,

16 completely fair.  He says, Okay.  Well, that.  But everything

17 else has value.  And the bottom line is under 702, he's not

18 qualified to talk about literature and art or politics and to

19 the extent he's even remotely qualified on the social science

20 of psychology, and I give him credit to the extent that he's

21 qualified by training and experience in psychology generally.

22          But he doesn't have any research in this area of

23 child sex stories or drawings.  He's done no publications on

24 that.  He's done no presentations on that.  He struggled with

25 the last answer there about, Well, I was at some conference in

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   Canada, and it sort of came up somewhere and sort of briefly

2   mentioned it.  This is not the expertise that 702 requires for

3   him to be able to give his opinion to the jury if it will

4   actually help them.  And for those reasons, Your Honor, the

5   United States asks that Dr. Ley's testimony be excluded

6   altogether.

7            THE COURT:  Thank you.

8            Mr. Haygood.

9            MR. HAYGOOD:  Thank you, Your Honor.

10            Your Honor, I believe it's important for us to

11   remember what the specific fact issue regarding value is and

12   who bears the burden on that.  The question under *Miller v.*

13   *California* is whether the work taken as a whole lacks

14   scientific, artistic, literary, political or other value;

15   therefore, it is a fact issue on which the government bears the

16   burden of proof.  They must prove beyond a reasonable doubt

17   that the challenge work lacks the *Miller* value.  And I'm going

18   to use *Miller* value as a shorthand for all the different types

19   there.

20            When Dr. Ley testifies that certain works may have a

21   certain type of value, may is equivalent to it does not lack

22   that type of value; therefore, Dr. Ley can assist the jury in

23   understanding whether these works could possess certain types

24   of *Miller* value.

25            His testimony is not to invade the province of the

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   jury, not to tell the jury for sure this work does contain this

2   type of value, but to educating our 12 jurors who are not

3   therapists of sex or who are not clinical psychologists as to

4   the type of value this work may have that the jurors have never

5   encountered within their own common experience.  That is the

6   very basis of Rule 702 expert testimony is that the proffered

7   expert has some additional information by virtue of their

8   training and experience that will assist the jury in

9   determining something.

10           The Supreme Court in *Kaplan v. California*, 413 U.S.

11   115 from 1973 said that the defendant should be free to

12   introduce appropriate expert testimony in obscenity cases.  In

13   his concurrence in *Smith v. California* 361 U.S. 147,

14   Justice Harlen said that the community cannot, where liberty of

15   speech and the press is at issue, condemn that which it

16   generally tolerates.

17           I will take it as a probable fact that every member

18   of our jury is not an historian of erotic art or historian of

19   erotic literature.  They may have never walked into that

20   section of the library before.  They may not know that you can

21   walk into the Reeves County library and pick up a copy of the

22   Marquis de Sade's 120 Days of Sodom or Vladimir Nabokov's

23   Lolita, which contains descriptions that might very well be

24   equivalent to the challenge material that the government is

25   putting out today.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          So looking at the Daubert factors, will Dr. Ley's

2    testimony assist the jury in understanding the evidence or

3    determining a fact in issue?  Yes.  Dr. Ley can put the stories

4    in context and aid the jury in determining whether they possess

5    *Miller* value because he can talk about their scientific

6    facility to clinical or treating psychologists.

7          As someone who is familiar with erotic literature and

8    art as he testified that he uses in his clinical practice, he

9    can talk about whether those types of things have an artistic

10   or literary value, again, as he discussed with the Court the

11   facts of the 120 Days of Sodom in the Marquis de Sade.  He's

12   conversant with those types of literature.  He's conversant

13   with the types of art that may be relevant in this case such as

14   the Japanese style drawings.  He can talk to the jury about

15   those things and help them in determining, like I said during

16   my questioning, the universe or the range of potential values

17   that might apply.

18          The second Daubert fact:  Is his testimony relevant

19   and reliable?  Answer:  Yes.  Dr. Ley is an educated, trained,

20   credentialed professional who is capable of discussing the

21   current state of scientific theory and knowledge in his field.

22          As you heard from his testimony, he is very

23   conversant in that, very capable of responding to questions

24   from the Court, to cross-examination, or questions from defense

25   counsel that would assist the jury in determining what value

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  there might be in terms of clinical psychology for stories or

2  drawings like these or sex therapy because the ultimate purpose

3  of the Daubert methodology is to keep out junk science.  And

4  one of the examples used in the Kumho Tire case was necromancy

5  or astrology from being presented to the jury as a way of

6  determining these very important issues.

7           To the extent that Dr. Ley is going to be testifying,

8  he'll be testifying as to generally accepted or commonplace

9  theories regarding psychology of sexuality, his methodology,

10 and that meets this portion of the Daubert test.

11          Finally, the last thing the Court has to decide is

12 whether Dr. Ley's methodology or technique fits the

13 conclusions.  And, again, here, I think this is very important

14 to stress.  His role is not meant to usurp the jury's

15 determination.  Dr. Ley is not going to be asked point blank:

16 Do you find value in these stories?  Because doing so invades

17 the province of the jury for the *Miller* test.

18          As the Court is aware from Paris Adult Theaters,

19 number one, the government is under no obligation to provide

20 any expert testimony.  The jury can determine whether or not

21 something is obscene.  And in doing so, however, I believe it

22 is important for the jury to have a knowledge of broader

23 context in order to determine whether erotic stories or erotic

24 art can have a potential value that the jury might be otherwise

25 unaware of.  That's the purpose of expert testimony, to educate

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 83 of 226

83

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  the jury about things that are so far outside of common

 2  experience that it requires specialized knowledge and testimony

 3  to do so.

 4        And in that regard, who better to educate the jury

 5  about the range of human sexuality or the potential uses for

 6  erotic art or erotic stories than a treating clinical

 7  psychologist and sex therapist who uses that in his own

 8  practice who is familiar with the academic literature

 9  surrounding it and who is familiar with the scientific

10  research.

11        Finally, the final Daubert factor is -- all relate to

12  procedural questions such as whether Dr. Ley's testimony would

13  create a risk of unfair prejudice or confuse the issues or take

14  an inordinate amount of time.  I believe we've established that

15  it's not going to take an inordinate amount of time.  I don't

16  believe that it will confuse any of the issues.  Certainly I

17  haven't heard any argument from the government as to how it

18  would confuse the issues or how there could be some risk of

19  unfair prejudice to the government by permitting Dr. Ley to

20  testify.

21        With that, I would ask the Court to overrule the

22  government's Daubert challenge to Dr. Ley, to admit him as an

23  expert, and to permit him to testify in front of the jury.

24  Thank you.

25        THE COURT:  Thank you, Mr. Haygood.  It's good to

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    have you back in court, Mr. Haygood.

2              MR. HAYGOOD:  Absolutely.

3              THE COURT:  It's been a long time.

4              The Court -- I have no question other than that

5    Dr. Ley would merely confuse the jury in an area I don't think

6    they need help with.  I don't see what the assist would be or

7    the assistance that he would provide would be.  I think we sell

8    a juror and common knowledge short.  I do believe that most

9    people, whether they're lawyers or driving a truck or

10   plumbing -- making real money, you know, plumbing or doing

11   electrical work, understands that some of erotica and sexually

12   explicit conduct, stories and photos are considered literature

13   and that they reside in our local bookstores, what are left of

14   them, and as well as libraries.

15             I think the first question -- and I go back to *Kaplan*

16   *vs. California* as well which is quoting *U.S. v. Ragsdale*, a

17   Fifth Circuit case in 2005 would basically -- my paraphrase is

18   that pornography can and does speak for itself or obscenity can

19   and does speak for itself.

20             I don't see what in reviewing -- and we've had a

21   lengthy hearing.  We've had great questions from both attorneys

22   a few lame ones from the judge, but at the same time when the

23   answer is, "Everything has value," I have a hard time

24   understanding how his testimony presents any value to that

25   jury.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          Whether his opinion would assist the trier of fact in

2   understanding the evidence or in determining a fact in issue,

3   Mr. Haygood, you and I disagree.  I have a resounding no when I

4   answer that.  I don't have any question that he doesn't add.

5   He's got interesting material.  It would be an interesting

6   class to audit or to take.  I would enjoy that as a challenge,

7   but I don't see how he's going to assist the trier of fact in

8   the determination they have to make as to this obscenity trial,

9   whether the testimony is relevant and reliable, I don't find

10  his testimony sufficiently reliable.  I just don't.

11          Because as Mr. Berry I think pretty astutely

12  exhibited, you know, we're not telling the jury it could.

13  We're not telling them anything.  We're not telling them -- and

14  I know he's not going to invade the province of the jury.  We

15  do everything we can not to, but what's he doing which is any

16  more effective than a criminal defense attorney cross-examining

17  the government's witnesses in saying, Well, couldn't it be?

18  Well, no, it couldn't be.  Whatever it is.  Whatever the stated

19  testimony is, casting doubt upon in some way.  And frankly, it

20  sounds like no matter what the question is, Dr. Ley has his

21  opinion which I don't find to be effective or compelling.  It

22  doesn't compel me that it's going to have an assist -- an

23  assistance -- an impact of assistance on the trier of fact.

24          The methodology used, I find it to be wholly

25  unreliable based upon the testimony I've heard and the

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 86 of 226

86

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    arguments even.  And then if I come down to -- I talked about

2    value a moment ago, whether the probative value, whatever it

3    may be, is substantially outweighed by the risk of unfair

4    prejudice, confusion of issues or undue consumption of time.

5           I'm not worried about the time.  That's why we've

6    taken time while the jury has been assembled for a few hours

7    here to go through this.  I'm not worried about how much time

8    it would take.  I would spend -- we'll spend into next week if

9    we have to for this trial.

10          The risk of unfair prejudice and especially the

11   confusion of the issues is overwhelming to me, and so any

12   probative value, were the Court to find any, is certainly

13   substantially outweighed by the risk of confusion of the

14   issues, and I would also state I believe it's outweighed by the

15   risk of unfair prejudice as well.

16          The jury can make this decision without this expert's

17   testimony or opinion and -- well, I'll leave it at that.  And

18   so I exclude -- I rule that Dr. Ley's testimony for this trial

19   is excluded and there won't be any need for him to review the

20   35 exhibits as well that we've discussed.

21          There was another -- with all due respect, of course,

22   to Dr. Ley.

23          Yes, sir.  Did you have something?

24          MR. BERRY:  I was just going to say:  I believe, Your

25   Honor, that that will moot the comparable materials issue.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  I was about to get to the comparable

2   materials.

3          Mr. Haygood, do you agree?

4          MR. HAYGOOD:  I don't agree, Your Honor.  I think as

5   a consulting expert, he still has some value to us even if he's

6   not going to testify.  So we would ask that he be allowed to

7   review them as a consulting expert only.

8          (Sotto voce discussion)

9          MR. HAYGOOD:  As well as not only the comparable

10  materials, but I believe it's Government's Exhibit 24 which is

11  the reconstruction of the Web site.

12          THE COURT:  Okay.

13          Mr. Berry, your response to that.

14          MR. BERRY:  If they want to keep him as a consulting

15  expert, we will certainly make that evidence available to him.

16  It should not change the issue about whether he comes in to

17  testify or not for sure.  And then, again, it's still getting

18  to the comparable materials issue moots whether that comes in

19  because they now no longer have a witness to put it in.

20          THE COURT:  The Court's had the, quote/unquote,

21  comparable materials since about eight o'clock this morning.

22  And we've reviewed those -- each item.  As you-all know, it's a

23  two-prong test.  The first test, there must be some reasonable

24  resemblance between the proffered comparable material and the

25  allegedly obscene materials.  The Court, first of all, doesn't

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  find that the first prong is met.  I can give you -- and I can

2  give you -- and I'll enter an order to that as well.

3        But secondly, I think there has to be some reasonable

4  degree of community acceptance that's established of the

5  proffered comparable material.  That might be easier to

6  establish.  I'm not convinced that the -- that there is a

7  reasonable resemblance.  Just as an example, we've got some

8  depictions of adults.  We've got depictions of super heroes,

9  more adults.  I mean, it's just men and women -- not just

10 women, but men and women.  And then we have excerpts from some

11 writings as well.

12        And so as far as consulting, that's up to the defense

13 as to whether you keep him.  And the government, of course, has

14 said they would make available whatever they have for Dr. Ley

15 however he may be able to assist the defense.

16        Certainly without more and without some different

17 testimony or input the Court is going to exclude Dr. Ley's

18 testimony as an expert.

19        There was a -- I think -- wasn't there one other

20 Motion in Limine that the Court hasn't ruled on, Ale?

21        LAW CLERK:  Just the comparable material.

22        THE COURT:  That was it?

23        LAW CLERK:  Yes.

24        THE COURT:  Okay.

25        All right.  Mr. Berry, anything further you want to

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   take up in this final pretrial conference?

2          MR. BERRY:  No, sir.

3          THE COURT:  Mr. Haygood?

4          MR. HAYGOOD:  No, sir.

5          THE COURT:  And poor Mr. Bennett asked me if he could

6   go use the restroom two hours ago.  I'm sorry.  I needed to go

7   too.  I thought I should have taken it.  But we're going to

8   take it now.  But what I would like all of you to do is when

9   we're done -- when you're done with your restroom break, come

10  through the judicial chambers and enter the courtroom through

11  that chambers door over here on this end because I don't want

12  you to have to traipse through -- just, you know, I don't want

13  anybody to feel uncomfortable, including you, going through.

14  So if you-all would go ahead and set up in the next ten minutes

15  or so.  Let's take ten minutes to do that.

16          MR. BENNETT:  Your Honor.

17          THE COURT:  Yes, sir, Mr. Bennett.

18          MR. BENNETT:  We might want to confer with our client

19  in light of the new posture of the case.  Dr. Ley was, as the

20  Court knows from our witness list, our entire case.  Just if we

21  could have a couple of extra minutes to talk with him and make

22  sure nothing changes.

23          THE COURT:  Sure.  Let's take 15.  That will put us

24  at -- I tell you what.  Let's start at five till.  I'll give

25  you like 18.  We'll start at five till 2:00 with jury selection

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  unless I'm advised otherwise.

2          All right.  We'll take a break.

3          (Recess from 1:38 p.m. to 1:59 p.m.)

4                    **VOIR DIRE PROCEEDINGS**

5          THE COURT:  Thank you.  Be seated.

6          Good afternoon, and welcome to all of you.  I'm sorry

7  you've had to wait a little while.  We've been doing some stuff

8  to try to help not to take as long during this trial all

9  together, and so I wanted you to be comfortable while we were

10 doing that.  And I apologize for any delay -- any delay was my

11 fault entirely.

12         It's great to see all of you here, and it's a little

13 cool in here.  We'll get the air conditioning cranked up

14 probably, if I say cranked up.

15         I'm David Counts.  I'm your United States District

16 Judge for the Pecos Division as well the Midland/Odessa

17 Division next door.  How many have you been here before for

18 jury selection some time ago?  Some of you?  Very nice.  Okay.

19 A lot of you.  And over the years, and it's probably been a

20 while since you've done that.

21         We're here to select a jury in a criminal case.  As

22 you know, the Pecos Division -- many of you know -- if you

23 don't know, you get to learn that the Pecos Division is one of

24 the seven divisions in the Western District of Texas.  We have

25 Waco, Austin, San Antonio, Del Rio, as well as El Paso, and

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  then Pecos and Midland/Odessa next door.  And so I always tell

2  people these are the two best ones because they're the ones I

3  preside in.  The rest of them aren't that good.

4         (Laughter)

5         THE COURT:  But I have good friends that work in

6  those, and I used to work in some of them as well.

7         I can tell you that the Pecos Division, if you're

8  wondering, is made up of Brewster County, Culberson, Jeff

9  Davis, Loving, Pecos, Presidio, Reeves, Ward, and Winkler

10 Counties, and actually Hudspeth as well.  But by some agreement

11 by judges about 17, coming up on 18 years ago now Hudspeth,

12 since it's in a different time zone, goes to El Paso by

13 statute.

14        Each of you as a prospective juror is being asked to

15 exercise a fundamental right of American citizenship, and that

16 is to participate directly in the fair and just administration

17 of government under law.  Jury service is one of the highest

18 duties of citizenship along with, of course, military duty and

19 voting.  And I want to take this opportunity to thank you all

20 for stepping up and doing what I think is one of the three most

21 important things that we all can do as citizens.  Some of you

22 have served in the military.  I hope all of you vote, but I

23 thank you today for serving on our jury duty.

24        The United States Constitution mandates that

25 defendants in criminal cases receive a fair trial through an

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  impartial jury of their peers.  To obtain such a jury, persons
2  are called from throughout the division in that particular
3  district throughout those counties that I've mentioned, and
4  people are selected at random to assure they represent a cross
5  section of people, and it's that random selection process
6  that's brought you here today.

7              And, again, I thank you for that.  And it's one of
8  the most important things, of course.  Like I say, you can
9  do -- and it's especially important to keeping our nation's
10  judicial system running.

11             As part of this important process, I'm going to ask
12  you some questions.  Various questions will be posed to you.
13  It may be things to check and see if there is anything in your
14  background or experience that might prevent you from taking the
15  juror's oath in good faith.  And so you might ask, Well, what
16  is the juror's oath?  What do I have to swear to do?  I know
17  you've already been sworn once.

18             But the juror's oath actually requires that you
19  evaluate the facts and the evidence in the case and follow the
20  law.  It's really that simple.  I wrote it down because I can't
21  believe it is that simple.  It requires you to do those few
22  things: evaluate the facts and the evidence in the case and
23  follow the law.

24             Each party is entitled to jurors who approach the
25  case with open minds and who agree beforehand to keep their

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  minds open until the evidence is presented.  Jurors must be as

2  free as humanly possible from bias, prejudice, or sympathy and

3  must be influenced by pre- -- not be influenced by preconceived

4  ideas, either as to the facts or the law.

5          When I'm asking you questions, I don't mean to pry or

6  embarrass anyone.  I'm the last person in here that wants to be

7  embarrassed, and so I will never embarrass you.  If there is a

8  question that you would rather speak to me privately about

9  or -- to me and the lawyers, of course, then just say, you

10  know, I would rather speak about that privately, and we'll make

11  sure that we get that done.

12          You might have noticed our plastic.  It may be a

13  little different than the last time you were here if you've

14  been here, and it's certainly not -- it doesn't look like

15  anything I can remember in my career ever.  But because of the

16  pandemic, we have followed CDC guidelines.  You may have

17  noticed the temperature kiosk downstairs.  I hope you noticed

18  it.  It's sort of like a wellness check free of charge and as

19  well as, of course, the hand sanitation stations.  We even have

20  one back there.  And then I've got the largest one I've ever

21  seen.  They must think my hands are really dirty but -- and I

22  keep it back there so I don't ever use it.  So I guess I ought

23  to put it up here.

24          We got that.  We've got the social distancing.  And

25  when we're not distanced, we have face coverings unless we're

1   speaking in court.  You'll notice the attorneys and witnesses

2   during the trial, when they're speaking, they will remove their

3   face coverings as well.  I'll allow them to do that.  And then

4   the rest of the time we'll keep those on.  And then I call it

5   plastic ranch.  It just looks so plasticity in here.  And you

6   can sort of see back through there.  But we want to keep

7   distance, but we can put people closer together with the

8   plastic.  So we're happy to do that.

9           We've tried now well over a dozen trials since I

10  think early to mid-September.  We never closed down because of

11  the pandemic.  We kept going.  We did some Zoom stuff.  We did

12  some in-person hearings.  We did abate our jury trials for

13  several months, four or five months.  While we did that, we

14  were figuring out how to best serve and how to best make these

15  jury trials happen, sometimes -- a lot of times with tape

16  measures trying to make sure we do everything right.

17          I got to looking around and I noticed here and Alpine

18  and Midland, I could go to the store with a face covering --

19  whether the hardware store, grocery store, or whatever it may

20  be -- and I know that we can and do take better care of your

21  health than even they do, and they're trying to keep their

22  businesses running.  I understand.  They're doing a great job.

23          But I know that we are being safe as well.  And the

24  first and foremost thing is your safety -- your health and

25  safety, and we want to keep, of course, you know, justice

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   going.  So we want to keep doing this.  So your safety is

2   critical in that.

3          So I hope you feel comfortable.  We've not had anyone

4   yet that didn't feel comfortable.  But if you do feel

5   uncomfortable, we'll talk about it after we talk here today.

6   And if you would rather serve at a later time, we can discuss

7   that as opposed to serving now.

8          I want to introduce some people to you.  Of course,

9   you've met the wonderful people from the district clerk's

10  office who have helped you thus far.

11         I also have Ms. Cristina Lerma is my courtroom deputy

12  district clerk.  She did grow up here in Pecos.  Some people

13  usually know her, and they have good stories about her as a

14  child.

15         And then Ms. Ann Record is our court reporter.  She's

16  the most important person in any court proceeding, typically a

17  trial.  And her name is Record and she's making a record of the

18  case and she's never been teased about that I'm sure.

19         Ms. Alejandra Salas is my law clerk -- she's one of

20  my law clerks, and she's assigned to this case as well.  And so

21  she'll be sort of the brains of the operation.

22         And you know -- I've told you my name is David

23  Counts.  I'm your district judge.

24         We're now going to select a jury in a case that's

25  styled United States of America vs. Thomas Alan Arthur.  This

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 96 of 226

96

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  is called jury selection, or voir dire.  You'll hear it
 2  sometimes on television as voir dire, and we call it voir dire
 3  in Texas.  So that's what this is.  It's imperative that all of
 4  you listen carefully to the questions I ask because any of you
 5  may be chosen to serve as a juror in this case.  You may think,
 6  They're never going to pick me.  Well, we don't actually pick
 7  juries.  It's not like when you're a kid and you play kickball
 8  at the playground or softball or something like that -- or
 9  maybe dodgeball.  I didn't play much of that -- but where they
10  picked up teams, chose up teams.

11          In jury selection, each side is given a statutorily
12  imposed number of strikes.  So they don't get to say, Well, I
13  want Juror No. 13.  They get to say, Well, I don't want him for
14  this particular case.  I don't think maybe he's the best person
15  for this particular trial.  And so they would do that and they
16  get their number.  And once their strikes are done, we take the
17  first 12 that aren't struck, or stricken, and then the next two
18  that we identify are alternates.  So we'll end up with 14 of
19  you as our jury, 12 serving, unless for any reason -- and if
20  for some reason one of those 12 can't finish, then one or both
21  of the alternates will step up.

22          During the voir dire process, I'm going to ask you a
23  series of yes-or-no questions most of the time, and you'll just
24  raise your hand if it's yes or no, whatever the answer is.
25  Again, if you feel like you need to speak privately, that's --

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 97 of 226

97

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   just say, I would rather speak privately about this.  But then

2   I'm going to sometimes follow back up.

3        When I call on you, for example, since I'm picking on

4   you, sir, if I may.  So Juror 13, if it's him, if I call him,

5   you'll stand up, remove your face covering just for the moment

6   that you're going to speak and state, I'm Juror No. 13,

7   whatever your number is, not by name because that gets too

8   cumbersome, actually.  And we can do it by number.  And then

9   I'll ask you -- I'll follow up with that or ask you what your

10  answer might be.  Those are for follow-up questions.

11       I want to make sure you understand what I tell you is

12  not evidence.  What the lawyers tell you is not evidence.  That

13  goes for today.  It goes through the whole trial.  The only

14  evidence you get in a jury trial is the sworn testimony of the

15  witnesses who take the stand.  This is our stand over here, our

16  witness stand.  It's got the Plexiglass.  And you'll see people

17  that when they get there and sit down, I'm going to ask them if

18  they're comfortable to take off their face covering and speak.

19  Everything is amplified, of course.

20       So everything you get in a jury trial comes from the

21  witness stand, from the testimony of the witnesses who take

22  that stand and take the oath, any exhibits that are admitted

23  during the course of the trial, any stipulations -- and those

24  are agreements by the parties that these are facts you can

25  consider -- or anything I instruct you to find.  If I say,

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   You've got to find this, then you have to find that.  And

2   that's it.

3           I'm going to introduce a few people to you now and

4   see if you're aware of them.  Mr. Berry, Mr. Austin Berry is an

5   Assistant United States Attorney.  Mr. Berry is going to tell

6   you who is at his counsel table, and he'll tell you if somebody

7   else might join him before the trial is over.

8           Mr. Berry.

9           MR. BERRY:  Yes, Your Honor.

10          My name is Austin Berry.  I'm a trial attorney with

11  the Department of Justice.  This is Fidel Esparza, an Assistant

12  United States Attorney.  Monica Morrison, also an Assistant

13  United States Attorney.  We have Alice Downie, who is a special

14  agent with the FBI.  Jeremy Ewan, sitting right behind me, also

15  an FBI agent.  And Derek Pearson, who works with the Department

16  of Public Safety.  And then this is Rosemary Martinez here at

17  the counsel table with us.

18          THE COURT:  Okay.  Very good.  Anybody get missed?

19  We have Ms. Morrison.  We got you?  Okay.

20          All right.  And then over here we have Mr. Mark

21  Bennett, defense counsel.  Would you tell us who is at your

22  table, sir.

23          MR. BENNETT:  Good afternoon, ladies and gentlemen.

24  My name is Mark Bennett.  I am a First Amendment lawyer from

25  Houston, Texas.  I represent Thomas Arthur.  You'll have to

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1   excuse him for not standing up, please.  Along with me at the

 2   counsel table is Mr. Lane Haygood from Odessa, Texas, and his

 3   assistant, Eden Butler from --

 4           MS. BUTLER:  Andrews.  Good afternoon.

 5           MR. BENNETT:  From Andrews.

 6           THE COURT:  Thank you very much.

 7           MR. BENNETT:  Thank you, Your Honor.

 8           THE COURT:  Does anybody know any of the people,

 9   whether it's court staff or any of the attorneys or witnesses,

10   investigators, anybody like that that you-all know?

11           Okay.  We've got a few.  All right.  So let me -- you

12   first, sir.  And I can't see your number.  Would you stand for

13   me.  What's your number, sir?

14           PROSPECTIVE JUROR:  Juror No. 41.

15           THE COURT:  Who do you know?

16           PROSPECTIVE JUROR:  Derek Pearson.

17           THE COURT:  Mr. Pearson.  Oh, very good.  How do you

18   know him?

19           PROSPECTIVE JUROR:  My brother is married to his

20   wife.

21           THE COURT:  Oh, my goodness.  So it's family.

22           (Laughter)

23           THE COURT:  So you kind of know him pretty well, I

24   guess.

25           PROSPECTIVE JUROR:  Yes, sir, I do.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  Do you like him at all?

2          PROSPECTIVE JUROR:  Yes, sir, I do.

3          THE COURT:  I meant the whole family.

4          PROSPECTIVE JUROR:  I'm kind of proud of him,

5   actually.

6          THE COURT:  Okay.  Very good.  All right.  Now, so

7   since he's a part of this trial and I don't know if he's going

8   to testify or not, he may.  But regardless, he's obviously part

9   of the prosecution team.  Are you able -- would you be able to

10  sit and be a fair and impartial juror in this trial?

11         PROSPECTIVE JUROR:  I don't think so.

12         THE COURT:  Okay.  You don't think so.  And you're

13  No. 41?

14         PROSPECTIVE JUROR:  Yes, sir.

15         THE COURT:  Thank you very much.

16         See, it's that simple.

17         Go ahead and have a seat.  You're fine.

18         It's that simple, really.  Hopefully not everybody is

19  disqualified.

20         Then we had somebody back there.  Yes, sir.

21         PROSPECTIVE JUROR:  Juror 47.  I know Mr. Arthur.

22         THE COURT:  Mr. Arthur.  Okay.  How do you know

23  Mr. Arthur?

24         PROSPECTIVE JUROR:  Professionally.  I've worked for

25  him on his residence in Terlingua.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  Okay.  You've actually worked for him.

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  All right.  How long ago was the last

4 time you worked for him probably?

5          PROSPECTIVE JUROR:  2019, I think, probably in March.

6          THE COURT:  Not that long.  A couple of years ago

7 almost.  Okay.  Very well.  Are you able to sit and be a fair

8 and impartial juror in his case?

9          PROSPECTIVE JUROR:  I don't think so.

10          THE COURT:  Okay.  Very good.  Thank you, sir.

11          Who else do we have?

12          I saw one right there.  Yes.

13          PROSPECTIVE JUROR:  Juror No. 12.  I know Rosemary.

14          THE COURT:  I'm sorry, can you speak up?

15          PROSPECTIVE JUROR:  Juror No. 12.

16          THE COURT:  You know Ms. Martinez?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  All right.  How do you know her?

19          PROSPECTIVE JUROR:  My sister is married to her side

20 of the family.

21          THE COURT:  Okay.  Somehow the family.

22          PROSPECTIVE JUROR:  Family friends, yes.

23          THE COURT:  All right.  And realizing -- you know

24 Ms. Martinez is like a paralegal, probably the chief paralegal.

25          Right, Rosemary?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1            So she's not an attorney for the office, but she's a

 2   chief paralegal for that U.S. Attorney's Office in Alpine.

 3   Would you be able to sit and be a fair and impartial juror in

 4   this case?

 5            PROSPECTIVE JUROR:  Yes, sir.

 6            THE COURT:  Thank you very much, ma'am.

 7            Anybody else?  Did I miss -- yeah, over here.  Yes.

 8   What's your number?

 9            PROSPECTIVE JUROR:  Good afternoon, Your Honor.

10   Juror No. 34.  I know most everybody.

11            (Laughter)

12            THE COURT:  Of course.  Good to see you.  And

13   Ms. Milliron.  Ms. Milliron is an attorney who practices here.

14   I'm surprised I didn't see you this morning, in fact.  I was

15   looking for you.  Maybe next week I think we have something

16   set, don't we?

17            PROSPECTIVE JUROR:  Next week, I believe.

18            THE COURT:  Over in Alpine.

19            All right.  Knowing everyone here, are you going to

20   be fair and impartial when you sit on that jury?

21            PROSPECTIVE JUROR:  Yes, Your Honor.

22            THE COURT:  You will.  All right.  Very well.  Thank

23   you so much.

24            Who else?

25            Yes, sir, way back in the back.  Sorry, I didn't mean

Ann M. Record, RMR, CRR, CMRS, CRI

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 103 of 226

103

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  to miss you a while ago.

2           PROSPECTIVE JUROR:  That's okay.  Juror 51.

3           THE COURT:  Who do you know?

4           PROSPECTIVE JUROR:  Mr. Pearson.

5           THE COURT:  Mr. Pearson.

6           PROSPECTIVE JUROR:  And Rosemary.

7           THE COURT:  And Rosemary.  Everybody pretty much

8  knows Rosemary, I think -- or Ms. Lerma and Ms. Martinez.  So

9  how do you know Mr. Pearson?

10          PROSPECTIVE JUROR:  My wife works with Mr. Pearson.

11          THE COURT:  Oh, okay.  She works at that office?

12          PROSPECTIVE JUROR:  DPS.

13          THE COURT:  Would you be able to sit and be a fair

14  and impartial in this case?

15          PROSPECTIVE JUROR:  Yes, sir.

16          THE COURT:  You will?  All right.  You assure me.

17          PROSPECTIVE JUROR:  Yes, sir.

18          THE COURT:  Okay.  Very good.  Thank you.  Who else?

19          All right.  That's it.  Yeah, it's tough to see

20  through the opaque, through all the plastic, but thank y'all

21  very much for bearing with me on this.

22          This is a trial that I'm going to tell you a little

23  bit more about as we go in a few more minutes.  I'm going to

24  tell you even more about it.  But I plan to be done with this

25  case this week.  Now, you-all know we've already been

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   struggling to try to save you time on the other end to get some

2   things done today, and it's a short week because of the federal

3   holiday yesterday.

4          It's always a hardship to serve.  I know because I

5   get called every so often.  Probably as often as you can, and I

6   know it's always a hardship.  It's never easy to say, well, I

7   can stop what I'm doing and go do my jury duty.  I always do,

8   and I've never gotten selected because they typically don't

9   want lawyers, and they certainly don't want judges.  But I

10  always go and try to serve.  And I would love to serve on a

11  jury.

12         But it's always a hardship.  I know that it is.  And

13  even though I think, I'm patriotic and this is a good thing, I

14  always want to do it.  And then when it happens, I get that

15  notice in the mail, I'm like, Oh, man, this is the worst time.

16         So I plan to be done with this trial this week.  This

17  week may be Friday, it may be Saturday.  Based upon that,

18  knowing that -- I'm not really predicting.  I'm just saying it

19  could be.  I don't want you to feel like I've not been honest

20  with you because I want to be.

21         Understanding that it is always a hardship for

22  everyone, is there anyone who would sustain an undue hardship

23  by serving this week?

24         And I don't see any hand raised.

25         Yes, sir, there is one right here.  Yes, sir.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  Number?

2          PROSPECTIVE JUROR:  Juror No. 21.

3          THE COURT:  Yes, sir.  Would you mind pulling your

4  face out -- not your face off, I mean your face mask.

5          (Laughter)

6          PROSPECTIVE JUROR:  I travel for my work; but if it's

7  just for this week, I should be able to get authorization for

8  that time off.

9          THE COURT:  I plan for it to be this week.

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  I'm going to do everything we can.

12          PROSPECTIVE JUROR:  I'll be fine then.

13          THE COURT:  Yes, sir.  Thank you very much.  I

14  appreciate you.  And I know it is always a hardship.

15          Yes, sir.

16          PROSPECTIVE JUROR:  Juror 17.  I'm a chiropractor,

17  and my father practices with me.

18          THE COURT:  Yes, sir.

19          PROSPECTIVE JUROR:  He's gone out of country for the

20  next ten days so this week would be tough on me.

21          THE COURT:  Okay.  And you're number?

22          PROSPECTIVE JUROR:  17.

23          THE COURT:  Thank you very much, sir.  And I'm sorry

24  we're taking you out today.

25          Way back there in the back.  Yes, ma'am.  You're

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  number?

2          PROSPECTIVE JUROR:  I'm Juror 44.

3          THE COURT:  Yes, ma'am.

4          PROSPECTIVE JUROR:  It's more of a personal matter

5  that I would like to speak with you in private about.

6          THE COURT:  Yes, ma'am.  I gotcha.  We'll talk to you

7  in a little bit, okay?

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  Thank you.

10         Anybody else?

11         Thank you.  Yes, ma'am.  Number?

12         PROSPECTIVE JUROR:  Juror No. 23.

13         THE COURT:  Yes, ma'am.

14         PROSPECTIVE JUROR:  I have a mother that was

15  diagnosed with cancer yesterday.

16         THE COURT:  Oh, I'm sorry.

17         PROSPECTIVE JUROR:  And I'm waiting on a phone call

18  for a scan.  And if they can get us this week, I would like to

19  go this week.

20         THE COURT:  Sure.  I wish you luck with that.  I hope

21  it works out.  I'm sorry to hear about your mom.

22         PROSPECTIVE JUROR:  Thank you.

23         THE COURT:  Thank you, ma'am.

24         Anyone else?

25         We've got one over here.  Yes, ma'am.  Yes, ma'am.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Yes, sir.  My daughter has an

2   appointment on Friday morning at 11:00 in Odessa, and I have to

3   watch her three kids.

4          THE COURT:  Okay.  And what's your number?

5          PROSPECTIVE JUROR:  35.

6          THE COURT:  Thank you.

7          Anybody else?

8          We're good.  And forgive me if I say "ma'am" or "sir"

9   and you're the other one.  If I say "ma'am" and you're a "sir,"

10  because sometimes looking through the plastic it's difficult to

11  tell.  I apologize.  So some of y'all back there who think I'm

12  a girl --

13          (Laughter)

14          THE COURT:  -- that's what I'm saying.  That's all

15  I'm saying is it's difficult to tell.

16          Now, I will tell you this.  The trial happens right

17  here.  It's up here.  This is called the well.  And we normally

18  don't have jurors and a panel up here.  Everybody is usually

19  back in what we call the gallery, back in the back.  And then

20  that's the jury box, and that's the witness stand.  I've

21  already told you the bench, and then the counsel tables.

22          So the trial happens here.  It happens between an

23  attorney with questions -- questioning from that lectern or

24  that podium over to the witness and then, of course -- it looks

25  a little different once we get the jury seated because there is

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  a lot less people than we have right now.  And so we end up

2  with more -- everybody pretty much from this half over.  We

3  actually have -- we space out pretty well.  Whoever gets in

4  these three seats have the best ones because they swivel and

5  you can turn them as you want to.

6          I tell you that to tell you this:  It all happens

7  right here.  It's not like it happens at a distance.  And we

8  have amplification on everybody who is speaking.  Rarely is

9  somebody away from a microphone.  It happens but rarely.  And

10  we also have hearing assistance if anybody needs that, either

11  today or at any time during the trial.  We can actually put

12  these headphones on that you see up here that are charging, and

13  we've had people even put them on top of their hearing aids.

14          And I tell you all that to say this:  You're going to

15  be able to see and hear.  We've not had any problem with that.

16  Does anybody here think even though it's going to be that close

17  and that loud that you're going to have difficulty?  We're

18  going to have a problem with you hearing or seeing what you

19  ought to?  And I don't see any hands being raised there.

20          Any other questions?  Anybody else on what I've

21  talked about so far?

22          Yes, sir.  Number?

23          PROSPECTIVE JUROR:  4.

24          THE COURT:  No. 4.

25          PROSPECTIVE JUROR:  I'm curious if we're chosen

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  whether we'll be sequestered or not.

2          THE COURT:  No, sir.

3          PROSPECTIVE JUROR:  We'll come and go from home?

4          THE COURT:  You'll come and go, yeah, no problem.

5          PROSPECTIVE JUROR:  That's all I wanted to know.

6          THE COURT:  Yes, sir.  Thank you so much.  We're not

7  going to lock you up or anything.  That's a good question,

8  though.

9          PROSPECTIVE JUROR:  I live in Terlingua.

10         THE COURT:  Yeah, I hear you.  It's a ways.  We work

11 around -- we will do the best we can to make it work.

12         PROSPECTIVE JUROR:  We'll go home late.

13         THE COURT:  You're used to it, aren't you?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  All right.  Ladies and gentlemen, a

16 criminal case is initiated by bringing a charge against a

17 defendant.  So in this case a federal Grand Jury considered

18 evidence and chose to return an indictment against this

19 defendant charging violations of laws of the United States.

20         You've got to know that an indictment in a criminal

21 case is not evidence, and the jury is instructed that it must

22 not consider the indictment as evidence of guilt against the

23 defendant named in it.

24         An indictment is very similar to a petition in a

25 civil case if you've had civil cases.  I hope you haven't.  But

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  if you have, now you kind of know what I'm talking about.  An

2  indictment is simply the way to apprise the defendant of what

3  sort of the nature and extent of the charges as well as the

4  means by which the case actually reaches the court.  But an

5  indictment is not in any way evidence and must not be

6  considered as evidence by the jury for any reason whatsoever.

7  These charges include a number of things.  I want to

8  talk to you about those just briefly and tell you very briefly

9  a general idea of what the charges are.

10  A federal Grand Jury sitting here in the Pecos

11  Division of the Western District of Texas returned a True Bill

12  of indictment against Mr. Arthur on certain charges and those

13  charges include these:  Producing, distributing, receiving, and

14  possessing with intent to distribute allegedly obscene stories

15  and visual depictions, such as drawings, allegedly depicting

16  minors engaging in sexually explicit conduct.

17  Some examples might be -- and this is in the

18  indictment -- a prepubescent female engaging in lascivious

19  exhibition of her genitals or pubic area.  A prepubescent

20  female performing oral sex on an adult penis, for example.

21  And those are just charges.  As I've just told you,

22  that's not evidence.  I'm telling you that so I can ask you

23  some questions about that.

24  Also, the indictment includes a notice of the United

25  States demand for forfeiture whereby the government seeks to

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 111 of 226

111

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  take property used in connection with such criminal conduct,

2  what they're alleging is criminal conduct.

3        Such examples would be real property, like land or a

4  home; personal property used in connection with that criminal

5  conduct, such as computers, phones, digital cameras, other

6  equipment; and proceeds -- of course, proceeds obtained from

7  the criminal conduct, meaning money.

8        While that subject matter I know is unpleasant for

9  everyone -- don't think that it's not -- the Constitution

10 requires that citizens make the determination as to each of the

11 criminal charges as well as any forfeiture.  The Court seeks

12 individuals who will keep an open mind, even when faced with

13 such allegations and make a decision based upon the evidence in

14 this case.  And as we often state:  If you don't do it, someone

15 else does, and there is no indication that anyone else would

16 enjoy the subject matter any more than you or enjoy the idea of

17 sitting in judgment on that.

18       With that having been said, raise your hand if --

19 well, let me back up and say it a different way.  Will each of

20 you be able to bear in mind that the indictment that I've

21 summarized for you and will be read at the trial before we

22 start the evidence, the indictment is not evidence of guilt in

23 this case?  Anybody -- raise your hand if you think, I can't

24 say it's not evidence.  What you just told me has to be

25 evidence.  Anybody at all?

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 112 of 226

112

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              No. 1.

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Please stand for me, if you would, and

4   remove your face covering.  You're Juror No. 1.  So I may have

5   confused you.  I hope I didn't.  But are you able to bear in

6   mind that this is merely a charge and it's not evidence against

7   him?

8              PROSPECTIVE JUROR:  I'm pretty sure there is going to

9   be some exhibits.

10             THE COURT:  Sure.

11             PROSPECTIVE JUROR:  And for us to come to this

12  level --

13             THE COURT:  You would hope so.

14             PROSPECTIVE JUROR:  -- a warrant must have been

15  issued out for him.  And I'm talking this for experience

16  because I was a deputy sheriff for 14 years here in Reeves

17  County so...

18             THE COURT:  So my question, though, is:  Will you

19  take the indictment as merely the charge, the list of charges

20  and not consider the indictment as evidence?

21             PROSPECTIVE JUROR:  The evidence -- there has to be

22  some evidence.

23             THE COURT:  I'm not asking you if there has to be

24  some.  If there is not any, the government loses; right?  But

25  my question is:  Do you understand that the indictment itself

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1   is not evidence?  Just the mere fact that --
 2             PROSPECTIVE JUROR:  Oh, yes, I understand that.
 3             THE COURT:  Okay.  I mean, I see what you're saying.
 4   Oh, there may be some evidence.  There may be; there may not
 5   be.  Do you understand?
 6             PROSPECTIVE JUROR:  Uh-huh.
 7             THE COURT:  Yes?
 8             PROSPECTIVE JUROR:  Yes, sir, I understand.
 9             THE COURT:  Okay.  All right.  Will you sit and keep
10   an open mind and be a fair and impartial juror listening to the
11   evidence and make up your mind, guilty or not guilty, based
12   upon what you hear in the trial?
13             PROSPECTIVE JUROR:  I'll try.
14             THE COURT:  You'll try.  Okay.  Let me ask -- let me
15   ask you a little deeper.  Can you put aside the fact that he's
16   been charged and just listen to the evidence and make your
17   decision on the evidence?
18             PROSPECTIVE JUROR:  Yes.
19             THE COURT:  I mean, you see why it's important to
20   put -- I mean, basically a grand jury meets and they don't have
21   the defendant there.  They don't have the defense counsel
22   there.  Charges are brought, obviously, typically submitted by
23   the government, and the Grand Jury makes a decision.  That's
24   why the indictment itself is merely to apprise that person who
25   is charged -- and the same for you or me, you and me both.
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1        If we get charged with something, we have a right, if

2   it's a felony, to have an indictment brought against us so that

3   we'll know what the charges are.  There's no trial by ambush

4   and we can prepare, right, you or I could prepare for trial.

5   And it's the way it gets to court.  Otherwise, I don't have a

6   way of logistically getting the case here.  Does that make

7   sense?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  Will you sit in judgment as a fair and

10  impartial juror in this case to both sides?

11       PROSPECTIVE JUROR:  Yes.

12       THE COURT:  Thank you very much.

13       Anybody else?

14       There being no other hands raised.

15       Do any of you believe that because the defendant was

16  criminally charged in an indictment by a Grand Jury, that he's

17  guilt of the crime he's charged -- with which he's charged?

18  Anybody at all?  I don't see any hands.

19       And I get it.  Heinous allegations, absolutely.  But

20  you could say the same about me.  You could charge me with

21  that; right?  The government could charge me with that.  They

22  could charge you with that.  The indictment is not evidence.

23       Do you understand that the defendant is on trial now

24  only for the specific charges stated in the indictment and not

25  something else?  Anybody not understand that, just raise your

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    hand.

2            And there being no hands raised.

3            Under the law, every defendant who is accused of a

4    crime is presumed to be innocent until the jury unanimously

5    agrees to the contrary beyond a reasonable doubt.  A defendant

6    is presumed to be innocent until his guilt has been established

7    to the satisfaction of the jury by legal and competent evidence

8    beyond a reasonable doubt.

9            Therefore, this defendant, although accused of a

10   crime, begins the trial with a clean slate.  The defendant is

11   presumed to be innocent until the government has discharged its

12   burden of proving the guilt of the defendant to each juror by

13   competent legal evidence beyond a reasonable doubt.

14           So at the conclusion of the hearing, if there is a

15   reasonable doubt in the minds of a jury as to the guilt or

16   innocence of this defendant, the jury must resolve that doubt

17   in favor of the defendant and reach a verdict of not guilty.

18           Is there anyone here who does not agree with the

19   presumption of innocence and would not abide by the presumption

20   of innocence as I've just explained it to you?  Just raise your

21   hand if you just don't think that's right.

22           I don't see any hands -- there being no hands raised.

23           Would any of you hold the fact that the defendant is

24   on trial here against him, the simple fact that he's on trial,

25   he decided to go to trial.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          Nobody -- no hands are raised.

2          Let me ask it a different way.  Does the fact that

3  the defendant is on trial cause you to think he is guilty?

4  Anybody?

5          I don't see any hands raised to that.

6          In a criminal case, the burden of proof is on the

7  accusing party.  In a criminal case, that's always the

8  government.  The government has the burden of proving the

9  defendant's guilt of each element of an offense charged beyond

10  a reasonable doubt.  A defendant does not have to prove himself

11  innocent.  The defendant has no obligation to produce any

12  evidence whatsoever for your consideration because there is

13  nothing that he's required to prove.

14          Is there anyone here who does not agree with the

15  burden of proof as I've just explained it and would be unable

16  to apply it in this case?  And if you're sitting there

17  thinking, well, the government can just put on a little proof.

18  I don't care if they meet their burden, then obviously that's a

19  problem.  Burden of proof is on the accusing party, and it's

20  beyond a reasonable doubt.  I'll further define that in your

21  instructions, of course.

22          Will each of you require the government to prove its

23  case against the defendant beyond a reasonable doubt before

24  rendering a verdict of guilty?  And if you cannot do that,

25  please raise your hand or if you won't do that, please raise

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  your hand.

2           There being no hands raised.

3           Would any of you have difficulty voting not guilty if

4  the government fails to prove the charge beyond a reasonable

5  doubt, please raise your hand.  Anyone at all?

6           There being no hands raised.

7           Each defendant has a privilege guaranteed by the

8  Constitution of the United States to remain silent.  A

9  defendant does not have to testify.  The defendant in this case

10 may or may not take the witness stand.  If a defendant elects

11 not to testify, you're not permitted to attach any significance

12 to that fact or hold it against the defendant in any way.

13          Now, it might be natural, especially those of us who

14 have kids, to think, Look, if I accuse that kid of something,

15 that child or children, I expect an explanation.  You can't

16 look at it this way.  This is different under the United States

17 Constitution.

18          Is there anyone who would attach any significance to

19 the defendant's failure to testify or hold it against him in

20 any way if he decided not to testify, if he persists in his

21 constitutional right to remain silent?  Anyone at all?

22          There being no hands raised.

23          If the defendant elects not to testify, would any of

24 you tend to convict him because of that exercise of his right?

25 Anybody at all just because of that?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              There being no hands raised.

2              Now, if he testifies, you treat him like every other

3    witness.  You can believe all of what he says, part of what he

4    says or none of what he says.  Totally up to you because you'll

5    be the judges of the facts.

6              If you're selected as a juror in this case, you

7    become the judge of the facts and the credibility or

8    believability as to each of the witnesses who testify and the

9    weight to be given their testimony.  You can believe, like I

10   said, everything somebody tells you; part of what they tell

11   you; or none of what they tell you.  That's totally up to you

12   because you're the exclusive judges of the facts and the

13   credibility.

14             You'll receive the law in the case from the Court.

15   In this case, it's me.  At the conclusion of all the testimony

16   when the parties have closed their evidence, I'll read to you

17   the charge of the Court.  In that charge, the Court will

18   provide you with the law that's applicable to this case as well

19   as other instructions.  So if you're sitting there thinking,

20   Gee, I don't know anything about this law, you can rest easy

21   because I'm going to give you the law.

22             You may or may not agree with the law that I give

23   you.  It's up to me to decide what the law is.  And if I give

24   you the wrong law, then I get my paper graded by the Fifth

25   Circuit Court of Appeals.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          So you may or may not agree with the law, and that's
2    okay.  You don't have to agree with the law, but it will be my
3    obligation to state to you what the law is in each relevant
4    respect as it pertains to the case, and you as jurors are bound
5    by that law.  You're obligated to follow the law as given to
6    you in the charge even if you disagree with it.
7          Is there anyone who could not or would not follow the
8    law given to you by the Court in the charge?  Just raise your
9    hand, please.
10         I actually had somebody raise their hand one time
11   during that question -- that line of questioning.  And I think
12   it was -- I want to say it was a marijuana case, and he just
13   did not agree with the law.  And I told him, It's okay for you
14   not to agree with it.  It's just important that you -- you'll
15   follow the law.  And he said, I just don't think I can quite
16   get there.  I don't think I'm going to be able to follow the
17   law.  So he didn't serve on that particular case.  I'm sure
18   there was a better case we could find for him.
19         Has anybody here learned, heard, read, or seen
20   anything about this case from any source whatsoever other than
21   in this courtroom today or in connection with your initial
22   qualification or orientation for jury service?  Anybody aware
23   of it?
24         So, No. 5, is it?
25         PROSPECTIVE JUROR:  No. 4.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  4, I'm sorry.

2          PROSPECTIVE JUROR:  No. 4.  I live in Terlingua.

3          THE COURT:  Sure.  So you've heard about it?

4          PROSPECTIVE JUROR:  I actually read the *Big Bend*

5  *Gazette* story pertaining --

6          THE COURT:  Oh, sure.

7          PROSPECTIVE JUROR:  And actually was over at -- I

8  live right next to the EMS center, and that's where the FBI and

9  a lot of the agents circulated in the morning.

10          THE COURT:  Okay.  So let me ask you this:  From

11  your -- what you've learned about the case -- and you're

12  welcome to remove your face covering if you want.  You don't

13  have to.

14          PROSPECTIVE JUROR:  I'm sorry, I forget.

15          THE COURT:  I just want to make sure.  Usually

16  everybody likes to remove it for a few minutes.

17          Are you able to put any of that aside, what you've

18  heard -- because you don't know if that's true or not,

19  obviously.

20          PROSPECTIVE JUROR:  I actually can do that because

21  that's the way I read all news stories.

22          THE COURT:  You're a wise man.

23          (Laughter)

24          THE COURT:  All right.  So -- I apologize if you're a

25  journalist.  So are you able to set that aside and make your

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  decision based on -- a fair and impartial decision based on

2  what you hear in this trial?

3  　　　　　PROSPECTIVE JUROR:  The evidence and the facts.

4  　　　　　THE COURT:  Thank you very much.

5  　　　　　Yes, sir.  No. 7.

6  　　　　　PROSPECTIVE JUROR:  Yes.

7  　　　　　THE COURT:  You heard about it?

8  　　　　　PROSPECTIVE JUROR:  I did.  Yeah, I read about it in

9  the *Big Bend Sentinel*.

10  　　　　　THE COURT:  In the *Big Bend Sentinel*.

11  　　　　　PROSPECTIVE JUROR:  Yeah.

12  　　　　　THE COURT:  I've read that paper.  It's a good paper.

13  　　　　　So whatever you read, I'm sure that was sometime ago,

14  I guess, but are you able to put that aside, not consider it,

15  but just listen to the evidence and the facts here and follow

16  the law in making up your mind on that?

17  　　　　　PROSPECTIVE JUROR:  Yep.

18  　　　　　THE COURT:  You will?  You promise?

19  　　　　　PROSPECTIVE JUROR:  Yep.

20  　　　　　THE COURT:  Thank you very much, sir.

21  　　　　　Oh, we've got one back over there.  Yes, I think it's

22  you, ma'am.

23  　　　　　PROSPECTIVE JUROR:  Juror No. 34, Your Honor.

24  　　　　　THE COURT:  Oh, of course.  I'm sorry.

25  　　　　　(Laughter)

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1        THE COURT:  Ms. Milliron, I couldn't see who you

2    were.  So you're aware of the case; right?

3        PROSPECTIVE JUROR:  Yeah, I believe I may have been

4    present during previous docket calls for other cases.

5        THE COURT:  Ah, naturally you would be.  And, ma'am,

6    let me ask you, Ms. Milliron:  Are you able to set anything

7    you've learned or heard aside and be a fair and impartial juror

8    in this case?

9        PROSPECTIVE JUROR:  Yes, Your Honor, I believe I can.

10       THE COURT:  Thank you, ma'am.

11       Very good.  Who else?  Anyone else?

12       We have one back over here.  Yes, sir, back -- we

13   have a couple of them back here.  Y'all flip a coin to see who

14   wants to go first.

15       PROSPECTIVE JUROR:  Juror No. 51.

16       THE COURT:  Yes, sir.

17       PROSPECTIVE JUROR:  I heard about it on the news.

18       THE COURT:  Okay.  Did you hear about it back -- like

19   a long while back?

20       PROSPECTIVE JUROR:  Yes, sir.  Well, when the arrest

21   happened.

22       THE COURT:  Yeah, yeah, some time ago.

23       PROSPECTIVE JUROR:  Yes, sir.

24       THE COURT:  And I don't know what you heard, but are

25   you able to put that aside and render a fair and impartial

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  verdict in this case?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  Thank you very much.

4          And then next to you is -- it looks like he's next to

5  you.  Yes, sir.

6          PROSPECTIVE JUROR:  Juror 47.  It was brought to my

7  attention since we knew him.

8          THE COURT:  Okay.

9          PROSPECTIVE JUROR:  Just news and stuff.

10          THE COURT:  I'm sorry?

11          PROSPECTIVE JUROR:  Just through the news.

12          THE COURT:  Oh, okay.  And you said you knew

13  Mr. Arthur; right?

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  And you know him.  Anything from that,

16  either knowing him or what you've heard, that's going to

17  influence you in this case?

18          PROSPECTIVE JUROR:  The news is the news, not that.

19  But I do know him.  So I think that would be a

20  disqualification.

21          THE COURT:  Okay.  Thank you, sir, very much.

22          Who else?  Have I missed anyone?

23          I'm sorry, it gets to be a strain to see back there,

24  y'all.  I'm sorry.  I apologize for that.  Thank you very much.

25          Has any member of the panel or a member of your

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 124 of 226

124

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   family been contacted or questioned by anybody other than the

2   office of the clerk -- the clerk of the court in this case in

3   connection with your being called for jury duty?  Anybody at

4   all?

5          Let me ask it a little differently.  Has anybody,

6   say, for example, contacted, directly or indirectly, maybe

7   neighbors, your employer or employers, coworkers, business

8   associates in connection with you being called for jury duty?

9          No?  No hands raised on either of those questions.

10         I call those the John Grisham questions because it

11  kind of makes you think, well, maybe somebody, you know, is out

12  there talking to other people who know you or something like

13  that and not directly to you.

14         This is a petit jury.  We're going to select a petit

15  jury or a regular jury, what you call a regular jury.  I

16  mentioned a grand jury earlier.  There are two kinds of grand

17  jury, federal and state.  Has anybody here ever served on a

18  state or federal grand jury?

19         Back in the back, No. 51, you have?

20         PROSPECTIVE JUROR:  Yes, sir.  Here.

21         THE COURT:  Here in Pecos?

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  Okay.  How long ago was it?

24         PROSPECTIVE JUROR:  2001 to 2003.

25         THE COURT:  Okay.  So a while back.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              PROSPECTIVE JUROR:  Yes, sir.

 2              THE COURT:  Were you the foreperson?

 3              PROSPECTIVE JUROR:  No, sir.

 4              THE COURT:  And a grand jury, just to explain to

 5    everybody else, that's different than a trial because you're

 6    there just hearing evidence usually from the government; right?

 7              PROSPECTIVE JUROR:  Yes, sir.

 8              THE COURT:  The state or the feds, whichever you're

 9    doing.  Anything from that that would keep you from being fair

10    and impartial in this case?

11              PROSPECTIVE JUROR:  No, sir.

12              THE COURT:  Thank you very much.

13              That was a long time ago.  You got a good memory.

14              Who else?  I saw someone else.  Yes, sir.  No. 21.

15              PROSPECTIVE JUROR:  Yes, Your Honor.  I was a grand

16    jury foreman back in 2019 here in Reeves County.

17              THE COURT:  In Reeves County just in the state?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  It wasn't federal.

20              PROSPECTIVE JUROR:  No, it was state.

21              THE COURT:  Okay.  Was that an enjoyable experience?

22              PROSPECTIVE JUROR:  I loved it.

23              THE COURT:  How long did you serve?

24              PROSPECTIVE JUROR:  It was about six months.

25              THE COURT:  Six months.  Okay.  Usually the federal
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  ones -- our federal ones go about a year or so.  Are you able

2  to sit and be a fair and impartial juror in this case?

3              PROSPECTIVE JUROR:  Yes, Your Honor.

4              THE COURT:  Very good.  Who else?  We had another

5  one.

6              Yeah, right there.  Yes, ma'am.  Number?

7              PROSPECTIVE JUROR:  28.

8              THE COURT:  Yes, ma'am.

9              PROSPECTIVE JUROR:  I served all last year in Kermit.

10             THE COURT:  Okay.  Are you the foreperson?

11             PROSPECTIVE JUROR:  No, sir.

12             THE COURT:  And it was a state grand jury.  Was that

13  an enjoyable experience?

14             PROSPECTIVE JUROR:  Yes, sir.

15             THE COURT:  It was?  How often did y'all meet?

16             PROSPECTIVE JUROR:  About every two or three months.

17  It was extended by the state because of the epidemic.

18             THE COURT:  Thanks for serving so long.  Are you able

19  to sit and be a fair and impartial juror in our case?

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  Thank you so much.

22             Right there.  Yes, ma'am.

23             PROSPECTIVE JUROR:  Juror No. 43.  I've served here

24  in Pecos before.

25             THE COURT:  How long?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  It's been about six or
2   seven years.
3          THE COURT:  Okay.  Were you the foreperson?
4          PROSPECTIVE JUROR:  No.
5          THE COURT:  Was it a good experience?
6          PROSPECTIVE JUROR:  Yes.
7          THE COURT:  It's okay if it wasn't, but usually
8   everybody --
9          (Laughter)
10         PROSPECTIVE JUROR:  It was okay.
11         THE COURT:  And with that, usually people bring
12   breakfast or brownies or whatever.  You can just eat all you
13   want usually.
14         Anything from that experience that would keep you
15   from being fair and impartial?
16         PROSPECTIVE JUROR:  No.
17         THE COURT:  All right.  Thank you.
18         PROSPECTIVE JUROR:  Thank you.
19         THE COURT:  Who else?  We have another one back
20   there, I know; right?  No?  Oh, I thought we did.
21         Well, thank y'all for your service.  That's
22   fantastic.  I'm sure I would never get to serve on a grand jury
23   here, although I know one judge who did for a while.
24         So let me ask you about a regular or a petit jury.
25   So I told you we're selecting a petit jury.  Just any trial

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  jury -- maybe I should just call it a trial jury.  That can be

2  state or federal, and that can be civil or criminal.  Just by a

3  show of hands, who has served on a regular or a trial jury?

4            Yes, ma'am.  You're number?

5            PROSPECTIVE JUROR:  I am No. 19.

6            THE COURT:  Yes, ma'am.

7            PROSPECTIVE JUROR:  But it's been so long ago I

8  actually have no --

9            THE COURT:  Are you sure you did it?

10           (Laughter)

11           PROSPECTIVE JUROR:  Well, I'm sure if we go through

12 this legal stuff, it will be on record somewhere.

13           THE COURT:  Whereabouts was it?

14           PROSPECTIVE JUROR:  I was an alternate here and then

15 in Monahans.

16           THE COURT:  Okay.  So were you on a jury in Monahans

17 or an alternate there?

18           PROSPECTIVE JUROR:  On the jury.

19           THE COURT:  On the jury.  And you were an alternate

20 here in federal court.

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Do you remember the judge?

23           PROSPECTIVE JUROR:  No, but there's pictures of him

24 all over, and I don't know if that was him or not.

25           THE COURT:  Okay.  How long ago?  Do you remember

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  when?

 2            PROSPECTIVE JUROR:  I don't.

 3            THE COURT:  Okay.

 4            PROSPECTIVE JUROR:  But I just know that I don't want

 5  that to eat me up inside.  You should have said something.

 6            THE COURT:  Oh, no, no, no.  I appreciate you.

 7  You're being honest to your oath -- obviously being true to

 8  your oath.  Anything from those experiences that would keep you

 9  from being fair and impartial in this case?

10            PROSPECTIVE JUROR:  No.  No, sir.

11            THE COURT:  Okay.  Thank you very much.  Smart woman

12  wearing those gloves.  That's pretty smart.

13            I have one right back there.  Yes, ma'am.

14            PROSPECTIVE JUROR:  Juror 18.  I was here when

15  Judge Bunton was here, and then I served on a jury in Pecos

16  County.

17            THE COURT:  When Judge Bunton was here, you were on a

18  jury?

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  So you were 12 years old probably about

21  that time.

22            (Laughter)

23            PROSPECTIVE JUROR:  10 1/2.

24            (Laughter)

25            THE COURT:  10 1/2.  I didn't know they let kids

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  serve.

2           (Laughter)

3           THE COURT:  So pleasant experiences, all of them?

4           PROSPECTIVE JUROR:  Yes, sir.

5           THE COURT:  Without telling me, were you all able to

6  reach a verdict without telling me what the verdict was in

7  those cases?

8           PROSPECTIVE JUROR:  Uh-huh.

9           THE COURT:  Yes?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  Okay.  Anything from that experience that

12  would keep you from being fair and impartial?

13          PROSPECTIVE JUROR:  No, sir.

14          THE COURT:  Thank you very much.

15          And No. 19, on the one you sat on in Monahans, you

16  were on the trial, not the one you were an alternate here, were

17  y'all able to reach a verdict?

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Okay.  Thank you.  Were both of those

20  criminal cases, I assume?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Not about money, but they were about --

23          PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Okay.

25          Yes, ma'am.  No. 3.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              PROSPECTIVE JUROR:  Yes, sir.  No. 3.  And I've

2   served here about five years ago, and I can't even count the

3   times I've served over at the other courthouse.  And we found a

4   verdict for all of them.

5              THE COURT:  Okay.  Were all those criminal cases?

6              PROSPECTIVE JUROR:  Yes, sir.

7              THE COURT:  And were you foreperson of any of those?

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  Oh, good.  Were you foreperson over here?

10              PROSPECTIVE JUROR:  No.

11              THE COURT:  Okay.  But in state court you have been?

12              PROSPECTIVE JUROR:  Sir?

13              THE COURT:  In state court you have been?

14              PROSPECTIVE JUROR:  Yes, I have.

15              THE COURT:  Very good.  Anything from those

16   experiences that would keep you from being fair and impartial?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Thank you, ma'am.

19              PROSPECTIVE JUROR:  Thank you.

20              THE COURT:  You know, I've never gotten to serve and

21   you've gotten to serve all those times.  That's fantastic.  You

22   must obviously be better than I am at being a juror, I have no

23   doubt.

24              Who do we have over here?  Yes, sir.  Number?  I

25   can't tell.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Juror No. 16.

2          THE COURT:  Yes, sir.

3          PROSPECTIVE JUROR:  I've served twice on two criminal

4  cases.

5          THE COURT:  Whereabouts?

6          PROSPECTIVE JUROR:  One in Central Texas, Lockhart,

7  and one in Portland, Oregon.

8          THE COURT:  Good barbecue in Lockhart; right?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  I should say great barbecue in Lockhart.

11  Oregon, okay, fine, but I know Lockhart has good barbecue.  So

12  were those criminal cases?

13          PROSPECTIVE JUROR:  Yes, both were.

14          THE COURT:  Lockhart, is that Caldwell County?

15          PROSPECTIVE JUROR:  Yes, Caldwell.

16          THE COURT:  Caldwell County.  Anything from those

17  experiences that would keep you from being fair and impartial?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Thank you, sir.

20          Who else?  I saw -- yes, ma'am.

21          PROSPECTIVE JUROR:  I'm Juror 27.  I was the

22  foreperson in a criminal case in Lubbock whenever I was in

23  college, and that's when I decided not to become a lawyer.

24          (Laughter)

25          PROSPECTIVE JUROR:  I was prelaw up until then, and I

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  decided to become a teacher.  It wasn't a bad experience, but

2  it was life changing.

3            THE COURT:  Okay.  Very good.  It was state court.

4            PROSPECTIVE JUROR:  Yes, sir, it was criminal.

5            THE COURT:  And you were the foreperson as a college

6  kid.

7            PROSPECTIVE JUROR:  Yes, sir.

8            THE COURT:  That's impressive, actually.

9            PROSPECTIVE JUROR:  Thank you.

10            THE COURT:  I think.

11            PROSPECTIVE JUROR:  Thank you.

12            THE COURT:  I'm sorry the legal profession lost out

13  on you.

14            PROSPECTIVE JUROR:  That's okay.  My mom is a lawyer

15  so I knew a lot, but I just had a life, yeah, that was it.

16            THE COURT:  You had your epiphany.

17            PROSPECTIVE JUROR:  Yes, sir.

18            THE COURT:  I'm glad you're a teacher.

19            PROSPECTIVE JUROR:  Thank you.

20            THE COURT:  Doing way more important stuff.  But

21  anything from that experience -- even though I know it wasn't

22  great -- anything that would keep you from being fair and

23  impartial in this trial?

24            PROSPECTIVE JUROR:  No, sir, not from that

25  experience.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              THE COURT:  Thank you very much, ma'am.  That's funny
 2   actually.
 3              Yes, sir.
 4              PROSPECTIVE JUROR:  I don't remember the year, but
 5   I've been here before.  And I was in Fort Stockton.
 6              THE COURT:  Fort Stockton?
 7              PROSPECTIVE JUROR:  Yes.
 8              THE COURT:  Were y'all always able to reach a
 9   verdict?
10              PROSPECTIVE JUROR:  Yes, sir.
11              THE COURT:  Anything from that that would keep you
12   from being fair and impartial?
13              PROSPECTIVE JUROR:  No.
14              THE COURT:  Thank you, sir.
15              THE REPORTER:  What was the number?
16              THE COURT:  I'm sorry?
17              THE REPORTER:  What was the number?
18              THE COURT:  Oh, I'm sorry.  What was your number?
19              PROSPECTIVE JUROR:  Juror No. 11.
20              THE COURT:  11.  I thought he said it.
21              Back there in the back.
22              PROSPECTIVE JUROR:  Juror No. 45.  I've served on two
23   civil juries, one in Bexar County and one in Tarrant County.
24              THE COURT:  Okay.  Were y'all able to reach verdicts?
25              PROSPECTIVE JUROR:  Yes, on both of them.  I was
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  foreman on both of them.

2          THE COURT:  Oh, you were?  Golly.  Normally, I ask

3  that question and nobody has been a foreperson, but we have

4  several here.  Were you -- are you able to sit and be a fair

5  and impartial juror in our case here?

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  Thank you very much.

8          I know we have a few more.  Yes, sir.  No. 8.

9          PROSPECTIVE JUROR:  No. 8.

10          THE COURT:  Yes, sir.

11          PROSPECTIVE JUROR:  Sat on a case in Fort Stockton,

12  civil case.

13          THE COURT:  Y'all able to reach a verdict?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And anything from that experience that

16  would keep you from being fair and impartial?

17          PROSPECTIVE JUROR:  No, sir.

18          THE COURT:  Thank you very much.

19          And I think I had one right there.

20          PROSPECTIVE JUROR:  Juror No. 6.  I've served in

21  grand jury in Brewster County.

22          THE COURT:  Oh, okay.  In Brewster.

23          PROSPECTIVE JUROR:  And it was back in -- I can't

24  remember the year.  I'm not going to lie to you.  It's been

25  about 20, 25 years.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  Did we have color yet on TV?

2          (Laughter)

3          THE COURT:  I'm teasing.  It sounds like a long time

4   ago.  You don't look old enough for it to be that long ago.

5   But were you -- on the regular or the petit jury, were y'all

6   able to reach a verdict?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  And anything from those experiences that

9   would keep you from being fair and impartial in our case?

10         PROSPECTIVE JUROR:  No, sir.

11         THE COURT:  Thank you.

12         Way back in the back there.

13         PROSPECTIVE JUROR:  Yes, sir.  Juror 50.  I've served

14   as a prosecution's officer for the Violent Criminal Alien

15   Section with ICE.

16         THE COURT:  Oh, yeah.

17         PROSPECTIVE JUROR:  And I've served as a juror

18   foreman.

19         THE COURT:  You served as a juror as well?

20         PROSPECTIVE JUROR:  Yes, sir, the foreman.

21         THE COURT:  As a foreman.  Whereabouts?

22         PROSPECTIVE JUROR:  Here, across the street.

23         THE COURT:  Okay.  Were y'all able to reach a

24   verdict?

25         PROSPECTIVE JUROR:  Yes, sir.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  And it was a criminal case?

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  And are you able to be a fair and

4  impartial juror?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Will you be?

7          PROSPECTIVE JUROR:  Yes, Your Honor.

8          THE COURT:  All right.  Now, you work for ICE, you

9  said; right?

10          PROSPECTIVE JUROR:  Yes, sir.  Correct.

11          THE COURT:  And so you're going to have, I suppose,

12  federal agents testifying.  Are you going to be able to be fair

13  and impartial to both sides?

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  All right.  Thank you.

16          Who do we have over here?  Yeah, raise them high,

17  please.  I've got you right there.  Yes, sir.

18          PROSPECTIVE JUROR:  Juror No. 48.  I served as an

19  alternate here --

20          THE COURT:  Can you pull that off just for a minute?

21          PROSPECTIVE JUROR:  Sorry.  Juror 48.  I served as an

22  alternate here for a criminal case.

23          THE COURT:  Oh, in federal court.

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  How long ago?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           PROSPECTIVE JUROR:  I'm going to say five years, but
2    time is a blur.  I travel a lot for work.
3           (Laughter)
4           THE COURT:  Well, it's probably that guy up there
5    with -- the last picture, probably for him, that you did that.
6    Were you the foreperson?
7           PROSPECTIVE JUROR:  No, I was an alternate.
8           THE COURT:  Oh, you were an alternate.  Do you
9    know -- did you ever get bumped up to serve on the jury?
10          PROSPECTIVE JUROR:  No, but they did come back with a
11   conviction.
12          THE COURT:  They did?
13          PROSPECTIVE JUROR:  Yes, sir.
14          THE COURT:  Anything from that experience that would
15   keep you from being fair and impartial here?
16          PROSPECTIVE JUROR:  No, Your Honor.
17          THE COURT:  Okay.  Thank you.  And the judge is a lot
18   taller and better looking now; right?
19          (Laughter)
20          THE COURT:  I would say it if he were here, but he's
21   not, thankfully for me.
22          Yes, ma'am.
23          PROSPECTIVE JUROR:  Juror 28.  I served as an
24   alternate here several years ago.
25          THE COURT:  Do you remember if it was Judge Furgeson

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  or Judge Junell?

2          PROSPECTIVE JUROR:  I do not remember.

3          THE COURT:  Either real tall or real short.  Or not

4  real short but...

5          PROSPECTIVE JUROR:  I don't remember.

6          THE COURT:  All right.  Anything from that experience

7  that would keep you from being fair and impartial?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Thank you so much.

10         Who else?  I know y'all get --

11         Oh, 51 back there.

12         PROSPECTIVE JUROR:  51.  I served three times in

13  Alpine.

14         THE COURT:  Okay.  And were you the foreperson of any

15  of those?

16         PROSPECTIVE JUROR:  No, sir.

17         THE COURT:  All state court; right?

18         PROSPECTIVE JUROR:  Yes, sir.

19         THE COURT:  And were you-all able to reach a verdict

20  in those cases?

21         PROSPECTIVE JUROR:  Yes, sir.

22         THE COURT:  And anything from that experience that

23  would keep you from being fair and impartial?

24         PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  All right.  Thank you very much.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          Anybody else?

2          Yes, sir.  Right there.

3          PROSPECTIVE JUROR:  Juror No. 24.  I also served in

4  Alpine --

5          THE COURT:  You did?

6          PROSPECTIVE JUROR:  -- in 2001.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  Yes, sir.

9          THE COURT:  Did you ever serve with him?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Y'all never served together.

12         PROSPECTIVE JUROR:  No, sir.

13         THE COURT:  Anything from that experience that would

14  keep you from being fair and impartial?

15         PROSPECTIVE JUROR:  No, sir.

16         THE COURT:  Were you the foreperson?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Were y'all able to reach a verdict?

19         PROSPECTIVE JUROR:  We sure did.

20         THE COURT:  Very good.  Thank you, sir.  Appreciate

21  you.

22         And I know I keep asking you the same question:  Will

23  you be fair and impartial?  Don't let that get so rote that

24  you're thinking, Oh, that's that question he always asks about

25  fair and impartial.  Of course, I am.  If you think something

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   is going to impact you, then please tell me.

2               Anyone else?  Am I missing anybody?

3               I don't see anybody else.

4               Do y'all see anybody?  Aida, anybody back there?  No?

5   Okay.  Very good.

6               Anybody here ever serve on a court-martial panel?  If

7   you were in the military, maybe you served on a panel at a

8   court-martial.  It would be a general or special assessment

9   court-martial?  No?

10              I don't see any hands.  Every now and then we'll get

11  one or two that will do that -- that have done that before.

12              Has anybody here or any member of your immediate

13  family -- and I say immediate family -- ever been involved in a

14  lawsuit as a party or a witness?  Anybody?

15              No. 21.

16              PROSPECTIVE JUROR:  Just small claims court.

17              THE COURT:  Yeah, that works.  Was it you or a family

18  member?

19              PROSPECTIVE JUROR:  Family member.

20              THE COURT:  Okay.  Did that come out to suit y'all?

21              PROSPECTIVE JUROR:  Partially.

22              THE COURT:  Partially?  Okay.  I guess that's better

23  than not at all; right?

24              PROSPECTIVE JUROR:  Right.

25              THE COURT:  Anything from that experience that would

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  keep you from being fair and impartial in this case?

2          PROSPECTIVE JUROR:  No, Your Honor.

3          THE COURT:  It doesn't have anything to do with this

4  case, obviously.

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Thank you so much.

7          Who else?

8          Yes, sir.  No. 7.

9          PROSPECTIVE JUROR:  7.  I was sued on a property at

10  issue in Presidio County.

11          THE COURT:  And did that come out okay?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  It was fine?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Okay.  Anything from that experience that

16  would keep you from being fair and impartial to either of these

17  parties?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Thank you, sir.

20          Who else?  I had a few more.

21          Yes, sir.  Right there.

22          PROSPECTIVE JUROR:  Juror No. 30.  My father served

23  on -- or was a witness for several cases.  He's a federal

24  employee.  None of it was directly related to my family.

25          THE COURT:  Okay.  And where is he a federal

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   employee?

2          PROSPECTIVE JUROR:  I guess it's Department of

3   Homeland Security.

4          THE COURT:  I'm sorry, he's what?

5          PROSPECTIVE JUROR:  DHS.

6          THE COURT:  DHS.  Okay.  Is he still?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Okay.  And are you able to be a fair and

9   reasonable juror in this case?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.  You're not going to come in here

12   and say, Well, dad works for the government.  I'm going with

13   them no matter what; right?  You wouldn't do that, would you?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Or you wouldn't go, you know, My dad

16   hates the government because he had to work for them.

17          (Laughter)

18          THE COURT:  I'm trying to figure out all the angles.

19   Thank you very much.  I appreciate you.

20          Who else back there?

21          Yes, back there.  Right there.

22          PROSPECTIVE JUROR:  Juror 45.  I sued for a release

23   of lien after refinancing a mortgage, and they didn't release

24   the lien quickly.  So they eventually released it.

25          THE COURT:  I understand.  Golly, what an annoyance.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  Anything from that that's going to keep you from being fair and

2  impartial?

3          PROSPECTIVE JUROR:  No, sir.

4          THE COURT:  Well, I'm glad it got figured out.

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  I'm sorry you had to deal with it.  What

7  an annoyance that would be.

8          Oh, yes, ma'am.

9          PROSPECTIVE JUROR:  Juror 27.  My dad's sister and I

10 were sued over a land dispute.  It ended up whatever it ended

11 up, and it was okay.

12         THE COURT:  You're fine?

13         PROSPECTIVE JUROR:  I'm fine.

14         THE COURT:  Okay.  Thank you.

15         Right back there, yes.

16         PROSPECTIVE JUROR:  Juror No. 43.  I actually sued an

17 oil company that went through federal court in Midland.

18         THE COURT:  Okay.  How long ago was that?

19         PROSPECTIVE JUROR:  2013.

20         THE COURT:  Okay.  Some time ago.

21         PROSPECTIVE JUROR:  Yeah.

22         THE COURT:  Did that turn out okay?

23         PROSPECTIVE JUROR:  We ended up settling.

24         THE COURT:  Okay.  Good.  Hopefully that was

25 agreeable to you then.  And I don't remember you.  I kind of

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  remember your name actually, but I don't remember meeting you

2  or seeing you.  Anything from that that's going to keep you

3  from being fair and impartial?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  Thank you so much.

6            PROSPECTIVE JUROR:  Thank you.

7            THE COURT:  I'm glad everything worked out okay for

8  you.

9            Ms. Milliron.

10           PROSPECTIVE JUROR:  Yes, Your Honor.  In 2012, my

11  father was a plaintiff in a land dispute.  He successfully

12  settled the case.  And I can continue to be fair and impartial

13  in this case.

14           THE COURT:  Have you ever been a witness yet?

15           PROSPECTIVE JUROR:  No, Your Honor.

16           THE COURT:  You haven't?  I'm sure you will be.

17           PROSPECTIVE JUROR:  I'm sure I will be now.

18           THE COURT:  Okay.  Thank you.

19           Who else?

20           No. 19.  Yes, ma'am.

21           PROSPECTIVE JUROR:  Just a small claims court that my

22  daughter was involved in.

23           THE COURT:  Okay.  Everything come out okay?

24           PROSPECTIVE JUROR:  It did.

25           THE COURT:  And is it going to impact you in this

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    case?

2           PROSPECTIVE JUROR:  Not at all.

3           THE COURT:  Thank you.

4           Who else?  Anybody?  I don't mean to miss anyone.

5           All right.  Let me ask this question:  Has anybody

6    ever testified before a grand jury or been a witness in a

7    criminal case -- just you -- been a witness in a criminal case

8    or testified before a grand jury?

9           I'm surprised, Ms. Milliron, you haven't testified.

10   You will.  It won't be long.

11          All right.  There being no hands raised.

12          Now, we're likely going to have law enforcement

13   officers, and I'm going to ask Mr. Berry, if he would, to list

14   a witness -- a witness list of witnesses he anticipates being

15   called to testify.  Now, this doesn't mean all these people are

16   going to testify.

17          Mr. Berry and Mr. Bennett know, as the other

18   attorneys know, if they don't name somebody, I'm probably not

19   going to let them testify if they came up with them later

20   because I want to vet them through you.  I want you to know.  I

21   want to know if you know them or anything.  So listen to this

22   list and see if you know anyone.

23          Mr. Berry.

24          MR. BERRY:  The only person -- there are two people

25   in addition to the ones we've already mentioned here at counsel

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  table and that is FBI Special Agent Brian Nishida, out of

2  Albuquerque, and Sandra Arthur.

3          THE COURT:  Okay.  Thank you so much.

4          Anybody know any of those names?  You already told me

5  you didn't know any of the names mentioned before, but now

6  there are only a couple more.

7          There being no -- do we have a hand raised?  Yeah,

8  right there.  Because you know the Arthurs?

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  Okay.  Got you.

11         Mr. Bennett, any other additional witnesses, sir?

12         MR. BENNETT:  No, Your Honor, the same witness list.

13         THE COURT:  Very good.

14         And I always want you to know -- I always want jury

15 panels to know, the defense attorney -- usually the witnesses

16 are the witnesses.  So he can't make up some.  I mean, he

17 could, but there is no reason to do that.  So the witnesses are

18 the witnesses.  And so the government gets to go first.  So

19 they usually tell you all the witnesses.

20         Now, have any of you ever been or are you currently

21 in law enforcement?  Now, I know we talked -- we think of law

22 enforcement in the traditional sense and, of course, we have an

23 ICE employee back there that we're going to talk to, but also I

24 want to broaden that definition to include employment such as a

25 security guard, working in a clerk's office, Child Protective

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  Services, or even a state or federal prosecutor's office.

2  Anybody?  Just raise your hand.

3              Yes, ma'am.  Right there.

4              PROSPECTIVE JUROR:  I work at the sheriff's office.

5  Oh, Juror No. 32.

6              THE COURT:  Would you mind pulling your face

7  covering.  You're juror number what?

8              PROSPECTIVE JUROR:  Juror No. 32.

9              THE COURT:  32.  You work at the sheriff's office.

10 Here at the county?

11             PROSPECTIVE JUROR:  Yes, sir, Reeves County.

12             THE COURT:  Here in Reeves County.  So what do you do

13 for them?

14             PROSPECTIVE JUROR:  Sheriff's administrative

15 assistant.

16             THE COURT:  You're the sheriff's administrative

17 assistant.

18             PROSPECTIVE JUROR:  Yes, sir.

19             THE COURT:  So, like, who is taking care of the

20 sheriff right now?

21             (Laughter)

22             THE COURT:  Do you have a deputy administrative

23 assistant?

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  Do you really?  I'll be darn.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  No.

2          (Laughter)

3          THE COURT:  So are you able to sit and be a fair and

4    impartial juror?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Now, will you be?

7          PROSPECTIVE JUROR:  Yes, sir.

8          THE COURT:  I don't think I heard an identified

9    sheriff's deputy or employee called.  But if one were to be

10   called, would you treat him or her like any other witness?

11         PROSPECTIVE JUROR:  Yes, sir.

12         THE COURT:  Not give them more credibility or less

13   just because of what they do for a living.

14         PROSPECTIVE JUROR:  Yes, Your Honor.

15         THE COURT:  Okay.  Thank you, ma'am.

16         Who else?

17         Yes, back there.  Oh, Ms. Milliron.  Sorry.

18         PROSPECTIVE JUROR:  Juror 34.  Your Honor, I was an

19   assistant district attorney in the 83th Judicial District for

20   about a year in 2017.

21         THE COURT:  I thought you were.  Thank you very much.

22         Who else?  Anybody?

23         All right.  Have any of your close relatives -- and,

24   I mean, close relatives, not -- like I've got an Uncle Leo in

25   Duncan, Oklahoma, that I love him, but he's not close.  So

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1  think about this.  Any close relatives that have been or are
 2  law enforcement?
 3              We've got right there.  Yes, ma'am.
 4              PROSPECTIVE JUROR:  28.  My husband is a retired
 5  deputy sheriff for Ward and Winkler.
 6              THE COURT:  For Ward County.
 7              PROSPECTIVE JUROR:  For Ward and Winkler.
 8              THE COURT:  Oh, Ward and Winkler.  Oh, okay.  So did
 9  he retire from both of them?
10              PROSPECTIVE JUROR:  No, he retired from Ward.
11              THE COURT:  Okay.  I thought he got retirement from
12  both --
13              PROSPECTIVE JUROR:  No, he went from Winkler to
14  Ward --
15              THE COURT:  That's excellent.
16              PROSPECTIVE JUROR:  -- and then retired.
17              THE COURT:  Anything from that that's going to keep
18  you from being a fair and impartial juror?
19              PROSPECTIVE JUROR:  No, sir.
20              THE COURT:  You're not going to sit here and go,
21  Well, I always believe cops.  I know they're always truthful
22  because my husband is always truthful.
23              (Laughter)
24              THE COURT:  You're on the record now.  Be careful
25  what you say.
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          (Laughter)

2          THE COURT:  No, thank you very much, and thank him

3  for his service.  He's retired, though, now.

4          PROSPECTIVE JUROR:  Uh-huh.

5          THE COURT:  Good for him, and good for you.

6  Hopefully he's either working at the house or under foot at the

7  house; right?

8          No. 5.  Yes, sir.

9          PROSPECTIVE JUROR:  No. 4.

10         THE COURT:  4.  Sorry.  I keep calling you 5.

11         PROSPECTIVE JUROR:  Juror No. 4.  I don't think -- I

12  don't think this is pertinent.  But my father was a police

13  officer in Austin.

14         THE COURT:  I think that's pertinent.

15         PROSPECTIVE JUROR:  And he's deceased.

16         THE COURT:  He worked for Austin Police Department?

17         PROSPECTIVE JUROR:  Two years after World War II and

18  did not want to be a cop so...

19         (Laughter)

20         THE COURT:  Anything you hold against cops?

21         PROSPECTIVE JUROR:  Of course not.

22         THE COURT:  Oh, of course not.  Thank you very much.

23  And I keep wanting to give you a promotion.  I keep calling you

24  5 instead of 4.

25         PROSPECTIVE JUROR:  It's okay.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              THE COURT:  Yes, ma'am.  Ms. Milliron.
 2              PROSPECTIVE JUROR:  Yes, Your Honor.  Juror No. 34.
 3  My husband is a senior sergeant with Alpine Police Department.
 4              THE COURT:  That's right.  Very well.  Do you have
 5  any issues with him?
 6              PROSPECTIVE JUROR:  No, Your Honor.
 7              (Laughter)
 8              THE COURT:  Anything you want to talk about?
 9              PROSPECTIVE JUROR:  No, Your Honor, all is well.
10              THE COURT:  Thank you.  I'm glad it's going well.
11              How about right there?
12              PROSPECTIVE JUROR:  Juror No. 35.  I'm married to an
13  investigator for the 143rd District.
14              THE COURT:  Okay.  And how long have you been married
15  to him?
16              PROSPECTIVE JUROR:  Five years.
17              THE COURT:  How long has he been an investigator for?
18              PROSPECTIVE JUROR:  Two years.  But he was working
19  with the PD for 27 years.
20              THE COURT:  Yeah.  I was going to say I bet he was
21  with some police department or sheriff's office before that.
22  Anything from that that's going to keep you from being fair and
23  impartial?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  You sure?
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right.  Thank you, ma'am.

3          Yes.  Right there.  No. 35.

4          PROSPECTIVE JUROR:  Juror No. 30.  As I mentioned

5  earlier, my father is with DHS.

6          THE COURT:  DHS, and he currently is.  Where did you

7  say he works?

8          PROSPECTIVE JUROR:  Currently he works in Halifax

9  actually, but he's moving to Baltimore soon.

10          THE COURT:  I'm sorry?

11          PROSPECTIVE JUROR:  Halifax.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR:  But he's moving to Baltimore

14  pretty soon.

15          THE COURT:  All right.  Very well.  Anything from

16  that relationship that's going to keep you from being fair and

17  impartial?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Thank you.

20          And so when I say that, "fair and impartial," I'll

21  come to the rest of you in a minute.  If you're sitting there

22  in the jury and you're thinking, Well, I don't think the

23  government has quite proved it, but I have to go to

24  Thanksgiving lunch or I have to go to Christmas with, oh,

25  so-and-so and I know he or she is going to be upset at me and I

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  don't want to have to tell them I found somebody not guilty,

 2  that's obviously a problem.  That doesn't have anything to do

 3  with what we're doing here.

 4          No. 51, did you have one?

 5          PROSPECTIVE JUROR:  Yes, sir.  My wife is the

 6  administrative assistant for DPS in Alpine.

 7          THE COURT:  DPS Alpine.  I think you mentioned that

 8  earlier.  Anything from that relationship that's going to keep

 9  you from being fair and impartial?

10          PROSPECTIVE JUROR:  No, sir.

11          THE COURT:  All right.  Thank you.

12          And then we've got No. 50, tell me about your job.

13  You're with ICE; right?

14          PROSPECTIVE JUROR:  Yes, Your Honor.  I'm a

15  deportation officer over 22 years.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  And I have been a prosecution's

18  officer with the Violent Criminal Alien Section.

19          THE COURT:  Okay.  Anything from that experience

20  that's going to keep you from being fair and impartial?

21          PROSPECTIVE JUROR:  No, Your Honor.

22          THE COURT:  Okay.  Are you able to sit and judge just

23  from the facts and the evidence and follow the law?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  And will you do that?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1           PROSPECTIVE JUROR:  Yes, sir.

 2           THE COURT:  All right.  And if a police officer or

 3   some kind of law enforcement officer or agent or whatever takes

 4   the stand, are you going to give them more or less credibility

 5   just because of what they do?

 6           PROSPECTIVE JUROR:  No, sir.

 7           THE COURT:  All right.  Thank you.

 8           Who else?  Did I miss somebody?  Yes, ma'am.

 9           PROSPECTIVE JUROR:  Juror No. 31.  My nephew was

10   chief of police in Fort Stockton.

11           THE COURT:  Oh, really.

12           PROSPECTIVE JUROR:  And my brother works for the PD

13   and Sheriff's Department.

14           THE COURT:  Here?

15           PROSPECTIVE JUROR:  Yes, sir, before passing away.

16           THE COURT:  Anything from those relationships that

17   would keep you from being fair and impartial?

18           PROSPECTIVE JUROR:  No, sir.

19           THE COURT:  You promise?

20           PROSPECTIVE JUROR:  Promise.

21           THE COURT:  All right.  Thank you.

22           It's really cute.  Y'all don't know it, but it's kind

23   of cute because you don't know your number at first.  And so

24   everybody has to look down to see what it is.

25           (Laughter)

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1          THE COURT:  It's just fun to watch, kind of.
 2          And then she had to open her coat so I felt like she
 3  was flashing me sort of.
 4          (Laughter)
 5          THE COURT:  I'm just trying to embarrass you.  I'm
 6  not.
 7          (Laughter)
 8          THE COURT:  Who else?
 9          I knew there was one more.  Right up here.
10          PROSPECTIVE JUROR:  Juror No. 16.
11          THE COURT:  Yes, sir.
12          PROSPECTIVE JUROR:  My father was a deputy sheriff in
13  Bee County.
14          THE COURT:  In what county?
15          PROSPECTIVE JUROR:  Bee County.
16          THE COURT:  Pee?
17          PROSPECTIVE JUROR:  Bee.
18          THE COURT:  Oh, Bee, B-E-E.  I gotcha.  Anything from
19  that -- is he still?
20          PROSPECTIVE JUROR:  No, no.
21          THE COURT:  Anything from that that would keep you
22  from being fair and impartial?
23          PROSPECTIVE JUROR:  No.
24          THE COURT:  Thank you so much, sir.
25          Who else we got?
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          I really didn't mean to embarrass you.  I embarrass

2   myself more by saying that probably.

3          (Laughter)

4          THE COURT:  I shouldn't have said it, but it was

5   okay.

6          (Laughter)

7          THE COURT:  All right.  Let me go back to this thing

8   I've covered once before.  There are likely going to be members

9   of law enforcement that are going to testify.  I'm almost

10  certain of it; right?  If they do, would anybody here give

11  greater or lesser weight to their testimony solely because of

12  their employment or maybe their experience?  Anybody at all?

13         Just -- there being no hands, that tells me you're

14  going to listen to the evidence, judge the credibility of every

15  witness, and not judge them solely based on where they work,

16  what experience they have.  Okay.

17         Have you or any members of your family ever worked --

18  employed -- I know we've a few of these -- by the federal

19  government?  And let's include military service and see if we

20  get a few of these.  Anybody?  I know we've got some.

21         Right back there.  Yes, sir.

22         PROSPECTIVE JUROR:  Juror 48, sir.  My wife served in

23  the Air Force, I've served in the Air Force, and I'm currently

24  a federal employee with the National Park Service.

25         THE COURT:  Very nice.  Thank you for your service

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  all the years.  That's fantastic.  And both of you are

 2  currently employed at the National Park Service?

 3          PROSPECTIVE JUROR:  No, sir, she's retired Air Force

 4  so she works at a vet clinic part time, she is adjunct at

 5  school part time, and an insurance adjustor.

 6          THE COURT:  That's outstanding.

 7          PROSPECTIVE JUROR:  I'm the only one still with the

 8  government.

 9          THE COURT:  That's outstanding.  Thanks for all you

10  do.  I would love to talk to you privately sometime just to

11  visit about the parks.  Thanks so much.

12          Yes, sir, right here.

13          PROSPECTIVE JUROR:  Juror No. 6.  United States Navy

14  1990 through 1994.

15          THE COURT:  All right.  Thank you for your service.

16          Who else?  Yes.  Yes, ma'am.  You.

17          PROSPECTIVE JUROR:  Juror No. 15.  My husband, he

18  served in the Army for ten years.

19          THE COURT:  Oh, be sure and thank him for us, please.

20          PROSPECTIVE JUROR:  I'm sorry?

21          THE COURT:  Thank him for his service, please.  Thank

22  you.

23          Who else?  Anybody?  Yes, ma'am.  No. 27.

24          PROSPECTIVE JUROR:  27.  My dad was in the Army and

25  then the National Guard, and then my mom was a DA in Lubbock

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  but before I was born so a long time ago.  And then she was the

 2  Assistant Dean at Tech Law School.

 3          THE COURT:  Okay.  Very good.  Man, she really did

 4  turn you sour on lawyers, didn't she?

 5          (Laughter)

 6          PROSPECTIVE JUROR:  I have a ton of respect for

 7  lawyers.  It is not in any way, shape, or form for me; but I

 8  have a ton -- I have admiration for them.

 9          THE COURT:  I don't blame you.  There are days I

10  don't like them.

11          (Laughter)

12          THE COURT:  Very good.  Thank you so much.

13          Who else?  We have one right here.  Yes, sir.

14          PROSPECTIVE JUROR:  My father was career Air Force,

15  retired, and I served in the Peace Corps 2015 to 2017.

16          THE COURT:  Oh, great.  Good for you.  That's

17  fantastic.

18          All right.  Who else?  I know we've got some over

19  here.  Yes, ma'am.

20          PROSPECTIVE JUROR:  My daughter was -- served Air

21  Force.  I'm Juror No. 33.

22          THE COURT:  33.  She served in the Air Force.  Is she

23  out now?

24          PROSPECTIVE JUROR:  Yes, sir, she's working for the

25  Pentagon.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           THE COURT:  She's working for who?

2           PROSPECTIVE JUROR:  The Pentagon.

3           THE COURT:  Oh, the Pentagon.  Really?  Wow.

4           PROSPECTIVE JUROR:  Yes, sir.

5           THE COURT:  That's pretty high cotton.  That's

6   pretty.  Any concerns there?  Are you going to be able to be

7   fair and impartial?

8           PROSPECTIVE JUROR:  Yes, sir.

9           THE COURT:  All right.  I know you will be.  I know

10  you will.

11          Yes, Ms. Milliron.

12          PROSPECTIVE JUROR:  Yes, Your Honor.  Juror 34.

13  Federal Task Force is -- my husband is on leave.

14          THE COURT:  Okay.  Thank you so much.

15          Yes, ma'am.  Number?  Other side.

16          PROSPECTIVE JUROR:  31.

17          THE COURT:  You looked at the wrong side first.

18          (Laughter)

19          PROSPECTIVE JUROR:  My son is currently in the United

20  States Army.

21          THE COURT:  Can you tell us where he's posted?

22          PROSPECTIVE JUROR:  He's in Killeen, Texas.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  Fort Hood.

25          THE COURT:  Fort Hood?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1            PROSPECTIVE JUROR:  Yes, sir.

2            THE COURT:  Okay.  I didn't know if you could tell us

3   or if it was a secret or what.

4            PROSPECTIVE JUROR:  No, no secret.

5            THE COURT:  Okay.  Thank you very much.  Thank him

6   for us for his service.

7            PROSPECTIVE JUROR:  And I work for the United States

8   Post Office.

9            THE COURT:  You do now?

10           PROSPECTIVE JUROR:  Yes, sir.

11           THE COURT:  Well, you need to go back to work because

12   we need to get our mail.

13           (Laughter)

14           THE COURT:  Don't bring the tax forms, though,

15   please.  None of us want those.

16           (Laughter)

17           THE COURT:  Thank you very much for your service.

18   That's outstanding.

19           PROSPECTIVE JUROR:  Thank you.

20           THE COURT:  Yes, sir.  No. 21.

21           PROSPECTIVE JUROR:  Juror No. 21.  My father served

22   in Korea.

23           THE COURT:  Okay.

24           PROSPECTIVE JUROR:  Navy.

25           THE COURT:  Korea, wow.  Is he still with us?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1          PROSPECTIVE JUROR:  Actually, he just passed in
 2   October.
 3          THE COURT:  Oh, I'm so sorry.  I don't know why I had
 4   a feeling about that.  Well, thank you for your service as well
 5   through him.
 6          PROSPECTIVE JUROR:  Thank you.
 7          THE COURT:  Have you ever been to the National
 8   Memorial in Washington?
 9          PROSPECTIVE JUROR:  Sir?
10          THE COURT:  Have you ever been to the Korea Memorial?
11          PROSPECTIVE JUROR:  I haven't yet.
12          THE COURT:  It's fantastic.  Fantastic.  It's really
13   different.
14          Anybody else?
15          I don't see any other hands so I'm going to move on.
16          And you wonder when I'm getting wrapped up.  We're
17   getting closer.
18          So has anybody here ever attended law school, taken
19   any law or even a business law-type course or received any
20   legal education or training or worked in a law office or for a
21   court?  Anybody?
22          So, No. 27, you have?
23          PROSPECTIVE JUROR:  Yes, sir.  Back in college, I
24   took -- I was prelaw until like my junior year.
25          THE COURT:  Did you go to Tech?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1              PROSPECTIVE JUROR:  Yes, sir.

 2              THE COURT:  Okay.  I did too.  Probably not the same

 3    time you went, though.

 4              (Laughter)

 5              THE COURT:  Sadly for me.

 6              Who else?  Yes, ma'am, back there.  And I know

 7    Ms. Milliron, No. 34.  We've got you.

 8              PROSPECTIVE JUROR:  Juror No. 43.  Oh.

 9              THE COURT:  No, no, you're fine.  She doesn't have to

10    tell me.  I know about it.

11              PROSPECTIVE JUROR:  I just took business law college.

12              THE COURT:  What college?

13              PROSPECTIVE JUROR:  Odessa.

14              THE COURT:  Odessa College?

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Good school.  Thank you.

17              PROSPECTIVE JUROR:  Thank you.

18              THE COURT:  And back there in the back.

19              PROSPECTIVE JUROR:  Business law.  I was a CPA.

20              THE COURT:  Oh, okay.  What's your number?

21              PROSPECTIVE JUROR:  45.  I'm sorry.

22              THE COURT:  That's okay.  You're a CPA so you took

23    business law.

24              PROSPECTIVE JUROR:  Retired CPA, yes.

25              THE COURT:  Okay.  Very good.  Thank you.  Anybody

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  else?  Back over here, yes, sir.

2          PROSPECTIVE JUROR:  Juror No. 21.  I have a law

3  degree from Regent University.

4          THE COURT:  Outstanding.  Very good.  Anything from

5  that that's going to cause you a problem here?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  I know you've already told me you didn't

8  think you'd be a great juror for this particular case.

9          THE REPORTER:  What was his number?

10          THE COURT:  41.

11          Anybody else?

12          Yes, sir.  No. 8.

13          PROSPECTIVE JUROR:  Yes, in college I took two law

14  classes.

15          THE COURT:  Okay.  What college?

16          PROSPECTIVE JUROR:  Texas A&M.

17          THE COURT:  Okay.  Good.  Were they in crayons or --

18  I'm just kidding.  I'm just teasing.

19          (Laughter)

20          THE COURT:  You know where I went so I had to say it.

21  I'm sorry.  When you don't have athletic teams, you have to

22  make fun of other people, or try to.

23          (Laughter)

24          THE COURT:  All right.  So two.  You took two

25  courses?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Construction Law 1 and 2.

2          THE COURT:  I see.  And that's a good program there,

3  the construction program.

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  Very good.  I have a friend who went

6  through that school.  Thank you so much.

7          Anybody else?

8          All right.  Anybody who just answered that question,

9  does anybody -- just raise your hand if you feel like you're

10 going to have to go back into the jury room and retry the case

11 for the lawyers.  I think that's why that question is probably

12 there, just to make sure.  Ms. Milliron might.  Probably not.

13 She'd probably just enjoy the time off.

14         All right.  Anybody here ever had any difficulty or

15 maybe somebody in your family that's had difficulty with the

16 federal government, like, including the IRS?  Anybody had any

17 difficulty -- not that you don't like them.  It's okay not to

18 like them.

19         I don't see any hands raised.

20         Anybody been personally involved or through a

21 relative, employer, or close friend in a criminal case or

22 investigation?  Except for Ms. Milliron.

23         Yes, ma'am.  Number?

24         PROSPECTIVE JUROR:  No. 10.

25         THE COURT:  No. 10.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Uh-huh.  My son.  Everything was

2   dropped, though; but it was under investigation.

3          THE COURT:  Was that a criminal matter?

4          PROSPECTIVE JUROR:  It was.

5          THE COURT:  I'm sorry to ask it.  How long ago was it

6   and where was it?

7          PROSPECTIVE JUROR:  I'm going to say about five or

8   six years ago.

9          THE COURT:  Okay.  Whereabouts?

10          PROSPECTIVE JUROR:  Fort Stockton.

11          THE COURT:  Fort Stockton.  So some state criminal

12   charges that were dropped?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  I'm so glad they were.  I know that's

15   tough to go through, though.

16          PROSPECTIVE JUROR:  Yeah.

17          THE COURT:  Is everything okay?

18          PROSPECTIVE JUROR:  Everything is good now.

19          THE COURT:  Are you able to be a fair and impartial

20   juror?

21          PROSPECTIVE JUROR:  Yes, I think I can.

22          THE COURT:  How come the hesitation?

23          PROSPECTIVE JUROR:  It had something to do -- he was

24   young, but it had something to do with statutory.

25          THE COURT:  Did you feel like he got treated fairly?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1        PROSPECTIVE JUROR:  Not at first, no.

2        THE COURT:  You're happy with the outcome.

3        PROSPECTIVE JUROR:  I'm happy with the outcome

4   because it was dropped because there was nothing to it.

5        THE COURT:  Okay.

6        PROSPECTIVE JUROR:  At the beginning, no, I didn't

7   think he was, no.

8        THE COURT:  Sure.  Sure.  Any parent would feel the

9   same way.  Thank you, ma'am.

10       Anyone else?

11       Anybody in your family or you have a personal

12  interest in the outcome of this case or a similar case?

13  Anybody at all?  I wouldn't think there would be anybody here

14  that would.

15       So there's no -- no hands being raised there.

16       Anybody here or your family -- and let's exclude

17  No. 10.  Anybody here, you or a close relative, ever been

18  charged with a felony offense?  Anybody?  And we can talk about

19  it privately, of course, if you want.

20       No. 4.

21       PROSPECTIVE JUROR:  No. 4.

22       THE COURT:  Do you want to talk about it privately or

23  are you okay --

24       PROSPECTIVE JUROR:  No, no, I made a mistake.  I got

25  charged a long time ago with unauthorized use of a motor

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   vehicle, 1983.

2            THE COURT:  Wow, a long time ago.

3            PROSPECTIVE JUROR:  And that's it.

4            THE COURT:  It got wiped off?

5            PROSPECTIVE JUROR:  Yes, sir, four years of

6   probation.

7            THE COURT:  Okay.

8            PROSPECTIVE JUROR:  And I've been voting and being a

9   citizen -- good citizen since.

10           THE COURT:  Excellent.  Thank you so much.  We used

11  to call that a UUMV.

12           Number -- I forget your number.

13           PROSPECTIVE JUROR:  31.

14           THE COURT:  31.

15           PROSPECTIVE JUROR:  Can we talk about it in private?

16           THE COURT:  Oh, yes, ma'am.  Absolutely.

17           Who else?

18           Yes, ma'am.

19           PROSPECTIVE JUROR:  No. 15.  And private.

20           THE COURT:  Okay.  You got it.

21           Anybody else I missed?

22           Yes, sir, back there.  Number?

23           PROSPECTIVE JUROR:  No. 47.  I don't know how close,

24  second cousin, was a homicide.

25           THE COURT:  It was a homicide?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           PROSPECTIVE JUROR:  Yes, sir.

2           THE COURT:  Oh, wow.

3           PROSPECTIVE JUROR:  He was the defendant.

4           THE COURT:  All right.  Thank you very much.  I'm

5   sorry that that happened.

6           Anybody else?

7           Yes, sir.

8           PROSPECTIVE JUROR:  No. 20.  I don't know what you

9   call it, but my dad whooped Judge Parks.

10          (Laughter)

11          THE COURT:  I think you just called it.

12          PROSPECTIVE JUROR:  Whatever that's called.

13          (Laughter)

14          THE COURT:  Will you be able to be a fair and

15  impartial juror?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  That's awesome.  May be the best answer I

18  ever received, at least on that question.

19          Anybody else?

20          All right.  I don't see any other hands being raised.

21          The Court is going to instruct you on the law.  I've

22  told you that before.  Is there anybody here who would not

23  follow the law that I give you?  You just say, Look, I'm just

24  contrarian -- I got a sister like this.  She would say, Look,

25  whatever you tell me, I'm going to do the opposite.  I'm just

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  not going to follow it.  Anybody at all?  If that's your

2  attitude, that's fine.  It's just not here.  That's not the

3  attitude we want -- we want people who will follow the law,

4  even if you disagree.

5          The nature of these charges, we've talked a little

6  bit about them.  I want to talk a little bit more about them,

7  and then let's kind of wrap up.  They evoke strong emotions.

8  They evoke strong feelings.  You've heard the summary.  I'm not

9  going to sit up here and tell you they don't because they do.

10         But, again, they're only that, charges that have been

11 brought.  That's all they are at this point.  You may -- if

12 you're on the jury, you may decide, Okay.  At some point the

13 evidence is beyond a reasonable doubt.  Okay.  Fine.  You may

14 decide it never gets there, and so you're going to vote not

15 guilty.

16         Should you determine that the government has not met

17 its burden of proof and each element beyond a reasonable doubt,

18 is there anyone who could not or would not find the defendant

19 not guilty?

20         I don't see any hands.

21         I don't want somebody sitting there thinking, Look,

22 these are just such bad charges I'm finding somebody guilty of

23 something.  Can't have that, obviously.

24         And there being no hands raised.  I trust and I

25 believe you.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              If selected, you'll be asked to determine whether

2   particular drawings and writings are obscene as defined by the

3   law.   To prove the matter is obscene, the government must

4   satisfy three tests:   That the work appeals prominently to

5   prurient interests which is an appeal to a morbid, degrading,

6   or unhealthy interest in sex as distinguished from any ordinary

7   interest in sex; two, that it depicts or describes sexual

8   conduct in a patently offensive way; and, three, that the

9   material taken as a whole lacks serious literacy, artistic,

10  political, or scientific value.   These drawings and writings

11  will be a sexually -- will be of a sexually explicit nature

12  involving children.

13              As part of your jury service, will you follow the law

14  and view drawings -- view these drawings and writings with

15  sufficient attention to enable you to determine whether these

16  drawings and writings meet the definition of obscenity?

17              If anybody can't or won't, please raise your hand.

18              Yes, ma'am.   No. 19.

19              PROSPECTIVE JUROR:   Juror No. 19.   If it's sexually

20  considering children, sexual pictures of children --

21              THE COURT:   Yes, ma'am.

22              PROSPECTIVE JUROR:   -- that's, I guess, an opinion as

23  far as offensive sexual with being -- I would probably be

24  biased.

25              THE COURT:   Okay.   Well, you'll be deciding whether

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  or not it's obscene.  My question is:  Are you able to view it

2  with sufficient attention as opposed to somebody who says, I'm

3  just never looking at that.  I'm just not going to look at

4  that.

5          PROSPECTIVE JUROR:  Oh, I can view it with sufficient

6  attention.

7          THE COURT:  And then make your decision.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  Thank you.

10          Anybody else?

11          I understand what you're saying.

12          None of you are going to stand up and say, you know,

13  I'm kind of in favor of what you've -- this obscenity.  You're

14  just not going to say that.  But I can't tell you it is or it

15  isn't.  You have to decide.  You're the jury.  You'll decide

16  whether or not it is obscene.

17          PROSPECTIVE JUROR:  Okay.

18          THE COURT:  And I'm sorry I confused you.  I didn't

19  mean to.

20          The case involves charges under federal obscenity

21  laws which necessarily call into question the jury's

22  conclusions about certain writings and drawings depicting

23  explicit sexual acts.  Therefore, if you're selected as a juror

24  in this case, you'll be required to view evidence, including

25  drawings and writings, which depict or portray sexual activity

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  of several natures, including urination and use of feces during
2  sexual activity.

3          Some people may be at ease or even willing to view
4  these drawings or writings, and some may be indifferent toward
5  viewing them, and still others are going to be uncomfortable or
6  even dread the thought of having to view such writings or
7  drawing.  However, a distaste for such material does not
8  disqualify a prospective juror from serving.  A prospective
9  juror, however, must promise to make his or her best effort to
10 view these drawings and writings as evidence in an impartial
11 and objective fashion as responsible adults.

12         You'll not be asked to personally approve or
13 disapprove of these drawings and writings or of such drawings
14 and writings in general.  You will be asked to render a fair,
15 impartial, and objective verdict based upon the evidence
16 admitted at trial and the law as defined by me.

17         Is there anyone who will not view the evidence as a
18 partial -- a fair and impartial juror and follow the law given
19 to you by the Court?  Please raise your hand.

20         There being no hands raised.

21         It's anticipated that the evidence in this case may
22 consist of graphic descriptions of and discussions about
23 sexually explicit conduct involving a minor child, including
24 images depicting such conduct.  Will you view the evidence as a
25 fair and impartial juror and follow the law given to you by the

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  court?  Raise your hand if you will not.

 2        There being -- yes, sir.  Number?

 3        PROSPECTIVE JUROR:  24.

 4        THE COURT:  Yes, sir.

 5        PROSPECTIVE JUROR:  I recognize it is just an

 6  uncomfortable thing, but how about if you just don't want to

 7  see those images?

 8        THE COURT:  Right.  I would suggest, though, that

 9  most of us don't want to see them.

10        PROSPECTIVE JUROR:  Right.

11        THE COURT:  My question is:  Will you view them to

12  determine if you believe they --

13        PROSPECTIVE JUROR:  No, I won't.

14        THE COURT:  You will not.  Okay.  Thank you, sir.

15        Anybody else?

16        Does anyone believe the obscenity laws of the United

17  States are in any manner unconstitutional or unfair such that

18  they should not be enforced by the government?  Anybody?

19        Does anyone believe the obscenity laws in this

20  country are not strict enough such that the government should

21  make and enforce stricter obscenity laws?

22        There being no hands raised for either of those

23  questions.

24        Again, the important thing is you can have -- you can

25  feel either way.  The important thing is that you'll follow the

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  law, whatever it may be.  You may want it to be worse.  You may

2  want it to be less.

3       The case involves charges brought by the United

4  States government which alleged violations of this country's

5  obscenity laws.  These laws making it illegal to sell or

6  distribute obscenity in interstate commerce have been upheld by

7  the United States Supreme Court holding that the First

8  Amendment does not protect the sale or distribution of obscene

9  material.  It has also held that the First Amendment protects

10  the sale or distribution of sexually explicit writings and

11  drawings that are not obscene.

12       Will you follow the Court's instructions regarding

13  the applicable law in this case regardless of any personal

14  feelings, personal views to the contrary?  Just raise your hand

15  if you'll not.

16       That tells me everybody will follow the law.

17       All right.  Thank you.

18       Does anyone hold the view that anything, no matter

19  how objectionable it may be, should be permitted as free speech

20  regardless of what this country's obscenity laws may say?

21  Anybody think just anything ought to be allowed because of free

22  speech?

23       There being no hands raised.

24       Or on the other hand, does anyone conversely hold the

25  view that nothing of a sexually explicit nature, even if deemed

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  not to be obscene, should be permitted as free speech, nothing

2  should be.  Anybody?  Just raise your hand if you do.

3          There being no hands raised.

4          Again, we want you to follow the law.  You'll be the

5  person who decides.

6          Do you belong to or are you associated with any

7  groups, society, or organization that supports changes in the

8  laws of the United States or any state concerning obscenity?

9  Anybody at all?  And that might be trying to get stricter

10  obscenity laws or it might be getting less strict obscenity

11  laws.

12          There being no hands being raised.

13          Do any of you have any close friend or family member

14  who is or has been associated with such a group, society, or

15  organization?  Anyone?

16          There being no hands raised for that question.

17          Have you or anyone close to you taken any course work

18  in any fields of counseling, psychiatry, psychology, human

19  sexuality, social work, sociology, criminology, or criminal

20  justice or been employed in those fields?  Anybody?

21          Yes, sir.  Number.

22          PROSPECTIVE JUROR:  No. 22.

23          THE COURT:  Yes, sir.  Is it you or someone else?

24          PROSPECTIVE JUROR:  My bachelor's degree is in social

25  work, and I've had stacks of psychology, sociology courses.  My

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  masters is a Master of Divinity.  So I've had counseling

 2  courses and --

 3            THE COURT:  Oh, you've got a lot of schooling.  What

 4  undergraduate?

 5            PROSPECTIVE JUROR:  Hardin-Simmons.

 6            THE COURT:  Hardin-Simmons in Abilene.  Great school.

 7  Did you play football there, by chance?

 8            PROSPECTIVE JUROR:  I did not.

 9            THE COURT:  Okay.  My son played football and loved

10  the school.

11            PROSPECTIVE JUROR:  Great place.

12            THE COURT:  He's not as big as you are.  I wish he

13  was, though.  He would have been a better football player.

14            (Laughter)

15            THE COURT:  So anything from that that will keep you

16  from being fair and impartial in this case?

17            PROSPECTIVE JUROR:  No, sir.

18            THE COURT:  All right.  You will be able to judge the

19  facts and the evidence, take the law as I give it to you and,

20  of course, you can always bring in your -- everybody brings

21  what they bring to the table, obviously, but you'll make a

22  decision based upon what you hear in these -- within these four

23  walls; right?

24            PROSPECTIVE JUROR:  Yes, sir.

25            THE COURT:  Thank you very much, sir.  Go Cowboys.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          Yes, sir.  Number?

2          PROSPECTIVE JUROR:  No. 17.  Just through my

3   doctorate we had several.

4          THE COURT:  Of course, as a chiropractor?

5          PROSPECTIVE JUROR:  Yes, sir.

6          THE COURT:  Thank you.

7          Who else?  Anybody?

8          Yes, ma'am.  No. 27.  As a teacher?

9          PROSPECTIVE JUROR:  Yes, sir.  I've had CPS training,

10  counseling, all of those things.  I'm a student council adviser

11  at my school so a lot of relationship building, training, stuff

12  like that.

13          THE COURT:  Sure.  And what do you teach exactly?

14          PROSPECTIVE JUROR:  I teach art and journalism.

15          THE COURT:  Oh, okay.  Interesting.

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  All right.  Thank you very much.

18          I thought I saw another hand.

19          PROSPECTIVE JUROR:  Could you repeat that question,

20  please?

21          THE COURT:  Sure.  Have you or anyone you're close to

22  taken any course work in the fields of counseling, psychiatry,

23  psychology, human sexuality, social work, sociology,

24  criminology or criminal justice or been employed in those

25  fields?  Anybody?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           I don't see any other hands being raised.

2           Have you or anyone you're close to been a victim --

3  and we can talk about this privately, of course, if you'll just

4  let me know.  Have you or anyone you're close to been a victim

5  of any form of sexual abuse as a child or an adult?

6           Ma'am, you're number?

7           PROSPECTIVE JUROR:  No. 2.

8           THE COURT:  No. 2.  Do you want to talk about it

9  privately?

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  Yes, ma'am.

12          And No. 7.

13          PROSPECTIVE JUROR:  No. 7.  I was molested by a

14  Catholic priest when I was a child.

15          THE COURT:  Understood.  Anything from that that's

16  going to keep you from being fair and impartial in this case?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Is that going to matter at all to you?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  I know it matters, but just not in this

21  case.

22          PROSPECTIVE JUROR:  Right.

23          THE COURT:  Thank you, sir.

24          Yes, ma'am.  No. 19.

25          PROSPECTIVE JUROR:  I would rather speak privately

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  about that.

2          THE COURT:  Yes, ma'am.

3          Yes, ma'am.  No. 27.

4          PROSPECTIVE JUROR:  Yeah, it hasn't happened to me or

5  anybody like in my immediately family, but a lot of students

6  that I talk to.

7          THE COURT:  Sure.  Okay.  Are you able to sit as a

8  fair and impartial juror in this case?

9          PROSPECTIVE JUROR:  I don't know.

10          THE COURT:  Okay.  Well, that tells me then that

11  probably no; right?

12          PROSPECTIVE JUROR:  I don't know.  It's hard to hear

13  from the other side.

14          THE COURT:  Sure.  Thank you.

15          Yes, sir.  No. 21.

16          PROSPECTIVE JUROR:  Juror No. 21, Your Honor.  My

17  sister-in-law.

18          THE COURT:  Oh, I'm so sorry.  As a child or as an

19  adult?

20          PROSPECTIVE JUROR:  Adult.

21          THE COURT:  Oh, okay.  Anything from that that's

22  going to keep you from being fair and impartial in our case

23  here?

24          PROSPECTIVE JUROR:  No, Your Honor.

25          THE COURT:  Thank you very much.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  17.

2          THE COURT:  17.

3          PROSPECTIVE JUROR:  It would be private.

4          THE COURT:  Yes, sir.

5          And let me go back to 21.  Sir, was that case, did it

6   get reported and did it go to trial or anything?

7          PROSPECTIVE JUROR:  It did.

8          THE COURT:  It went to trial?

9          PROSPECTIVE JUROR:  Sir?

10         THE COURT:  It did go to trial?

11         PROSPECTIVE JUROR:  Yes, it did.

12         THE COURT:  Was there anything about that experience

13  that would make you unable to sit fairly?

14         PROSPECTIVE JUROR:  No, Your Honor.  I don't know all

15  the details.  I just know a little bit what I heard through the

16  grapevine.

17         THE COURT:  Yes, sir.

18         Anybody else?

19         Yes, ma'am.  No. 34.

20         PROSPECTIVE JUROR:  Juror No. 34, Your Honor.

21  Nothing that would keep me from being fair and impartial in

22  this case.

23         THE COURT:  Okay.  Thank you so much.

24         Anybody else?

25         Yes, sir.  No. 24.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1          PROSPECTIVE JUROR:  24.  Yeah, a cousin of mine was

 2   sexually abused as a child so...

 3          THE COURT:  Thank you, sir.

 4          Who else?  Did I miss anyone?

 5          Have you or anyone close to you had experience with a

 6   person who was engaged in or was accused of sexual activity

 7   with or involving a child?

 8          Yes, ma'am.  Number?

 9          PROSPECTIVE JUROR:  No. 10.  Yeah, it was just -- it

10   was teenage stuff.

11          THE COURT:  Teenage stuff.  Was that your son?

12          PROSPECTIVE JUROR:  My son.

13          THE COURT:  Oh, okay.  Was that the charge you were

14   talking about before?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  I'm glad it got cleared up.  Thank you.

17          PROSPECTIVE JUROR:  Can you repeat that?

18          THE COURT:  Sure.  Have you or anyone close to you

19   had an experience with a person who was engaged in or accused

20   of sexual activity with or involving a child?

21          No. 21.

22          PROSPECTIVE JUROR:  My sister-in-law's ex-husband.

23          THE COURT:  Okay.  And was that -- does that case go

24   to trial?

25          PROSPECTIVE JUROR:  Yes.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  Okay.  And anything about that experience
2   that keeps you from being able to sit fairly and impartially?
3          PROSPECTIVE JUROR:  No, Your Honor.
4          THE COURT:  Thank you.
5          Who else?
6          Back here.  No. 34.
7          PROSPECTIVE JUROR:  Juror 34, Your Honor.  Family
8   member.  Did not go to trial.  Does not keep me from being fair
9   and impartial in this case.
10          THE COURT:  Thank you.
11          And No. 41.
12          PROSPECTIVE JUROR:  My neighbor was accused of sexual
13   abuse of a child.  Went to trial and was convicted.  And he is
14   currently in jail.  And I was close to that trial.  I mean, he
15   was, you know, my neighborhood.
16          THE COURT:  Sure.
17          PROSPECTIVE JUROR:  And it was hard to go through
18   that.
19          THE COURT:  Would --
20          PROSPECTIVE JUROR:  But I went through the trial and
21   witnessed and observed, and it was a hard thing to go through.
22          THE COURT:  Sure.  Anything from that experience that
23   would keep you from being fair and impartial here?
24          PROSPECTIVE JUROR:  No.
25          THE COURT:  Okay.  Thank you.  I'm sorry you had to

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   go through that.

2          I don't see any other hands.

3          Have you or anybody close to you been accused,

4   whether fairly or unfairly, of child sexual abuse?  Anybody

5   here or somebody close to you maybe?

6          I know No. 10.

7          There being no hands raised to that.

8          Have you made or known anyone who made a report of

9   sexual abuse or child sexual abuse whether it turned out to be

10  accurate or false?

11         No hands.

12         Oh, back there.  Yes, sir.  No. 50.

13         PROSPECTIVE JUROR:  Yes, sir.  In private.

14         THE COURT:  Sure.

15         Anybody belong to any group which encourages,

16  advocates, or condones sexual relations between adults and

17  children who are less than 18 years of age?  Anybody?

18         There being no hands raised on that.

19         Does anyone subscribe to any publication that

20  encourages, endorses, or recommends sexual relations between

21  adults and children who are less than 18?

22         There being no hands raised there.

23         Do you believe -- does anybody believe that a minor

24  is capable of consenting to sexual activity with an adult?

25  Just raise your hand.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              There being no hands raised.

2              Does anybody condone sexual activity between adults

3       and minors or between minors even?

4              There being no hands raised to that question.

5              The government has the responsibility to declare some

6       materials contraband and further declare that those materials

7       cannot be imported into the United States from a foreign

8       country or carried even from one state to another state or sent

9       by computer from one state to another state.  Does anybody

10      disagree with this responsibility that we've put on the

11      government?  Anybody at all?

12             I see no hands raised.

13             And in certain circumstances, the law allows the

14      United States to forfeit or take from a convicted person the

15      property that person used to commit the crime as well as

16      proceeds the person obtained from his or her crime or property

17      the person bought with that money, with those proceedings.

18      That may include real estate, equipment, furniture, vehicles,

19      money, and any number of things.  If the defendant is

20      convicted, the United States seeks to forfeit property they

21      claim is forfeitable pursuant to law.

22             Does anybody disagree with that law?  Just raise your

23      hand if you disagree with that law.

24             There being no hands raised.

25             Will you follow the law as the Court instructs as it

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  pertains to forfeiture?  Raise your hand if you'll not do that,

 2  if you'll not follow the law as to forfeiture.

 3             And there being no hands raised.

 4             Have you or anyone close to you been involved in any

 5  action involving government officials taking property or even

 6  just seizing property?  Raise your hand if you have been

 7  involved in anything like that.  If the government has ever

 8  taken property from you or anybody you know or you've been an

 9  employee of an agency or something that actually took property

10  from people.

11             There being no hands raised.

12             Let me ask you to do something for me for a few

13  minutes.  It won't be more than a couple of minutes, I think.

14  Maybe less.  The lawyers -- I'm going to have the lawyers come

15  up here and speak with me privately for a moment.  And then I'm

16  going to come back and ask you a few final follow-up questions.

17  Then we're going to do some individual questions privately with

18  some people, and I'll be able to tell you who that is.

19             So I need you to give me a few minutes.  And while I

20  ask you not to talk to each other, not to share because that

21  gets too loud, it gets to be a mumble.  We have a hard time

22  hearing anyway.  You are -- I do allow you to stand.  You've

23  been sitting a long time.  If you just want to stand and

24  stretch, please feel free to do that.

25             If the lawyers would join me, please.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
1              (On-the-record sidebar conference)

2              THE COURT:  All right.  Outside the presence of the

3    jury panel.

4              Mr. Berry, let me ask you first:  Any questions you

5    ask the Court to expand upon, that I have asked that you would

6    like for me to expand upon of the group.

7              MR. BERRY:  Other than the individual voir dire, just

8    separate and apart from that.

9              (Sotto voce discussion)

10             MR. BERRY:  On the forfeiture question, your question

11   related to real property sort of generically.  We think that

12   there is a qualitative difference in asking about whether they

13   would be okay with a home, taking someone's residence and their

14   home.  So we think that would be worth expanding upon.

15             THE COURT:  And I mentioned that earlier, but I will

16   ask it again.  I mentioned that, but that was way early before

17   they even probably knew.  In fact, I agree with that.  So

18   that's a good question.

19             MR. BERRY:  That's it.

20             THE COURT:  Any additional questions I didn't ask you

21   want me to request?

22             MR. BERRY:  Yeah, my whole questionnaire.

23             THE COURT:  I did almost all of it.

24             MR. BERRY:  No, nothing else.

25             THE COURT:  Mr. Bennett, are there any questions I
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  did ask that you would like me to expand upon?

2          MR. BENNETT:  No, Your Honor.

3          THE COURT:  Any additional questions you would like

4  me to ask?

5          MR. BENNETT:  Mr. Berry's entire questionnaire and

6  mine.  I am concerned for the emotional well-being of jurors

7  who might react adversely to these images and stories, and I'm

8  not sure they have been given a clear, safe space to express

9  the possibility that it might be harmful to them to see these

10 materials involving the sexual abuse of minors.  And I'm seeing

11 something I've never seen before which is Mr. Berry nodding his

12 head.  I think we concur that this is a concern for our jurors.

13         THE COURT:  All right.  And so I guess the answer is

14 no, there's no additional questions you would like me to ask.

15         MR. BENNETT:  No, I wanted to express that concern,

16 though.

17         THE COURT:  Thank you.

18         MR. BENNETT:  We might need it going forward as well.

19         THE COURT:  So let's then ask, Mr. Berry, what

20 individual jurors do you have for voir dire?

21         MR. BERRY:  For individual?

22         THE COURT:  Yes.

23         MR. BERRY:  Yes, sir.  We have 2, 7, 15, 17, 19, 31,

24 44, and 50 is what our records show.

25         THE COURT:  Mr. Bennett, in addition to those,

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   what --

2          MR. BENNETT:  I'm going to have to get my head

3   together with Mr. Haygood.

4          THE COURT:  That's fine.

5          MR. HAYGOOD:  I've got 44.

6          THE COURT:  Got it.

7          MR. HAYGOOD:  I've got 31, 15.

8          MR. BERRY:  Yep.

9          MR. HAYGOOD:  2, 19, 17, and 50.

10         THE COURT:  Okay.  They match up exactly.  Is there

11  one more?

12         MR. BENNETT:  Did we get -- I have question marks on

13  cause for a couple.  Are we including those at this point?

14         THE COURT:  I'm sorry?

15         MR. BENNETT:  I have questionable cause on a

16  couple --

17         THE COURT:  No, no, I'm not talking about that.

18  Okay.  Thank y'all.

19         (On-the-record sidebar conference concluded)

20         THE COURT:  All right.  Thank you very much for your

21  patience.

22         Is there any reason at all, whether I've asked you or

23  not -- and maybe I asked a question an hour and a half ago and

24  you are just now thinking, I should have answered that.  I

25  should have said something, you're second-guessing yourself

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  maybe, anything at all, so whether I've asked it or not that

2  would prevent you from being a fair and impartial juror in this

3  case if you're selected?  Other than what we've already talked

4  about, anything at all?  Unless you've already told me.

5           Okay.  There being no hands raised.

6           Here's what we're going to do.  I'm going to take

7  some individuals and visit with them -- with some of you

8  privately, and we're going to go in chronological order/and so

9  I'm going to call off your name and you'll know I'm going to

10 call you back in this order.  No. 2, No. 7, 15, 17, 19, 31, 44,

11 and 50.  2, 7, 15, 17, 19, 31, 44, 50.

12          Cristina, do you have those?

13          THE CLERK:  Yes, sir.

14          THE COURT:  So Ms. Lerma is going to be the

15 conductor.  She's going to help you get back there.  Because

16 we're going to go back.  You-all can stay here.

17          Also, Ms. Baeza is back there, and she's fortified.

18 She's got help.  And if you need a restroom, which I know some

19 people do, we have got restrooms.  We're going to have to do it

20 safely, of course, and you can get up and go.  She'll help

21 you -- she'll conduct that and help you go safely.  I mean,

22 she's not going to help you go to the bathroom.

23          (Laughter)

24          THE COURT:  She's going to -- and I've said that

25 several times.  That wasn't the first time I've ever said that.

Case 4:19-cr-00774-DC   Document 145   Filed 09/14/21   Page 191 of 226

191

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  She's going to help you go -- safely get out and come back into

 2  the courtroom.  All right?  We're going to go back, the lawyers

 3  and I, and we're going to do this as quickly as we can, and

 4  we'll come back.

 5          So whenever No. 2 comes in, that will be the first

 6  one.  Then when 2 comes back, No. 7 will go in.  It's not like

 7  an initiation, I promise.  It's just we want to talk privately

 8  for a few minutes with these individuals, just seven or so

 9  individuals, or eight or nine or so individuals and that will

10  be it, okay?  Thank you for your patience.  I appreciate it.

11  We're close to the finish and bear with us a little bit longer.

12          So if No. 2 wants to get ready, as soon as she tells

13  you, then come on back.

14          (In Chambers Individual Voir Dire Proceedings)

15             **INDIVIDUAL VOIR DIRE PROCEEDINGS**

16          THE COURT:  Hi, ma'am.  If you would have a seat

17  there.  Thank you.  And you're Juror No. 2.

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  We're outside the presence of the panel.

20  I asked you a question about -- I think about sexual abuse.

21  Were you or someone you know a victim of --

22          PROSPECTIVE JUROR:  It was myself.

23          THE COURT:  As a child or as an adult?

24          PROSPECTIVE JUROR:  I was about 13.

25          THE COURT:  Okay.  I'm so sorry.  Well, this case is

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  not about child abuse, you understand that.  You understand now

 2  what it's about, of course.

 3          PROSPECTIVE JUROR:  Yes, sir.

 4          THE COURT:  It's drawings and writings as to whether

 5  or not they're obscene.  Was that reported?  Was that ever

 6  reported?

 7          PROSPECTIVE JUROR:  No.  Because within my family, it

 8  was just like -- I was raised by my aunt.  My mom had died when

 9  I was 6 years.  So I was raised by an aunt.  And my aunt was

10  real strict, and she didn't like to -- for us kids to always be

11  bothering her with random rumors or anything kind of, you know,

12  gossip or anything like that.  So it was always kept -- I

13  always kept it to myself.

14          THE COURT:  Sure.  I'm so sorry.  So nothing was ever

15  reported.  So there was never a trial or anything like that.

16  So whoever that was never got called on it.

17          PROSPECTIVE JUROR:  No, sir.

18          THE COURT:  Are you able to sit as a fair and

19  impartial juror and determine whether or not drawings and

20  stories are obscene?  Are you able to do that fairly and

21  impartially?

22          PROSPECTIVE JUROR:  Yes, sir.

23          THE COURT:  Will you?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  Okay.  Don't -- and you won't let any of

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  those other thoughts creep into your head; right?

2          PROSPECTIVE JUROR:  No, sir.

3          THE COURT:  Okay.  Very well.  Thank you so much.

4  You're excused.  Thank you, ma'am.  God bless you.

5          Before we get No. 7 in here, Mr. Bennett, did you

6  have a challenge for cause for any of these that are coming?

7  Like No. 15?

8          MR. BENNETT:  Like No. 15?

9          THE COURT:  Have a seat, sir.

10         Juror No. 7, I'm trying to remember what we wanted to

11 speak with you about.  Do y'all recall?

12         MR. BENNETT:  No. 7.

13         MR. BERRY:  Were you victim or close friend...

14         THE COURT:  Yeah.  Were you a victim or you knew --

15 you had a close friend that was a victim of sexual abuse?

16         PROSPECTIVE JUROR:  When I was like maybe junior

17 high, my parents sent my brother and I camping with a family

18 friend who was a priest and he --

19         THE COURT:  Oh, that's what you were talking about.

20         PROSPECTIVE JUROR:  I wasn't raped, but I was hugged

21 and kissed.  And, you know, he put his cock next to me.  And it

22 was just like just one of those things that happened in our

23 family.  That's kind of like fucking Catholic priests, yeah.

24         THE COURT:  Did you ever report it?

25         PROSPECTIVE JUROR:  I talked to my father about it.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              THE COURT:  Sure.

 2              PROSPECTIVE JUROR:  Yeah.

 3              THE COURT:  Did anything else happen about it, do you

 4    know?  He never was tried or anything; right?

 5              PROSPECTIVE JUROR:  You know, I've looked for his

 6    name in the list of priests that have -- but, you know, this

 7    was almost 50 years ago.  So, you know, it's just things that

 8    happen.

 9              THE COURT:  Are you able to sit -- and you know this

10    is not a sex abuse case.

11              PROSPECTIVE JUROR:  I do know that.

12              THE COURT:  It obviously has, you know, sexually

13    explicit conduct.  And are you able to sit and be a fair and

14    impartial juror in this case?

15              PROSPECTIVE JUROR:  Yeah, I understand that this

16    is -- fundamentally this comes down to something that's about

17    free speech and about whether something's --

18              THE COURT:  Obscene.

19              PROSPECTIVE JUROR:  -- obscene or to -- I understand

20    the nature of the case.

21              THE COURT:  And you'll view the drawings and the

22    stories and make your decision based upon the evidence?

23              PROSPECTIVE JUROR:  I could do that.

24              THE COURT:  Will you?

25              PROSPECTIVE JUROR:  I will.
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1            THE COURT:  All right.  Thank you very much, sir.

2  Appreciate you.

3            PROSPECTIVE JUROR:  When were you at Texas Tech, Your

4  Honor?

5            THE COURT:  I graduated in '83.

6            PROSPECTIVE JUROR:  '83?

7            THE COURT:  Yeah.

8            PROSPECTIVE JUROR:  Did you run into Tim Crowley?

9            THE COURT:  The name sounds real familiar.

10            PROSPECTIVE JUROR:  He's my brother.

11            THE COURT:  Is that right?  I'll be darn.  Is that

12  when he graduated or what?

13            PROSPECTIVE JUROR:  He would have been undergraduate

14  in '79.

15            THE COURT:  All right.  Thanks.

16            MR. HAYGOOD:  No, Your Honor, I didn't have a

17  challenge for cause on, I believe, you said 15.

18            THE COURT:  50.

19            MR. HAYGOOD:  Oh, 50.  I'll have to look again.

20            THE COURT:  That's the ICE employee.

21            MR. HAYGOOD:  Yes, I think we may have a challenge

22  for cause.

23            THE COURT:  I think Mr. Berry said the one with a big

24  X over on Mark's.

25            (Laughter)

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1        THE COURT:  There's a pretty big X on mine too.

2        MR. BENNETT:  I'm transparent, Judge.

3        THE COURT:  Go ahead and have a seat, ma'am.  And

4  you're No. 15; right?

5        PROSPECTIVE JUROR:  Yes, sir.

6        THE COURT:  Great.  I asked you a question about a

7  felony charge.  Was that you or someone in your family?

8        PROSPECTIVE JUROR:  My niece.

9        THE COURT:  Oh, I'm so sorry.

10        PROSPECTIVE JUROR:  My niece.

11        THE COURT:  What type of charge was it?

12        PROSPECTIVE JUROR:  I think it's drug related.  I

13  know she's in jail right now.

14        THE COURT:  Oh, I'm sorry.  Yeah, drugs have impacted

15  every family just about.

16        PROSPECTIVE JUROR:  And we live in a border city

17  El Paso, Juarez.

18        THE COURT:  At the time you did.  And she's serving

19  time now.  Are you okay with that?  Do you think it came out to

20  suit everybody?  Or probably not her but...

21        PROSPECTIVE JUROR:  Well, yeah.

22        THE COURT:  Was she treated fairly?

23        PROSPECTIVE JUROR:  Yes, she was.

24        THE COURT:  She was.

25        PROSPECTIVE JUROR:  Yes, sir.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           THE COURT:  You hate to see that happen but hopefully

2  that will change her.

3           PROSPECTIVE JUROR:  We hope so.  She's young.

4           THE COURT:  Yeah.  Anything from that that's going to

5  keep you from being fair and impartial to both sides here?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Okay.  Thank you so much.

8           PROSPECTIVE JUROR:  Thank you.  I have one thing.

9           THE COURT:  Yes, ma'am.

10          PROSPECTIVE JUROR:  When you ask if we know somebody

11  that had -- no, not threaten.  It was another question.  Sorry.

12          THE COURT:  Sexual abuse?  A victim of sexual abuse

13  possibly as a child or adult or somebody who had reported it or

14  you've reported it?

15          PROSPECTIVE JUROR:  No.  I don't remember the

16  question, but I know the answer.  I have a coworker, and she

17  got fired because they found pictures of students on her phone.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR:  I don't know if it was true or

20  not, but that happened.

21          THE COURT:  She did get fired.

22          PROSPECTIVE JUROR:  She did get fired.

23          THE COURT:  Okay.  Anything from that that's going to

24  cause you a problem?

25          PROSPECTIVE JUROR:  No.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1            THE COURT:  Did you ever see any of that stuff?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Okay.  Thank you so much.

4            PROSPECTIVE JUROR:  Okay.  Thank you.

5            THE COURT:  So 50 is a defense challenge for cause?

6            MR. HAYGOOD:  Yes, I have 50 down as challenge for

7    cause.

8            THE COURT:  Mr. Berry?

9            MR. BERRY:  Your Honor, I don't have any notes about

10   him saying he couldn't be fair.  He said he was a prosecution

11   investigator.  He worked for ICE, DRO, but at no point did he

12   ever say that he could not be fair so we would object to that

13   strike for cause.

14           THE COURT:  We're going to talk to him here in a

15   minute.

16           MR. BERRY:  Okay.

17           THE COURT:  Hey there.

18           PROSPECTIVE JUROR:  Yes, sir.

19           THE COURT:  No. 17, our chiropractor.  I'm sorry we

20   took you out of the office today.

21           PROSPECTIVE JUROR:  Oh, no, no worries.

22           THE COURT:  Thank you very much for being here.

23           PROSPECTIVE JUROR:  Yes, sir.

24           THE COURT:  There was a question about I think sex

25   abuse that you wanted to talk about privately.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  Go right ahead.

3          PROSPECTIVE JUROR:  My wife was sexually abused as a

4   child, her stepfather.  It does go to trial.  He was prosecuted

5   and luckily he died a couple of weeks ago so life is good.

6          THE COURT:  Congratulations.  I'm sorry that that

7   happened, of course.  Anything from that that would keep you

8   from being fair and impartial in this case?

9          PROSPECTIVE JUROR:  No, sir.

10          THE COURT:  Now, I know you have a busy practice.

11          PROSPECTIVE JUROR:  I do.

12          THE COURT:  And you're likely going to be called back

13   some other time as opposed to serving on this trial.  But if

14   you were to be seated on this trial, because the lawyers may

15   say, you know, we just have to have him, if that were to

16   happen, can you be attentive to this evidence?

17          PROSPECTIVE JUROR:  You're taking me out of practice

18   for -- actually, my father is coming back -- I misspoke.  He is

19   gone from tomorrow till the 30th.

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR:  So you're closing my practice for

22   five, six, seven, eight -- almost nine days.  I serve a large

23   area from Presidio to Sanderson to Van Horn to here treating

24   lots of y'all's people.  I actually might even know some of

25   those guys.  But, you know, where I am crossing lines and not,

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  I don't know, and I can't tell everyone's face because I treat

 2  a large population of those federal guys.

 3          So to be attentive is hard for me to do to take my

 4  mind off of all of that with my father being gone.  When he's

 5  here, this is easy for me to do.  He is not, and I have lots of

 6  federal student loans.

 7          THE COURT:  I understand.  I know somebody who

 8  understands that.  Thank you very much.  I appreciate you very

 9  much.  You're excused.

10          PROSPECTIVE JUROR:  Okay.  Thank you.

11          THE COURT:  You're excused to go back in there.

12          PROSPECTIVE JUROR:  Yes, sir, I realize that.

13          THE COURT:  I'll talk to the lawyers.

14          PROSPECTIVE JUROR:  Thank you.

15          MR. BENNETT:  I think he misunderstood the duration

16  of this trial, but shutting down his practice for three or

17  four days seems like too much.

18          THE COURT:  Any objection to excusing him by

19  agreement, government?

20          MR. HAYGOOD:  No objection.

21          MR. BERRY:  Oh, we want him.

22          THE COURT:  You don't have to.

23          MR. BERRY:  I mean, I'm going to say no, I don't

24  think he needs to be excused.

25          THE COURT:  Okay.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          MR. BERRY:  I mean, everybody has a job and

2    everybody -- and small business owners don't get extra credit.

3          THE COURT:  Hi.  How are you?  You're No. 19.

4    Outside the presence of the jury.  And you had -- when I -- I

5    mentioned something about -- I think when it was about sex

6    abuse.

7          PROSPECTIVE JUROR:  Correct.

8          THE COURT:  Would you tell us a little bit about

9    that.

10          PROSPECTIVE JUROR:  My father sexually abused my two

11    older sisters.

12          THE COURT:  Oh.  But not you.

13          PROSPECTIVE JUROR:  No.  One is three years older

14    than me and the other one is seven years older than me.

15          THE COURT:  And, you know, this case is not about sex

16    abuse; right?  You understand that.

17          PROSPECTIVE JUROR:  Right.  Right.

18          THE COURT:  Are you able to sit and be a fair and

19    impartial juror in this case?  Meaning taking the evidence as

20    it comes and the lawyers are going to put the evidence in and

21    they'll question it and all that stuff, but make your decision

22    based upon what you hear in that courtroom and not what you

23    know from that sex abuse.

24          PROSPECTIVE JUROR:  Take the evidence and apply the

25    law, is that what you're asking me if I can do?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  Yes, ma'am.

3          PROSPECTIVE JUROR:  Yes, sir.

4          THE COURT:  And not only can you but will you?

5          PROSPECTIVE JUROR:  I will.

6          THE COURT:  Thank you very much.

7          31 is a felony related.  It's a postal worker.

8          (Discussion off the record)

9          THE COURT:  Hi, how are you?  Come in.  Have a seat.

10          PROSPECTIVE JUROR:  Yes, sir.

11          THE COURT:  You're No. 31.  Outside the presence.  So

12    I like your military jacket.

13          PROSPECTIVE JUROR:  My son gave it to me.

14          THE COURT:  I love it.  I would wear it proudly as

15    well.

16          PROSPECTIVE JUROR:  Oh, yes.

17          THE COURT:  Good for you and good for him.  That's

18    fantastic.

19          Ma'am, there was something about a felony, I think,

20    that I asked about.

21          PROSPECTIVE JUROR:  Yes.  My other son, I have two

22    boys, and he was convicted of a crime in Fort Stockton, and

23    he's in prison.

24          THE COURT:  Okay.  I'm so sorry to hear that.

25          PROSPECTIVE JUROR:  Yes.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  And the charge there was what?

2          PROSPECTIVE JUROR:  Murder.

3          THE COURT:  Oh, I'm so sorry.

4          PROSPECTIVE JUROR:  Yep.

5          THE COURT:  So did he go to trial or did he work out

6  a deal?

7          PROSPECTIVE JUROR:  We went -- he went to trial, but

8  I really felt that they just had somebody they could pin it on,

9  and they did it.  Because there is so much talk of the actual

10 person that did it and -- but, yeah, that's...

11         THE COURT:  You don't feel like he got treated

12 fairly.

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Okay.  And where was that exactly?

15         PROSPECTIVE JUROR:  Fort Stockton.

16         THE COURT:  Fort Stockton in the state court.  How

17 long ago was that?

18         PROSPECTIVE JUROR:  The actual crime happened in late

19 February of '99.  He graduated from high school and then, of

20 course, he was picked up as a suspect.  And the actual trial, I

21 believe was in that June, June of 2020 [sic].

22         THE COURT:  From 1999?  It took 20 years to get to

23 trial?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Oh.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1           PROSPECTIVE JUROR:  Okay.  It was a year later.  I'm

2    sorry.

3           THE COURT:  2019 and then 2020.

4           PROSPECTIVE JUROR:  It happened, yeah, in '99 and

5    then the next year, 2000.

6           THE COURT:  Oh, 2000.  I thought you said 2020.

7           PROSPECTIVE JUROR:  Yeah, 2000.

8           THE COURT:  I'm sorry.  So he's been locked up a long

9    time.

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  So.

12           PROSPECTIVE JUROR:  He was -- actually he fled.

13           THE COURT:  He fled.

14           PROSPECTIVE JUROR:  Which made him look guilty.

15           THE COURT:  Oh, sure, of course.

16           PROSPECTIVE JUROR:  But still, you know, the talk to

17    today is still that they know who did it, but they don't care.

18           THE COURT:  So you're not happy with the government

19    in that case, and I don't blame you.

20           PROSPECTIVE JUROR:  No.

21           THE COURT:  Are you able to sit as a fair and

22    impartial juror in this case?

23           PROSPECTIVE JUROR:  Yes, sir.

24           THE COURT:  You're sure?

25           PROSPECTIVE JUROR:  Yes, sir.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1              THE COURT:  Any doubt in your mind?
 2              PROSPECTIVE JUROR:  No, no doubt.
 3              THE COURT:  You would be all right.  You would be
 4   able to sit there.  Now, you work at the postal service?
 5              PROSPECTIVE JUROR:  Yes, sir.
 6              THE COURT:  Are you going to be able to be absent
 7   from that for the rest of the week?
 8              PROSPECTIVE JUROR:  (Nodding head.)
 9              THE COURT:  Yes?
10              PROSPECTIVE JUROR:  If possible, yes.
11              (Laughter)
12              THE COURT:  Okay.  You are under oath.
13              PROSPECTIVE JUROR:  We've been working six days a
14   week for two years.  I'm tired.  We're shorthanded.
15              THE COURT:  Thank you very much, ma'am.  You're
16   excused.
17              PROSPECTIVE JUROR:  Yes, sir.
18              MR. BERRY:  Your Honor, this next one coming in,
19   No. 44, she doesn't list as having a child.
20              THE COURT:  As having what?
21              MR. BERRY:  As having a kid.
22              THE COURT:  Hi, ma'am.
23              PROSPECTIVE JUROR:  Hello.
24              THE COURT:  You're No. 44.  Outside the presence of
25   the jury panel, and you said you wanted to speak to us about
```

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   something?

2          PROSPECTIVE JUROR:  Yes, sir.  One year ago on the

3   17th, my 14-year-old son hung himself at school.

4          THE COURT:  Oh, gracious.

5          PROSPECTIVE JUROR:  And tomorrow is the day that I

6   actually lost him before his donation to Gift of Life, and I

7   just -- it's nothing -- I've served before.  I don't mind

8   serving.  I just don't think tomorrow.  I haven't been in my

9   right state of mind.

10          THE COURT:  Sure.  And you're okay to come back and

11   serve another time.

12          PROSPECTIVE JUROR:  Yes, sir.

13          THE COURT:  You've served before.

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  Thank you very much.

16          PROSPECTIVE JUROR:  It's just for tomorrow.

17          THE COURT:  I understand.  Yeah, it's a special day.

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  Thank you, ma'am.

20          PROSPECTIVE JUROR:  Thank you.

21          THE COURT:  Any objection by agreement?

22          MR. BERRY:  No.

23          MR. BENNETT:  By agreement.

24          THE COURT:  44 is struck by agreement -- excused by

25   agreement, excuse me.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          Yes, sir.  Have a seat.

2          PROSPECTIVE JUROR:  Yes, sir.

3          THE COURT:  You're No. 50.  Outside the presence of

4   the jury panel.  I believe you're an ICE employee; right -- I'm

5   sorry, you're a deportation officer.

6          PROSPECTIVE JUROR:  Yes, sir.

7          THE COURT:  A DO?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And there was something about the sexual

10  abuse question I think that you had an issue.

11          PROSPECTIVE JUROR:  I had made a report when my

12  daughter was 3.  And across the street, my sister-in-law lived

13  there with her husband, and my daughter came home one time

14  saying that she had been hurt.  So I called the sheriff and

15  they came and picked him up.  He had pled not guilty.  But when

16  they did the lie detector with the Texas Rangers, it came out

17  different.  So then he had to make a written statement, but he

18  only got probation from it.

19          THE COURT:  How long ago was that, sir?

20          PROSPECTIVE JUROR:  16 years ago, but she was 3.

21          THE COURT:  Sure.  Anything from that that's going to

22  keep you from being fair and impartial here?

23          PROSPECTIVE JUROR:  No, sir, I mean, the law is the

24  law.  I mean, I worked as a CO for five years with the TDC as

25  well.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  You did?  So obviously you're not real

2   happy with the way that came out with him getting probation.

3          PROSPECTIVE JUROR:  No, sir.

4          THE COURT:  Sure.  But do you hold it against the

5   defense attorney or against the government or anything in this

6   case?

7          PROSPECTIVE JUROR:  No, sir.  I mean, the law is the

8   law, and I have to make my decision based on the facts.

9          THE COURT:  Now, as a deportation officer, federal

10  employee -- how long have you been employed?

11         PROSPECTIVE JUROR:  Over 22 years.

12         THE COURT:  22 years.  And before that you were a CO,

13  you said?

14         PROSPECTIVE JUROR:  CO for TDCJ.

15         THE COURT:  Four years or five years?

16         PROSPECTIVE JUROR:  Five years, and then I was

17  four years in the Marine Corps.

18         THE COURT:  Oh, cool.  Well, Semper Fi.  Good for

19  you.  Do you believe you can be a fair -- will you be a fair

20  and impartial juror in this case?

21         PROSPECTIVE JUROR:  Yes, sir.

22         THE COURT:  Well, there is a little hesitation there.

23  So tell me about that.

24         PROSPECTIVE JUROR:  I mean, like I say, what happened

25  previously and the outcome of it --

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  Right.

2          PROSPECTIVE JUROR:  -- I didn't see it as fair then.

3  But my decision if I was to get on the jury, I mean, it

4  wouldn't be biased.

5          THE COURT:  You wouldn't let any of that impact you?

6          PROSPECTIVE JUROR:  Well, I hope not.  I say -- I

7  mean, I say I won't.

8          THE COURT:  Right.

9          PROSPECTIVE JUROR:  But, you know, everybody, once

10  they see pictures do whatever they -- but that's not my

11  intention, yes, sir.

12          THE COURT:  Sure.  Let me ask you this.  So once

13  you're on the jury, it's very difficult to get off.  So once

14  you get on the jury and you decide, you know what?  This does

15  bother me.  You know, something is impacting me from before,

16  then it's too late to get you off.  And so my question is:

17  Will --

18          PROSPECTIVE JUROR:  I mean, I wouldn't be biased

19  about it or going in saying it's be guilty or not.  I mean, I

20  just -- I don't think I would feel -- because of what happened

21  to my daughter --

22          THE COURT:  Right.

23          PROSPECTIVE JUROR:  -- I wouldn't feel good sitting

24  there in the jury.

25          THE COURT:  Okay.  On this case.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              PROSPECTIVE JUROR:  Yes, sir.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  This case, yes, sir.

4              THE COURT:  This case in particular.  Like, you'd be

5   fine to serve on other juries, just not this case.

6              PROSPECTIVE JUROR:  Yes, sir.

7              THE COURT:  Is that what you're saying to me?

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  And that's because you feel like you

10  would not be fair and impartial or you're concerned that you

11  might not --

12             PROSPECTIVE JUROR:  Yeah, I just have a dislike

13  against that person so it's feelings as well.

14             THE COURT:  Okay.

15             PROSPECTIVE JUROR:  Yes, sir.

16             THE COURT:  Thank you very much.

17             PROSPECTIVE JUROR:  Yes, sir.

18             THE COURT:  All right.

19             Mr. Berry, any challenges for cause from the

20  government?

21             MR. BERRY:  Just one second, yes, Your Honor.

22             THE COURT:  Of course.

23             (Sotto voce discussion)

24             MR. BERRY:  Oh, 27 for sure.

25             THE COURT:  24?  Said he wouldn't view pornography.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

```
 1            MR. BERRY:  Oh, yes.

 2            THE COURT:  View the materials, whatever.

 3            MR. BERRY:  Yes.  24, 27.  I think the defense would

 4   say 41, and we can't really object to that one.

 5            THE COURT:  47?

 6            MR. BERRY:  I'm sorry?

 7            THE COURT:  47?

 8            MR. BERRY:  Yeah, 47 for sure obviously.

 9            (Sotto voce discussion)

10            MR. BERRY:  Okay.  Those are all I have, Your Honor.

11            THE COURT:  Mr. Bennett and Mr. Haygood?

12            MR. BENNETT:  We also have No. 1, who equivocated

13   about the presumption of innocence.

14            THE COURT:  Yes, sir.

15            MR. BENNETT:  And, Mr. Haygood, anything else you

16   have?

17            MR. HAYGOOD:  I had, of course, 41 who knew one of

18   your agents as his brother-in-law.  And I had, oh, 24.  I had

19   written down as well, that he wouldn't view the evidence.  And

20   47 did state that he wouldn't be fair.

21            THE COURT:  Okay.  So let's just start this way.  Let

22   me do it chronologically.  Defense makes a challenge for cause

23   as to No. 1.  Any objection from the government?

24            MR. BERRY:  No.

25            THE COURT:  No. 1 is struck for cause -- defense
```

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  cause.

 2        Then come to chronologically No. 24, the government

 3  is moving -- is challenging for cause.  Any objection?

 4        MR. BENNETT:  No objection, Your Honor.

 5        THE COURT:  24 is government cause.

 6        All of these are unobjected, Cristina.

 7        27, government is moving to -- challenging for cause.

 8  Any objection?

 9        MR. BENNETT:  No, Your Honor.

10        THE COURT:  27 is government's cause without

11  objection.

12        41 is defense cause.  Any objection?

13        MR. BERRY:  No objection.

14        THE COURT:  No. 41 is defense cause without

15  objection.

16        And 47 is government's cause.  Any objection from the

17  defense?

18        MR. BENNETT:  No, Your Honor.

19        THE COURT:  And that was government's cause without

20  objection.  So all of these -- 1, 24, 27, 41, and 47 are all

21  without objection.

22        Any others?

23        MR. HAYGOOD:  What about 50?  50, the gentleman we

24  just had in here.

25        THE COURT:  50.  Oh, okay.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          MR. HAYGOOD:  He said he wouldn't be good for this

2     one but might be good for another one.

3          THE COURT:  Mr. Berry?

4          MR. BERRY:  I mean, I think you worked him over

5     pretty good.  He was saying he was fair for a while.  I don't

6     know how we ended up, but I think he was pretty clear that even

7     though his 3-year-old daughter had been molested, that he would

8     take this case at face value.

9          THE COURT:  Okay.  So I'll grant defense challenge

10    for cause over objection on 50.

11         MR. BENNETT:  Unless I'm mistaken, Judge, I don't

12    think we get there.

13         THE COURT:  I don't either.  I just want to kind of

14    get those clear.

15         Did y'all have any more from the defense?

16         MR. BENNETT:  I don't think so, Your Honor.

17         THE COURT:  Any more from the government?

18         MR. BERRY:  No, sir.

19         THE COURT:  Okay.  Cristina, do your math magic.

20         MR. BERRY:  Do we want -- do you want to excuse 44?

21         MR. BENNETT:  That was by agreement.

22         THE COURT:  That's the child.

23         MR. BENNETT:  Yeah.

24         THE COURT:  Yeah, I'm sorry.

25         MR. BERRY:  It's not a strike for cause but --

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  I thought we already did -- I already

2   said by agreement, excused by agreement, 44.

3          MR. BERRY:  I'm sorry.  I misunderstood.

4          THE COURT:  That's okay.

5          And you weren't here yet, Cristina, I'm sorry.  I had

6   it on my page.

7          MR. BERRY:  Do we have any other excuses?

8          MR. BENNETT:  How about the doctor?

9          THE COURT:  That's the only other one.  I think

10  that's even up -- and I typically don't excuse them just for

11  work because everybody works.  I don't excuse them for kids

12  because most of us have kids, and that's just the way that

13  works unless somebody is in real dire straits.  But if you-all

14  agree to 17, I would be glad to excuse him by agreement.

15         MR. BERRY:  Keep him.

16         THE COURT:  All right.

17         MR. HAYGOOD:  And on that note, No. 35 did state that

18  she has to watch her daughter's kids on Friday when her

19  daughter goes to an appointment in Odessa.

20         THE COURT:  Right.

21         MR. HAYGOOD:  I don't know if the Court wants to --

22         THE COURT:  What does the government say?

23         MR. BERRY:  We can keep her.  Her husband is an

24  investigator.  They might want to strike her anyway.

25         THE COURT:  Well, I typically wouldn't allow her.  It

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  makes it tough, I know, on them, but it also -- there is always

2  going to be that.  That stuff is always going to happen.

3          MR. BENNETT:  In this case, however, there are two of

4  those.  I mean, I don't think we would lose a whole panel if we

5  allowed the doctor and the grandma to be excused.

6          THE COURT:  I think we're going to be okay.  If we're

7  not going to excuse them by agreement, then I'm not going to

8  excuse them, because there is really no reason for cause.

9          So which gives us -- we take off number --

10          THE CLERK:  It gets us to 31.

11          THE COURT:  We get to 31?

12          THE CLERK:  Yeah, that's just the ten and six on

13  both -- on each side.

14          MR. BENNETT:  How many alternates?

15          THE COURT:  Two.  So we have a big enough panel.  I

16  can give everybody an extra one on the 12 if y'all want it.

17          Does the government want an extra?

18          MR. BERRY:  Not really.

19          THE COURT:  Defense?

20          MR. BENNETT:  No.

21          THE COURT:  No.  Okay.  That's a "no" from both.  So

22  we're going to go through 31.  The defense, use your ten; the

23  government uses their six.  We're going to take the first 12

24  between 2 and 31 that are -- and I haven't checked that.

25          You're sure?

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1            THE CLERK:  Yes.

2            THE COURT:  And then the strike pool for the

3     alternates will be 32, 33, 34, and 35, each side gets an extra

4     strike; is that right?

5            THE CLERK:  So you're just giving them one alternate?

6            THE COURT:  Yes.

7            THE CLERK:  Yeah.

8            THE COURT:  By statute.

9            THE CLERK:  Okay.

10           THE COURT:  So keep in mind just that if you use your

11    alternate strike on the first 31, you lose it.  It's got to be

12    used on the alternates:  32, 33, 34, or 35.

13           MR. BERRY:  How many do I get on the first 31?

14           THE COURT:  You get six by statute.

15           MR. BERRY:  Six.  And then one on the alternate.

16           THE COURT:  Yes, sir.  And they get ten and one.

17           MR. BERRY:  I just want to make sure.

18           THE COURT:  Talk to your congressman if you want more

19    strikes.

20           (Laughter)

21           MR. BERRY:  We didn't use them all in November.

22           THE COURT:  Who else?  Anybody else?  Everybody okay?

23           MR. BENNETT:  I think we're okay, Judge.  I'm trying

24    to figure out why we need four in our alternate panel if each

25    of us is just striking from one --

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1        MR. BERRY:  So you end up with two.

2        THE COURT:  So if you both strike --

3        MR. BENNETT:  I thought we were doing one alternate.

4        THE COURT:  We're doing two alternates.

5        MR. BENNETT:  Oh, I'm sorry.

6        THE COURT:  So it will be the 12 plus two.  I'm not

7   great on math.

8        MR. BENNETT:  Judge, I went to law school.

9        MR. BERRY:  So when we double strike the defense

10  attorney in the alternate pool --

11        MR. HAYGOOD:  Double strike.

12        (Laughter)

13        THE COURT:  He wishes.  All right.  Defense can stay

14  here.

15        MR. BENNETT:  Thank you.

16        THE COURT:  We'll close the doors.

17        Y'all can go wherever you want to go.

18        Ten minutes is all I'm going to give you.

19        (In Chambers Individual Voir Dire Proceedings

20  concluded)

21        (Jury strikes)

22        (Recess from 4:19 p.m. to 4:41 p.m.)

23        THE COURT:  If I could have the attorneys come up

24  real quick.

25        (On-the-record sidebar conference)

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              THE COURT:  Outside the presence of the panel.

2              Mr. Berry, you've had an opportunity to look at

3    the -- you and your team have had an opportunity to look at the

4    jury.  Is the government satisfied?

5              MR. BERRY:  Yes.

6              THE COURT:  Any objection?

7              MR. BERRY:  No.

8              THE COURT:  Mr. Bennett, same for the defense.

9              MR. BENNETT:  We're satisfied, Your Honor.  No

10   objections.

11             THE COURT:  All right.  Very good.  Thank y'all.

12             MR. BENNETT:  Your Honor, may I ask a procedural

13   question.

14             THE COURT:  Yes, sir.

15             MR. BENNETT:  Two things, actually.  Would it be okay

16   if we wore transparent face shields while we're at the defense

17   table?

18             THE COURT:  Sure.

19             MR. BENNETT:  And do you think the Court might allow

20   us to open tomorrow morning when everybody is fresh rather than

21   this evening when everybody has been working for --

22             THE COURT:  Are we going to get done by Friday?

23             MR. BERRY:  I'm sorry?

24             MR. BENNETT:  I believe so.

25             MS. MORRISON:  Yes.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1    MR. BENNETT:  We don't have any testimony now.

2    MS. MORRISON:  We will be done Friday, Judge.

3    THE COURT:  Sure.  We can do it in the morning.

4    MR. BENNETT:  Thank you, Your Honor.

5    MS. MORRISON:  Thank you, Judge.

6    (On-the-record sidebar conference concluded)

7    THE COURT:  All right.  Thank you for your patience.

8 The attorneys have been working diligently, and I appreciate

9 that.

10    What's going to happen now is Ms. Lerma is going to

11 call you by name if you're on the jury.  When your name is

12 called, if you'll stand up and collect anything you've got --

13 purse, man purse, whatever.  You know, it doesn't have to be a

14 female purse, jacket, whatever you have --

15    (Laughter)

16    THE COURT:  I don't see a lot of stuff on the

17 floor -- but whatever you have, collect it and go back, and

18 Ms. Baeza is going to direct you to where you're going to

19 return in the morning, and we'll start fresh at 8:30 in the

20 morning.  So that means the jury needs to be back -- be in

21 there no later than 8:20, let's say.  Okay?  So give yourself

22 time.  So if you're on the jury, your name is about to be

23 called and if you'll go on back.

24    THE CLERK:  Emmett Montgomery, Sammy Villarreal,

25 Robert Crowley, Tyler Young, Kacey Evans, Antonio Trujillo,

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   Beau Coggins, Clay Taylor, Christopher Powell, Amber Reeves,

2   Thomas Day, Bobby Sinclair, Bridget Oliphant, Yolanda Dawdy.

3           THE COURT:  So that's going to be -- that's our jury

4   for this trial.  A lot of that is just from where you got chose

5   to sit because they do a random selection of where you sit and

6   what your number is.  A lot of the reason -- if you're sitting

7   in here and not on the jury, a lot of that is just because of

8   the random jury selection, and that's the way it goes.

9           We can never tell where you're going to end up.

10  Also, we can never get to that where we have a jury without the

11  jury pool, the panel, you.  So your being here has been

12  critically in seating that jury.  We'll be asking you back, I'm

13  sure, over the next three months or so.  We'll see.  But we

14  couldn't do what we did today without you and I thank you for

15  your patience and I thank you for your patriotism, I really do.

16          We're going to rise in honor of you as you leave.

17  You're going to leave safely, and I think we've got some folks

18  at the back that are going to help you with that.

19          So let's rise for this jury panel.

20          Thank y'all so much.  God bless and have a great

21  evening.  Thank you.

22          (Jury panel leaves at 4:45 p.m.)

23          THE COURT:  All right.  Outside the presence of the

24  panel.  The panel has been excused.  We have a jury.  They have

25  not been sworn.  The first thing we'll do in the morning is

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1   bring them in, swear them, and I'll read preliminary

 2   instructions.  Ms. Lerma will read the nine count indictment.

 3   Defense will enter their plea of not guilty to all nine counts.

 4           Mr. Berry or Ms. Morrison, whoever wants,

 5   Ms. Morrison is going to open.  Ten minutes or less.

 6           And then for the defense will be who?  Mr. Haygood?

 7           MR. HAYGOOD:  I will be doing the opening, Judge.

 8           THE COURT:  Okay.  Ten minutes or less.

 9           And then first witness.  We'll get rolling.  Right

10   there.  Okay.  Very good.  I appreciate all of your work.

11           Mr. Berry, anything you want to take up outside the

12   presence before we get going?

13           MR. BERRY:  The only thing, Your Honor, that I would

14   ask is that the -- based upon Mr. Bennett's comment in front of

15   the panel about being a First Amendment attorney --

16           THE COURT:  Yeah.

17           MR. BERRY:  -- I would ask that that not happen

18   again.

19           THE COURT:  Sure.

20           MR. BERRY:  I don't think that's an appropriate thing

21   to mention in front of the jury.  They're not asked to pass on

22   anything related to the First Amendment.  They're asked to pass

23   on your instructions regarding the law and him saying, I'm here

24   as some First Amendment, you know, knight in shining armor is

25   not the appropriate thing to present to them.

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1          THE COURT:  I meant to bring that up, Mr. Bennett, if
2     we could just refrain from mentioning that again.  They've
3     heard it already.  That's plenty.
4          MR. BENNETT:  Yes, Your Honor, I will do as the Court
5     asks.  But in fairness, it is on my business cards, it's on my
6     Web site.  That's what I do, and that's what brought me here.
7          THE COURT:  Well --
8          MR. BENNETT:  And as far as them not having to rule
9     on it, the Court's instructions refer to the fundamental right.
10         THE COURT:  Certainly.
11         MR. BENNETT:  I will, of course, do what the Court
12    instructs.
13         THE COURT:  But, I mean, you could see how that
14    might -- in a case like this might lend some credibility that
15    it might tip the scale one way or the other.  I'm a First
16    Amendment advocate, but I'm not a First Amendment attorney.
17    But you're here as an attorney for Mr. Arthur, and so we won't
18    mention that again.
19         MR. BENNETT:  Yes, Your Honor.
20         THE COURT:  And Mr. Berry is, I will tell you,
21    probably had --
22         And I always call you an AUSA.  I apologize, Austin.
23         I know he's a Department of Justice employee now, and
24    I -- and he has some expertise in the field of -- in the field
25    that we're in that I don't think would be appropriate for him

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1   to say, I'm a DOJ lawyer in this particular area.  I mean, I

2   think it just leans one way or the other and it's necessary.

3          MR. BENNETT:  That's a fair point, Your Honor.  Thank

4   you.

5          THE COURT:  Okay.  Very good.  Anything you want to

6   bring up, Mr. Bennett, outside the presence?

7          MR. BENNETT:  I don't think so.

8          THE COURT:  All right.  So what I want from the

9   lawyers -- is everybody staying locally?

10          MR. HAYGOOD:  I'm driving back and forth from Odessa,

11   Your Honor.

12          THE COURT:  Okay.  It's not too far.

13          MR. HAYGOOD:  It's an hour.

14          THE COURT:  So I would like you-all here by ten after

15   8:00.  That way if anything comes up we need to talk about, and

16   you let Ms. Lerma know, and I'll come in.  I'll just be in

17   chambers.  If they're here at 8:20, I want to start at 8:20.  I

18   think that would be a really good way to start off on the right

19   foot.  They might not be here for us, but no later than 8:30

20   we'll start.  And we'll have as few pregnant pauses and delays.

21          That first witness is going to take roughly?

22          MR. BERRY:  A while.

23          THE COURT:  Okay.

24          MR. BERRY:  Ms. Morrison is going to take --

25   Ms. Morrison is going to direct his examination.  It's the case

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1  agent who started the investigation.  And so it could be a

2  little while.

3          THE COURT:  Outstanding.  Okay.  Very good.  I've

4  tinkered with the idea of bringing lunch in for them every day

5  if you-all think we're going to be crushed to get it done by

6  Friday afternoon, evening.  I mean, because otherwise I have to

7  give them about an hour and a half for lunch just because of

8  restaurants and stuff.  Are we okay to do that?

9          MS. MORRISON:  Your Honor --

10          MR. BERRY:  I'm --

11          Go ahead, Monica.

12          MS. MORRISON:  I think we will be done by Friday, but

13  I also think given the jurors, lack of restaurants, I think it

14  would be better to bring lunch in for them.  We could get done

15  much more quickly.

16          MR. BERRY:  And I'm certainly in favor of speeding it

17  along so that we're not -- I don't want any risk or danger of

18  us having to stay over on Saturday.

19          THE COURT:  Sure.

20          MR. BERRY:  I don't think that's going to be an

21  issue, especially with the Court's ruling this morning about

22  Dr. Ley -- or this afternoon about Dr. Ley.  That will

23  certainly speed things up a little bit, but I'm certainly in

24  favor of having lunch brought in, but it's not my nickel.

25          THE COURT:  If there is a conviction, of course, then

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

 1  we have the forfeiture issue as well.

 2          MR. BERRY:  That will be fast as well, based upon the

 3  stipulations and what's left.

 4          THE COURT:  Okay.  Great.  And I'll study the

 5  stipulation tonight.  So I'll do that.  So I say that to be

 6  sure and tell you, you know, if you -- we're going to take for

 7  them to eat lunch, but I'm not going to take enough break for

 8  you-all to go to a restaurant either.  So, you know, bring

 9  something and grab it.  Of course, we won't eat in here, but

10  we'll make sure we get a place to eat.

11          MR. BENNETT:  As far as making sure Mr. Arthur is

12  fed, Your Honor.

13          THE COURT:  Yeah, he will.

14          MR. BENNETT:  Will the marshals provide lunch?

15          THE COURT:  That's the easy part.

16          MR. BENNETT:  Okay.

17          THE COURT:  That's easy.  He'll be fed.  I'm worried

18  more about you, Mr. Bennett.

19          MR. BENNETT:  I'm ketoing, Judge, so I'll be fine.

20          THE COURT:  Is that right?

21          All right.  Very good.  Thank y'all very much, and

22  I'll see you in the morning no later than ten after 8:00.

23          MR. HAYGOOD:  Thank you, Judge.

24          (Proceedings adjourned at 4:54 p.m.)

25                          * * * * * *


                    Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 1 - January 19, 2021

1              **C E R T I F I C A T E**

2

3          I, ANN M. RECORD, Former United States Court

4    Reporter for the United States District Court in and for the

5    Western District of Texas, hereby certify that the above and

6    foregoing contains a true and correct transcript of the

7    proceedings in the above-entitled and numbered cause.

8              WITNESS MY HAND on this 14th day of September,

9    2021.

10

11

12                    _____/s/Ann M. Record_____
                      Ann M. Record, RMR, CRR, CMRS, CRI
13                    Former United States Court Reporter
                      P.O. Box 2357
14                    Midland, Texas  79702

15

16

17

18

19

20

21

22

23

24

25

Ann M. Record, RMR, CRR, CMRS, CRI