USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
 2                             PECOS DIVISION

 3
    UNITED STATES OF AMERICA,          ) Case No. 4:19-CR-774
 4                                     )
           Plaintiff,                  ) COA No. 21-50607
 5                                     )
        vs.                            ) Pecos, Texas
 6                                     )
    THOMAS ALAN ARTHUR,                )
 7                                     ) January 20, 2021
           Defendant.                  )
 8   _____) 8:16 a.m.

 9
                    TRANSCRIPT OF JURY TRIAL - VOL. 2
10             BEFORE THE HONORABLE DAVID COUNTS
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13
     FOR THE GOVERNMENT:
14        MR. AUSTIN M. BERRY, TRIAL ATTORNEY
          Department of Justice, Child Exploitation
15        601 N. Loraine, Suite 398
          Midland, Texas  79701
16
          MS. MONICA R. MORRISON, AUSA
17        Office of the United States Attorney
          Pecos/Alpine Division
18        2500 North Highway 18, Suite A200
          Alpine, Texas  79830
19

20   FOR THE DEFENDANT:
          MR. LANE ANDREW HAYGOOD
21        Haygood Law Firm
          522 North Grant
22        Odessa, Texas  79761

23        MR. MARK BENNETT
          Bennett & Bennett
24        917 Franklin Street, Fourth Floor
          Houston, Texas  77002

25
```

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1    **APPEARANCES:   (CONTINUED)**

2

3    **COURT REPORTER:**
           MS. ANN M. RECORD, RMR, CRR, CMRS, CRI
4          P.O. Box 2357
           Midland, Texas   79702
5

6

7           Proceedings reported by machine shorthand reporter.
           Transcript produced by computer-aided transcription.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

```
 1                       I N D E X

 2

 3                                                    PAGE

 4   Proceedings                                         6

 5   Opening Statement by Ms. Morrison                  32

 6   Opening Statement by Mr. Haygood                   35

 7   Government rests                                  254

 8   Motion by Mr. Haygood                             255

 9   Ruling by The Court                               255

10   Defense rests                                     261

11   Government closes                                 261

12   Defense closes                                    262

13

14   WITNESSES FOR THE GOVERNMENT:                    PAGE

15   JEREMY EWAN
         Direct Examination By Ms. Morrison            39
16       Cross-Examination By Mr. Bennett              96
         Redirect Examination By Ms. Morrison         108
17       Recross-Examination By Mr. Bennett           111

18   BRIAN NISHIDA
         Direct Examination By Mr. Berry              112
19       Cross-Examination By Mr. Haygood             157

20   DEREK PEARSON
         Direct Examination By Ms. Morrison           167
21       Cross-Examination By Mr. Bennett             197

22   SANDRA ARTHUR
         Direct Examination By Mr. Berry              206
23       Cross-Examination By Mr. Bennett             234
         Redirect Examination By Mr. Berry            236
24       Recross-Examination By Mr. Bennett           238

25
```

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1                        **I N D E X** (CONTINUED)

2                                                          **PAGE**

3   ALICE DOWNIE
        Direct Examination By Ms. Morrison              239
4       Cross-Examination By Mr. Haygood                251
        Redirect Examination By Ms. Morrison            253
5

6   **GOVERNMENT EXHIBITS:**                                **RCVD**

7   GX 1     9/25/2019 Screen capture - Screen names      46
             - 8:08
8   GX 2     9/25/2019 Screen capture - Forum             49
             registration - 5:18
9   GX 3     9/25/2019 Screen capture - Member            49
             services - 2:06
10  GX 4     9/25/2019 Screen capture - Stories -         49
             5:29
11  GX 5A    A - Story 1 - "A Spectacle to Beat All       51
             Others" by babyNpop
12  GX 5B    Story Locations                             117
    GX 6A    A - Story 2 - "Baby Wank" by Evil Dad        51
13  GX 6B    Story Locations                             117
    GX 7A    A - Story 3 - "Buttfucking a 10-Year-Old     51
14           Girl" by Steven Seven
    GX 7B    Story Locations                             117
15  GX 8A    A - Story 4 - "Replacing My Wife - She       51
             Had it Coming" by Baby Raper
16  GX 8B    Story Locations                             117
    GX 9A    A - Story 5 -"The Baby Mangler" by           51
17           Lachurna
    GX 9B    Story Locations                             117
18  GX 10A   Drawing 1 - Netman169                        50
    GX 10B   Drawing Locations                           117
19  GX 11A   Drawing 2 - Girls_suck                       80
    GX 11B   Drawing Locations                           117
20  GX 12A   Drawing 3 - Loadthemule                      80
    GX 12B   Drawing Locations                           117
21  GX 13    Articles of Incorporation                   123
    GX 14    List of Story Names - Summary Chart         125
22  GX 15    List of Author Names - Summary Charts       125
    GX 16A-DD30 photos from November 7, 2019              68
23           residential search
    GX 17    Instructions on uploading to Mr. Double     127
24

25

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1            I N D E X (CONTINUED)

2    GOVERNMENT EXHIBITS:                                      RCVD

3    GX 18    Authors Balance Report (129 pages) -        128
              W9info (1999 & 2000); Aug99; Balance
4             Aug_Oct 2002; Balance Aug_Oct 2003;
              Balance Aug_Oct 2004; Balance Aug_Oct
5             2005
     GX 19    Tax records summary chart                   245
6    GX 20    Letter to accountant - Scott2002.doc        249
     GX 21A-B Letter to accountant - *Scott2003.doc;      249
7             Scott2_2003. doc
     GX 22    Letter to accountant - Scott2007 .doc       249
8    GX 23    Letter to accountant - Scotttax20 11.doc    249
     GX 24    Mr. Double website                          141
9    GX 25A-E Aerial photos pre-SW                         59
     GX 26A   Interview of Thomas Arthur                  169
10   GX 26B   Interview of Thomas Arthur                  172
     GX 26C   Interview of Thomas Arthur                  175
11   GX 26D   Interview of Thomas Arthur                  177
     GX 26E   Interview of Thomas Arthur                  179
12   GX 26R   Interview of Thomas Arthur                  180
     GX 26Q   Interview of Thomas Arthur                  183
13   GX 26P   Interview of Thomas Arthur                  184
     GX 26O   Interview of Thomas Arthur                  185
14   GX 26N   Interview of Thomas Arthur                  186
     GX 26M   Interview of Thomas Arthur                  188
15   GX 26F   Interview of Thomas Arthur                  190
     GX 26G   Interview of Thomas Arthur                  191
16   GX 26H   Interview of Thomas Arthur                  192
     GX 26L   Interview of Thomas Arthur                  193
17   GX 26I   Interview of Thomas Arthur                  193
     GX 26K   Interview of Thomas Arthur                  194
18   GX 26J   Interview of Thomas Arthur                  195
     GX 27A   LNK files - Authors Balance Report          130
19   GX 27B-C LNK files - Child Raper; Ally and Her       132
              Dad
20   GX 28    Sitema2.gif (Sitemap of Mr. Double          130
              website)
21   GX 29A-M E-mails from Mr. Double                      89
     GX 30    Fort Davis bank records                      64
22   GX 31A-D Forum posts from Mr. Double                  92
     GX 32    Aerial photo                                 61
23   GX 33A-B Story codes                                  57
     GX 34    Stipulation                                  94
24   GX 35AA  Stories                                      56
     GX 35BB  Stories                                      56
25   GX 35A-II Stories (excluding AA and BB)               57

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

```
1                    P R O C E E D I N G S
2            THE COURT:  All right.  Good morning.  The Court is
3    going to call outside the presence of the jury, U.S. vs. Thomas
4    Arthur.  We're all here.  Mr. Arthur is here.  Y'all switched
5    places on me.  Good for y'all.
6            MR. BERRY:  Were we supposed to?
7            THE COURT:  Yes, but I didn't go into it or discuss
8    it.
9            MR. BERRY:  Yeah, no worries.
10           THE COURT:  I want to make sure the defense, and most
11   in particular, Mr. Arthur has a direct line of sight to the
12   witness who is testifying.
13           Mr. Berry, does the government have anything outside
14   the presence that you want to discuss?
15           MR. BERRY:  Yes, Your Honor.  Mr. Bennett filed
16   something last night.  I don't know if you have had a chance to
17   look at it.
18           THE COURT:  I have.
19           MR. BERRY:  Okay.  So I would like to address that.
20   I don't know if you want to hear from me first or --
21           THE COURT:  I'll just address it with Mr. Bennett.
22   Did you have anything other than that?
23           MR. BERRY:  No.
24           THE COURT:  Mr. Bennett, let me ask you a few
25   questions.  So I assume that you filed this since your name is
```

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  signed to it; right?

2        MR. BENNETT:  Yes, Your Honor.

3        THE COURT:  Okay.  And you drafted it?

4        MR. BENNETT:  Yes, Your Honor.

5        THE COURT:  Okay.  And the first five words says:

6  "The Court's comments about argument..."

7        MR. BENNETT:  Yes, Your Honor.

8        THE COURT:  What are you talking about?  The Court is

9  confused as to the -- but let me set the stage.  The lawyers

10  approached yesterday, and I was ready to keep going, and the

11  defense requested that we not keep going.  It was almost 5:00.

12  It was going to take some time to read the preliminary

13  instructions and get started.

14        I thought we could surely use our time till 5:30 or

15  so.  The defense -- and not only the defense, you, Mr. Bennett

16  in particular, Can we just wait and start fresh in the morning?

17  And I agreed.  And what I thought you meant was you were going

18  to get fresh for this morning instead of spending time on stuff

19  like this, but I guess that's what you prefer to use your time

20  doing.  I'm not going to try to manage your time.

21        I will say that my comment was only as to your single

22  comment when I asked you to introduce the people at your table,

23  you said, I'm Mark Bennett.  I'm a First Amendment lawyer.

24  That's the only comment -- that's not argument.  That is trying

25  to influence the jury panel that you're some attorney that's

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  elevated above other attorneys because they're not,

2  quote/unquote, First Amendment attorneys.  Or I'm a Second

3  Amendment attorney in a gun case.  Whatever you would like to

4  say.

5          Now, that's fine.  You commented when Mr. Berry asked

6  that we not do that again, and the Court made a simple

7  statement that you not do that again.  I don't want Mr. Berry

8  doing that.  You stated, It's on my business card.  It's just

9  who I am.  I've looked at your business card.  I don't see it.

10  I've looked at your Web sites this morning.  I don't see any

11  reference to First Amendment.  There may be some.  We did a

12  search.  I can't find it.  I see criminal defense.  I see:  You

13  need to stop and see us first.  That's the one "first" I found,

14  was:  Stop in and see us first.

15          And so it's a little aggravating that you tell me I

16  made comments about your argument.  We've not argued yet.  And

17  then you go into this, frankly, you know, are we going to be

18  able to defend our client.  Can I not say that this is a matter

19  of free speech.  You're welcome to argue within the rules.

20          And then you make some slight about your opposing

21  brethren making objections.  We're going to try a lawsuit.  The

22  rules of evidence apply.  Each side has the right to object.

23  I'm happy to entertain any objections, whether they be

24  frivolous or whether they be -- have merit.

25          I can't -- I don't appreciate, one, the waste of your

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   time; two, the waste of mine.  I made no comments about

2   argument.  And I also say your opening statement is not an

3   argument.  I think you should know this by now.  How long have

4   you practiced?

5           MR. BENNETT:  25 years, Your Honor.

6           THE COURT:  25 years.  Well, that's ten less than me,

7   but that's a long time.  That's a long time.  And you've

8   tried -- I assume you've tried a lot of cases.  I think it's

9   embarrassing to the craft that we have that you would spend

10  time putting something like this in writing.

11          If you had some comment like this yesterday, I would

12  have entertained that; but you spent time, I guess, last night

13  getting fresh -- while you're getting fresh for trial -- and I

14  just hate that we wasted time when we could have had this jury

15  here and gotten -- we could have started evidence immediately

16  this morning.

17          I made no comments about argument.  Do you believe I

18  did?

19          MR. BENNETT:  Yes, Your Honor.

20          THE COURT:  How so?

21          MR. BENNETT:  And may I explain?

22          THE COURT:  I guess you can.

23          MR. BENNETT:  All right.  Thank you, Your Honor.  In

24  the course of that conversation, there was mention of saying

25  that I represented the First Amendment.  And my recollection is

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   fuzzy, Your Honor, and I don't have the transcript.  And it may

2   have been Mr. Berry rather than the Court and the Court may

3   have endorsed Mr. Berry's statement in my perception.

4          But I just -- for the sake of representing -- and I

5   have been practicing a long time, Your Honor, and I hate that I

6   filed something that the Court finds an embarrassment because I

7   didn't mean to.  And I think the Court may have -- I think I

8   may have misconveyed my tone there.  When I'm talking about my

9   brethren on the other side, of course I have great respect for

10  my brethren on the other side.  I wouldn't call them brethren

11  otherwise.

12         However, I need to know that I can make the arguments

13  that need to be made for my client --

14         THE COURT:  Well, so you want a preliminary ruling

15  that you can make arguments.  Argue your case when we get to

16  argument, and then I'll make rulings if there are objections.

17  I expect you'll object to the government's arguments should you

18  believe they not be appropriate.

19         MR. BENNETT:  Yes, Your Honor.  And in ordinary

20  circumstances, that's just where it would have gone; however,

21  the discussion that we had yesterday about my introduction --

22  for which I apologize, Your Honor.  And you're right.  The

23  government has its own expertise that it didn't refer to in its

24  opening statement and would have really gotten my goat if they

25  had.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1            THE COURT:  Well, sure.  Yeah.

2            MR. BENNETT:  And I appreciate Mr. Berry having the

3    conscience not to do that, and I appreciate the Court pointing

4    that out.

5            I'm proud of my ethics, I'm proud of my service to

6    the criminal justice system over 25 years, and I just want to

7    make sure that I can do everything possible to get Mr. Arthur a

8    fair trial.  And my concern, Your Honor, is that there was some

9    discussion about what I could and couldn't say.  The Court

10   said, Don't say that again.  And my interpretation of that

11   colloquy, the three-way discussion was, don't say these other

12   things again.

13           And I just want to make sure that if there are things

14   that the Court wants me not to delve into or not to say, that I

15   know beforehand.  Because if the Court already has something in

16   mind that it thinks would be out of line, then I know

17   beforehand.  Because the worst thing for Mr. Arthur would be

18   for me to say something the Court has -- that the Court has --

19   that the Court has already ordered me not to say and I don't

20   realize that the order encompassed that.

21           So I understand don't say First Amendment lawyer.

22           THE COURT:  I just admonished you for saying it is

23   all I was doing --

24           MR. BENNETT:  Okay.

25           THE COURT:  -- hoping that the admonishment would be

Case 4:19-cr-00774-DC  Document 146  Filed 09/14/21  Page 12 of 286

12

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1    enough, that it wouldn't come up again.

2              MR. BENNETT:  Okay.

3              THE COURT:  That's the Court's intention.  I find it

4    disingenuous that the motion was filed for clarification from a

5    seasoned, well-thought-of attorney as yourself.  I was shocked.

6    But I'll get over it.

7              MR. BENNETT:  Okay.  Thank you, Your Honor.

8              THE COURT:  I want to move on.  I don't want to waste

9    our time on stuff like this.

10             Mr. Berry, did you have anything you needed to say or

11   respond?

12             MR. BERRY:  Your Honor, just very briefly.  What I

13   want to make sure of is, because I am still hearing some

14   uncertainty on his side, which makes me concerned about what

15   he's prepared to say and not say.

16             THE COURT:  Right.

17             MR. BERRY:  And as you point out, and that was going

18   to be my first point, is today is not argument.  Today is the

19   evidence will show.

20             THE COURT:  Right.

21             MR. BERRY:  That's all I can say.  That's all he can

22   say.  At no point today or probably tomorrow, if we get to

23   closing arguments tomorrow, before we get there, should any of

24   this that was filed last night have any bearing whatsoever in

25   anything he says or I say.  I'm not going to say, Hey,

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  remember, he asked the Court to say, Hey, Mr. Berry, you can't

2  say these stories cause kids to get raped.  I can't say that;

3  right.  I can't say the reverberations in the community are if

4  you don't convict this guy, kids are going to get molested.  I

5  can't say that.

6        He can't wrap himself in the First Amendment and come

7  out and say, Ladies and gentlemen, even if you find all the

8  elements beyond a reasonable doubt, you need to nullify and

9  uphold the First Amendment, because that's essentially what

10  he's suggesting here, is a nullification argument.

11        So I have prepared some case law.  I'm prepared to

12  file it with the court.  If the Court wants to make a more

13  formal ruling with case law or whatever, I'm happy to file that

14  tonight to put it on the record.  But I don't want to belabor

15  that point for now because all we have is opening statements

16  today, and I can address this later, but I do have a -- my

17  argument is:  You can't argue nullification.

18        THE COURT:  So we're clear, though, Mr. Bennett?  Are

19  we clear?  Are you clear?

20        MR. BENNETT:  I am clear that what the Court said

21  yesterday was, Don't say you're a First Amendment lawyer, and

22  that's the limit of the Court's order.  The worst thing would

23  be for me to violate the order that the Court has already given

24  and be held in contempt and harm my client.

25        THE COURT:  I'm not going to do that.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BENNETT:  Okay.

2          THE COURT:  You're not going to do that.  I just --

3  and it was over.  It was all done.  I'm concerned that you're

4  not clear.

5          MR. BENNETT:  I've apparently made a mountain out of

6  a molehill, Your Honor.  And I don't have the transcript.  I'm

7  not going to argue jury nullification.  We know this.  So I

8  think Mr. Berry's concern about jury nullification is

9  misplaced.  I have no intention of arguing that.  I think we're

10  clear.  I will take the Court at this morning's statement

11  figuring that I misunderstood what happened yesterday.

12          THE COURT:  Thank you.

13          MR. BENNETT:  Thank you.

14          THE COURT:  Anything else we need to bring up?  I

15  know the government may --

16          Mr. Bennett, did you have anything you wanted to

17  bring up?

18          MR. BENNETT:  While I'm at the lectern, Your Honor.

19  We got some Jencks material this morning.

20          THE COURT:  Okay.

21          MR. BENNETT:  It's grand jury transcripts.

22          THE COURT:  Okay.

23          MR. BENNETT:  We may need some time after direct

24  examination of the respective witnesses who are Agent Ewan,

25  Agent Downie, and Ms. Arthur to review the Jencks material.  I

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  just wanted to give the Court heads up that we just got it.

2          THE COURT:  If that comes at a convenient time for a

3  break, then we'll take it.  If not, we won't.

4          MS. MORRISON:  And, Your Honor, just for defense

5  counsel's information, Agent Ewan will be testifying.  He will

6  be our first witness.  The other two will not be towards --

7  until the end of the trial.

8          THE COURT:  Okay.

9          MS. MORRISON:  So there should be a natural break to

10 allow for the review of the other two witnesses.

11         THE COURT:  When is your responsibility to give them

12 that information, to give them what you gave them this morning?

13         MR. BERRY:  After they testify, Your Honor.

14         THE COURT:  After.  So you're doing it ahead of time.

15 So I appreciate that.  I know every attorney would always like

16 it earlier.  I've litigated, you know; but we're not going to

17 take a break just for review of that.  Hopefully it will work

18 out to where we can take a break and you-all can do that.  Any

19 other witnesses, obviously you've got plenty of time, and so

20 that shouldn't be an issue.  So very well.

21         Your first witness is going to be?

22         MS. MORRISON:  Agent Ewan.

23         THE COURT:  All right.  Very good.

24         MS. MORRISON:  And, Your Honor, for the Court's

25 information, we just wanted to make sure that the Court

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1 approves of the manner in which we're going to introduce the

 2 five stories.

 3            THE COURT:  Yeah.

 4            MS. MORRISON:  It is my plan to have Agent Ewan

 5 testify.  We will introduce them.  But rather than circulating

 6 all five of them at once, we will give them the opportunity to

 7 see one at a time, have them collected, and then circulate the

 8 second one so they're not fussing through a lot of papers.

 9            THE COURT:  Sure.  So you'll take them back up before

10 you go to the next story.

11            MS. MORRISON:  Yes, sir.

12            THE COURT:  Okay.

13            MS. MORRISON:  And the same thing with the drawings

14 as well.

15            THE COURT:  I think that's likely the best way, most

16 efficient way to do it.  I'm not trying to figure out the best

17 way for you-all to try your case, either side.  I'm trying

18 to -- best way to efficiently use this jury's time and to have

19 a good, clean, fair trial.  So I think that's a good way.

20            MS. MORRISON:  Well, I think that will allow for the

21 most efficient way to accomplish this.

22            THE COURT:  So just don't forget.  Any witnesses are

23 going to come -- they're going to walk all the way up here to

24 your right really and so -- yeah, to come back up this way.

25 And when y'all approach, you're going to come this way.  So how

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  are we going to hand out these stories?  How is the best way to

2  do that without you getting in the middle of the jury?

3          MS. MORRISON:  Your Honor, would the Court prefer to

4  have court personnel pass them out?

5          THE COURT:  I think that's probably better.

6          So Ms. Lerma.

7          THE CLERK:  Yes, sir.

8          THE COURT:  Our jack-of-all-trades.  She'll do it all

9  and she's good at everything.

10          MS. MORRISON:  Okay.

11          THE COURT:  So we'll have her do that, and then she

12  can take them all up.  What I don't want is I don't want to

13  hand them out and then have her --

14          Cristina, I don't want you standing there waiting for

15  them to get done.  So you'll come back here and sit down.  When

16  they're done --

17          THE CLERK:  They will circulate it --

18          THE COURT:  Well, they're each going to have their

19  own copy, is the way it sounds.

20          MS. MORRISON:  Yes, sir.

21          THE CLERK:  Oh.

22          THE COURT:  And so I think that's likely going to be

23  better for them than putting it up on a screen and just doing

24  that.  I think that works.  So you probably need to give a head

25  nod to Ms. Lerma as when you think they're done.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MS. MORRISON:  We're going to be timing as well.

2     They'll have an allotted amount of time.  I mean, certainly for

3     people that are struggling to read, we might give them a little

4     bit more; but we want to keep it moving.

5          THE COURT:  Sure.

6          MR. BERRY:  Your Honor, if it's okay with you, our

7     thought was that we would give them each about ten minutes.

8          THE COURT:  Okay.

9          MR. BERRY:  Because it is a story.  It is text.

10         THE COURT:  Sure.

11         MR. BERRY:  I don't know what everyone's proficiency

12    that's going to be -- and obviously, I should say the monitor

13    is not going to be conducive to 14 people reading at different

14    speeds and the size and text and then scroll and see.  So

15    that's why we are doing it that way.  But if you think we

16    should do less, then by all means, you know, just signal us and

17    say, Hey, it's been six minutes.

18         THE COURT:  Yeah, I'll watch.  If they set them aside

19    and all of them are done, then I think that makes it obvious.

20         MR. BERRY:  And then at the same time, if at the

21    ten-minute mark they're all still deeply engrossed in that high

22    quality literature, then we'll wait a few more minutes.

23         THE COURT:  Mr. Bennett, you had something like that?

24    I'm sorry.

25         MR. BENNETT:  No, I was just getting straight

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   wondering how many copies were going to be handed out to the

2   jury.  It sounds like 14 copies of each story and then get

3   those returned and 14 copies of the next.

4           MS. MORRISON:  Yes, sir.

5           THE COURT:  Yeah, so we're not going to hand them out

6   all at once, you know, five stories at once.  That would be a

7   mess.

8           MS. MORRISON:  Yes, Your Honor, just one at a time.

9           THE COURT:  Mr. Bennett, what else do you have?

10          MR. BENNETT:  I think that's it, Your Honor.  Thank

11  you.

12          THE COURT:  Thank you.

13          MR. BENNETT:  It's going to be a good day.

14          THE COURT:  It is.

15          Do we have a jury?

16          COURT SECURITY OFFICER:  Yes, sir.

17          THE COURT:  So let's bring the jury in.

18          Let's rise for the jury, please.

19          (Jury enters at 8:32 a.m.)

20          (Jury sworn by the clerk at 8:33 a.m.)

21          THE COURT:  Thank you.  You may have a seat.  Thank

22  you so much.  You'll see a notebook in your chair.  And what

23  we'll do every time you come in and go out, we'll be rising for

24  you in honor of you because you are the judges of the facts in

25  this case and you're the exclusive judges of the credibility of

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the weight to give to the witnesses and the evidence.

2          What we'll do each time you come in is if you would

3  stay standing until all of your members come in.  That way we

4  can honor everyone.  Because if you're not the first, you're --

5  everybody will already be sitting down.  So we'll stay standing

6  and I'll have everybody have a seat together, all of us.

7          Members of the Jury:

8          You've now been sworn as the jury to try this case.

9  You and you alone are the judges of the facts.  By your verdict

10  you'll decide the disputed issues of fact.  I will decide all

11  questions of law that arise during the trial.  And before you

12  retire to deliberate at the close of the case, I'll instruct

13  you on the rules of law that you must follow and apply in

14  deciding upon your verdict.

15          Nothing I may say or do during the trial is intended

16  to indicate nor should be taken by you as indicating what your

17  verdict should be.  Your verdict should be based upon your

18  independent assessments of the facts in this case as applied to

19  the law in which the Court instructs you at the conclusion of

20  the case.

21          The evidence from which you will find the facts will

22  consist of the testimony of witnesses, documents and other

23  things received into the record as exhibits, and any facts the

24  lawyers agree to -- agree or stipulate to, or that the Court

25  may instruct you to find.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          Certain things are not evidence and must not be

2    considered by you.  Statements, arguments, and questions by

3    lawyers are not evidence.  Objections to questions by lawyers

4    are not evidence.  Lawyers have an obligation to their clients

5    to make an objection when they believe evidence being offered

6    is improper under the rules of evidence.

7          You should not be influenced by the objection or by

8    the Court's ruling on it.

9          If I sustain an objection, ignore the question.  If I

10   overrule an objection, treat the answer like any other.  If you

11   are instructed that some item of evidence is received for a

12   limited purpose only, you must follow that instruction.

13   Testimony the Court has excluded or told you to disregard is

14   not evidence and must not be considered.  Anything you may have

15   seen or heard outside the courtroom is not evidence and must be

16   disregarded.  You will decide the case solely on the evidence

17   presented here in the courtroom.

18          There are two kinds of evidence: direct and

19   circumstantial.  Direct evidence is direct proof of a fact such

20   as testimony of an eyewitness.  Circumstantial evidence is

21   proof of facts from which you may infer or conclude that other

22   facts exist.  I'll give you further instructions on these as

23   well as other matters at the end of the case, but have in mind

24   that you may consider both kinds of evidence, both direct and

25   circumstantial.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          It will be up to you to decide which witnesses to
2   believe, which witnesses not to believe, and how much of any
3   witness' testimony to accept or reject.  I'll give you some
4   guidelines for determining the credibility of witnesses at the
5   end of the case.
6          You should give careful consideration and attention
7   to the testimony and evidence presented for your consideration
8   during the trial, but you should not form or express any
9   opinion about the case one way or the other until you have
10  heard all of the evidence, the closing arguments of the
11  lawyers, and my instructions on the applicable law.
12          Although exhibits which I admit into evidence during
13  the course of the trial will be available to you for your
14  inspection and review during your deliberation on a verdict,
15  under normal circumstances, no written transcript of the
16  testimony of witnesses can be made available to you for your
17  review during deliberations.  Nor under normal circumstances
18  can all or any significant portion of a witness' testimony be
19  read to you once you commence your deliberation.  It's,
20  therefore, very important that you pay strict attention to the
21  testimony given by each witness during the trial of this case.
22          If you would like to take notes during the trial, you
23  may do so.  On the other hand, you're not required to take
24  notes.  Each of you should make your own decision about this.
25  If you decide to take notes, be careful to not get so involved

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1  in your note-taking that you become distracted from the ongoing

 2  proceedings.  Your notes should be used only as memory aids.

 3  You should not give your notes precedence over your independent

 4  recollection of the evidence.

 5          If you do not takes notes, you should rely upon your

 6  independent recollection of the proceedings and not be unduly

 7  influenced by the notes of other jurors.  Notes are not

 8  entitled to any greater weight than the memory or impression of

 9  each juror as to what the testimony may have been.  Whether you

10  take notes or not, each of you must form and express your own

11  opinion as to the facts of the case.

12          You will note that we do have an official court

13  reporter.  I introduced her to you yesterday.  She's making a

14  record of the trial.  However, we will not have typewritten

15  transcripts of the record available for your use in reaching a

16  decision in this case.

17          During the trial you must not discuss the case in any

18  manner among yourselves or with anyone else, and you must not

19  permit anyone to attempt to discuss it with you or even in your

20  presence.  And insofar as the lawyers are concerned as well as

21  others whom you may come to recognize as having some connection

22  with the case, you're instructed that in order to avoid even

23  the appearance of impropriety, you should have no conversation

24  whatsoever with those persons while you're serving on the jury.

25          You'll notice that -- the court security officers

1  present in the courtroom, those folks with the blue blazers.

2  They actually have a tie on as well.  Mr. Pruett does back

3  there.  And sometimes they will have a vest that will cover up

4  the tie, but his is showing.  So if you have a question that

5  you feel you need to ask me or something to bring to my

6  attention, let one of them know, and they will get that

7  information to me.

8         You may not attempt to conduct any independent

9  investigation concerning the case.  You must avoiding reading

10  any articles that might be published about the case now that

11  the trial is in progress.  And you must avoid listening to or

12  observing any broadcast program -- whether on television, radio

13  or Internet -- because there is a possibility that mention

14  might be made of the case during such a broadcast.

15         Do not research this case on the Internet or post

16  about the case on social media.  I repeat:  Do not research

17  this case on the Internet or anywhere else or post about the

18  case on social media.  The reason for these cautions, of

19  course, lies in the fact that it will be your duty to decide

20  this solely on the basis of the testimony and the evidence

21  presented during trial without consideration of any other

22  matters whatsoever.

23         At times during the trial, I'll be called upon to

24  make rulings of law on motions or objections made by lawyers.

25  You should not infer or conclude from any ruling I may make

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   that I have any opinions on the merits of the case favoring one

2   side or the other.

3          If I sustain an objection to a question that goes

4   unanswered by the witness, you should not speculate on what

5   answer might have been given.  Nor should you draw any

6   inferences or conclusions about the question itself -- or from

7   the question itself.

8          During the trial, it may be necessary for me to

9   confer with the lawyers at times out of your hearing concerning

10  questions of law or procedure that require consideration by me

11  alone.  Feel free to stand and stretch quietly during any such

12  sidebar or bench conference.  On occasion, should I think it

13  may take longer, I may excuse you from the courtroom as a

14  convenience to you while I discuss matters with the lawyers.

15  We'll try to limit such interruptions as much as possible, but

16  you should remember and at all times the importance of the

17  matter you are here to determine and should be patient even if

18  the case seems to go slowly at times.

19         We'll take regular comfort breaks, and there are

20  snacks and beverages in the jury room, as you've likely

21  noticed, along with restrooms that are available as well and

22  people to help and assist with that.  At any time, however,

23  that you feel a need to take an unscheduled break, simply raise

24  your hand so that I can see it, and I will take a break at the

25  soonest point possible thereafter.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          As the trial begins, the lawyers for each side will

2   be given an opportunity to make opening statements in which

3   they may explain the issues in the case and summarize the facts

4   they expect the evidence will show.

5          First, the prosecution may make an opening statement

6   which, again, is simply an outline to help you understand the

7   evidence the prosecution expects to introduce.

8          Next, the defense attorney may elect to make an

9   opening statement or may defer such opening statement until

10  after the prosecution rests its case in chief should the

11  defense wish to make an opening statement at all.  No opening

12  statement is required by either party.

13         The government will then present witnesses.  Counsel

14  for defendant may cross-examine them.  Following the

15  government's case, the defense may, should the defense elect,

16  present witnesses and the prosecution will have the opportunity

17  to cross-examine.  Subsequently, the government may decide to

18  present rebuttal witnesses.

19         After all the testimony and evidence has been

20  presented, the lawyers will then be given another opportunity

21  to address you and make their summations or final arguments in

22  the case.  The statements the lawyers make now as well as the

23  arguments they present at the end of the trial are not to be

24  considered by you either as evidence in the case, which comes

25  only from the witnesses and exhibits, or as your instruction on

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the law, which will come only from me.

2          Nevertheless, these statements now and the arguments

3  at the end of the trial are intended to help you understand the

4  issues and the evidence as it comes in as well as the positions

5  taken by both sides.

6          Ms. Lerma.

7          THE CLERK:  In Cause Number P:19-CR-774, United

8  States of America vs. Thomas Alan Arthur.

9          The Grand Jury Charges:

10                         **Count One**

11          On or about October 24, 2019, the Defendant,

12                    THOMAS ALAN ARTHUR,

13  did knowingly produce, distribute, receive, and possess with

14  intent to distribute, a visual depiction of any kind,

15  including a drawing that depicts a minor engaging in

16  sexually explicit conduct and is obscene, to wit: a drawing

17  of a prepubescent female engaged in the lascivious

18  exhibition of genitals or pubic area and this visual

19  depiction had been mailed, or shipped or transported in

20  interstate or foreign commerce by any means, including by

21  computer, or was produced using materials that have been

22  mailed, or that have been shipped or transported in

23  interstate or foreign commerce by any means, including by

24  computer.

25          A violation of Title 18, United States Code,

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1  Section 1466A(a)(1), Section 2, and *Pinkerton vs. United*
 2  *States*, 328 U.S. 640 (1946).

 3                          **Count Two**
 4          On or about November 7, 2019, in the Western District
 5  of Texas, the Defendant,
 6                      THOMAS ALAN ARTHUR,
 7  aided and abetted by others, knowingly used an interactive
 8  computer service for carriage in interstate and foreign
 9  commerce, an obscene matter, to wit: obscene story 1.
10          A violation of Title 18, United States Code,
11  Section 1462(a), Section 2, and *Pinkerton vs. United States*,
12  328 U.S. 640 (1946).

13                         **Count Three**
14          On or about November 7, 2019, in the Western District
15  of Texas, the Defendant,
16                      THOMAS ALAN ARTHUR,
17  aided and abetted by others, knowingly used an interactive
18  computer service for carriage in interstate and foreign
19  commerce, an obscene matter, to wit: obscene story 2
20          A violation of Title 18, United States Code,
21  Section 1462(a), Section 2, and *Pinkerton vs. United States*,
22  328 U.S. 640 (1946).

23                          **Count Four**
24          On or about November 7, 2019, in the Western District
25  of Texas, the Defendant,

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1                    THOMAS ALAN ARTHUR,

2  aided and abetted by others, knowingly used an interactive

3  computer service for carriage in interstate and foreign

4  commerce, an obscene matter, to wit: obscene story 3.

5            A violation of Title 18, United States Code

6  Section 1462(a), Section 2, and *Pinkerton vs. United States*,

7  328 U.S. 640 (1946).

8                    **Count Five**

9            On or about November 7, 2019, in the Western District

10  of Texas, the Defendant,

11                    THOMAS ALAN ARTHUR,

12  aided and abetted by others, knowingly used an interactive

13  computer service for carriage in interstate and foreign

14  commerce, an obscene matter, to wit: obscene story 4.

15            A violation of Title 18, United States Code,

16  Section 1462(a), Section 2, and *Pinkerton vs. United States*,

17  328 U.S. 640 (1946).

18                    **Count Six**

19            On or about November 7, 2019, in the Western District

20  of Texas, the Defendant,

21                    THOMAS ALAN ARTHUR,

22  aided and abetted by others, knowingly used an interactive

23  computer service for carriage in interstate and foreign

24  commerce, an obscene matter, to wit: obscene story 5.

25            A violation of Title 18, United States Code,

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Section 1462(a), Section 2, *Pinkerton vs. United States*,
2  328 U.S. 640 (1946).

3                          **Count Seven**

4           From on or about January 1, 1996, to on or about
5  November 7, 2019, in the Western District of Texas, and
6  elsewhere, the Defendant

7                        THOMAS ALAN ARTHUR,

8  aided and abetted by others, was engaged in the business of
9  selling and transferring obscene matter, and knowingly
10 received and possessed with the intent to distribute obscene
11 stories and drawings of minors engaging in sexually explicit
12 conduct, which was shipped and transported in interstate and
13 foreign commerce.

14          A violation of Title 18, United States Code
15 Section 1466, Section 2, Section 2, and *Pinkerton vs. United*
16 *States*, 328 U.S. 640 (1946).

17                          **Count Eight**

18          On or about November 7, 2019, in the Western District
19 of Texas, the Defendant,

20                        THOMAS ALAN ARTHUR,

21 did knowingly produce, distribute, receive, and possess with
22 intent to distribute, a visual depiction of any kind,
23 including a drawing that depicts a minor engaging in
24 sexually explicit conduct and is obscene, to wit: a drawing
25 of a prepubescent female performing fellatio on an adult

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  male and the visual depiction had been mailed, or shipped or

2  transported in interstate or foreign commerce by any means,

3  including by computer, or was produced using materials that

4  had been mailed, or that have been shipped or transported in

5  interstate or foreign commerce by any means, including by

6  computer.

7           A violation of Title 18, United States Code,

8  Section 1466A(a)(1), Section 2, and *Pinkerton vs. United*

9  *States*, 328 U.S. 640 (1946).

10                         **Count Nine**

11          On or about November 7, 2019, in the Western District

12  of Texas, the Defendant,

13                    THOMAS ALAN ARTHUR,

14  did knowingly produce, distribute, receive, and possess with

15  the intent to distribute, a visual depiction of any kind,

16  including a drawing that depicts a minor engaging in

17  sexually explicit conduct and is obscene, to wit: a drawing

18  of prepubescent females performing fellatio on adult penises

19  and this visual depiction had been mailed, or shipped or

20  transported in interstate or foreign commerce by any means,

21  including by computer, or was produced using materials that

22  have been mailed, or that have been shipped or transported

23  in interstate or foreign commerce by any means, including by

24  computer.

25          Signed by the Foreperson of the Grand Jury.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          THE COURT:  And that count is a violation of

2   Title 18, United States Code, Section 1466A(a)(1), Section 2,

3   and *Pinkerton vs. United States*, 328 U.S. 640 (1946).

4          Counsel for the defense, how does Mr. Arthur plead to

5   Counts One through Nine, guilty or not guilty?

6          MR. BENNETT:  Mr. Arthur pleads not guilty, Your

7   Honor.

8          THE COURT:  Thank you, sir.

9          The sides have the same amount of time to give you

10  their opening statements, should they wish.

11         I'll recognize the government to begin with our

12  opening statements.

13              **OPENING STATEMENT BY MS. MORRISON**

14         MS. MORRISON:  "The Baby Mangler," "Baby Wank," "A

15  Spectacle to Beat All Others," "Replacing My Wife — She Had It

16  Coming," and "Buttfucking a 10-Year-Old Girl" are the titles of

17  five stories that appeared on the defendant's Web site,

18  mrdouble.com.

19         These stories describe in graphic detail the sexual

20  abuse, rape, torture, and even murder of children by adults.

21  You will have the opportunity to read these stories and other

22  stories that were posted on the defendant's Web site.

23         You will also see three drawings that were posted on

24  the Web site that depict children masturbating and performing

25  sexual acts on adults.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1          The defendant operated the Web site for over 20 years

 2  starting in the early '90s.  While he operated the Web site out

 3  of his home in Terlingua, Texas, the Web site itself was hosted

 4  by a server in the Netherlands.  The defendant chose this

 5  server in part because it allowed him to have total control

 6  over the Web site.

 7          MR. HAYGOOD:  Object to argument, Your Honor.

 8          THE COURT:  The attorneys are allowed to make their

 9  open statements, these are not arguments, and you'll take it as

10  such and what the attorneys say is not evidence.

11          You may proceed.

12          MS. MORRISON:  Now, the Web site boasted over 20,000

13  stories.  Members of the general public could click on the Web

14  sites and review partial versions of the stories; but to view

15  complete versions, a paid membership was required.

16          Members could search by story, by topics such as

17  torture, bestiality, and incest.  The Web site displayed the

18  most popular stories of the day.  Through the Web site, members

19  could communicate with other members, authors, and even the

20  defendant.

21          During the trial you will hear testimony from a

22  number of witnesses.  Special Agent Jeremy Ewan of the FBI will

23  testify about his investigation into the Mr. Double Web site

24  that began in April of 2019.

25          Special Agent Ewan will testify about the features of

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the defendant's property in Terlingua, which was remote and

2  secluded, and allowed the defendant to operate the Web site in

3  relative anonymity for over 20 years.

4          Special Agent Ewan will testify about a search

5  warrant that was executed on the defendant's residence on

6  November 7, 2019.  Agent Ewan will testify about the evidence

7  that was removed from the defendant's residence, including a

8  number of computers.

9          You will hear testimony from Special Agent Brian

10  Nishida of the FBI, who is also a computer forensic examiner.

11  Special Agent Nishida will testify about the computer forensic

12  examination he and members of his team conducted.  You will see

13  the evidence that was located during those forensic

14  examinations, and you will see the Web site itself.

15          You will hear testimony from Lieutenant Derek Pearson

16  of the Texas Department of Public Safety who interviewed the

17  defendant on November 7, 2019.  You will hear the defendant's

18  own words.  You will hear him tell Lieutenant Derek Pearson and

19  Special Agent Clay Tran of the FBI twice that he was no author,

20  yet you will see stories written by the defendant.

21          You will hear testimony from the defendant's

22  estranged wife, Sandra Arthur.  She will testify about the

23  defendant's operation of the Web site.  She will tell you that

24  the Mr. Double Web site was their primary source of income.

25          Lastly, you'll hear testimony from Special

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Agent Downie, Alice Downie of the FBI.  She will testify about

2  the income generator from the Web site, and that in the past

3  the Web site generated enough income that the defendant paid

4  his authors for their stories.

5          At the conclusion of the trial after you've had the

6  opportunity to hear the testimony and see all of the evidence,

7  we will stand before you and ask you to return guilty verdicts

8  on all counts.

9          THE COURT:  Thank you, Ms. Morrison.

10         Does the defense wish to proceed?

11         MR. HAYGOOD:  Yes, Your Honor.  May it please the

12  Court.

13         THE COURT:  Thank you.

14              **OPENING STATEMENT BY MR. HAYGOOD**

15         MR. HAYGOOD:  Good morning, ladies and gentlemen of

16  the jury.  My name is Lane Haygood.  I'm an attorney from over

17  in Odessa, and together with my co-counsel Mark Bennett, we

18  have the honor of representing Thomas Alan Arthur for you

19  today.

20         You've heard the charges as read by the Court.

21  You've heard our client's invocation of his plea of not guilty.

22  And you are going to see some evidence today that may -- no,

23  scratch that -- that is going to shock you.  It is going to

24  offend you.  But we are going to ask you to also listen to the

25  law as you receive from the Court today.  And we believe that

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 36 of 286

36

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  after you receive the law from the Court today, you'll

2  understand as we do that this case is about more than just one

3  man, more than just five stories and three drawings.  It's

4  about those fundamental principles which govern the entire

5  country.

6          The Judge is going to charge you with the law in the

7  case, and I can anticipate what I think that's going to be

8  based on what I, as a lawyer, know of the law.  And I think

9  that you are going to be called on to decide whether certain

10 materials are obscene.  And we have a three-part test for

11 obscenity in the United States.  It comes from a 1973 court

12 case called *Miller vs. California*.  And in doing so, you're

13 going to have to decide three things:  One, does the work taken

14 as a whole appeal to a prurient interest in sex, and prurient

15 interest will be defined for you.

16         No. 2, you're going to have to decide if the work

17 taken as a whole is what we called patently offensive.

18         And then No. 3, finally, the third part of the Miller

19 test is you're going to have to decide whether the work taken

20 as whole lacks any artistic, literary, scientific, or political

21 value.  In the ultimate analysis, ladies and gentlemen of the

22 jury, y'all are the judges of that.  You're going to receive

23 the law from the Court, and I want you to listen to all the

24 evidence that you hear today and make sure that the government

25 satisfies its burden of producing to you some evidence from

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   which you could find all of those three factors.

2           You're also going to hear some evidence today about

3   how this Web site, mrdouble.com, worked.  I believe the

4   evidence is going to show you that this was not a Web site that

5   someone would stumble across just surfing through the Internet,

6   just clicking on links.  I believe the evidence is going to

7   show you this is something that had to be deliberately sought

8   out by someone who wanted to read these stories.

9           I believe the evidence is also going to show you the

10  pictures you're going to see were not a prominent part of the

11  Web site.  The evidence is going to show that these were author

12  profile pictures that could only be accessed whenever you

13  clicked on that author's profile.

14          And I think that's all going to be very important as

15  you're looking through these things because, again, you are

16  going to be the ones who are going to have to judge whether

17  these individual works considering in and of themselves meet

18  the test for whether something is obscenity.

19          And I just want you to bear that in mind, bear in

20  mind the law, and bear in mind who bears the burden on that.

21  Because I think at the end of the day after you have received

22  all the evidence, I believe you're going to look at the stories

23  and say, You know what?  Not my cup of tea, but I believe that

24  this is still America and we still have --

25          MS. MORRISON:  Objection, Your Honor.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          THE COURT:  Yeah, the attorneys will be reminded that

2     this is not argument.  The jury is instructed that what lawyers

3     say is not evidence regardless.

4          Mr. Haygood, go right ahead.

5          MR. HAYGOOD:  Thank you, Your Honor.

6          THE COURT:  All right.  Your first witness?

7          MS. MORRISON:  Your Honor, the United States calls

8     Agent Jeremy Ewan to the stand.

9          THE COURT:  Agent Ewan, if you would come on up this

10    way.

11         MR. BENNETT:  Your Honor, I don't believe the rule

12    has been invoked.  We would invoke the rule.

13         THE COURT:  Very good.  Are there other witnesses?

14         MR. BERRY:  Your Honor, the other case agent -- we

15    have the agent who is about to take the stand.  The other case

16    agent is Special Agent Alice Downie.  As the case agent, is she

17    permitted to stay in here?

18         THE COURT:  Is she a case agent?

19         MR. BERRY:  She is.  So Agent Ewan was here, moved to

20    South Dakota.

21         THE COURT:  Oh, okay.

22         MR. BERRY:  So Agent Downie took over.  So we have

23    two agents on this case.

24         THE COURT:  So, Agent Downie, if you will stand where

25    you are right there.  And if you would raise your right hand,

Ann M. Record, RMR, CRR, CMRS, CRI

Jeremy Ewan - Direct Examination - January 20, 2021

1   we'll have both of you sworn at this time and I'll give you

2   some instructions.

3              (Witnesses sworn by the clerk at 8:59 a.m.)

4              THE COURT:  All right.  Thank you, both.  Now, as to

5   both of you, the rule has been invoked, which basically means

6   you don't get to be in here unless you're testifying.  However,

7   as the case agent, you're allowed to stay in here.  So you'll

8   be allowed to stay.

9              And, ma'am, if you will still continue to listen to

10  me, please.  I'll tell you that you're not to speak with

11  anybody else about the case except for the lawyers, for the

12  duration of the trial.  And I'll -- y'all can go ahead and have

13  a seat.

14             Ms. Morrison and Mr. Berry, Mr. Esparza, if you will

15  instruct your other witnesses that the rule has been invoked

16  and the intention of the Court would be that even though

17  they're not here to be sworn that those -- of course those

18  rules apply to them.  The defense will do likewise, okay?

19  Thank you.

20             MS. MORRISON:  Thank you.

21             THE COURT:  You may proceed.

22                        **JEREMY EWAN,**

23            **GOVERNMENT'S WITNESS SWORN AT 8:59 a.m.**

24                     **DIRECT EXAMINATION**

25  BY MS. MORRISON:

Jeremy Ewan - Direct Examination - January 20, 2021

1  Q.   Could you please state your name for the record, spelling
2  your last name.
3  A.   Sure.  My name is Jeremy Ewan, E-W-A-N.
4  Q.   Agent Ewan, where are you currently employed?
5  A.   I am a special agent for the FBI.
6  Q.   How long have you worked for the FBI?
7  A.   Just a little bit short of three years.
8  Q.   Prior to joining the FBI, where did you work?
9  A.   I was a police officer and a criminal investigator in the
10 state of Montana since 2006.
11 Q.   Where are you currently assigned to the FBI?
12 A.   I'm assigned to the Rapid City, South Dakota resident
13 agency.
14 Q.   How long have you been there?
15 A.   Since September.
16 Q.   How long were you in Alpine?
17 A.   I was in Alpine about two years.
18 Q.   What types of crimes do you investigate with the FBI?
19 A.   I investigate all matter of violent crimes, sex crimes,
20 white collar crimes, anything that's a violation of federal
21 statutes.
22 Q.   Could you describe for the jury how you began the
23 investigation into the Mr. Double Web site?
24 A.   You bet.  I was alerted to -- by another law enforcement
25 agency about a gentleman who was running a Web site based out

1  of the Terlingua area.  I was told that the Web site

2  featured -- the Web site would allow people to subscribe and

3  access stories that graphically depicted the sexual abuse of

4  children.

5  Q.   After you received this information, what did you do?

6  A.   I began preliminary investigation to determine that the

7  Web site he was talking about was Thomas Arthur from Terlingua,

8  Texas.

9  Q.   Is Mr. Arthur present here in court today?

10  A.   He is, yes.

11  Q.   Could you describe what he's wearing?

12  A.   That's him at the defense table in the blue shirt without

13  a jacket.

14        MS. MORRISON:  Your Honor, please let the record

15  reflect that the defendant has been identified.

16        THE COURT:  The record shall so reflect.

17  Q.   (BY MS. MORRISON)  After you identified the defendant as

18  the individual that was operating the Web site, what steps did

19  you take, Agent Ewan?

20  A.   Preliminarily we started doing some background looking

21  through our own files to see if we had any information on him

22  and the Web site, doing some surveillance of the property.

23        MR. BENNETT:  I'm sorry, Your Honor, I hate to

24  interrupt Ms. Morrison; but Mr. Arthur doesn't have a line of

25  sight now to the witness.

Jeremy Ewan - Direct Examination - January 20, 2021

1           THE COURT:  You're free to move around however you
2  need to see him at the table.  He's not required to sit there
3  at the table.  He's required to sit with you at the table, but
4  he's not required to be right there.  You-all decide where you
5  want to put him.
6           MR. BENNETT:  Thank you.
7           THE COURT:  Of course.
8           MR. BENNETT:  I'm sorry, Ms. Morrison.
9           THE COURT:  And, Mr. Haygood, you know you can move
10 if you need to too.
11          Can you see now?
12          THE DEFENDANT:  Yes, sir.
13          THE COURT:  Thank you.
14          Go ahead, Ms. Morrison.
15          MR. BENNETT:  Thank you, Your Honor.
16 Q.  (BY MS. MORRISON)  Special Agent Ewan, I believe you were
17 testifying about you had reviewed your files.  After you began
18 reviewing your files for background information on the Web
19 site, what did you do?
20 A.  We did some surveillance on the place, reviewed some bank
21 records.
22 Q.  Were there features of the property that made it difficult
23 for you to conduct surveillance?
24 A.  Yes, it was an extremely difficult location to conduct
25 surveillance on.  It was remote.  It had a security gate that

1  was offset somewhere between a quarter and half mile from the

2  actual home.  The back side of the home was blocked by two

3  large hills they call camel humps.  You basically couldn't get

4  to within a mile or so of the property without being seen.

5  Q.   Where was this property?

6  A.   The property is about 60 miles south of Alpine, Texas as

7  you take Highway 118 south.  Before you get to Terlingua, there

8  is a road called Terlingua Ranch Road, and it was in that

9  Terlingua Ranch area.

10  Q.   Is that located within the Western District of Texas?

11  A.   Yes, it is.

12  Q.   After you conducted the surveillance of the property, what

13  did you do?

14  A.   We obtained consent from a subscriber of the Web site to

15  review the Web site; and in an undercover capacity using that

16  person's credentials, we accessed the Web site and viewed some

17  of the material on.

18  Q.   Special Agent Ewan, why did you need to access the Web

19  site in an undercover capacity?

20  A.   Well, the Web site had an area that was open to the

21  public, and you could view the general nature of it, but you

22  couldn't read the entire stories without a paid subscription.

23  You could read -- from what I could tell, you could read the

24  introduction to the stories, a few paragraphs, but you couldn't

25  read the whole actual story.

Jeremy Ewan - Direct Examination - January 20, 2021

1  Q.   Could you describe for the jury what you were able to see

2  when you accessed the Web site in an undercover capacity?

3  A.   We were able to see complete stories.  We were able to see

4  each of the stories -- or not each of them, but ones that were

5  written by authors that wanted to could create an author page

6  where the author includes a biographical information and a

7  photo, if they chose, or a drawing or however they chose to

8  represent themselves.  There was also instructions for how to

9  upload stories onto the Web site and contact information to

10 contact Mr. Double.

11 Q.   Approximately how many stories were on the Web site?

12 A.   The site had more than 25,000, I believe, by a couple

13 thousand authors.  I didn't see anything to suggest that was

14 wrong.

15 Q.   What other features did the Web site have?

16 A.   There was something called a Double Speak Easy, which I

17 think it was like a forum, but I wasn't able to access that

18 with the credentials that we had then.

19 Q.   How generally was the Web site organized?

20 A.   It had like a landing page where you had to agree to go

21 into it.  And once you entered it, there was basically scans of

22 whole novels that featured erotic work on the front and then

23 there were -- the newest stories were posted.  And then on the

24 sidebar, there were various spots where it listed like the most

25 popular story of the day or the most popular stories of the

Jeremy Ewan - Direct Examination - January 20, 2021

1  day, most popular stories of the week, and so on.

2  Q.   Was there a copyright that appeared on the Web site?

3  A.   Yes, I think the earliest copyright I saw was 1996; but

4  the individual stories had a copyright up to the time we

5  accessed it.

6         THE COURT:  Is everybody able to hear?  Be sure and

7  stay awake, everyone.

8         Thank you.  Go ahead.

9  Q.   (BY MS. MORRISON)  What were you able to learn about the

10 membership fees for the Web site?

11 A.   As I recall, the membership was $25 a month -- or maybe it

12 was $10 a month and $90 for a year.  And then $25, I think,

13 would get you three months, but you had to pay for a

14 membership.

15 Q.   What forms of payment were accepted?

16 A.   At that time I believe he was anticipating credit cards or

17 personal check or money order.

18 Q.   Was there some sort of arrangement that could be worked

19 out for authors with respect to payments for membership?

20 A.   Yes.  The site advertised that if you wrote stories for

21 the Web site -- a sufficient number of stories for the Web

22 site, that you would be granted complimentary access to all the

23 other stories as well.

24 Q.   Now, while you were accessing the Web site in an

25 undercover capacity, did you happen to do any sort of screen

Jeremy Ewan - Direct Examination - January 20, 2021

1  captures?

2  A.   I did, yes.  As I was going through, I used what they call

3  a Snipping tool on our computers just to preserve what I was

4  looking at on my screen.

5  Q.   What was the purpose in doing those screen captures?

6  A.   To document the stories, the authors, and such that I had

7  observed.

8  Q.   How many screen captures did you do?

9  A.   Several.  At least four that I remember.

10         MS. MORRISON:  Your Honor, at this time we would move

11  for the admission of Government's Exhibit 1 and would seek

12  permission to publish to the jury.

13         THE COURT:  And that's a screen capture?

14         MS. MORRISON:  Yes, sir.

15         THE COURT:  Mr. Haygood, I guess, or Mr. Bennett.

16         MR. BENNETT:  One second, please, Your Honor.

17         THE COURT:  Yes, sir.

18         (Sotto voce discussion)

19         MR. BENNETT:  No objection, Your Honor.

20         THE COURT:  Government's Exhibit 1 is admitted

21  without objection.

22         MR. BENNETT:  May I move to where I can observe the

23  government's screen, please?

24         THE COURT:  Yes, sir.  Sure.  I tell you what.  Let's

25  wait and see -- is it going to be right there?

Jeremy Ewan - Direct Examination - January 20, 2021

1          MR. BERRY:  Yes.

2          THE COURT:  Oh, sure.

3  A.    I'm sorry, is this a video?

4  Q.   (BY MS. MORRISON)  Yes.

5  A.    May I clarify what that is from then?

6          THE COURT:  Make sure, Mr. Bennett, that you're not

7  blocking.  Our alternates have to look right through there as

8  well.

9          MR. BENNETT:  I'm sorry.

10         THE COURT:  And your client is able to see,

11 Mr. Bennett?

12         You're good?  Okay, Mr. Arthur.

13 Q.   (BY MS. MORRISON)  Special Agent Ewan, are you able to

14 see?

15 A.    Yes.

16         THE COURT:  All right.  Ms. Morrison, you may

17 proceed.

18 Q.   (BY MS. MORRISON)  Special Agent Ewan, is this the front

19 page of the Web site, the landing page?

20 A.    That last screen is what you first come to when you type

21 in the URL.  Then when you agree to enter, this is the first

22 thing that comes up.

23 Q.   So just for clarification purposes, the black screen that

24 we saw at the beginning with the purple was the landing page?

25 A.    Correct.

Jeremy Ewan - Direct Examination - January 20, 2021

1  Q.   Special Agent Ewan, as the page is being scrolled down,

2  what are you looking at?

3  A.   I'm looking at the general content of the stories.  I

4  believe -- I'm having a little trouble seeing exactly what's on

5  the screen from here, but I believe it is looking through the

6  different authors and stories in these categories.

7  Q.   Special Agent Ewan, were there particular codes associated

8  with the stories?

9  A.   Yes.  At the top of the story, there were -- in

10  parentheses, there were abbreviations that were supposed to

11  alert the reader to what the story contained.

12  Q.   Could readers search using those particular story codes?

13  A.   There was a search function, yes.

14  Q.   What did that allow for?

15  A.   It allowed to search for particular things like every

16  entry number one, the letters INC were supposed to reference

17  incest; the letters PED, pedophilia.  I believe the letters NC

18  were nonconsensual.  And there was a lengthy list of

19  abbreviations they could use to search.

20         MS. MORRISON:  And, Your Honor, for the record we've

21  paused the screen capture at 3 minutes and 39 seconds.  I think

22  the jury has had sufficient time to review.  They'll have the

23  opportunity to take it back with them.

24         THE COURT:  Thank you.

25  Q.   (BY MS. MORRISON)  Special Agent Ewan, did you perform

Jeremy Ewan - Direct Examination - January 20, 2021

1  three other screen captures in connection with the case?

2  A.    I did, yes.

3  Q.    Are they substantially similar to what we've seen in the

4  courtroom?

5  A.    Yes, ma'am.

6         MS. MORRISON:  Your Honor, I would move for admission

7  of Government's Exhibits 2 through 4, but we will not seek to

8  publish those.

9         MR. BENNETT:  No objection, Your Honor.

10        THE COURT:  Government's 2, 3, and 4 are admitted

11 without objection.

12 Q.    (BY MS. MORRISON)  Now, Special Agent Ewan, while you were

13 doing the screen captures in an undercover capacity, what else

14 did you locate on the Web site of significance?

15 A.    On one of the author pages, I observed a drawing that was

16 next to their biographical information.  The drawing appeared

17 to be of a prepubescent or pubescent child -- female child

18 lying nude.  The drawing was focusing on her breast and

19 genitals, and she appeared to be masturbating.

20 Q.    What particular author was that drawing associated with?

21 A.    He went by the name Netman169.

22 Q.    How did his particular drawing relate to his stories?

23 A.    In all of the stories that I saw written by him involved

24 the sexual abuse of young females.  In his bio, he mentioned

25 that he was inspired by a story he had heard of a 10-year-old

1  female who was sexually abused when she was a child.

2          MS. MORRISON:  Your Honor, at this time I would move

3  for the admission of Government's Exhibit 10A.

4          THE COURT:  Mr. Bennett?

5          MR. BENNETT:  No objection, Your Honor.

6          THE COURT:  Government's Exhibit 10A is admitted

7  without objection.

8          MS. MORRISON:  Your Honor, we would also seek to

9  publish to the jury.

10         THE COURT:  Yes, ma'am, you may.

11  Q.   (BY MS. MORRISON)  Special Agent Ewan, is this the drawing

12  that was associated with the Netman169 --

13  A.   Yes, it is.

14  Q.   -- author page?

15         Special Agent Ewan, I want to ask you about the five

16  stories that form the basis of the indictment.  Where were

17  those stories located?

18  A.   Where were they located?  Sorry.

19  Q.   Yes.

20  A.   There was a sidebar on there that said most popular

21  stories of the day.  I guess most popular stories over the last

22  24 hours.  I can't remember the exact term, but it was on the

23  side of that front page of the Web site.

24  Q.   All five of those stories were the most popular stories of

25  the day?

Jeremy Ewan - Direct Examination - January 20, 2021

1  A.   I think they -- they were on that list.  I don't know if

2  they were the top five.  We were kind of trying to limit it to

3  shorter stories just to save our burden of reading so much

4  material.

5  Q.   When were those stories located?

6  A.   It was, I want to say, September or October of 2019 was

7  when we did all of the searches.

8  Q.   Were some stories, in fact, located after a search warrant

9  was executed on the defendant's property?

10  A.   Yes.  After the search warrant, we located a bunch of

11  additional stories as well.

12           MS. MORRISON:  Your Honor, at this time the

13  government would seek to admit and publish Government's

14  Exhibits 5A through 9A.

15           THE COURT:  Mr. Bennett?  They seek to admit and

16  publish.  Any objection?

17           MR. BENNETT:  No, Your Honor.

18           THE COURT:  And that's 5A, B, C?

19           MS. MORRISON:  No, Your Honor.

20           THE COURT:  Just the A's.

21           MS. MORRISON:  Just 5A, 6A, 7A, 8A, 9A.

22           THE COURT:  And as described, those are admitted

23  without objection.  That's 5A, 6A, 7A, 8A, and 9A.

24           MS. MORRISON:  Yes, sir.

25           Your Honor, it's the government's intention to give

Jeremy Ewan - Direct Examination - January 20, 2021

1  the jurors ten minutes to read each particular story starting

2  with 5A now.

3          THE COURT:  So if you'll start with that, read that.

4  We're going to give you one after you're done, and we'll keep

5  going.  If you look up, I'll know you're done, and then --

6  we'll go ten minutes at the most.  So go right ahead.

7          Anybody still reading?  Still reading?  Is everybody

8  done?  That was about eight minutes.  All right.  Thank you.

9          MS. MORRISON:  Your Honor, the government now seeks

10 to publish Government's Exhibit 6A.

11          THE COURT:  Yes, ma'am, you may.

12          Anyone need anymore time?  Everybody good?

13          All right.  Let's take those up.

14          MS. MORRISON:  Your Honor, the government now seeks

15 to publish Government's Exhibit 7A.

16          THE COURT:  Yes, ma'am, you may.

17          Does anybody need more time?  Anybody want more time?

18 All right.  Very good.

19          Let's take them up.

20          MS. MORRISON:  Your Honor, at this time the

21 government seeks to publish Government's Exhibit 8A.

22          THE COURT:  Yes, ma'am, you may.

23          Is everybody done?  I'm not trying to rush anyone.

24 Everybody done?

25          All right.  Let's take those up.  Thank you.

Ann M. Record, RMR, CRR, CMRS, CRI

Jeremy Ewan - Direct Examination - January 20, 2021

1    MS. MORRISON:  And, Your Honor, we'll publish

2 Government's Exhibit 9A momentarily, but we would like to

3 continue questioning on other issues.

4    THE COURT:  Yes, ma'am.

5    Hang on a second.

6    You may proceed.

7    Thank you, Ms. Lerma.

8    MS. MORRISON:  Thank you, Your Honor.

9 Q.  (BY MS. MORRISON)  Special Agent Ewan, during the course

10 of your investigation, how many stories have you reviewed that

11 appeared on the Mr. Double Web site?

12 A.   Not all of them in their entirety.  There is a lot to read

13 there.  But I've either skimmed, read in their entirety, read

14 the intro codes and a brief couple of paragraphs probably

15 several hundred, 300, 400 maybe.

16 Q.   What was the predominant theme of these stories?

17 A.   Almost all of them.  I could only think of a few -- I

18 could only think of maybe two or three that didn't involve the

19 sexual abuse of children.

20 Q.   Even after you departed the Alpine office, have you

21 continued to work on this case?

22 A.   Yes, I have.

23 Q.   During that time frame, have you continued to read stories

24 associated with the Web site?

25 A.   Yes, I have.

1  Q.   Were you able to, in fact, locate stories that were
2  written by the defendant?
3  A.   Yes, I was.
4  Q.   How do you know they were written by the defendant?
5  A.   There was a forum on -- once we actually managed to get
6  into some of his devices after the search warrant, we found
7  some old -- what they called a forum where users could just
8  post information on there and have discussions back and forth.
9  And we had determined that one of the posters who went by the
10 name Mr. Double was, in fact, Thomas Arthur from the contacts
11 of some of his posts where he referenced his wife, who we knew,
12 and the location where he lived and such.  And in one of those
13 posts he wrote that -- or he mentioned that he wrote stories
14 under the name Que, Q-U-E.
15          THE COURT:  Sir, could I get you to move up a little
16 bit.  I'm having a hard time hearing you.
17          THE WITNESS:  Yes, sir.
18 Q.   (BY MS. MORRISON)  Do you recall the names of the stories
19 written by the defendant?
20 A.   I believe one of them was "Katrina and her Daddy" offhand.
21 I'd have to look to see what the other one was, but there was
22 at least one other one I remember.
23 Q.   Do you recall the subject of the other story?
24 A.   It was -- it involved the sexual abuse of children.  I
25 remember that much.  I don't remember the exact thought of it.

Jeremy Ewan - Direct Examination - January 20, 2021

1  Q.   Do you remember the main character's name?

2  A.   In Katrina, the main character's name was Katrina.

3  Q.   In the other story, do you recall the main character's

4  name?

5  A.   I would have to look at the story if that's available.  I

6  can't remember offhand.

7  Q.   Special Agent Ewan, you have in front of you Government's

8  Exhibits 35A through II, if you would take a moment and refresh

9  your recollection.

10  A.   I'm sorry, Ms. Morrison.  Could you repeat that exhibit

11  number?

12  Q.   35A through II.

13  A.   Oh, yes.

14  Q.   Special Agent Ewan, if you would look at Government's

15  Exhibits 35AA and 35BB.

16  A.   That's right.  The other story that I believe appeared to

17  be written by Mr. Arthur was called "Tracy," and the main

18  subject was named Tracy.

19  Q.   Special Agent Ewan, did both of those stories,

20  Government's Exhibit 35AA and 35BB, appear on the Web site?

21  A.   Yes, they did.

22         MS. MORRISON:  Your Honor, at this time the

23  government would move for admission of 35AA and 35BB.

24         THE COURT:  Mr. Bennett.

25         MR. BENNETT:  We have no objection, Your Honor.

Jeremy Ewan - Direct Examination - January 20, 2021

1          THE COURT:  Government's Exhibit 35AA and 35BB are

2   admitted without objection.

3   Q.   (BY MS. MORRISON)  Now, Special Agent Ewan, following the

4   search warrant of the defendant's property, were a number of

5   other stories located?

6   A.   Yes, we located, we think, most of the stories that were

7   on the Web site on his devices at the home.

8   Q.   Were you able to determine that all of those stories, in

9   fact, appeared on the Web site?

10  A.   Yeah, all of the ones that we reviewed we were able to see

11  that they had been on the Web site as well.

12  Q.   With the exception of 35AA and 35BB, the binder that's in

13  front of you contains Government's Exhibits 35A through 35II.

14  Are those the other stories that you have had the opportunity

15  to review in connection with this case?

16  A.   Yes, they are.

17  Q.   Excuse me.  Some of the stories you've had the opportunity

18  to review in connection with this case.

19  A.   Yes, they are some of them.

20          MS. MORRISON:  Your Honor, at this time the

21  government would move to admit the remaining exhibits

22  associated with 35A through II.

23          THE COURT:  Through II?  So it's -- so you basically

24  go through the alphabet once and come back around, right, to

25  doubles?

Jeremy Ewan - Direct Examination - January 20, 2021

1          MR. BERRY:  Yes, sir.

2          THE COURT:  Mr. Bennett?

3          MR. BENNETT:  We have no objection.

4          THE COURT:  So then the remaining of 35A through

5   35II, so I guess that would exclude AA and BB, those are

6   admitted without objection.

7          MS. MORRISON:  Yes, sir.

8   Q.  (BY MS. MORRISON)  Now, Special Agent Ewan, during the

9   exhibition of the screen capture, it appeared that there were

10  story codes referenced in the stories.  On the Web site itself,

11  were there instructions that explained what story codes were

12  associated with particular topics?

13  A.   Yes, they had a couple of different documents.  One that

14  seemed to be for the authors themselves, and one for the

15  readers on what those story codes meant and how to use them.

16         MS. MORRISON:  Your Honor, at this time the

17  government would move for admission of Exhibit 33A and 33B.

18         THE COURT:  Mr. Bennett?

19         MR. BENNETT:  One moment please, Your Honor.

20         (Sotto voce discussion)

21         MR. BENNETT:  No objection, Your Honor.

22         THE COURT:  Government's Exhibits 33A and 33B are

23  admitted without objection.

24         MS. MORRISON:  Your Honor, the government seeks to

25  publish Government's Exhibit 33B.

Jeremy Ewan - Direct Examination - January 20, 2021

1              THE COURT:  Yes, ma'am, you may as to 33B.

2    Q.   (BY MS. MORRISON)  Now, Special Agent Ewan, was there a

3    different set of codes for -- excuse me.  Let me strike that

4    and ask it differently.

5              What is the difference between Government's Exhibits

6    33A and 33B?

7    A.   One of them was instructions for authors, and one of them

8    was instructions for readers.

9    Q.   The story codes used in both Government's Exhibits 33A and

10   33B were the same, no?

11   A.   I believe for the most part they were.  I didn't go word

12   for word to make sure that there were no differences, but the

13   general sense of them was the same.

14   Q.   Special Agent Ewan, when you were reviewing the stories,

15   did you have the opportunity to see these codes in the actual

16   stories?

17   A.   Yes.  I don't know if you recall in one of the exhibits, I

18   believe it was in the first one, "A Spectacle to Beat All

19   Others," it started with three capital M's and a small g.

20   Q.   Special Agent Ewan, I want to turn your attention back to

21   your initial surveillance of the property before the search

22   warrant was executed.  Did you take any -- did you take any

23   aerial photographs in connection with that surveillance?

24   A.   Yes, we did.

25              MS. MORRISON:  Your Honor, at this time the

Jeremy Ewan - Direct Examination - January 20, 2021

1  government would move for admission of Government's Exhibits

2  25A through E.

3          THE COURT:  Mr. Bennett?

4          MR. BENNETT:  A moment, Your Honor.

5          No objection, Your Honor.

6          THE COURT:  Government's 25A through E are admitted

7  without objection.

8          MS. MORRISON:  Your Honor, we would seek to publish

9  these one by one.

10          THE COURT:  Yes, ma'am, you may.

11  Q.   (BY MS. MORRISON)  Special Agent Ewan, are you able to

12  see?

13  A.   I can follow along in the exhibits I have.

14  Q.   We're publishing Government's Exhibit 25A.  Could you

15  describe for the jury what's depicted in Government's

16  Exhibit 25A.

17  A.   That is an overview of Mr. Arthur's property down in

18  Terlingua.

19  Q.   Are there, in fact, multiple buildings on that property?

20  A.   There is.  The primary residence where he and his wife

21  lived is circled in black.  They had a separate casita with a

22  greenhouse and kind of a barn next to it circled in red, and

23  then there was a large shop circled in yellow.

24          MS. MORRISON:  If we can publish Government's

25  Exhibit 25B.

Jeremy Ewan - Direct Examination - January 20, 2021

1  Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in
2  Government's Exhibit 25B?
3  A.   That is the main entrance to the primary residence where
4  he lived.
5         MS. MORRISON:  If we could publish Government's
6  Exhibit 25C.
7  Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in
8  Government's Exhibit 25C?
9  A.   That is from the backside looking at the casita.  The
10 brown roof is the casita itself.  There is a garage next to it
11 with a roof and a barn on the other side and a greenhouse
12 behind the side garage.
13        MS. MORRISON:  If we could publish 29D.  Excuse me,
14 25D.
15 Q.   (BY MS. MORRISON)  Special Agent Ewan, if you could
16 describe for the jury what's depicted in 25D.
17 A.   I am having a little trouble with the photo quality, but I
18 think that is still the back side of the casita and the garage
19 area.  Oh, sorry, there it is.  And that appears to be an adult
20 female carrying out two plates of food.
21        MS. MORRISON:  If we could publish 25E.
22 Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in
23 Government's Exhibit 25E?
24 A.   That is the side of the casita.
25 Q.   Now, was other aerial -- were other aerial photographs

Jeremy Ewan - Direct Examination - January 20, 2021

1  taken of the property?

2  A.   We took a continuous video of the surveillance and then

3  took out screenshots as we needed them for planning our search

4  warrant execution.

5  Q.   Did U.S. Marshals also take another aerial photograph?

6  A.   Yes, they did.

7         MS. MORRISON:  Your Honor, at this time the

8  government would move for the admission of Government's

9  Exhibit 32.

10        THE COURT:  Mr. Bennett?

11        MR. BENNETT:  A moment please, Your Honor.

12        No objection, Your Honor.

13        THE COURT:  Government's 32 is admitted without

14 objection.

15        MS. MORRISON:  Your Honor, the government seeks to

16 publish Government's Exhibit 23.

17        THE COURT:  Yes, ma'am, you may.

18 Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe

19 what's depicted in Government's Exhibit 32?

20 A.   Sure.  That is Mr. Arthur's property.  The two hills at

21 the bottom are what we call the camel humps that I was talking

22 about earlier on the south side of the property.  Just to the

23 north of that are -- is the cluster of residences and the shop

24 and the garages.

25 Q.   Now, between the time of April and November of 2019,

1  you've testified a little bit about your investigation that you

2  did, including the screen captures.  At some point did you

3  conduct what's called a pen register or a track and trace?

4  A.   Yes, we did.

5  Q.   Could you describe for the jury what that is.

6  A.   Sure.  Typically, pen registers or trap and trace is done

7  on a phone situation.  And it's a way to see what phone numbers

8  are calling your target number and what phone numbers your

9  phone is calling.  In this case, we did it on an Internet

10  provider, and it was a way for us to see what Internet protocol

11  addresses were contacting our target address and what Internet

12  protocol addresses our target address was contacting.

13  Q.   Why did you do that?

14  A.   We wanted to see basically who Mr. Arthur was in contact

15  with.  We had established what his Internet protocol address

16  was.  We tried to figure out who he was in contact with and who

17  was in contact with him.

18  Q.   What did you learn as a result of the pen register or

19  track and trace?

20  A.   We found that the majority of the traffic going from his

21  Internet protocol address was going to two IP addresses in the

22  Netherlands that were in the name of a company called Schuberg

23  Philis B.V., I believe.

24  Q.   What did do you use that information for?

25  A.   We used that to get a court order to get records from

1 Schuberg Philis.

2 Q.   Where was Schuberg Philis located?

3 A.   I can't remember if they were -- at least some operation

4 in the Netherlands and then some in Belgium.

5 Q.   What type of information was obtained from the Netherlands

6 or Belgium?

7 A.   They provided us with a couple of computer servers that

8 had data and information on them.

9 Q.   At some point, were those servers from the Netherlands or

10 Belgium searched?

11 A.   Yes, they were.

12 Q.   Now, prior to the executing of the search warrant, what

13 did you learn about the defendant's business?

14 A.   I learned that it was his only source of income.  That he

15 had started mrdouble.com as a sole proprietor, although it

16 won't a sole proprietorship, but he was the registered owner of

17 Mr. Double.  He also used a doing business as name of

18 AOK Contractors.

19 Q.   How were you able to determine that?

20 A.   With documents he had filed with his various financial

21 institutions.

22 Q.   Where did the defendant bank?

23 A.   He banked at Fort Davis State Bank, and I believe at Bank

24 of America.

25 Q.   Were you able to obtain records from those banks that

1  demonstrated his business relationships with respect to the Web

2  site?

3  A.   Yes, I was.

4       MS. MORRISON:  Your Honor, at this time the

5  government would move for the admission of Government's

6  Exhibit 30.

7       THE COURT:  Mr. Bennett?

8       MR. BENNETT:  No objection, Your Honor.

9       THE COURT:  Government's Exhibit 30 is admitted

10  without objection.

11  Q.   (BY MS. MORRISON)  Special Agent Ewan, did you also obtain

12  records from the Texas Secretary of State?

13  A.   There were records from the Texas Secretary of State

14  included with his bank documents.

15  Q.   And what did you learn from those documents?

16  A.   That Mr. Double was in the name of Thomas Arthur.  He

17  provided an address that was basically the same address that we

18  had later tied to him in Terlingua.  It was kind of a

19  complicated street address because not everybody out there uses

20  street addresses but...

21  Q.   After you obtained the defendant's business records, did

22  you review those records?

23  A.   Yes, I did.

24  Q.   Based on your review of the records, what, if anything,

25  did you learn about any other sources of income?

Jeremy Ewan - Direct Examination - January 20, 2021

1  A.   I did not observe any other sources of income except for I

2  think at a certain point maybe Social Security, but no other

3  sources of employment or business income.

4  Q.   During your review of either the defendant's bank records

5  or documents obtained related to the business, did you ever

6  discover that there was any other location that the defendant

7  used to operate his business?

8  A.   No, I did not.

9  Q.   In November of 2019, did you obtain a search warrant to

10  search the defendant's residence?

11  A.   Yes, I did.

12  Q.   Could you describe how that search was conducted?

13  A.   We asked Thomas Arthur to come into Alpine under pretenses

14  other than what we were there for, and then we executed a

15  search of the property once he was safely off of it.

16  Q.   Were you there when his residence was searched?

17  A.   Yes, I was.

18  Q.   How many other agents were present during that search?

19  A.   Many.  I'm guessing we had 25 to 30 law enforcement

20  personnel, support personnel, and agents there.

21  Q.   Was there a concern about searching -- strike that.  Let's

22  ask this a different way.

23        Given the nature of the property and the difficulty

24  of conducting surveillance, was that part of the reason so many

25  agents were there to conduct the search?

Jeremy Ewan - Direct Examination - January 20, 2021

1  A.   Yeah.  There were quite a few safety considerations we had

2  to take into consideration.  The gate and what was locked, it

3  was -- I think from the gate to the property it was a quarter

4  to half mile.

5        MR. BENNETT:  I'm sorry, Your Honor, I have to object

6  that it's nonresponsive to the question.

7        THE COURT:  Sustained.

8        MR. BENNETT:  Thank you.

9        THE COURT:  You can reask if you would like.

10  Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe

11  why so many agents were there to conduct the search of the

12  residence?

13  A.   Because we were concerned about the security on the

14  property, and we had some concerns that there were a lot of

15  firearms on the property.

16  Q.   Prior to the execution of the search warrant, had your

17  efforts to surveil the property itself been limited?

18  A.   Yes.

19  Q.   You testified previously that you were able to conduct

20  aerial surveillance.  Were you able to actually physically

21  surveil the property from a vehicle?

22  A.   In very limited instances, I was.  Not close enough where

23  I could learn anything pertinent.

24  Q.   Why not close enough?

25  A.   If I was close enough to see the property, there was no

1  way to conceal my vehicle or me out there.

2  Q.   Did you have any concerns about the defendant being able

3  to see you?

4  A.   Yes.

5  Q.   What were those concerns?

6  A.   My concerns were whether he had apparently security

7  cameras out there that would -- I was guessing.  Since they

8  were security cameras, record anything that went in front of

9  his gate where it was pointed.  And then also he had a line of

10 sight to anywhere that I would like to sit and watch the

11 property.

12 Q.   Now, during the course of the execution of the search

13 warrant, were photographs taken of the defendant's residence?

14 A.   Yes, they were.

15        MS. MORRISON:  Your Honor, at this time the

16 government would move to admit Government's Exhibit 16A through

17 16DD.

18        THE COURT:  16A through 16DD?

19        MS. MORRISON:  Yes, sir.

20        THE COURT:  As in David, dog?

21        MS. MORRISON:  Yes, sir.

22        THE COURT:  We'll take a break in a few minutes.

23 Everybody doing okay for a few more?

24        Mr. Bennett?

25        MR. BENNETT:  No objection, Your Honor.  Thank you.

Jeremy Ewan - Direct Examination - January 20, 2021

1              THE COURT:  Thank you.  Yes, sir.

2              Government's Exhibit 16A through 16DD are admitted

3    without objection.

4              MS. MORRISON:  Your Honor, the government would seek

5    to publish those at this time.

6              THE COURT:  Yes, ma'am, you may.

7              MS. MORRISON:  If we could start with Government's

8    Exhibit 16A.

9    Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe

10   for the jury what's depicted in Government's Exhibit 16A?

11   A.   That is the intersection of Terlingua Ranch Road and

12   Highway 118.

13   Q.   With respect to the photograph that's on the screen, where

14   would the defendant's property have been located?

15   A.   So as you're going -- if you're going right to left on the

16   photograph, you would be going south and then you would take a

17   left turn onto Terlingua Ranch Road and drive a mile and a

18   half.

19   Q.   To be clear, the defendant's residence is not depicted in

20   Government's Exhibit 16A.

21   A.   No, it is not.

22             MS. MORRISON:  If we could publish 16B.

23   Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe

24   what's depicted in Government's Exhibit 16B?

25   A.   That is the gate that was at the front of his driveway and

Jeremy Ewan - Direct Examination - January 20, 2021

1   the lock and chain.

2           MS. MORRISON:  If we could zoom in on the sign.

3   Q.  (BY MS. MORRISON)  Special Agent Ewan, could you describe

4   what's depicted in this sign?

5   A.   Security Notice.  Surveillance Camera in Use.  I can't

6   read the exact language from here, but I believe there is a No

7   Trespassing sign somewhere there as well.

8   Q.   Special Agent Ewan, do you recall how many signs are on

9   the defendant's property?

10  A.   Three or four signs to that effect at the front gate.

11  Q.   Now, we can see that there is a gate depicted in

12  Government's Exhibit 16B.  Was there more than one gate on the

13  property?

14  A.   There was another gate further down the driveway as well.

15          MS. MORRISON:  If we could publish 16C.

16  Q.  (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

17  Government's Exhibit 16C?

18  A.   That was a pole that appeared to have a security camera at

19  the top facing towards the very front gate.

20  Q.   Was this pole in or outside of the gate?

21  A.   Inside the gate, I believe.

22          MS. MORRISON:  If we could publish 16D.

23  Q.  (BY MS. MORRISON)  Special Agent Ewan, could you describe

24  what's depicted in Government's Exhibit 16D?

25  A.   That is Mr. Arthur's residence and the other buildings.

Jeremy Ewan - Direct Examination - January 20, 2021

1           MS. MORRISON:  If we could publish 16E.

2  Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

3  Government's Exhibit 16E?

4  A.   That was the interior gate that I described a moment ago.

5  Q.   How far away was the defendant's property -- excuse me --

6  defendant's residence and other buildings from this gate?

7  A.   It was still at least a couple hundred yards from that

8  gate, I believe.

9           MS. MORRISON:  If we could publish 16F.

10 Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

11 Government's Exhibit 16F?

12 A.   That was a sign outside of his driveway.

13 Q.   Was that the last gate into the property?

14 A.   Yes.

15 Q.   Is there a significance associated with the name

16 "Doubleleena"?

17 A.   It's a variation on the Mr. Double Web site and the term

18 that had been used on the Web site a few times.

19           MS. MORRISON:  If we could publish 16F.  If we could

20 zoom in on the building.

21 Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe

22 what building this is depicted in 16F?

23 A.   That is the shop.

24 Q.   Where would the defendant's residence be from the shop?

25 A.   As you're looking at that photograph, it would be to the

1  right.

2          MS. MORRISON:  If we could publish 16G.

3  Q.  (BY MS. MORRISON)  Special Agent Ewan, could you describe

4  what's depicted in 16G?

5  A.   The residence was the primary residence.  That's the end

6  of it, not the side that was used to access it from the looks

7  of things, and there is a small greenhouse in the front of the

8  photo.

9          MS. MORRISON:  Could we publish Exhibit 16H.

10 Q.  (BY MS. MORRISON)  Special Agent Ewan, is that the front

11 of the defendant's residence?

12 A.   Yes, it is.

13         MS. MORRISON:  If we could publish 16I.

14 Q.  (BY MS. MORRISON)  What is depicted in Government's

15 Exhibit 16I?

16 A.   That's the end of the same residence.

17         MS. MORRISON:  If we could publish 16J.

18 Q.  (BY MS. MORRISON)  Special Agent Ewan, what is depicted in

19 16J?

20 A.   This was the first room in the house.  As you went in the

21 front door, this was immediately off to your left.

22         MS. MORRISON:  If we could zoom in.

23 Q.  (BY MS. MORRISON)  Special Agent Ewan, there's a letter

24 "A" that appears in this exhibit.  Who placed that letter "A"?

25 A.   Our evidence technicians did.

Jeremy Ewan - Direct Examination - January 20, 2021

1   Q.   What was the purpose in doing that?

2   A.   To keep straight where the various items of evidence come

3   from, we label each room and take photographs.

4   Q.   What did you learn about this particular room?

5   A.   There was multiple computer towers, monitors, electronic

6   storage devices, a desk.  It appeared to be primarily where he

7   worked from.

8        MS. MORRISON:  Could we zoom in on that particular

9   screen.

10       (Sotto voce discussion)

11  Q.   (BY MS. MORRISON)  Special Agent Ewan, on Government's

12  Exhibit 16J, there appears to be a screen.  What is shown on

13  that screen?

14  A.   It appears to be the surveillance cameras that were on the

15  property.  As we were there, it froze at a scene that showed

16  our spot guys.  You can see the legs anyway.  The top half is

17  cut off.  But that seems to be where the surveillance cameras

18  stopped recording.

19       MS. MORRISON:  If we could go to 16K.

20  Q.   (BY MS. MORRISON)  Special Agent Ewan, were all of the

21  electronic devices that are depicted in this photograph, were

22  they collected?

23  A.   Yes, they were.

24       MS. MORRISON:  If we could go to the next photograph.

25  Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in

1   Government's Exhibit 16L?

2   A.   That is the area by the kitchen, I believe.

3   Q.   Is this a different room than the previously depicted

4   room?

5   A.   Yeah, it's open to it; but, yeah, it's kind of a different

6   living area.

7          MS. MORRISON:  If we could go to 16M.

8   Q.   (BY MS. MORRISON)  Special Agent Ewan, what would be the

9   purpose in taking multiple photographs of the same room?

10  A.   To get different angles and make sure that you get all of

11  the items in there so that we know for sure where those items

12  are recovered from.

13         MS. MORRISON:  If we could go to 16N.

14  Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in

15  Government's Exhibit 16N?

16  A.   That is the desk from room A earlier.

17         MS. MORRISON:  Okay.  If we could go to 16O.

18  Q.   (BY MS. MORRISON)  What is depicted in Government's

19  Exhibit 16O?

20  A.   This was money that we recovered from his wife's bedroom.

21  Q.   How much money was recovered?

22  A.   It was a little over $2,000.  I don't remember the exact

23  amount.

24  Q.   How were you able to determine that this was Sandra

25  Arthur's room?

1  A.   She later told us.  And then from the belongings in it,

2  all of the belongings seemed to belong to a female.

3  Q.   Did you locate any other cash in the house?

4  A.   I don't recall any.

5       MS. MORRISON:  If we could go to 16P.

6  Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

7  Government's Exhibit 16P?

8  A.   That is a statement from Global Electronic Technology.  It

9  was their credit card processor in the name of SC Prod, Inc.

10       MS. MORRISON:  If we could go to the next exhibit.

11  Q.   (BY MS. MORRISON)  Let me stop here for a second.  Special

12  Agent Ewan, what was the relationship between SC Prod, Inc.,

13  and the Mr. Double Web site?

14  A.   SC Prod, Inc., was the company that they used to process

15  payments to them.  It looked like a lot of the card processers

16  wouldn't process from mrdouble.com.  They went from SC Prod,

17  Inc., and we saw them.

18  Q.   Now, we can see that Sandra Arthur's name appears on that

19  particular document.  During the course of your investigation,

20  did you learn that she had some association to the defendant's

21  business?

22  A.   Yes, she was the president of the business with documents

23  they filed with the bank while Thomas was considered an officer

24  in those documents.

25  Q.   Okay.

Ann M. Record, RMR, CRR, CMRS, CRI

Jeremy Ewan - Direct Examination - January 20, 2021

1          MS. MORRISON:  If we could go to the next exhibit.

2   Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in

3   Government's Exhibit 16Q?

4   A.   A bank document, specifically hers, and a box of assorted

5   documents, but included in it was bank documents.

6   Q.   Where were these located?

7   A.   Inside the residence.

8          MS. MORRISON:  If we could go to the next one.

9   Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

10  Government's Exhibit 16R?

11  A.   Same thing.  It was multiple boxes of documents, and this

12  was another box.  This one had some Fort Davis State Bank

13  records.

14  Q.   Now, we can see that there is reference to Mr. Double,

15  Inc., as well as AOK Contractors.  What did you learn about the

16  relationship between the Web sites and AOK Contractors?

17  A.   AOK Contractors was an assumed business name for

18  Mr. Double, Inc.

19  Q.   But that was associated with the defendant.

20  A.   Yes.

21          MS. MORRISON:  If we could go to the next exhibit.

22  Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

23  Government's Exhibit 16S?

24  A.   More boxes of documents -- or another box of documents.

25  Q.   This was also located in the residence?

Jeremy Ewan - Direct Examination - January 20, 2021

1  A.   Yes.

2        MS. MORRISON:  If we could go to the next exhibit.

3  Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

4  this exhibit?

5  A.   Another box of documents.  This one contained a statement

6  from UPS -- or statements from UPS.

7  Q.   Did you learn that the defendant had a business account

8  with UPS?

9  A.   Yes, he did.

10 Q.   Special Agent Ewan, what's depicted in Government's

11 Exhibit 16U?

12 A.   A tax return sent to him from an attorney, Scott Ragsdale.

13       MS. MORRISON:  If we could go to the next exhibit.

14 Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

15 Government's Exhibit 16D?

16 A.   More records.  Specifically on top, that was a W-2 to

17 Thomas Arthur from Mr. Double, I believe.

18       MS. MORRISON:  And if we could go to the next

19 exhibit.

20 Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

21 Government's Exhibit 16W?

22 A.   Behind the residence we found a number of computer hard

23 drives that appeared to have been burned or destroyed in other

24 ways, and they were buried throughout the property.  This is a

25 photograph of some of them.

Jeremy Ewan - Direct Examination - January 20, 2021

1          MS. MORRISON:  If we could go to the next exhibit.
2   Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in
3   Government's Exhibit 16X?
4   A.   More burned or destroyed hard drives.
5   Q.   Special Agent Ewan, do you recall how many burned hard
6   drives you located on the property?
7   A.   I don't.  There was a lot of them.  More than -- I would
8   say more than 15.
9          MS. MORRISON:  If we could go to the next exhibit.
10  Q.   (BY MS. MORRISON)  Is this another photograph of the
11  burned hard drives?
12  A.   Yes, it is.
13         MS. MORRISON:  If we could go to the next exhibit.
14  Q.   (BY MS. MORRISON)  Special Agent Ewan, is this another
15  photograph of the burned hard drives?
16  A.   Yes, it is.
17         MS. MORRISON:  If we could go to the next exhibit.
18  Q.   (BY MS. MORRISON)  Special Agent Ewan, could you describe
19  for the jury where the burned hard drives were located in
20  reference to the property?
21  A.   They were behind the primary residence.
22         MS. MORRISON:  If we could go to the next exhibit.
23  Q.   (BY MS. MORRISON)  This is a close-up?
24  A.   Close-up of one of the hard drives, yes.
25  Q.   And that's 16BB?

Jeremy Ewan - Direct Examination - January 20, 2021

1   A.    Yes.   Sorry.

2           MS. MORRISON:   If we could go to the next exhibit.

3   Q.    (BY MS. MORRISON)   What is depicted in Government's

4   Exhibit 16CC?

5   A.    We found some T-shirts that had mrdouble.com printed on

6   them.

7   Q.    Where were those located?

8   A.    This one was located in the shop, but I seem to recall

9   there was at least another one located in the residence.

10          MS. MORRISON:   If we could go to the next exhibit.

11  Q.    (BY MS. MORRISON)   What's depicted in this photograph?

12  A.    That's the dirt berm where more hard drives were located.

13  Q.    Special Agent Ewan, how many electronic devices were

14  recovered from the defendant's residence?

15  A.    I don't remember the exact number, but a lot of them.

16  Q.    What happened with those devices?

17  A.    They were sent to our forensic computer examiners so that

18  they could be preserved and examined.

19  Q.    We've seen photographs of a lot of the evidence that was

20  collected from the defendant's residence.   Did you locate any

21  printed materials that were similar to the content on the Web

22  site?

23  A.    Yes, we did.

24  Q.    Could you describe those?

25  A.    In the shop, we found boxes of printed paperback books

Jeremy Ewan - Direct Examination - January 20, 2021

1  that focused on a lot of the same content.

2  Q.   Approximately how many of those did you locate?

3  A.   It was between 95 and 98 boxes.

4  Q.   How many materials -- individual materials, if you recall?

5  A.   Thousands.  I don't remember the exact number.

6  Q.   Were these collected by the FBI?

7  A.   Yes, they were.

8  Q.   Did you also have the opportunity to photograph and

9  catalog these?

10  A.   Yes, we did.

11  Q.   In addition, during the search of the defendant's

12  residence, did you locate a box of VHS tapes?

13  A.   Yes, we did.

14  Q.   Where were those located?

15  A.   They were in the shop as well.

16  Q.   Did you have the opportunity to watch those tapes?

17  A.   Yes, I did.

18  Q.   What was on those tapes?

19  A.   It was news coverage of the start of the Iraq War from

20  2003, I believe.

21  Q.   Did you also recover a Canon digital camera?

22  A.   Yes, we did.

23  Q.   Did you have the opportunity to look at what was on the SD

24  card for the camera?

25  A.   They examined it, yes.  I don't remember specifically

Jeremy Ewan - Direct Examination - January 20, 2021

1  which SD card it was, though.

2  Q.    What was on the camera?

3  A.    I don't know if there was anything pertinent on the

4  camera.

5  Q.    Where was the camera located?

6  A.    In a safe in Thomas Arthur's bedroom.

7  Q.    After the forensic examination of all of the defendant's

8  devices, including the materials received from the Netherlands

9  or Belgium were complete, did you have the opportunity to go

10 through all of the material?

11 A.    Yes, I did.

12 Q.    After you had the opportunity to go through additional

13 material, did you locate other drawings on the Web site?

14 A.    We located them on the devices and then found they had

15 also been published to the Web site.

16         MS. MORRISON:  Your Honor, at this time the

17 government would move to admit Government's Exhibit 11A and

18 12A.

19         MR. BENNETT:  We have no objection, Your Honor.

20         THE COURT:  That's 11A and 12A, individuals?

21         MS. MORRISON:  Yes, sir.

22         THE COURT:  Those are admitted without objection.

23         MS. MORRISON:  Your Honor, if we could publish

24 Government's Exhibit 11A.

25         THE COURT:  How long does it run?

Jeremy Ewan - Direct Examination - January 20, 2021

```
 1            MS. MORRISON:  It's a photograph, drawing.

 2            THE COURT:  Oh, it's just a photograph.  I thought we

 3    were talking about VHS.  Okay.  Thank you.

 4            MS. MORRISON:  No, sir.

 5            THE COURT:  Yes, ma'am, you may.

 6    Q.   (BY MS. MORRISON)  Special Agent Ewan, what is depicted in

 7    Government's Exhibit 11A?

 8    A.   That was an image for the author -- page of the author

 9    that went by the name of Girls_suck.

10            MS. MORRISON:  If we could publish Government's

11    Exhibit 12A.

12    Q.   (BY MS. MORRISON)  Special Agent Ewan, what's depicted in

13    Government's Exhibit 12A?

14    A.   That was an image from the image page of the author by the

15    name of Loadthemule.

16            MS. MORRISON:  Your Honor, if we could publish

17    Government's Exhibit 9A.

18            THE COURT:  Hang on.  Should we -- let's take a break

19    real quick.

20            Ladies and gentlemen, we're going to take our morning

21    break.  You're going to leave your notebook in your chair, if

22    you don't mind, or below it, whatever.  Just leave it in here.

23    Don't take it with you.  And you're going to go into the jury

24    room.  We've got, of course, snacks and beverages.  You've got

25    restrooms available.  Nobody will be bothering you and the
```

Jeremy Ewan - Direct Examination - January 20, 2021

 1  court security officers will be helping and the marshals will

 2  be helping you with that.  If you need anything else, let us

 3  know.

 4          You are instructed that until the trial is over,

 5  you're not to discuss the case with anyone, including your

 6  fellow jurors.  If anyone approaches you, tries to talk to you

 7  about the case, advise me about it immediately.  Don't read or

 8  listen to anything.  Don't post anything or do research.

 9  Remember to keep an open mind until the evidence has been

10  received.  Finally, don't speak with anyone in or around the

11  courthouse other than your fellow jurors or court personnel.

12          And so we're going to take a break -- let's go

13  15 minutes.  We'll be back at 10 till.  So if you'll be lined

14  up ready to come in, we'll be ready to go as well.  We're going

15  to stay here and do some work while you do that.

16          Let's rise for the jury, please.  Thank you.

17          (Jury leaves at 10:37 a.m.)

18          THE COURT:  Please be seated.  Thank you.  Outside

19  the presence of the jury.

20          How much more do you think you have?

21          MS. MORRISON:  Your Honor, I would say probably about

22  20 minutes.

23          THE COURT:  Okay.  I'm not holding you to it.  I'm

24  just trying to get an idea.

25          Okay.  Very good.  Anything the government wants to

Ann M. Record, RMR, CRR, CMRS, CRI

Jeremy Ewan - Direct Examination - January 20, 2021

1  bring up outside the presence?

2          MR. BERRY:  Just to sort of understand the

3  scheduling.  You are bringing in lunch for the jurors?

4          THE COURT:  We are.  I am going to try to break

5  around 12:15-ish.  We're trying to have it for them by then.

6  So if we go a little longer than that, that's okay.  We'll

7  probably give them 30 to 45 minutes to eat.

8          MR. BERRY:  That's what I wanted to account for so I

9  could have something brought in.

10          THE COURT:  So I'm hoping to start back at 1:00 or

11  so, thereabouts.

12          MR. BERRY:  Okay.  Thank you.

13          THE COURT:  Mr. Bennett.

14          MR. BENNETT:  Don't know the layout here.  Does the

15  jury have their own restrooms?

16          THE COURT:  They actually have access to them, and so

17  they won't be going to the main restrooms.

18          MR. BENNETT:  That's what I needed to know.

19          THE COURT:  Yeah, it's all good.  Thank y'all.  Let's

20  take a break.  Let's be back in ten minutes or so.

21          (Recess from 10:38 a.m. to 10:54 a.m.)

22          THE COURT:  Mr. Berry or Ms. Morrison, anything y'all

23  want to bring up outside the presence?

24          MR. BERRY:  No.

25          THE COURT:  Mr. Haygood or Mr. Bennett, anything

Jeremy Ewan - Direct Examination - January 20, 2021

1   y'all want to bring up before we bring the jury back in?

2           MR. BENNETT:  I don't think so, Your Honor.

3           THE COURT:  We're good?

4           All right.  Let's bring them back in.

5           (Jury enters at 10:54 a.m.)

6           THE COURT:  Ms. Morrison, you can continue.

7           MS. MORRISON:  Thank you, Your Honor.

8           If we can publish Government's Exhibit 33B.

9           THE COURT:  Yes, ma'am.

10  Q.   (BY MS. MORRISON)  And, Special Agent Ewan, in the

11  meantime, if you would turn to Government's Exhibit 5A.

12           Special Agent Ewan, what story codes appear with

13  respect to the Government's Exhibit 5A?

14  A.   The story codes are MMMg toddler.

15  Q.   And we're looking at Government's Exhibit 33B.  Do some of

16  those codes appear on the screen?

17  A.   The small g and the capital M, I believe.

18  Q.   If you could turn to Government's Exhibit 6A.

19  A.   Go ahead.

20  Q.   What story codes appear in Government's Exhibit 6A?

21  A.   Mf, dad, daughter, baby, masturbation, mild, ws.

22  Q.   If you could go to Government's Exhibit 7A.

23  A.   Okay.

24  Q.   What story codes appear in Government's Exhibit 7A?

25  A.   MgM, dong, male, domination, men/ten-year-old girl, ped,

Jeremy Ewan - Direct Examination - January 20, 2021

1  first, oral, anal, ws, scat, and extreme.

2  Q.   Special Agent Ewan, can you see the screen?

3  A.   Sorry, not real well.

4  Q.   Can you read it?  Can you see it?

5  A.   Age 12 and below.

6  Q.   What is the story code there?

7  A.   ped.

8  Q.   Do you see anything else?

9  A.   With the Mg or something similar.

10 Q.   Special Agent Ewan, can you turn to Government's

11 Exhibit 8A?

12 A.   Okay.

13 Q.   I'm going to back you up for a second.

14       With respect to Government's Exhibit 7A, you

15 mentioned one of the story codes was "ws."  What does "ws"

16 stand for?

17 A.   Water sports.

18 Q.   And you mentioned the story code "scat."  Are you able to

19 read from the screen what "scat" stands for?

20 A.   Scatology or involving feces.

21 Q.   If you could turn to Government's Exhibit 8A.

22 A.   Okay.

23 Q.   What are the story codes that appear in that story?

24 A.   MFMffff, M baby, snuff, torture, rape, and necro.

25 Q.   Special Agent Ewan, if you could now turn to Government's

Jeremy Ewan - Direct Examination - January 20, 2021

1   Exhibit 9A.

2   A.    Okay.

3   Q.    What story codes appear in Government's Exhibit 9A?

4   A.    M infant, rape, and snuff.

5          MS. MORRISON:  Your Honor, at this time the

6   government would seek to publish Government's Exhibit 9A.

7          THE COURT:  Yes, ma'am, you may.

8          Is everybody done?  Okay.  Thank you.

9          Let's take them back up.

10          You may proceed.

11          MS. MORRISON:  Thank you, Your Honor.

12   Q.    (BY MS. MORRISON)  Special Agent Ewan, during the course

13   of your investigation, were you able to identify some of the

14   authors on the Web site?

15   A.    Some of them, yes.

16   Q.    What did you learn about the locations of the authors?

17   A.    There were authors in most of the states I think we found

18   and then some overseas.  One specifically I remember in

19   England.

20   Q.    During the search of the defendant's forensic devices,

21   were e-mails located sent by the defendant?

22   A.    Yes, they were.

23          MS. MORRISON:  Your Honor, at the time the government

24   would move to admit Government's Exhibits 29A through M.

25          THE COURT:  29A through M; is that right?

Jeremy Ewan - Direct Examination - January 20, 2021

1              MS. MORRISON:  Yes, Your Honor.

2              THE COURT:  Mr. Bennett?

3              MR. BENNETT:  Your Honor, I object to 29I which

4    contains 404 evidence.

5              THE COURT:  Let me have the attorneys approach.

6              (On-the-record sidebar conference)

7              THE COURT:  So outside the presence of the jury.  So

8    29A through M was offered, correct, A through M?

9              MS. MORRISON:  Yes, Your Honor.

10             THE COURT:  And your only objection is 29I?

11             MR. BENNETT:  Yes, Your Honor.

12             THE COURT:  Are there others?  Are there others in

13   those, 29A through M?

14             MR. BENNETT:  I have no other objection.

15             THE COURT:  Okay.  Your objection as to 29I.

16             MR. BENNETT:  It's 404 --

17             THE REPORTER:  I can't hear you.

18             MR. BENNETT:  -- they are evidence of other alleged

19   acts.

20             THE COURT:  What in particular?

21             MR. BENNETT:  "I tried my hot 14-year-old cousin..."

22             THE COURT:  I'm sorry?

23             MR. BENNETT:  It says, "I tried my hot 14-year-old

24   cousin..."

25             THE COURT:  The part that's highlighted there?

Jeremy Ewan - Direct Examination - January 20, 2021

1          MR. BENNETT:  The part that's highlighted.

2          THE COURT:  Okay.

3          Your response?

4          MS. MORRISON:  Your Honor, I think it goes to the

5    deviant nature of the material; and in the line before, he

6    emphasized "it could have been a great time."  So clearly

7    nothing happened.

8          MR. BERRY:  More specifically, Your Honor, under the

9    first prong of the Miller test, we have to prove prurient

10   interest which it can be that it appeals to a deviant sexual

11   group.  These are e-mails between him and others establishing

12   the deviant sexual nature of that particular group.

13         MR. BENNETT:  And in response to that, which may come

14   up again, Your Honor, our position is that the documents

15   themselves speak to their prurient nature.  We're not arguing

16   that they don't appeal to a prurient interest group, and there

17   is other evidence here of this alleged deviant group without

18   this particular exhibit.  So this exhibit is cumulative of that

19   as well.

20         THE COURT:  I'll overrule the objection, and we'll go

21   from there.  Everything else is without objection?

22         MR. BENNETT:  Everything else.

23         THE COURT:  It's only I.

24         MR. BENNETT:  Yes, Your Honor.

25         THE COURT:  Okay.  Very well.

1          MR. BERRY:  Your Honor.

2          THE COURT:  Yes, sir.

3          MR. BERRY:  Do you want to give a limiting

4   instruction all the same?

5          THE COURT:  If he wants to.

6          MR. BENNETT:  Yes, we do, please.

7          THE COURT:  Okay.

8          (On-the-record sidebar conference concluded)

9          THE COURT:  So Government's 29A through M are

10  admitted all without objection except for 29I, which is

11  admitted over objection.

12         You may proceed.

13         MS. MORRISON:  Your Honor, if we could publish

14  Government's Exhibit 29J.

15         THE COURT:  Yes, ma'am.

16  Q.   (BY MS. MORRISON)  Special Agent Ewan, are you able to see

17  29J in front of you?

18  A.   Yes.

19  Q.   What indication do you have that this particular e-mail

20  was written by the defendant?

21  A.   The Mr. Double at mrdouble.com e-mail address, we tied it

22  to him, found that it was his.  And it is also signed by "Tom."

23         MS. MORRISON:  If we could go to the highlighted

24  portion.

25  Q.   (BY MS. MORRISON)  Special Agent Ewan, referring to the

1  highlighted portion, what was your understanding based on

2  reading that particular portion and then the other items that

3  were located during your investigation?

4  A.   That at one time he was able to pay authors for submitting

5  stories, but he had some trouble finding card processors who

6  would accept him so he couldn't pay the authors.

7  Q.   Do you know what time period the defendant was paying

8  authors?

9  A.   In the early 2000s, I remember he was.  I don't remember

10 specifically what year he stopped.

11 Q.   With respect to Government's Exhibits 29A through M, were

12 all of those e-mails authored by the defendant?

13 A.   Yes, a couple of them are replies to other e-mails so

14 there are parts that were written by somebody else; but he

15 authored at least part of all of these exhibits, yes.

16 Q.   Special Agent Ewan, what did you learn about e-mail

17 communication through the Web site?

18 A.   When the authors were provided with a mrdouble.com e-mail

19 address, that was hosted on that server in the Netherlands.

20 Q.   Were readers assigned e-mail addresses -- or, excuse me,

21 members assigned e-mail addresses?

22 A.   I don't know if all members were assigned an e-mail

23 address.  I know that authors were, but I don't know that all

24 members were.

25 Q.   Through the Web site, was the defendant able to control

Jeremy Ewan - Direct Examination - January 20, 2021

1  the e-mail communication?

2  A.   He could observe it.   In some of the e-mails he talked

3  about how if -- his system wouldn't allow photographs.   If a

4  photograph came through, it would be sent to him for review

5  right away or he could monitor it and stop content that he

6  didn't approve of or stuff that violated his Web site's rules.

7  Q.   How -- I'm sorry.

8        How were the stories submitted to the defendant?

9  A.   They could either be e-mailed directly to him or he had

10 like a submission form that you could fill out and put your

11 story in and upload it.

12 Q.   What was your understanding about how the stories that

13 appeared on the Web site itself?

14 A.   Tom would have to take them and format them in whatever

15 way he formatted them for the site and upload them to the site.

16 Q.   Is it your understanding that the stories could not be

17 posted by the authors themselves directly?

18 A.   No, I don't believe they could.

19 Q.   Were you also able to review forum postings by the

20 defendant?

21 A.   Yes, I was.

22 Q.   Could you explain to the jury what the forum was?

23 A.   Over the history of the Web site there were a couple

24 different iterations of it, but they were all basically just a

25 forum where users, authors, and such could post and have

1  conversations online.  They would post and somebody could

2  respond to it, but the entire chain of the posts and replies

3  would be viable.

4  Q.   Who was permitted to post on the forum?

5  A.   I think any member was permitted to participate in the

6  forum, from what I could tell.

7  Q.   Did you locate forum postings by the defendant?

8  A.   Yes, I did.

9         MS. MORRISON:  Your Honor, at this time the

10 government would seek to admit Government's Exhibit 31 -- 31A

11 through D.

12        MR. BENNETT:  No objection, Your Honor.

13        THE COURT:  Government's Exhibits 31A through D are

14 admitted without objection.

15        MS. MORRISON:  Your Honor, if we could publish

16 Government's Exhibit 31D.

17        THE COURT:  Yes, ma'am.

18 Q.   (BY MS. MORRISON)  Special Agent Ewan, did the defendant

19 posting as mrdouble.com post on the forum posting that's

20 depicted in Government's Exhibit 31D?

21 A.   Yes, he did.

22 Q.   Could you read aloud that particular passage by the

23 defendant?

24 A.   Sure.  Would you like me to read the title of the thread

25 for context too so they know what he's responding to?

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Q.   Yes.  And for the purposes of the record, I understand

2  that this exhibit is multiple pages.  When you read, if you

3  could read what page of that particular exhibit you're reading

4  from as well.

5  A.   Yes, ma'am.  The title of this thread was:  "Pedophilia or

6  Incest Fantasies.  Change if you could?"

7            If you review this later, you read from the last page

8  to the front and from the bottom to the top to get them in the

9  order that they appeared on the site.

10           The posting by Tom is on -- it's labeled Page 1 of 3,

11 but it was actually one of the last pages.  And it said:  "I

12 can say with certainty that I will never stop

13 fantasizing/reminiscing/thinking back of the experiences I had

14 in my younger years.

15           "Nor will I stop writing about them, telling others

16 about them, or reading about other people's experiences.

17           "Now, I must get back to my preteen time machine."

18           And an emoji for a smiley face.

19 Q.   Special Agent Ewan, is it your understanding that the

20 parties have stipulated to some of the elements that the

21 government has to prove in this case?

22 A.   Yes.

23           MS. MORRISON:  Your Honor, at this time I would move

24 for the admission of Government's Exhibit 34 into evidence.

25           THE COURT:  Which is the Stipulation?

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MS. MORRISON:  Yes, sir.

2          THE COURT:  Mr. Bennett?

3          MR. BENNETT:  Is this the recently signed

4  Stipulation?

5          MS. MORRISON:  That's correct.

6          MR. BENNETT:  With ink signatures?

7          MS. MORRISON:  Yes.

8          MR. BENNETT:  Thank you.

9          No objection, then.

10          THE COURT:  Government's Exhibit 34, the Stipulation,

11  is admitted without objection.

12          Yes, ma'am.

13          MS. MORRISON:  May I approach madam clerk?

14          THE COURT:  Yes, ma'am.

15          MS. MORRISON:  Your Honor, I don't have any further

16  questions of this witness at this time.

17          THE COURT:  Ladies and gentlemen of the jury, you've

18  just taken in a lot of exhibits.  There's some evidence that

19  you have heard as well as evidence that you have -- that you'll

20  be looking at.  As you look at those, you may see items in some

21  of those e-mails or written materials that regard other acts of

22  the defendant.  That evidence is admitted for limited purposes.

23          Though other acts may be similar to those charged in

24  the indictment, they may have been committed on another

25  occasion; they may not have been committed at all.  You must

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 95 of 286

95

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   not consider the defendant's other acts in deciding if the

2   defendant committed the acts charged in this indictment.  You

3   may, however, consider that such evidence for other limited

4   purposes.

5           If you find beyond a reasonable doubt from other

6   evidence in the case that the defendant did commit the acts

7   charged in the indictment, you may consider this evidence of

8   other acts committed on another occasion to determine whether

9   the defendant had the state of mind, the intent, or knowledge

10  necessary to commit the crimes charged in the indictment or

11  whether the defendant committed the acts for which he's on

12  trial here by accident or by mistake.  These are limited

13  purposes for which any such prior acts or other acts may be

14  considered.

15          You may not know what I'm talking about because I'm

16  not sure you've seen all the evidence that I'm discussing.  But

17  when you come across other acts that are not included as

18  charges, you'll know what I mean; and those are to be used by

19  you for these limited purposes only.

20          The witness has been passed.  Thank you.

21          Mr. Bennett, your witness.

22          MR. BENNETT:  Thank you, Your Honor.

23          And, Your Honor, I hope to be brief and wrap up

24  before the jury's lunch arrives.

25          THE COURT:  Oh, they're not lunching till

Jeremy Ewan - Cross-Examination - January 20, 2021

 1  four o'clock.  So you're good.

 2          (Laughter)

 3          MR. BENNETT:  Oh, piece of cake then, Judge.

 4                    **CROSS-EXAMINATION**

 5  BY MR. BENNETT:

 6  Q.   Special Agent Ewan, how are you?

 7  A.   I'm good, Mr. Bennett.  How are you?

 8  Q.   Good.  It's nice to see you.

 9  A.   You too.

10  Q.   Welcome back to Texas.

11  A.   Thank you, sir.

12          MR. BENNETT:  Would you mind putting Government's

13  Exhibit 33A up on the screen for me, please.  Thank you.

14  Q.   (BY MR. BENNETT)  Looking at Government's Exhibit 33A?

15          MR. BENNETT:  Could I have the next page, please.

16  And the next.  And then the -- below the line of -- below the

17  block, the question, if you would highlight that question.

18  Q.   (BY MR. BENNETT)  All right.  You can see what Exhibit 33A

19  says:  Frequently Asked Questions, about, Abbreviated Story

20  Codes in A.S.S.

21  A.   Correct.

22  Q.   Do you know what A.S.S. is?

23          MS. MORRISON:  Objection.  Relevance.

24          THE COURT:  What is the relevance, Mr. Bennett?

25          MR. BENNETT:  These are imported from another Web

Ann M. Record, RMR, CRR, CMRS, CRI

Jeremy Ewan - Cross-Examination - January 20, 2021

 1  site, and I wanted to know if the witness knows about the other

 2  Web site.

 3          THE COURT:  The witness can ask if he know -- you can

 4  answer whether you know.  I'll overrule the objection

 5  momentarily.

 6          Do you know what that is, A.S.S.?

 7          MR. BENNETT:  A.S.S.

 8  A.   I think I do.

 9  Q.   (BY MR. BENNETT)  Okay.  Do you know about HughesNet?

10          MS. MORRISON:  Objection.  Relevance.

11          THE COURT:  Are we going to get somewhere with that,

12  Mr. Bennett?

13          MR. BENNETT:  Just two minutes' worth of this is --

14  of the source of this information.

15          THE COURT:  All right.

16          You may answer that question.

17          Overruled.  I overrule the objection.

18  A.   Yes, I've heard of it.

19  Q.   (BY MR. BENNETT)  Okay.  Do you know that A.S.S. is all

20  about sex dot stories on HughesNet?

21  A.   I did not know that's what it stood for; but I have heard

22  of that, yes.

23  Q.   Okay.  Does it appear to you that this came from a 2001

24  frequently asked questions on A.S.S. on HughesNet?

25  A.   That's what the text says, yes.

1  Q.   Likewise, Exhibit 33B also refers to Frequently Asked

2  Questions on HughesNet.

3  A.   Correct.

4  Q.   Okay.  And so these weren't authored by Mr. Arthur, but

5  they were brought over to his Web site from HughesNet.

6  A.   I can't --

7       MS. MORRISON:  Objection.  Calls for speculation on

8  the part of the witness.

9       THE COURT:  Sustained.

10      MR. BENNETT:  Okay.

11 Q.   (BY MR. BENNETT)  In my examination, I want to refer only

12 to stories and images that we know that users with access such

13 as you obtained to the Web site would find through Mr. Double.

14 Agreed?

15 A.   Okay.

16 Q.   I don't want to talk about books in a barn, okay?  I don't

17 want to talk about things that were on a server that were not

18 accessible to Mr. Double users.

19 A.   Okay.

20 Q.   Or that we don't know were accessible to Mr. Double users.

21 Fair?

22 A.   Okay.

23 Q.   Mr. Double didn't advertise images; right?

24 A.   No.  There was a disclaimer in the front that said:  Text

25 only; no images.

Jeremy Ewan - Cross-Examination - January 20, 2021

1  Q.   So the public going to the Web site would see that it's a

2  text only site.

3  A.   Correct.

4  Q.   And would see samples of some stories, snippets of some

5  stories.

6  A.   Correct.

7  Q.   And based on that would have to decide whether to

8  subscribe to the Web site or not.

9  A.   Correct.

10 Q.   All right.  There was nothing saying stories and images.

11 A.   I don't recall any advertising for images, no.

12 Q.   Okay.  The images that we have in this case, the three

13 images, were author images.  They were associated with an

14 author's stories; correct?

15 A.   Correct.

16 Q.   So you go to a story and it has an author.

17 A.   Yes.

18 Q.   And then you click on the author.

19 A.   Yes.

20 Q.   And you go to the author page.

21 A.   Correct.

22 Q.   It has a list of stories by the author.

23 A.   Correct.

24 Q.   Has a bio by the author.

25 A.   Correct.

1  Q.   And has an image if the author choose to have an image.

2  A.   Correct.

3  Q.   Were there other author images other than the three that

4  are charged in this case?

5  A.   There were, yes.

6  Q.   Okay.  Were many or few of them similar to the materials

7  in this case, that is, apparently or possibly images of

8  children?

9  A.   Are you saying were many of them?

10 Q.   Were many or few?

11 A.   There might have been a couple more, but there weren't a

12 lot of images.  A lot of the authors didn't have images.  So I

13 didn't get to see all of the authors and see exactly who had

14 images, but I would say the majority did not, no.

15 Q.   Okay.  And the images that authors did have, were the

16 majority of possible children or were they clearly not

17 contraband, illegal material?

18 A.   Probably 50/50, more or less, of the images.

19 Q.   And these images were only available for the people

20 signing up for the Web site.

21 A.   No, I believe you didn't have to be a member to click on

22 an author page.  I believe you could click on an author page.

23 Q.   Okay.  Have you reviewed the government's mock-up of the

24 Web site that it created from the server that was acquired from

25 the Netherlands?

Jeremy Ewan - Cross-Examination - January 20, 2021

1  A.   I've seen it, but I haven't had a chance to actually

2  interact with it.

3  Q.   So you can't tell us whether it works the same as the site

4  on the Web?

5  A.   From what I saw I can't say for certain that it's exactly

6  the same.

7  Q.   Thank you.

8         Images were only a tiny part of the content on

9  Mr. Double; correct?

10 A.   Correct.

11 Q.   In fact, these are three images, and there were advertised

12 to be 25,000 stories.

13 A.   Correct.

14 Q.   Now, on direct you testified about Government's

15 Exhibit 10, which is the black and white image.

16 A.   Yes, sir.

17 Q.   And you testified that it was a drawing of a prepubescent

18 or pubescent child lying nude appearing to be masturbating.

19 A.   Correct.

20 Q.   Okay.  Do you agree that prepubescent term refers to

21 children before the onset of puberty and pubescent refers to

22 children during puberty?

23 A.   I agree.

24 Q.   So we would have prepubescent, pubescent, postpubescent,

25 and adults.

Jeremy Ewan - Cross-Examination - January 20, 2021

1   A.   Sounds correct, yes.

2   Q.   All right.  How would you tell prepubescent from pubescent

3   looking at an image?

4   A.   If you can't tell specifically from the image, you look

5   for other context clues.  In this case, the text was decided

6   based on the context clue.

7   Q.   So on the image, a prepubescent child has not yet started

8   to sexually develop; right?

9   A.   Correct.

10  Q.   So it does not have breasts.

11  A.   Correct.

12  Q.   It does not have pubic hair.

13  A.   Correct.

14  Q.   And in this image, the subject of the image actually has

15  budding breasts; correct?

16        MS. MORRISON:  Objection, Your Honor.

17        THE COURT:  I'm sorry?

18        MS. MORRISON:  I'm objecting, Your Honor.  I don't

19  think this individual is qualified to testify about this.  He's

20  essentially testifying for the witness.

21        THE COURT:  Overruled.  Go ahead.

22  Q.   (BY MR. BENNETT)  An image, Government's Exhibit 10, this

23  subject has -- apparently has -- pretty obviously has budding

24  breasts; correct?

25  A.   I don't know that I would characterize them as budding.

Jeremy Ewan - Cross-Examination - January 20, 2021

1  Q.   As breasts.

2  A.   Yes.

3  Q.   Visible breasts.

4  A.   Inasmuch as all human beings do, yes.

5           MR. BENNETT:  Would you pop that up on the screen.

6           MR. BERRY:  There you go.

7           MR. BENNETT:  Could I ask you, Mr. Berry, to

8  highlight this portion.

9           (Sotto voce discussion)

10 Q.   (BY MR. BENNETT)  All right.  That appears to be a female

11 breast, you'll agree.

12 A.   I don't know if that's from development or just a normal

13 child.  I'm not familiar enough with the sexual development of

14 children to make that call.

15 Q.   Fair enough.  In any case, you testified it could be

16 pubescent or prepubescent.

17 A.   Correct.

18 Q.   In fact, it could be a slender young adult.

19 A.   I have no idea, but I don't think that could be a slender

20 young adult from an image.

21 Q.   Okay.  But you'll agree with me that we don't know whether

22 it is prepubescent or pubescent?

23           MS. MORRISON:  Objection.  Asked and answered.

24           THE COURT:  Sustained.

25 Q.   (BY MR. BENNETT)  You'll agree with me that people had to

Jeremy Ewan - Cross-Examination - January 20, 2021

 1  take steps to view the full stories.  They couldn't just

 2  stumble upon the site and read these stories.

 3  A.    The full stories, no.

 4  Q.    And that's paid subscribers and authors could read the

 5  stories.

 6  A.    Yes.

 7  Q.    You agree with me that the charged stories and drawings

 8  are not child pornography.

 9  A.    Yes.

10  Q.    And why is that, for the jury?

11          MS. MORRISON:  Your Honor, I am going to object.

12          THE COURT:  Sustained.

13  Q.    (BY MR. BENNETT)  Were these author pictures the draw of

14  the Web site, in your view?

15  A.    I don't know what attracted people, individual readers to

16  the Web site.  But like you mentioned before, that wasn't what

17  was advertised, no.

18  Q.    Would you agree with me that we have no way of knowing if

19  the charge stories reflect fantasy or actual events?

20  A.    Correct.

21  Q.    And would you agree with me, likewise, that people don't

22  tell the truth all the time on the Internet so that we don't

23  know whether the e-mails and the forum posts are true or

24  reflect fantasy or puffery?

25  A.    That's correct.

Jeremy Ewan - Cross-Examination - January 20, 2021

1  Q.   In fact, all of the stories have disclaimers saying

2  they're fiction.

3  A.   Yes.

4  Q.   Looking at Government's Exhibit 11A and 12A, you'll agree

5  with me that 11A is a cartoon drawing.

6  A.   Yes.

7  Q.   Okay.  It doesn't appear to represent any -- or at least

8  not recognizably any real human being.

9  A.   Correct.

10  Q.   Has impossibly large eyes?  Yes?

11  A.   Yes, sorry.

12  Q.   Not physiologically possible for this to be an actual

13  human being.

14  A.   Correct.  I agree.  Those aren't actual human beings

15  depicted.

16  Q.   Now, in 11A, we see the pubic region.

17  A.   Yes.

18  Q.   And we see no hair.

19  A.   Correct.

20  Q.   What we can't tell if there are breasts development.

21  A.   Not from that image, no.

22  Q.   So from this image, we also cannot tell if this is a

23  prepubescent or pubescent child.

24  A.   I can't, no.

25  Q.   Okay.  And likewise, Government's Exhibit 12A.  All right.

Jeremy Ewan - Cross-Examination - January 20, 2021

1  Likewise, in this, we can't tell if there are breasts.  We

2  can't tell if there is pubic hair.

3  A.   I think in the image you can see the breast area; but, no,

4  I'm not qualified to say the age of that child.

5  Q.   It's a cartoon, and we don't know whether it depicts a

6  prepubescent or pubescent child.

7  A.   Correct.

8  Q.   In fact, it's Japanese style of art; correct?

9          MS. MORRISON:  Objection.  Relevance; speculation.

10         THE COURT:  Sustained on both.

11  Q.   (BY MR. BENNETT)  Do you recognize it as a Japanese style

12  of art?

13  A.   Sorry, I don't know enough about Japanese art to know.

14  Q.   Fair enough.

15         So these five stories that were chosen to be named in

16  the indictment, these were the most popular stories of a

17  particular day or a particular week?

18  A.   That was in the first indictment.

19  Q.   Sorry?

20  A.   That was in the first indictment.

21  Q.   Are these different stories than those?

22  A.   Yes.

23  Q.   How were these stories picked?

24  A.   When we went through and -- when we had the devices, I

25  went through and searched for stories that more clearly fit the

1  obscenity statute and narrowed it down to stories that I

2  thought the jury could read in one sitting.

3  Q.   Okay.  So you chose stories that were short enough to read

4  in one setting, not necessarily pleasant, but that you saw

5  clearly reflected the obscenity of the Web site.

6  A.   Correct.

7  Q.   Okay.  Now, it's not per se illegal to write about a child

8  sexual assault; correct?

9           MS. MORRISON:  Objection, Your Honor.  Calls for

10  speculation on the part of the witness and a legal conclusion.

11           THE COURT:  Overruled.

12  A.   I know of instances where it has been written about where

13  it is legal and accepted, yes.

14  Q.   (BY MR. BENNETT)  So not per se illegal.

15  A.   That's -- yes.  Sorry.  I'm not an attorney.

16  Q.   Sorry.  Lawyer talk.

17           So Mr. Arthur facilitated the connection of people

18  across the world to publish and read these stories, yes?

19  A.   Yes.

20  Q.   Okay.  All people who wanted to publish stories and wanted

21  to read the stories.

22  A.   Yes.  As far as I know, nobody was forced to do it against

23  their will.

24  Q.   And if somebody stumbled upon the site, within a few

25  lines, they would know it's not for them and it was not for

1 them?

2 A.   It wouldn't take long to figure out that content, yes.

3          MR. BENNETT:  I'll pass the witness, Your Honor.

4          THE COURT:  Redirect?

5                    **REDIRECT EXAMINATION**

6 BY MS. MORRISON:

7 Q.   Special Agent Ewan, defense counsel asked you about the

8 Web site and the disclaimer that appeared on the Web site.  Was

9 there particular information that was included in instructions

10 for the Web site itself to use a different pen name?

11 A.   Yes, there was.  On the instructions on how to upload

12 stories, it instructed authors to use a pen name, something

13 that wouldn't identify them, and something that they don't use

14 on other Web sites so it can't be traced to them.

15 Q.   During the course of your investigation, have you had the

16 opportunity to review e-mails aside from those that have been

17 admitted that were authored by other individuals?

18 A.   Yes.

19 Q.   To be clear, these e-mails were between authors and

20 members?

21 A.   Yes.

22 Q.   What did the authors and members correspond with in the

23 e-mails that you had the opportunity to review?

24 A.   With a mrdouble.com e-mail address?

25 Q.   Yes.

1  A.    Yes, mrdouble.com e-mail address.

2  Q.    What were the subject -- I'm sorry, I interrupted you,

3  sir.

4           What were the subject of some of these e-mails?

5           MR. BENNETT:  Judge, I'm going to have to object.

6  It's hearsay, first of all.

7           THE COURT:  Is this offered to prove the truth of the

8  matter asserted?

9           MS. MORRISON:  No, Your Honor, the effect on

10 listener.

11          THE COURT:  Overruled.

12          MR. BENNETT:  Rule 403 and 4, Your Honor.  403, Your

13 Honor.

14          THE COURT:  I was going to say pick one.  Sorry.

15 Yeah, the Court would believe that the probative value would

16 outweigh the prejudicial effect.  You may proceed.

17 Q.    (BY MS. MORRISON)  Special Agent Ewan, based on the e-mail

18 correspondence that you had the opportunity to review, what

19 were the members and authors corresponding about?

20 A.    Some of it was correspondence about stories.  Some of it

21 was correspondence about their lives.

22 Q.    Did members ever ask the authors if the stories were true?

23 A.    Yes.

24 Q.    Did the authors, in fact, respond to those e-mails?

25 A.    Yes, the authors responded to those e-mails.

Jeremy Ewan - Redirect Examination - January 20, 2021

1  Q.   Without getting into specifics, was there information to
2  suggest that some of this may have been true?

3       MR. BENNETT:  Judge, I'm sorry, I have to renew the
4  hearsay objection.  Sort of backdooring the hearsay.

5       THE COURT:  I already stated it wasn't hearsay.  The
6  Court doesn't find it to be hearsay because it's not offered to
7  prove the truth of the matter asserted therein.  So overruled.

8       You may ask your question again.

9  Q.   (BY MS. MORRISON)  Special Agent Ewan, based on the
10 content of these e-mails, what were the authors and the members
11 corresponding about?

12      MR. BENNETT:  Objection.  Asked and answered, Your
13 Honor.

14      THE COURT:  Overruled.  Let's get to it.

15 A.   They were asking in some instances whether or not the
16 stories were based on actual events.

17 Q.   (BY MS. MORRISON)  Did the authors respond in some of
18 those situations?

19 A.   Yes, they did.

20 Q.   What were they telling the members?

21 A.   Some of the authors made it out to be that they were true
22 stories, yes.

23      MS. MORRISON:  I don't have any further questions,
24 Your Honor.

25      THE COURT:  Mr. Bennett, your witness.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1                   **RECROSS-EXAMINATION**

2   BY MR. BENNETT:

3   Q.   But people don't always tell the truth on the Internet.

4   A.   Correct.

5           MR. BENNETT:  Pass the witness.

6           THE COURT:  Redirect on that question?

7           MS. MORRISON:  No further questions, Your Honor.

8           THE COURT:  You may step down.

9           THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Your next witness.

11          MR. BERRY:  Your Honor, the United States calls Brian

12  Nishida.

13          THE COURT:  Mr. Nishida.

14          Sir, if you would come on up.  You have not yet been

15  sworn.  So we'll have you sworn once you get up here.

16          (Witness sworn by the clerk at 11:40 a.m.)

17          THE COURT:  Agent, as you're having a seat, let me

18  tell you:  Once you get situated and get comfortable, you're

19  welcome to remove your face covering if you're comfortable with

20  that.  I'll tell you that the rule has been invoked which means

21  you're not allowed in the courtroom unless you're testifying,

22  and you're to speak with only the attorneys from either side

23  for the duration of the trial, all right?

24          THE WITNESS:  Yes.  Thank you.

25          THE COURT:  Thank you, sir.

Brian Nishida - Direct Examination - January 20, 2021

1        You may proceed, Mr. Berry.

2        MR. BERRY:  Thank you, Your Honor.

3                  **BRIAN NISHIDA,**

4        **GOVERNMENT'S WITNESS SWORN AT 11:40 a.m.**

5                **DIRECT EXAMINATION**

6   BY MR. BERRY:

7   Q.   Good morning, Mr. Nishida.  Please introduce yourself to

8   the jury.

9   A.   Yes, my name is Brian Nishida.  I am a special agent with

10  the FBI, and I am also a computer forensic examiner.

11  Q.   And explain to the jury what is a computer forensic

12  examiner at the FBI?

13  A.   So we examine digital evidence such as computers, servers,

14  mobile devices, DVRs for evidence.

15  Q.   And do you have to have special education or training to

16  do this type of job?

17  A.   Yes, we have to be certified by the FBI.  So we go through

18  several classes, and then we get tested with a capstone and we

19  do a moot court.

20  Q.   Okay.  We'll test that out today, I guess.

21        What about your experience itself in terms of working

22  with this type of electronic evidence?

23  A.   Yes.  So in addition to our standard training, I've gone

24  through numerous commercial trainings for different types of

25  forensic software:  Windows forensics, Linux forensics, Mac

Brian Nishida - Direct Examination - January 20, 2021

1   forensics, network tech forensics, also network security

2   courses, and I'm also an instructor for the FBI in digital

3   forensics.

4   Q.   So you're an instructor as well.

5   A.   Yes.

6   Q.   What does that involve?

7   A.   So we have to take courses and get kind of certified in

8   presenting information and then also presenting lesson plans.

9   Q.   And do you also have any kind of special education for

10  doing this type of work?  Or what was your undergraduate

11  degree?  Let's start there.

12  A.   So my background is actually aeronautical engineering, but

13  I recently received a master's degree in information security

14  engineering.

15  Q.   And how long have you been doing this work for the FBI?

16  A.   I've been a computer examiner for over 15 years now.

17  Q.   And could you estimate the number of electronic devices

18  that you have examined over those 15 years, or is that an

19  impossible question?

20  A.   So I can tell you we have statistics, and I've examined

21  over a thousand hard drives.

22          MR. BERRY:  At this time, Your Honor, the United

23  States moves to qualify Agent Nishida as an expert in computer

24  forensics examination.

25          THE COURT:  Mr. Haygood.

Ann M. Record, RMR, CRR, CMRS, CRI

1          MR. HAYGOOD:  No objection, Judge.

2          THE COURT:  The Court so finds.  You may proceed.

3          MR. BERRY:  Thank you.

4  Q.  (BY MR. BERRY)  Okay.  Please explain to the jury sort of

5  what your process is when an agent sends you some devices and

6  sort of how that works.  How does it go from Mr. Arthur's house

7  to your desk essentially as best you can understand.

8  A.  Okay.  So I'm detailed at the New Mexico Regional Computer

9  Forensics lab, and we have an evidence control room.  So a case

10  agent will bring in the evidence.  It will be checked into our

11  evidence control room.  When I'm ready for the exam, I'll check

12  it out.  I'll do an inventory.  I'll look at them: make, model,

13  and serial number of the computer.  I'll take photographs of

14  the computer.  Then I'll remove the hard drives or SSDs.  I'll

15  note the make, model, and serial numbers of those.  I will

16  attach the hard drive or the SSD to what's called a write

17  blocker and this prevents write signals -- oops -- to go to

18  the --

19          MR. BERRY:  We just had a little bump of the screen.

20          THE COURT:  Oh, okay.

21  A.  Okay.  It presents write signals so that the evidence

22  won't be altered.  Then I'll make a forensic copy or an image

23  of that device.  So it will take -- in computers, we have

24  binary digits.  Those are the 0s and 1s of computer data.  So I

25  will copy all of the 0s and 1s, or bits, off of that hard drive

Brian Nishida - Direct Examination - January 20, 2021

1  or SSD, and then I'll do a verification to make sure it's a

2  good copy.

3          From that point on, I don't deal with original

4  evidence.  I just deal with a copy or forensic image, and I'll

5  run it through a bunch of tools that will do things like

6  extract files and e-mails and Internet history and computer

7  settings and so forth.  And then -- this is called processing.

8          So after the image is processed, then reviewers can

9  look at the contents of that hard drive or SSD and find

10 evidence.  We will mark that evidence, extract it, burn it on

11 disks, like Blu-ray disks or DVDs, and then we write a report.

12 And at the end, we verify that image again to make sure it

13 hasn't changed during our whole process.

14 Q.   (BY MR. BERRY)  And what is the point of doing all these

15 sort of compartmentalized steps with regards to the evidence?

16 What is the goal -- overall goal?

17 A.   So we want to do several things.  In forensics, there are

18 three principles.  First, you try not to alter the evidence

19 when possible.  You also want to have an accurate exam, and

20 then you want to have your exams be repeatable.

21         So along the way, we use the write blockers.  We do

22 the verification so that we show that nothing was altered, and

23 then we use approved software to show that our exam has been

24 accurate, and then we'll take notes along the way to make sure

25 that we can repeat the exam.

Brian Nishida - Direct Examination - January 20, 2021

1   Q.   And did you do that in this case?

2   A.   Yes.

3   Q.   And you worked with some other colleagues in your office

4   in Albuquerque who examined some of the devices as well.

5   A.   Yes.  There was about 20 to 25 hard drives, and so it was

6   split among several examiners.

7   Q.   If you would, please turn in the one of the white binders

8   that doesn't have the red in front of it.  So I believe that

9   one.  And if you would, do you have Exhibit 5B in that?

10  A.   Yes.

11  Q.   All right.  So we're going to talk about 5B, 6B, 7B, 8B,

12  and 9B, and then we will also talk about 10B, 11B, and 12B.  Do

13  you see each of those and recognize them?

14  A.   Yes.

15  Q.   How do you recognize them?

16  A.   So I generated these spreadsheets.

17  Q.   Right.  So you generated each one of those --

18  A.   Yes.

19  Q.   -- 5B through 12B, just the Bs?

20  A.   Yes, they're -- it looks like all of these I generated.

21  Yes.

22              MR. BERRY:  At this time, Your Honor --

23  Q.   (BY MR. BERRY)  And just -- roughly, what are they?  Just

24  generically.

25  A.   So they are five stories and three graphic files, the

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

1   names of those.  And then the paths or where they were located

2   on different pieces of evidence for this examination.

3   Q.   And so, for example, 5B is the -- what did you call it,

4   the file path or location; is that correct?

5   A.   Yes.  So the first column will list the name of the file

6   and then the second column lists the path.  And you could

7   tell -- there are NM numbers.  Those are what we -- so when we

8   get evidence, we will give you a New Mexico, our CFL bar code.

9   So you'll see an NM005547 and NM00552, etc., those are

10  different evidence items.

11  Q.   And we'll get to those details.  Do each one correlate

12  to -- for example, 5B is the story -- is the location of the

13  story in 5A?

14  A.   Yes, 5B is the location of the story.

15  Q.   And 5A will be the story in the small red binder?

16  A.   Oh, okay.  So, yeah, I mean, the B are these spreadsheets.

17  Q.   That correlate; correct?

18  A.   Yes.

19        MR. BERRY:  At this time, Your Honor, the United

20  States moves for the admission of Government's Exhibits 5B, 6B,

21  7B, 8B, 9B, 10B, 11B, and 12B.

22        THE COURT:  Mr. Haygood?

23        MR. HAYGOOD:  No objection, Judge.

24        THE COURT:  Those exhibits, Government's Exhibits 5,

25  6, 7, 8, 9, 10, 11, 12B, all B, are admitted without objection.

Brian Nishida - Direct Examination - January 20, 2021

1   Q.   (BY MR. BERRY)   Okay.  So we're going to start with 5A

2   even though we just admitted all the Bs.  So 5A, did you

3   create -- which is already in evidence -- did you create this

4   exhibit?

5   A.   So this exhibit was created by TFO Brad Strife.  He was

6   one of the examiners on this --

7   Q.   On the team there in Albuquerque; correct?

8   A.   On the team, yes.

9   Q.   Okay.  Explain the first page.  The jury has already

10  looked at the As in 5A through 9A, but we haven't talked about

11  this first page.  Explain to them this first page and the

12  significance of it.

13  A.   So the first page is actually the photographs of the

14  evidence items.  So this is when we're doing the inventory.

15  And you could see our bar code in this inventory.  It's kind of

16  small, but it's on the upper left -- our New Mexico bar code.

17  And then on the right -- upper right is the El Paso bar code

18  because we received this from the El Paso field office.  And

19  then the two pictures of the server on the bottom are the

20  actual server before it was examined.

21  Q.   So this is the actual device.  So we've seen pictures of

22  this device in another context.  That's what this would be.

23  A.   Yes.

24  Q.   Okay.  And then as we move on to the next page still in

25  5A, what is this -- what is the jury looking at here when it

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

1  says file name, file path, all that stuff?

2  A.   So the file name is actually the file, this particular

3  file on this specimen.  The path is the whole path.  So, for

4  example, you might have a path C:\user\johndoe\documents.

5  That's the file path.  So in this case, we're seeing the file

6  path.  It starts with all this partition information but it's

7  \D:\mrdouble\servers, etc.  Then the next field is the file

8  type.  So, you know, you have different file types like

9  graphics and movies.  And this is a text file.

10  Q.   So let's stop there for a second.  On the file path, you

11  said D:\mrdouble.  What does that tell you as a computer

12  forensic examiner about this particular file, where it was on

13  that device we just saw a picture of?

14  A.   So there -- it's just telling me there was an actual

15  folder called D, like delta, and below that is a subfolder

16  called Mr. Double, and these are nested folders.  And it

17  finally ends with the -- a zip file.  And in the zip file,

18  there's -- after the zip file, you see a double caret, and this

19  file was one file within that zip file archived.  It's called

20  aspectec.txt.

21  Q.   And then as we go down in the exhibit, we if go past the

22  story to Page 9 of the 5A, what is the jury looking at here?

23  A.   So this computer was virtualized.  So it is basically put

24  into an environment where we can boot up that forensic image

25  and look at it like a user who actually is sitting at that

1  computer looking at it.  So we didn't boot the actual computer

2  because that would have altered it.  We made it -- we booted it

3  with a forensic image.

4          And you can see this.  Immediately the D folder is

5  there.  And then if you move down, you see the Mr. Double

6  folder below that and then so forth.  As we go down the file

7  folder structure, we're seeing the different folders and

8  finally the zip file, and then within the zip file we see the

9  actual text file.

10 Q.   So these screenshots, are they just helping the jury see

11 this is how the user -- or the defendant, Mr. Arthur, would

12 have viewed these files on his own device?

13 A.   Yes.

14 Q.   From the user perspective as opposed to the forensic

15 perspective you were showing us a moment ago.

16 A.   Yes, this is more user friendly to view this like a user.

17 Q.   All right.  Now, let's look at 5B now in evidence, and

18 we're not going to go through all this line by line.  Let's

19 just explain to the jury what this is essentially.

20 A.   Yes.  So we have the names of five target files and three

21 graphic files, and what we did is we computed what's called a

22 hash.  And hash is an algorithm that you could take any amount

23 of data -- it could be a big movie or a small text file -- and

24 it will compute a nearly unique fixed stream number.  So they

25 call it a digital fingerprint because what we do is now search

Brian Nishida - Direct Examination - January 20, 2021

1  for that number or fingerprint over all the devices and find
2  the copies of these quickly over all these devices.
3  Q.   Okay.  And so all these lines here are this story in a
4  different location on the devices?
5  A.   Yes.
6  Q.   What does that tell you as a forensic examiner?
7  A.   So it looks like different copies or backups of this story
8  were scattered across these devices.
9  Q.   And the same with 6B?
10 A.   Yes.
11 Q.   That's the story in 6A, and this is the Baby Wank story
12 that is now scattered throughout the other devices and a whole
13 bunch of locations as well?
14 A.   Yes.  Yes.
15 Q.   Same with 7B?
16 A.   Yes.
17 Q.   Less locations, but still quite a few?
18 A.   Yes.
19 Q.   And that is the story in 7A; correct?
20 A.   Yes.
21 Q.   It would be the same of 9B, also the same; correct?
22 A.   Yes.
23 Q.   And you don't have to go to each of the A's.  I'm just
24 looking at each of the Bs.  Those are the same thing
25 essentially; is that correct?

Brian Nishida - Direct Examination - January 20, 2021

1    A.    Yes.

2    Q.    Okay.  And then let's look at 10B.  Now, this one just has

3    the one.  Explain that to the jury.

4    A.    So this was a graphics file, and it actually was deleted,

5    and you can tell it was deleted based on two things.  The name

6    starts with DC9 and also this -- it was in a recycle bin.

7    Q.    Okay.  11B, that was in multiple locations?

8    A.    Yes, another graphics file in multiple locations.

9    Q.    And this is the one associated with 11A.  Let's go to 12B.

10   Same thing there?

11   A.    Yes.

12   Q.    That graphic file located in multiple locations across

13   devices?

14   A.    Yes.

15   Q.    If you would, please turn in the white binder to

16   Government's Exhibit 13.  Do you see that exhibit?

17   A.    Yes.

18   Q.    Do you know what it is?

19   A.    Yes.  Again, some graphics files.

20   Q.    And can you tell where they came from?

21   A.    Yes.  So they were recycled.  They were deleted, let's

22   see, and their original name was under in

23   Users\Public\raid__bu.

24        MR. BERRY:  At this time the United States moves for

25   the admission of Government's Exhibit 13.

Brian Nishida - Direct Examination - January 20, 2021

1          MR. HAYGOOD:  No objection, Judge.

2          THE COURT:  Government's Exhibit 13 is admitted

3    without objection.

4    Q.   (BY MR. BERRY)  And so, again, on Exhibit 13 we see the

5    front page.  It shows where this file came from; correct?

6    A.   Yes.

7    Q.   And then we scroll down and we can see again sort of the

8    screenshot of where it would have been located for the user?

9    A.   Yes.  So when you're seeing these kind of colored files

10   that have Windows Explorer, that's the virtualization of the

11   machine so that you see the user perspective.

12   Q.   Okay.  And then it happened to be -- what is the actual

13   files that we're concerned about or interested in here?

14   A.   They're just Certificate of Incorporation, Articles of

15   Incorporation.

16   Q.   For what?

17   A.   Mr. Double, Inc.

18   Q.   And Page 2 of the Articles of Incorporation, what does it

19   show the name of the corporation is?

20   A.   Are you on Page 4 of the exhibit?

21   Q.   Yes.

22   A.   Yes, the name of the corporation is Mr. Double, Inc.

23   Q.   And who controls that company?

24   A.   So on Page 5 it shows Thomas A. Arthur, Post Office

25   Box 702093, Dallas, Texas.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   Right.  If you look at Exhibits 14 and 15, please,

2  together.  Tell me if you recognize them.

3  A.   I have Exhibit 15.  I don't see 14, though.

4  Q.   So there's another white binder up next to you.  Because

5  that exhibit was so large, it got put in a separate binder.  Do

6  you see that one?

7  A.   Yes.  This binder has Exhibit 35.

8  Q.   There is yet another white binder.  Sorry.  Maybe this

9  one.

10 A.   Oh, the one up there.  Yes.  Yes, 14 is up here.

11 Q.   So you've now located 14 and 15?

12 A.   Yes.

13 Q.   All right.  Do you recognize 14 and 15?

14 A.   Yes.

15 Q.   Briefly, what are they?

16 A.   So Exhibit 14, there were story files that were in text

17 format and HTML format; and Exhibit 14 is a list of the names

18 of the HTML files corresponding to stories.

19 Q.   Explain that a little bit more fully where they come from.

20 They come from the device itself, the Web site, what was it?

21 A.   So they come from a copy of the Web site that was on a

22 server that I examined.  So there were multiple copies of this

23 Web site.  I took the one that had the home page with a date of

24 November 7, 2019.  And so these stories were in a format so

25 that we could bring up with a browser, per se.  And these are

Ann M. Record, RMR, CRR, CMRS, CRI

1  basically -- I dumped all these stories, I alphabetized them,

2  and listed them out on these documents.

3  Q.   Okay.

4         MR. BERRY:  At this time the United States moves for

5  the admission of Government's Exhibit 14 and 15.

6         THE COURT:  Mr. Haygood?

7         MR. HAYGOOD:  No objection, Judge.

8         THE COURT:  Government's Exhibits 14 and 15 are

9  admitted without objection.

10  Q.   (BY MR. BERRY)  When you were creating Exhibit 15 --

11  explain to the jury what is 15 again as opposed to 14.

12  A.   So 14 were the story files, the file names, but not

13  necessarily the names within -- the names within the files are

14  much longer than the actual files.  And then 15 are author

15  names.

16  Q.   And these were author names from authors who had published

17  or had something published on Mr. Double site that you

18  examined.

19  A.   Yes.  So the way it was organized were that there were

20  folder names with authors and then beneath that were the

21  stories.

22  Q.   And roughly how many author names did you note?

23  A.   It was over 2,000.

24  Q.   Okay.  And we're obviously not going to go through all of

25  those.  Were any of them as you were creating this list that

1  jumped off the page at you?

2  A.    Yes.   There were some like -- Baby Raper was one I

3  remember, Child Raper.

4  Q.    All right.   So you said you remembered Baby Raper; is that

5  correct?

6  A.    Yes.

7  Q.    I'm showing that on the screen; is that correct?

8  A.    Yes.

9  Q.    And right above that, is that another one called babyNpop?

10 A.    BabyNpop, yes.

11 Q.    Was that significant in the case?

12 A.    One of the five stories came from that author, babyNpop.

13 Q.    You said another one?

14 A.    Child Raper.

15 Q.    Is that another one that you were referring to?

16 A.    Yes.

17 Q.    And right underneath that, what's that one?

18 A.    Child Slayer.

19 Q.    What's underneath that?

20 A.    Childs Play.

21 Q.    If you would please look at Government's Exhibit 17

22 previously marked.   Tell me when you're there.

23 A.    Yes, I'm here.

24 Q.    Do you recognize it?

25 A.    Yes.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   What is it?

2  A.   So this is an HTML message page from another server.   This

3  one is the server that I actually examined.

4          MR. BERRY:   At this time the United States moves for

5  the admission of Government's Exhibit 17.

6          THE COURT:   Mr. Haygood?

7          MR. HAYGOOD:   No objection.

8          THE COURT:   Government's Exhibit 17 is admitted

9  without objection.

10 Q.   (BY MR. BERRY)   On 17, again, we see the first page.   We

11 see a picture of the device that was examined; is that correct?

12 A.   Yes.

13 Q.   And, again, the relevant information about file path, file

14 type, and all that?

15 A.   Yes.

16 Q.   And then what is the actual file?

17 A.   So it is like the frequently asked questions.   Let's see.

18 Well, actually there are some frequently asked questions toward

19 the bottom, and it's just some information on the Web site.

20 Q.   And what is it generally telling people?

21 A.   So it's talking about if you're having trouble logging in.

22 And then it also talks about a counter.   And then if they have

23 questions, it has some questions and answers.

24 Q.   And turn to Exhibit 18.   It's in the other one.   It's

25 where 14 was.   It's another big exhibit.   Like 129 pages, I

Brian Nishida - Direct Examination - January 20, 2021

1  believe.

2  A.   Okay.

3  Q.   You found it?

4  A.   Yes.

5  Q.   Do you recognize it?

6  A.   Yes.

7  Q.   What is it?

8  A.   So there was an access database and within the database

9  were several like tables of payments to authors.

10          MR. BERRY:  At this time the United States moves for

11  the admission of Government's Exhibit 18.

12          THE COURT:  Mr. Haygood?

13          MR. HAYGOOD:  No objection, Judge.

14          THE COURT:  Government's Exhibit 18 is admitted

15  without objection.

16          MR. BERRY:  We're not going to publish that at this

17  time.  We will deal with that exhibit with another witness.

18          THE COURT:  Yes, sir.

19  Q.   (BY MR. BERRY)  All right.  We're getting to the main

20  event, and that is Government's Exhibit 24 which you're not

21  going to have up there.  Because what is Exhibit 24,

22  Agent Nishida?

23  A.   So it is a copy of the Web site.  It's not fully

24  functional, but it gives an idea of how a user on the Internet

25  would see the Web site.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   And explain to the ladies and gentlemen of the jury

2  roughly how you were able to create this exhibit or pull it

3  together in the format that is as similar to what a person

4  would see as possible.

5  A.   So I created a web server.  They use Microsoft IIS,

6  Internet Information Services, or web server software.  And

7  then I extracted the Web site.  It was within a folder.  And

8  then you configure the IS server to point to the home page, the

9  index.HTML page.  And then you can bring it up and clicking on

10 links and you will be able to navigate the Web site.

11 Q.   You know what?  We're going to take a break on that for

12 just a second.  Let's do two more exhibits before we get to

13 that one.  Look at Exhibits 27A through C and 28, and then

14 we'll come back to 24.

15 A.   Okay.

16 Q.   Do you recognize those?

17 A.   Yes.

18 Q.   What are they?

19 A.   So the first three exhibits, 27A through C, are what are

20 called link files.  So a link file is a pointer to another

21 file.  You've probably seen link files on your desktop where

22 there is a link file to an executable.  You click on that and

23 it runs the executable.  And the executable is usually stored

24 in Program Files or Program Files (x86).

25          So when you open a file, Windows will actually create

1  a link file for things like documents and pictures.  And then

2  when you bring up Windows Explorer, you can kind of see your

3  recent files that you have clicked on.  It's kind of a

4  convenience features.  But what this tells us is it lets us

5  know that the file had been opened.

6  Q.   And so is this something from a forensic perspective you

7  can look at someone's computer and see what has been opened and

8  approximately when?

9  A.   Yes.  So you can tell it was opened and then the link file

10 will tell you like the first time it was opened and the last

11 time it was opened, that kind of information.

12 Q.   And then 28 is what?

13 A.   28 is a site map for the Mr. Double Web site.

14            MR. BERRY:  At this time the United States moves for

15 the admission of Government's Exhibits 27A, B, and C and 28.

16            THE COURT:  Mr. Haygood?

17            MR. HAYGOOD:  I have no objection to 27A or 28.  27B

18 and 27C I'd object to the 401 and 403.  I don't know the

19 relevance of those for this case.

20            THE COURT:  Let me have the lawyers approach.

21            For the record, 27A and 28 are admitted without

22 objection.

23            (On-the-record sidebar conference)

24            THE COURT:  Outside the presence of the jury.

25            27B and C your issue is relevance?

Ann M. Record, RMR, CRR, CMRS, CRI

1         MR. HAYGOOD:  Relevance and potential for prejudice

2    versus probative value.

3         THE COURT:  You want to respond to that?

4         MR. BERRY:  Sure, Your Honor.  The relevance, of

5    course, is that this is -- we're establishing both that the

6    defendant was the one that was clicking around on these files,

7    that he had knowledge of what it was that he was working with,

8    and specifically these files one clicks on, a file was called

9    Child Raper, which he just testified to.

10        So the relevance is very clear.  It's not more

11   prejudicial than probative here because the jury needs to

12   understand how involved he was with this Web site, what he was

13   doing after it, whether he knew -- had the knowledge of the

14   prurient interests, whether he's part of this deviant sexual

15   group.

16        THE COURT:  Thank you.

17        Do you have something else?

18        MR. HAYGOOD:  I do have something to add to that,

19   Your Honor.  All we know from the exhibits is the names of

20   these files and the last time they were accessed; one in 2019

21   and one in 2012.  Based on the file name alone, we have no idea

22   what the context is.  It's just trying to prove that my client

23   has done something by supposition by tying him to the name of

24   this file when we have no idea what the content is.  The danger

25   is the jury will infer from that something the file doesn't

 1  say.

 2          THE COURT:  Well, you've got one name Child Raper,

 3  which has already been testified about.

 4          MR. HAYGOOD:  But it says childrapermessage.html.

 5          THE COURT:  Hang on a second.  And you've already

 6  gotten this other one.  That's 27B.  27 -- I'm sorry, yeah, 27C

 7  is "Ally and Her Dad" or something like that.

 8          MR. BERRY:  Which is an admitted exhibit already.

 9          THE COURT:  It's already been admitted.

10          So the Court overrules the objections both as to 404

11  and -- you said 40-...

12          MR. HAYGOOD:  401 and 403.

13          THE COURT:  Excuse me -- 401 and 403.  The Court does

14  find that the probative value outweighs the prejudicial effect

15  and you may proceed.

16          (On-the-record sidebar conference concluded)

17          THE COURT:  So Government's Exhibit 27B and C are

18  admitted over objection.

19  Q.   (BY MR. BERRY)  Now showing Government's Exhibit 27A in

20  evidence.  Again, we see the front page.  This is where this

21  file comes from; correct?

22  A.   Yes.

23  Q.   So this is the device that we're going to see that someone

24  had clicked around on.  When they were clicking on the file,

25  the file was on this device; correct?

Brian Nishida - Direct Examination - January 20, 2021

1   A.   Yes.

2   Q.   Okay.  So then we scroll down.  And what is the link file

3   that was being clicked on that we're referring to here?

4   A.   Okay.  So within the link file, there is a target file.

5   And that is listed as a local path there.  It was on the D

6   drive, and it lists "Authors Balance Report.mdb."

7   Q.   And is that -- that authors balance report similar to what

8   we just admitted in Government's Exhibit 18 but didn't publish

9   also called Authors Balance Report?

10  A.   Yes.

11  Q.   And 27B, what is that link file?

12  A.   The target name would be "childraper__email.htm."

13  Q.   And 27C -- well, before we go to 27C.  So 27B, this link

14  file, explain to the jury again what this is.

15  A.   Okay.  So it is basically a shortcut to another file.  So

16  when you open a file up in Windows, it will create a link file.

17  And then within the link file, these are the contents you're

18  seeing here.  It says shortcut file.  You're seeing like the

19  full path of the target file, the volume -- so there is a

20  volume, like a serial number-type volume on the device and then

21  the created date, last access and last write, these are the

22  dates of that target file.

23  Q.   And what is that target file?  Do we know?

24  A.   I did not look at that.  I just know its title.

25  Q.   And does that title -- is that file name, is that created

Brian Nishida - Direct Examination - January 20, 2021

 1  by the user, does the computer create it, or do you know?

 2  A.    So the -- the actual target name or the link file name?

 3  Q.    The -- either one.  Explain both.  Sorry.

 4  A.    Okay.  So the target name, you know, I don't know who

 5  created the title for that or the file name.  The link file

 6  name which ends in .LNK, that's automatically created based on

 7  the target file name.

 8  Q.    All right.  So let's go back to that for just a second.

 9  So that would be -- where is the LNK?

10  A.    If you go to the first page of that exhibit with the

11  pictures.  Yeah, so under the file name and the file path, you

12  see the LNK file.

13  Q.    And that's created by the computer?

14  A.    Yes.

15  Q.    Okay.  And then 28 --

16          MR. BERRY:  Does Your Honor want to break for lunch

17  after this one?  Judge Counts?

18          THE COURT:  I'm sorry?

19          MR. BERRY:  Did Your Honor -- this next, Exhibit 28.

20  And then we're going to spend a lot of time in 24.  Would you

21  like me to finish 28 --

22          THE COURT:  Please.

23          MR. BERRY:  -- and then we'll break for lunch?

24          THE COURT:  Please.

25          MR. BERRY:  Okay.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   (BY MR. BERRY)  So 28, again, we're talking about a file
2  that came off of this same device that we keep seeing pictures
3  of; correct?
4  A.   Yes.
5  Q.   And tell the jury what this is.
6  A.   This is a site map.  So it's kind of like a map of the Web
7  site.
8  Q.   Can you explain that a little bit further?
9  A.   So when you're going through a Web site, you click on
10 links and you move -- basically you're kind of snaking through
11 the Web site, and this is kind of showing you the paths you can
12 take through the Web site.
13 Q.   What is this map useful for?
14 A.   So it's just documents.  It's just kind of like a
15 blueprint, documents the Web site.
16 Q.   Useful for someone who is administering a Web site?
17 A.   Yes, or someone who wants to learn about it.
18 Q.   Okay.
19       MR. BERRY:  We will pick up on 24 after lunch, I
20 think.
21       THE COURT:  Thank you, Mr. Berry.
22       So, ladies and gentlemen of the jury, we'll come back
23 and this witness will be back in the witness stand, of course.
24       You're going to leave your notebooks here.  You'll go
25 with Ms. Baeza, who is just outside in the hallway.  She'll --

Brian Nishida - Direct Examination - January 20, 2021

1      THE CLERK:  Ms. Licon is.  She's going to direct
2  them.
3      THE COURT:  I'm sorry?
4      THE CLERK:  Ms. Licon.
5      THE COURT:  Ms. Licon is going to be out there and
6  direct you to where we have lunch waiting for you.
7      And remember your instructions.  So you can talk
8  about how bad the Cowboys are or were because we're not playing
9  anywhere, are we?  So -- and how good we're going to be next
10  year.  We're going to win the Super Bowl next year.  But you
11  can talk about anything you want, just don't talk about the
12  case.  You have not received the case yet for deliberations.
13  You don't have all the facts and the evidence.  And so I would
14  ask you to remember your instructions.
15      And with that, we're going to have you back in
16  here -- we're going to start back up at one o'clock whenever
17  you-all are ready to go as close to 1:00 as possible, all
18  right?
19      Let's rise for the jury, please.
20      Thank y'all.  Have a good lunch.  Please leave your
21  notebooks here.
22      (Jury leaves at 12:18 p.m.)
23      THE COURT:  Please be seated.
24      Just so you know, we're going to have the jury -- we
25  are putting them elsewhere in the building where they have

Brian Nishida - Direct Examination - January 20, 2021

 1  tables and stuff to eat their lunch.  So they'll be moved a

 2  little bit, and they will be moved back.  They will be escorted

 3  all the way to and from and the restrooms, of course.  Now we

 4  have access to the private ones.  But what we'll do -- just be

 5  aware of that as you move through the courthouse.  If you run

 6  into them, if you would look the other way, and they're going

 7  to be fine with that.

 8          Mr. Berry, anything you want to take up before we

 9  break?

10          MR. BERRY:  Very briefly, and I meant to do it

11  earlier.  It was brought to my attention by Ms. Martinez that

12  when she was here and the jury came in, one of the jurors tried

13  to say hi to her.  She very stoically did nothing --

14          THE COURT:  Okay.

15          MR. BERRY:  -- and followed the rules.  But we

16  thought it might be a good idea -- I don't remember --

17          THE COURT:  Maybe remind them.

18          MR. BERRY:  -- I'm sure Your Honor admonished them.

19          THE COURT:  I did.

20          MR. BERRY:  Hey, Counsel, might -- they're not being

21  rude if they don't talk to you.

22          THE COURT:  Sure.

23          MR. BERRY:  And then right after she told me that, I

24  walked out of the U.S. Attorney's Office and Juror No. 3 was

25  standing outside there, and I just turned and instinctively

Brian Nishida - Direct Examination - January 20, 2021

 1  went "Hi" and then turned and walked away and realized he was a

 2  juror.  So I apologize about that.  So I just did exactly what

 3  she didn't do.  She did the right thing in not saying hi to

 4  them and I promptly did.

 5          THE COURT:  It doesn't surprise me at all.

 6          (Laughter)

 7          THE COURT:  Anything else y'all want to take up?

 8          MR. BENNETT:  Yeah.  Judge, I'm sure the Court is

 9  going to tell me that I'm being hypersensitive.

10          THE COURT:  Yeah.

11          MR. BENNETT:  But I feel like my script yesterday is

12  affecting the Court's attitude toward me and toward my client,

13  Mr. Arthur.

14          THE COURT:  How so?  What manifestation have I given

15  you?

16          MR. BENNETT:  I feel like the tone of the Court in

17  dealing with me is more hostile than it was yesterday.

18          THE COURT:  Do you have -- I mean, is it?

19          MR. BENNETT:  And like I said, you're probably going

20  to tell me I'm being hypersensitive.  I just want to make

21  sure --

22          THE COURT:  I had already forgotten about it.  But

23  now that you bring it back up, I mean, I think it's water under

24  the bridge.  We're all matured, seasoned -- seasoned attorneys,

25  which makes this fun.  I mean, I've got tell you.  I was

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

1    talking to my staff this morning.  It's just fun to be in

2    trials with good lawyers, and so that's how I feel.

3              MR. BENNETT:  Thanks, Judge.

4              THE COURT:  And please don't take anything -- only my

5    wife can read my mind.

6              (Laughter)

7              THE COURT:  She's the only one who tells me what I'm

8    thinking.  And I don't know if she's right or not, but she's

9    the one that is allowed that.

10              And so, no, I harbor no ill will; and I appreciate

11   everything you-all are doing.  It's been a great trial.  You

12   even started the morning by saying it's going to be a great

13   day.  I think it has been thus far, and I want to keep it

14   going.

15              MR. BENNETT:  Thank you, Judge.

16              THE COURT:  Thank you.  Y'all have a good lunch.  I

17   hope you get to choke down something.

18              I know Mr. Arthur is going to get something to eat,

19   if he wants it.

20              All right.  Thank y'all.  We'll be back here at five

21   till 1:00.

22              (Luncheon recess from 12:22 p.m. to 12:56 p.m.)

23              THE COURT:  Mr. Berry, anything you want to take up

24   before the jury?

25              MR. BERRY:  No, sir.

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

1           THE COURT:  Mr. Bennett.

2           MR. BENNETT:  No, Your Honor.

3           THE COURT:  All right.  Let's bring the jury in,

4    please.

5           (Jury enters at 12:56 p.m.)

6           THE COURT:  All right.  Welcome back.  I hope your

7    lunch was good.  We're ready to go with Mr. Berry.

8           MR. BERRY:  Pardon me, Your Honor.  Just one second,

9    Your Honor.  Sorry, Your Honor, give me just one second.  This

10   is a complicated exhibit.

11          THE COURT:  You'll save us time later, I know, by

12   doing this.

13          MR. BERRY:  Your Honor, could I ask Agent Nishida to

14   step down.

15          THE COURT:  Yes.

16   Q.  (BY MR. BERRY)  Okay.  Good afternoon, Agent Nishida.

17   We're back here in front of the jury.  And I want to go back to

18   what we were talking about before the lunch break about

19   Exhibit 24 and the reconstitution of the Mr. Double Web site.

20          Explain for the jury again what you did from a

21   forensic perspective so that you can then present what we're

22   about to show in Exhibit 24?

23   A.   Yes, I could see that there was a copy of the Web site,

24   and there were actually numerous copies of the Web site.  So on

25   the web page is a date.  So I went through all of the copies of

Brian Nishida - Direct Examination - January 20, 2021

1  the Web site and found the one with the latest date, which is

2  November 7, 2019.  Then I extracted the whole folder that

3  contained that Web site, downloaded it into a web server, a

4  Microsoft IIS web server.  And I configured that web server to

5  point to that folder with that index .HTM home page.

6  Q.   Okay.

7          MR. BERRY:  At this time, Your Honor, the United

8  States moves for the admission of Government's Exhibit 24.

9          THE COURT:  Mr. Haygood?

10          MR. HAYGOOD:  Is this for demonstrative purposes

11  only, Your Honor, or substantive?

12          MR. BERRY:  Substantive evidence.

13          MR. HAYGOOD:  No objection.

14          THE COURT:  Government's Exhibit 24 is admitted

15  without objection.

16          And you may publish it whenever you would like.

17          MR. BERRY:  Thank you, Your Honor.

18          THE COURT:  I don't know if you're going into that or

19  not.

20          MR. BERRY:  That's what I am going to do right now,

21  Judge.

22          THE COURT:  Excellent.

23  Q.   (BY MR. BERRY)  Okay.  So we're now showing what's in

24  evidence as Government's Exhibit 24.  Tell the ladies and

25  gentlemen of the jury what they're looking at here.

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

 1  A.   So this is the Google Chrome web browser, and it's going

 2  to the home page for that Mr. Double copy of that Web site.

 3  Q.   Okay.  And what is the date on that -- the top of that

 4  home page?

 5  A.   It has November 7, 2019.

 6  Q.   What do you know is significant that that date?

 7  A.   That is the date of the search warrant.

 8  Q.   So that's the last date these devices were online from the

 9  FBI's perspective?

10  A.   Correct.

11       THE COURT:  Can I get you on a microphone or a little

12  bit louder, Mr. Berry.

13       MR. BERRY:  Sure.

14       THE COURT:  Will it work?

15       THE REPORTER:  Or you can move that other one.

16       THE COURT:  Oh, yeah, you can use --

17       MR. BERRY:  Oh, you do need me on a microphone.

18       THE COURT:  Yeah, that's why I want you on a mic.

19       MR. BERRY:  I'm happy to do that for Ann.  Hopefully

20  everyone else can hear me.

21  Q.   (BY MR. BERRY)  So on this -- so we -- the ladies and

22  gentlemen of the jury saw on Exhibit 1, didn't publish 2, 3,

23  and 4, but in 1 a screen capture of the Web site that the case

24  agent had done.  That was just a static video.  Is this

25  something I can move around on like it's a web page myself?

Brian Nishida - Direct Examination - January 20, 2021

1  A.   Yes, it's the Web site so you can click on links and they
2  will work.
3  Q.   So I can just move down this site.  Can I click on some of
4  these links?
5  A.   Yes, the links that say like "Authors" and "Stories," they
6  work.
7  Q.   Okay.  So let's see if this one works here.  So if we
8  click on this first one, that goes to a 404 error.  What does
9  that mean?
10  A.   That means the web page is found so there's a broken link.
11  Q.   And is that the case with some of the links in here?
12  A.   Yes, this is not fully functional.
13  Q.   Okay.  So some links work and some don't; is that correct?
14  A.   Yes.
15  Q.   So, for example, if we go to the Authors page and we click
16  on "palisadeauthors," is this what a user in any of the 50
17  states around the world that was looking at this Web site is
18  generally how it would have worked for them?
19  A.   Yes.
20  Q.   This is an end-user version of it; correct?
21  A.   Yes.
22  Q.   So we have authors here and broken down by letter of the
23  alphabet for the authors.  Do you see that?
24  A.   Yes.
25  Q.   Okay.  So we could just click on one of these.  And I

Brian Nishida - Direct Examination - January 20, 2021

1  clicked on B, and what comes up under B?

2  A.    A list of authors.

3  Q.    And at the top it says over 2300 palisade authors; is that

4  right?

5  A.    Yes.

6  Q.    Can you see that there?

7  A.    It's a little far, but I can kind of make it out.

8  Q.    And then I'm not asking you to read the names here, but is

9  this, from your understanding of putting this exhibit together

10 and going through the Web site, are these names of authors with

11 their stories listed there?

12 A.    Yes.

13 Q.    So, for example, you could click on babyNpop down here,

14 which was the author of one of the stories; correct?

15 A.    Yes.

16 Q.    That's one of the charged stories; is that right?

17 A.    Yes.

18 Q.    So we click on that.  And there is links to those stories;

19 is that correct?

20 A.    Yes, so it's a red link and a blue link.  One of the links

21 is just kind of a preview; the other is the full story in text

22 mode.

23 Q.    Okay.  So let's go back to the home page, and we can just

24 click to go back to the home page like any other Web site;

25 correct?

Brian Nishida - Direct Examination - January 20, 2021

1   A.    Yes.

2   Q.    So we go back to the home page.  And down the page on the

3   left -- so we see -- on the left, we see stuff about a story

4   search; is that correct?

5   A.    Yes.

6   Q.    And online banking with a Visa, MasterCard, American

7   Express icon.  Do you see that?

8   A.    I see the credit cards, yes.

9   Q.    And then a sign up or renew early link.  Can you see that?

10  A.    I cannot make that out from here.

11  Q.    If I click on that.  And then it takes you to a region,

12  U.S.A.  Whether you are signing up within the U.S. or outside?

13  A.    Okay.  Yes.

14  Q.    And then as we scroll down.

15        MR. BERRY:  And we may need Agent Nishida to step

16  down off the stand, Your Honor.

17        THE COURT:  That's fine.

18        MR. BERRY:  I don't have the same ability to zoom in

19  on a Web site as I do on other exhibits.  So if I could ask him

20  to step down.

21  Q.    (BY MR. BERRY)  So you see on the left, Agent Nishida, the

22  top 25 list?  Do you see that?

23  A.    Yes.

24  Q.    Okay.  And what are those top 25 lists?

25  A.    Most visited author or most viewed stories.

Brian Nishida - Direct Examination - January 20, 2021

1   Q.   Okay.  And most downloaded stories?

2   A.   Yes, most downloaded stories.

3   Q.   Okay.  So under most downloaded stories, what is the name

4   of the author of the one at the top of that list for now, this

5   particular version?

6   A.   Tank -- oh, boy.  That's a weird name.   TANKENGINEXX.

7   Q.   Tank Engine XX?

8   A.   Tank Engine XX, yes.

9   Q.   And we can click on that; correct?

10  A.   Yes.

11  Q.   So that link -- and what does that do?  That takes us to

12  where?

13  A.   To like the author's -- it takes us to the author's page

14  where we see their stories.

15  Q.   Okay.  And so this author page has -- it says:  Welcome to

16  my fantasy world and a little bit more text from the author.

17  Do you see that?

18  A.   Yes.

19  Q.   And there happens to be a picture out to the side;

20  correct?

21  A.   Yes.

22  Q.   And what does the picture say at the top?

23  A.    (As read) Once in a while right in the middle of an

24  ordinary life love gives us a fairytale.

25  Q.   And then there is a bunch of stories; is that correct?

1  A.   Yes.

2  Q.   And, again, the blue is what and the links we have blue

3  and red on the same link?

4  A.   Yeah, one is a preview; the other is the full story.

5  Q.   Okay.

6       THE COURT:  Agent Nishida, do you want to use this

7  other mic maybe on the podium?

8       THE WITNESS:  Okay.

9       THE COURT:  Would that work?

10      MR. BERRY:  That would be fine, Judge.

11      THE COURT:  If you need to move around, that's fine.

12  Q.   (BY MR. BERRY)  All right.  Let's look at another author

13  page also still under that Most Downloaded Stories.  So there's

14  another list of top 25.  It's top 25 most visited author pages

15  as opposed to individual stories; is that correct?

16  A.   Yes.

17  Q.   So there were multiple top 25 lists; is that correct?

18  A.   Yes.

19  Q.   Some were for the most downloaded stories.  Some were the

20  authors that got the most reads overall regardless of story;

21  correct?

22  A.   Correct.

23  Q.   All right.  So Daddy Do Right is another top 25 author; is

24  that correct?

25  A.   Yes.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   And does that one have a gif or picture off to the side as

2  well?

3  A.   Yes, it's an animated picture.

4           THE COURT:  Be sure and speak up.

5           THE WITNESS:  I'm sorry.

6  A.   It's an animated picture.

7  Q.   (BY MR. BERRY)  And then also still on the top 25 most

8  visited author pages is one called Load the Mule.  Do you see

9  that?

10  A.   Yes.

11  Q.   We're going to click on that.  Does that look familiar?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's another author with a little bit of introduction, and

15  then there is a picture of a -- there's a graphic picture

16  there.

17  Q.   And is that graphic picture one of the ones in the

18  drawings that were charged in this case?

19  A.   Yes.

20  Q.   So this is how it would have been seen by the end user on

21  the Web site if they had traveled to this author's page; is

22  that correct?

23  A.   Correct.

24  Q.   And if you would, just underneath where it says Stories

25  written by Load the Mule, what does that first sentence say?

1  A.   (As read) Look at the blonde type on the right.  Ain't she

2  cute?  Makes for a great fantasy, huh?  That's all it is,

3  though, a fantasy.

4  Q.   Okay.  Another top 25 author is Preteen Pleasures.  Do you

5  see that?

6  A.   Yes.

7  Q.   And what does it say above the cartoon image to the right

8  there?

9  A.   It says:  I love to lick little girls.

10  Q.   Okay.  Another top 25 author called Pedo Phil.  Do you see

11  that?

12  A.   Yes.

13  Q.   What is that picture?

14  A.   It's an adult male and a juvenile female.

15  Q.   And are they facing each other in an embrace?

16  A.   Yes, they're embracing each other.

17  Q.   And what is the first line of this author's bio?

18  A.   It says:  A hundred percent pure pedophilia, not from

19  concentrate.

20  Q.   Okay.  Let's look at another top 25 author.  You see Child

21  Raper?

22  A.   Yes.

23  Q.   And he has a bunch of stories as well; correct?

24  A.   Yes.

25  Q.   And then here Big Mess.  Do you see that one?

Brian Nishida - Direct Examination - January 20, 2021

1   A.    Yes.

2   Q.    Does that one also have an image on the right?

3   A.    Yes.

4   Q.    Okay.  Now, that's not one of the charged drawings, is it?

5   A.    No.

6   Q.    Now, another part of this home page is story categories.

7   Do you see that there on the left?

8   A.    Yes.

9   Q.    What is that?  Underneath there, it says quick searches.

10  So what are these links?

11  A.    They are links that are like tags or when you categorize

12  the story you can add a tag to it.  And so these look like tags

13  that would show all the stories with those tags.

14  Q.    So each of these have a link; correct?

15  A.    Yes.

16  Q.    Do they work?

17  A.    I don't know if this works or not.

18  Q.    Okay.  So is there an issue with the search function on

19  the Web site in the way that it was recreated by you?

20  A.    Yes.  So this is not fully functional.  There could be

21  other servers involved and databases and scripting languages

22  that need to be activated on the web server for certain

23  functions to work.

24  Q.    So, for example, if we click on Babysitter, it doesn't

25  take us to a bunch of stories about babysitters; right?

Brian Nishida - Direct Examination - January 20, 2021

1  A.   Yeah, it says an error when processing.

2  Q.   But would that have ordinarily worked under your

3  understanding the way this Web site functioned for an end user?

4  A.   Yes.

5  Q.   Okay.  And one of the categories which I just clicked on

6  was Baby-sitter.  Do you see that?

7  A.   Yes.

8  Q.   Another one is called Diaper.  Do you see that?

9  A.   Yes.

10  Q.   So that would have let user just click straight into a

11  bunch of stories that had to do with diapers; correct?

12  A.   Yes.

13  Q.   And that would have been one of the story codes or tags?

14  A.   Yes.

15  Q.   We saw earlier you could sign up as a new member or

16  U.S. -- inside U.S.A. or outside.  That was one of the options.

17  Do you recall that?

18  A.   Yes, I do.

19  Q.   Okay.  Now, let's go back up.  Under the Submit

20  category -- or section, there was a place where you could

21  submit stories to the Web site; is that correct?

22  A.   Yes.

23  Q.   So was it possible for a user to just put up a story

24  straight onto site or do they have to submit it to the

25  administrator?

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Direct Examination - January 20, 2021

1  A.   So I don't know of the details, but they submitted through
2  this form.
3  Q.   But it wasn't just straight access to the Web site from
4  what you could tell?
5  A.   No, I think they're trying to be something that would have
6  to be pushed to the Web site.
7  Q.   Okay.  And you put together the exhibits in 33A and B that
8  were the story codes; is that correct?
9  A.   Yes.
10 Q.   Okay.  And that's already into evidence.
11        Now, when we go back to the author pages and we have
12 the five charged drawings.  So one of them -- all right.  So,
13 for example, 5A, the jury when they have this exhibit could go
14 back there, click on Authors, B, and then go down to babyNpop;
15 right?
16 A.   Yes.
17 Q.   And then you're going to see all the stories written by
18 babyNpop; is that right?
19 A.   Yes.
20 Q.   And so if they wanted to go find the one that was charged
21 in this case, there is a whole bunch of others to look at, but
22 the one charged in this case was called a "Spectacle to Beat
23 All Others."  Do you see that there on the page?
24 A.   Yes.
25 Q.   And what are the tags for it?

Brian Nishida - Direct Examination - January 20, 2021

1  A.   M/M/Mg toddler.

2  Q.   And then again you have the two different links, blue and

3  red.  Now, this one has to be, I guess, purple because I've

4  already clicked on it; right?

5  A.   Yes.

6  Q.   Okay.  So we click on it again, on the full side here, and

7  it takes us to the full story; is that correct?

8  A.   Yes, and I think if you go to the bottom -- yeah, there is

9  another thing.  If you click on one of them, it brings up the

10 text version.

11 Q.   It has that at the top here as well?

12 A.   Yes, it has on the top.

13 Q.   So that would bring up --

14        THE COURT:  Be sure and speak up, please.  Be sure

15 and keep your voice up.

16        THE WITNESS:  I'm sorry.

17 A.   It brings up in a text version when you click like on that

18 little icon, like a notepad icon.

19 Q.   (BY MR. BERRY)  And the same thing.  We could go to Evil

20 Dad, click on Evil Dad, and then we have the Baby Wank story.

21 Do you see that?

22 A.   Yes, I do.

23 Q.   And the same thing.  Sometimes it creates a zip file that

24 you have to download.  Sometimes you click on it and it takes

25 you straight to the text file; is that right?

Brian Nishida - Direct Examination - January 20, 2021

 1  A.    That's right.  One of them -- I think it is the blue

 2  link -- will take you to the preview and then the red link will

 3  take you to the full version.

 4  Q.    And sometimes the full version displays and sometimes you

 5  have to download; is that right?

 6  A.    That's correct.

 7  Q.    It all just depends on how the Web site was formulated at

 8  the time; is that right?

 9  A.    Correct.

10  Q.    Another one charged was by an author named Lachurna.  Do

11  you see that there under "L"?

12  A.    Yes.

13  Q.    And that one was the one called "The Baby Mangler."  Do

14  you see that?

15  A.    Yes.

16  Q.    And that's Exhibit 9A.

17        Now, if we go back to the home page and we talk about

18  some of the different pages -- the terms on this page, in your

19  experience as a computer forensic examiner doing these

20  thousands of hard drives over 15 years, have you worked on

21  child exploitation cases before?

22  A.    Yes.

23  Q.    Are you familiar with terms that are consistent with

24  people that are seeking out this type of material?

25  A.    Yes.

Brian Nishida - Direct Examination - January 20, 2021

1  Q.   And what are some of the terms you're familiar with?

2  A.   Pedo, preteen --

3           THE REPORTER:  I can't hear.

4           THE COURT:  We can't hear you, sir.

5           THE WITNESS:  I'm sorry.

6  A.   Pedo, preteen, Lolita.

7  Q.   (BY MR. BERRY)  Okay.  So if I go back to the home page

8  and I search "pedo" just on the home page here, which is just a

9  control F function, not the Web site function, but just control

10 F, how many times does "pedo" come up on the home page?

11 A.   142 times.

12 Q.   And if I type in "baby" on the first page, on the home

13 page, just on the home page itself, how many times does it come

14 up?

15 A.   61 times.

16 Q.   And if I type in "toddler," how many times does it come

17 up?

18 A.   29 times.

19 Q.   And one of the first stories that comes up is -- what's

20 the title of that story?

21 A.   "Toddler Fuckers."

22 Q.   Right.  And if I type in "infant" on the home page, how

23 many times does that come up?  Just on the home page.

24 A.   11 times.

25 Q.   If I type in "rape" on the home page, how many times does

1  that come up?

2  A.   It's 85 times.

3  Q.   And finally, if I type in "scat," how many times does that

4  come up on the home page?

5  A.   23 times.

6  Q.   When we go to click on the link for "stories" and it says

7  at the top there, "Where the hell are the stories," and you can

8  search them, how many does it say are posted on this site here?

9  A.   Over 25,000.

10 Q.   Can you read that again?

11 A.   Oh.  Over 55,000.

12 Q.   Thank you.

13         And we already talked about the number of authors and

14 that was a large number too as well; correct?

15 A.   Yes.

16 Q.   Over 2200; is that right?

17 A.   Yes.

18 Q.   All right.  You can go back to the witness stand.

19         MR. BERRY:  If I could have just a second, Your

20 Honor.

21         THE COURT:  Yes, sir.

22         (Sotto voce discussion)

23         MR. BERRY:  Your Honor, I pass the witness at this

24 time.

25         THE COURT:  Thank you.

1          Mr. Haygood, your witness.

2          MR. HAYGOOD:  Thank you, Your Honor.  May I proceed?

3          THE COURT:  Yes, sir.

4                    **CROSS-EXAMINATION**

5    BY MR. HAYGOOD:

6    Q.   Good afternoon, Agent.

7    A.   Hello.

8    Q.   I've got just a few questions for you.  If I ask something

9    in a confusing way, don't be afraid to tell me to ask it

10   another way, because you're obviously the one who is educated

11   about computers here and I'm just a hobbyist, okay?

12   A.   Okay.

13   Q.   All right.  Do you know what a robots.txt file is?

14   A.   So it has to do with browsers.  I think you could set up

15   robots.txt so it won't, what's called crawl a certain Web site.

16   Q.   And is that important for search engines like Google or

17   Ask Jeeves -- or I don't know even know what the other ones

18   are -- to index the web pages so people can find them through

19   search engines?

20   A.   Yeah, so when -- Google is constantly crawling the

21   Internet to find Web sites.

22   Q.   Okay.  Did you extract the robots.txt file from the

23   Mr. Double Web site in any of the images you created?

24   A.   No, I did not.

25   Q.   Okay.  So you have no idea if it was configured in such a

Brian Nishida - Cross-Examination - January 20, 2021

1  way as to be indexed by search engines.

2  A.    That's correct.

3  Q.    Okay.  With the Web site that you recreated, what

4  determines whether a link is functional or nonfunctional on

5  that Web site?

6  A.    So if it can go to a page that exists, that's, for

7  instance, functional.  If it executes a script and the web

8  server knows how to run that code, then it will be functional.

9  Q.    So if it was -- I'm trying to think of something here.  If

10  you clicked on the Sign Up link on Exhibit 24, is that going to

11  go anywhere?

12  A.    So I think the Sign Up link will get you to another page

13  that shows up.

14  Q.    But you wouldn't be able to actually go in, put in your

15  credit card information, sign up, and have a new account

16  created.

17  A.    Yeah, not on this copy.

18  Q.    Okay.  And so is the view that the jury will have, if they

19  choose to click through Exhibit 24, is that the view of a

20  log-in user or just a member of the general public who somehow

21  browsed through the site?

22  A.    I think it's of a general user -- I mean, someone who

23  hasn't logged in.

24  Q.    Someone who has logged in?

25  A.    Has not logged in.

Brian Nishida - Cross-Examination - January 20, 2021

1  Q.   Has not logged in.

2  A.   Yes.

3  Q.   Okay.  So if someone who was not logged in, were they then

4  able to view the stories?

5  A.   I think they can -- yeah, I think they can view -- preview

6  some stories.  Now, the other thing that's not functional is if

7  it had some kind of security, that might not be functional on

8  this copy of the Web site.

9  Q.   Okay.  Because we've had previous testimony that you had

10  to be a logged in, authenticated user to read the stories.

11  A.   So then this must bypass -- obviously, we are seeing the

12  stories.  So something -- some security had been bypassed when

13  I did this copy.

14  Q.   Okay.  So the security check, that could be one of those

15  scripts you were talking about.

16  A.   Yes.

17  Q.   And in recreating this Web site, did you have a chance to

18  go through Exhibit 24 and look at a number of the different

19  pages?

20  A.   Yes.

21  Q.   Were there pages for international authors?

22  A.   Yes.

23  Q.   Were those written in English?

24  A.   No.

25  Q.   Okay.  Do you know how many stories were written in

Brian Nishida - Cross-Examination - January 20, 2021

1  English versus how many were written in foreign languages?

2  A.    No, I don't.

3  Q.    Okay.  Do you know how many users on the Web site -- or

4  not even users.  Let's narrow it down -- how many authors on

5  the Web site were U.S. based versus those outside of the United

6  States?

7  A.    No.

8  Q.    Okay.  One of the things that you talked about with

9  Exhibits 5B to 9B were these printouts of all the different

10  places in which some of these files could be found.  Do you

11  recall that?

12  A.    Yes.

13  Q.    And I believe your testimony was that the reason why they

14  could have been in different places is because of automated

15  backups or things like that.

16  A.    So it could be automated or manual backups, just plain

17  copies.

18  Q.    Okay.  But there is nothing nefarious about having

19  multiple copies of the same file located on the same device, is

20  there?

21  A.    I guess that depends.

22  Q.    Well, depends on what?

23  A.    Well, I mean, what is -- what are you talking about

24  "nefarious"?  I don't --

25  Q.    Well, would you expect that behavior from someone who is

Brian Nishida - Cross-Examination - January 20, 2021

 1  operating a computer perfectly legally, not violating any laws?

 2          MR. BERRY:  Objection.  Calls for speculation --

 3          THE COURT:  Sustained.

 4          MR. HAYGOOD:  -- on the forensic --

 5          THE COURT:  Sustained.

 6          MR. HAYGOOD:  I'll move on.

 7  Q.  (BY MR. HAYGOOD)  Now, on Exhibit 10B, that was the

 8  graphics file that you said you found in the recycle bin.  What

 9  is the significance of that being in a recycle bin?

10  A.   It's just that it was deleted -- or it was prepared to be

11  deleted.

12  Q.   Okay.  Was that particular file, I believe, DC9.jpg, was

13  that found in any other locations or was it only in the recycle

14  bin?

15  A.   Only in the recycle bin.

16  Q.   Can you tell at what point that was moved to the recycle

17  bin?

18  A.   I think there was some date on that.

19          What exhibit number is that?

20  Q.  (BY MR. HAYGOOD)  10B, sir.

21  A.   There is another exhibit that shows kind of like the user

22  perspective.  Is that on this?

23  Q.   I believe that would be 10A.  And 10A would be in the red

24  binder you have there in front of you.

25  A.   Okay.

1  Q.   It's one of the charged images.

2  A.   Oh, okay.

3         So this is -- no, this doesn't show what I was

4  looking for.  So, no, I don't have that data on when it was

5  deleted.

6  Q.   Okay.  Do you find it significant that the image in 10A,

7  which was retrieved from one of the author profile pictures,

8  doesn't show up anywhere else on any of the computers you

9  imaged?  Is that significant to you?

10  A.   No, I don't --

11  Q.   Okay.

12  A.   I don't know.

13  Q.   With regard to some of the files that we talked about in

14  27A, B, and C, do you recall those?  Those were the link files.

15  A.   Yes.

16  Q.   Okay.  Are these link files, are they hard links or soft

17  links?

18  A.   I don't know if Windows has a concept of hard links or

19  soft links.  They -- so a hard link -- there's two types of

20  links: hard link and soft link.  A hard link is kind of -- has

21  like another copy of the data.  Whereas the soft link, there's

22  one copy of the data, but then there are a bunch of pointers to

23  it.  So I guess it would be a soft link.

24  Q.   Okay.  And the soft link specifically for 27B, that points

25  to a recent document opened in Microsoft Word; correct?

Brian Nishida - Cross-Examination - January 20, 2021

1  A.   Yes, Microsoft Office it's saying, but let's see.  So

2  it -- well, it is showing in the folder for Microsoft Office.

3  This doesn't show what it was opened with, though.

4  Q.   Okay.  And the type of document that's being opened is a

5  .htm file; correct?

6  A.   That's correct.

7  Q.   And HTM stands for hypertext markup.

8  A.   That's correct.

9  Q.   What is hypertext markup?

10 A.   So it's the kind of language used for a web page.

11 Q.   So this would be opening up a web page in one program with

12 the Microsoft Office suite?

13 A.   So this is where the file was opened, but it doesn't --

14 the link file here doesn't -- it doesn't tell you what it was

15 opened with.  It's just showing you a path that's in Office.

16 Q.   And nothing about in Exhibit 27B actually contains the

17 file that was opened?

18 A.   Yes, just a pointer to that file.

19 Q.   And that pointer was last opened sometime in 2014?

20 A.   No.  So if you look on the front sheet, the last access

21 date is November 7, 2019.  And so the last access date of the

22 link file is the time it was last opened.

23 Q.   Okay.  And would that last open date on November 7, 2019,

24 that was the date of the execution of the search warrant of my

25 client's computers; correct?

Ann M. Record, RMR, CRR, CMRS, CRI

Brian Nishida - Cross-Examination - January 20, 2021

1  A.    Yes.

2  Q.    So my client wouldn't have had access to the computer to

3  access it on that day, would he?

4  A.    I'm sorry, your client what?

5  Q.    My client would not have been the one to make that last

6  access on November 7, 2019, because he wasn't in possession of

7  his computer?

8          MR. BERRY:   Objection, Your Honor.   This witness was

9  not there for the search warrant.   He doesn't have knowledge

10  about what he's asking.

11          THE COURT:   Sustained.   Sustained.

12          MR. HAYGOOD:   Okay.

13  Q.   (BY MR. HAYGOOD)   Agent, with regard to some of the

14  sections of the Web site, do you recall there being a section

15  for scanned books or novels?

16  A.    I remember an e-novels section.

17  Q.    Okay.   And when you were recreating that, did you have any

18  of the image files for the scan versions of the novels?   Were

19  you able to re-create that?

20  A.    I believe I saw some covers for those.

21  Q.    And these appeared to be books that were actually

22  published, not just stories submitted by users; correct?

23  A.    I can't tell if they were published.

24  Q.    One of the things you talked about on direct examination

25  was that you have come across what you call child exploitation

Brian Nishida - Cross-Examination - January 20, 2021

1   material in the course of your employment as an FBI special

2   agent; correct?

3   A.   Yes.

4   Q.   And by child exploitation material, we're talking about

5   child pornography, aren't we?

6   A.   Yes.

7   Q.   And none of the text stories that were recovered from my

8   client's Web site meet the definition of child pornography, do

9   they?

10          MR. BERRY:  Objection.  Calls for a legal conclusion.

11          THE COURT:  Sustained.

12          MR. HAYGOOD:  Your Honor, he's testified he's an

13   expert.

14          MR. BERRY:  Not an expert in child exploitation

15   material and experience.

16          THE COURT:  And the law of what -- and what the

17   definition of that is.  I sustain the objection.

18          The jury will disregard.

19   Q.   (BY MR. HAYGOOD)  Did you find anything on my client's Web

20   site that you would consider to meet the definition of child

21   exploitation material as you've been trained on it?

22   A.   Are you talking about stories?

23   Q.   Talking about the stories.

24   A.   Yeah, I mean, that's how I would characterize -- that

25   material is child exploitation.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Q.   Even though no actual children, as far as you know, were

2  involved in the making of it?

3  A.   Yeah, I mean, I would call like even those cartoons, kind

4  of child -- child exploitation material.

5  Q.   Well, I'm talking about just the stories.

6  A.   The stories, yes.

7  Q.   Okay.  So what would be the difference in your mind

8  between those stories and, say, a novel like Lolita by Vladimir

9  Nabokov?

10          MR. BERRY:  Objection.  What would be in his mind is

11  not in the purview of this witness.

12          THE COURT:  Sustained.

13          MR. HAYGOOD:  Pass the witness.

14          THE COURT:  Redirect?

15          MR. BERRY:  Just one second, Judge.

16          (Sotto voce discussion)

17          MR. BERRY:  Pass the witness.  No further questions,

18  Judge.

19          THE COURT:  You may step down.  Remember you're under

20  the rule still until the trial is over.  You're excused.

21          THE WITNESS:  Okay.

22          THE COURT:  Next witness.

23          MS. MORRISON:  Your Honor, the government calls

24  Lieutenant Derek Pearson.

25          THE COURT:  Lieutenant Pearson?

Derek Pearson - Direct Examination - January 20, 2021

```
 1              MS. MORRISON:  Yes, sir.
 2              THE COURT:  Sir, if you would come on around here.
 3  Come on up to the right of Ms. Morrison, please, and then
 4  you'll come along behind the staff here in front of me.
 5              If you would raise your hand, please.
 6              (Witness sworn by the clerk at 1:34 p.m.)
 7              THE COURT:  As you're being seated, if you feel
 8  comfortable, you may remove your face covering, please.
 9              THE WITNESS:  Yes.  Thank you, Your Honor.
10              THE COURT:  You're under the rule.  So that means
11  that you're not allowed in the courtroom unless you're
12  testifying, and you're only allowed to speak with the attorneys
13  from either side for the duration of the trial, all right?
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  Thank you, sir.
16              Ma'am, you may proceed.
17              MS. MORRISON:  Thank you, Your Honor.
18                         DEREK PEARSON,
19              GOVERNMENT'S WITNESS SWORN AT 1:34 p.m.
20                       DIRECT EXAMINATION
21  BY MS. MORRISON:
22  Q.   Would you please state your name for the record, spelling
23  your last name.
24  A.   My name is Derek Jordan Pearson, P-E-A-R-S-O-N.
25  Q.   Lieutenant Pearson, where are you currently employed?
```

Derek Pearson - Direct Examination - January 20, 2021

1   A.   At the Texas Department of Public Safety.

2   Q.   How long have you been employed by the Texas Department of

3   Public Safety?

4   A.   16 years.

5   Q.   What is your current position with that organization?

6   A.   I'm a lieutenant over human trafficking in El Paso.

7   Q.   How long have you been in that position?

8   A.   Just since the first of this month.

9   Q.   Prior to that, where were you working?

10  A.   I was a special agent assigned to Alpine.

11  Q.   How long had you worked in the Alpine area?

12  A.   The first time I worked as a special agent in Alpine was

13  three years.  I took one year off.  I was a pilot in the

14  aircraft division, and then I've been back four years.

15  Q.   Did you participate in an interview of the defendant,

16  Thomas Arthur, on November 7, 2019?

17  A.   Yes, ma'am, I did.

18  Q.   Where did that interview take place?

19  A.   At first at the sheriff's office and continued the

20  interview at the jail.

21  Q.   Was the defendant in custody at that point in time?

22  A.   At the sheriff's office, no.

23  Q.   Who else was there during that interview?

24  A.   FBI Agent Clay Tran.

25  Q.   Now, did you video record your interview with the

Derek Pearson - Direct Examination - January 20, 2021

1  defendant?

2  A.   Yes, ma'am, I did.

3  Q.   How long did that interview take?

4  A.   I don't remember off the top of my head.  Several hours.

5  Q.   When you began speaking with the defendant, did you ask

6  him how long he lived in the area?

7  A.   Yes, ma'am, I did.

8  Q.   What did he tell you?

9  A.   20 years.

10 Q.   Did you ask him about how he got to this area?

11 A.   I did.  He originally told me that he was from here, is

12 what he said.  He said, I'm from here.  And he said he left to

13 go to college and now he was back.

14         MS. MORRISON:  Your Honor, at this time I would move

15 for the admission of Government's Exhibit 26A.

16         THE COURT:  Mr. Bennett.

17         MR. BENNETT:  Which is?  I'm sorry, 26A is what?

18         THE COURT:  26A, as in alpha.

19         (Sotto voce discussion)

20         MR. BENNETT:  No objection, Your Honor.

21         THE COURT:  So that's 26A only; correct?

22         MS. MORRISON:  Yes, Your Honor.

23         THE COURT:  Yes, ma'am.  26A is admitted without

24 objection.

25         MS. MORRISON:  Your Honor, we would seek to publish a

Ann M. Record, RMR, CRR, CMRS, CRI

Derek Pearson - Direct Examination - January 20, 2021

1  clip from 26A.  And just for the record, it is five minutes and

2  42 seconds into the interview and concludes at 5 minutes and

3  51 seconds.

4          THE COURT:  Thank you.  You may publish.

5          (Video played)

6          MS. MORRISON:  And, Your Honor, for the record, this

7  particular clip was nine seconds long.

8          THE COURT:  Thank you.

9  Q.   (BY MS. MORRISON)  Later in your interview, did you ask

10 the defendant additional questions about his background in the

11 area?

12 A.   Yes, ma'am, I did.

13 Q.   Did you ask him specifically if he lived in Terlingua?

14 A.   Yes, I did.

15 Q.   What did he tell you about living in Terlingua?

16 A.   He told me that he lived in Terlingua 21 years, told me

17 that he likes the desert, and that he -- him and his wife just

18 want to live in solitude.

19 Q.   Did you ask him about whether or not -- did you or

20 Agent Tran ask him about whether or not he owned any property

21 in that area?

22 A.   Yes, ma'am, we did.

23 Q.   Did you ask him whether or not they had lived in that

24 particular property for any length of time?

25 A.   Yes, ma'am, I did.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.   What did he tell you about living in that particular area?

2  A.   He described his property as a ranch and told me they

3  lived there 21 years.

4  Q.   In that same ranch?

5  A.   Yes, ma'am.

6  Q.   Was he also asked about what he did for work?

7  A.   Yes, ma'am.

8  Q.   What did he tell you?

9  A.   He told me he was retired.

10        MS. MORRISON:  Your Honor, at this time the

11  government would move for admission of Exhibit 26B.

12        THE COURT:  Mr. Bennett.

13        MR. BENNETT:  Your Honor, I'm assuming that's another

14  clip from the interview.  We have no objection.

15        THE COURT:  Thank you.

16        MR. BENNETT:  However, I'm presuming here, and we

17  don't seem to have these exhibits on a disk or elsewhere.

18        THE COURT:  Were these statements and this interview

19  disclosed to the defense?

20        MS. MORRISON:  Yes, Your Honor, in their entirety.

21        THE COURT:  So we just have clips of what the -- the

22  whole interview.  She's got smaller clips from the entire

23  interview, which you have discovery of.  Do you object to this

24  or not?

25        MR. BENNETT:  No, but I'm asking that we have copies

Derek Pearson - Direct Examination - January 20, 2021

 1  of the exhibits -- the specific clips from the interview.  We

 2  have the whole interview, but these are specific clips from the

 3  interview.

 4          THE COURT:  So 26B is admitted without objection, is

 5  what you're telling me, you don't have any objection.

 6          MR. BENNETT:  Correct.

 7          THE COURT:  So between you and the government can

 8  work on whether or not you-all have copies of the exhibits.

 9  You have copies of what's going to be played.  They may not

10  have shown you.  I don't know.  I wasn't involved in discovery

11  between the parties, Mr. Bennett.  So I would ask you to have a

12  seat.

13          MR. BENNETT:  All right.  Thank you, Your Honor.

14          MS. MORRISON:  And, Your Honor, just for

15  clarification purposes, we identified specifically those clips

16  we intended to play in our trial memorandum.  So defense

17  counsel has been notified of the particular clips we planned to

18  play.

19          THE COURT:  So they could go to it from the entire

20  interview that you had given them?

21          MS. MORRISON:  Yes, Your Honor.

22          THE COURT:  When was that disclosure made, do you

23  know?

24          MS. MORRISON:  The interview was one of the first --

25          THE COURT:  Which would have been roughly when?

Derek Pearson - Direct Examination - January 20, 2021

1          MS. MORRISON:  December of 2019, Your Honor.

2          THE COURT:  Okay.  And you told them which clips

3  prior to the trial?

4          MS. MORRISON:  Yes, Your Honor, I believe we filed

5  our charge memorandum two weeks ago.

6          MR. BENNETT:  I'm simply asking that we have copies

7  of the specific trial exhibits.

8          THE COURT:  And if you wish to ask them about that,

9  that's fine.  I don't have control of any copies of any clips,

10 Mr. Bennett.  So what would you like the Court to do to help?

11         MR. BERRY:  Your Honor, could we do this outside the

12 presence --

13         MR. BENNETT:  We'll do this outside the presence of

14 the jury.  That's a good idea.

15         Thank you, Your Honor.

16         THE COURT:  Go right ahead.

17         MS. MORRISON:  Your Honor, I just want to make sure.

18 May I publish 26A?

19         THE COURT:  Yes, you may.

20         MS. MORRISON:  Thank you, Your Honor.

21         THE COURT:  26B.

22         (Video played)

23         MS. MORRISON:  For the record, that was 12 minutes

24 through 18 minutes and 14 seconds of the entire interview with

25 the defendant.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.  (BY MS. MORRISON)  Lieutenant Pearson, at some point

2  during the interview, was there a discussion about a diabetic

3  cat?

4  A.   Yes, ma'am, there was.

5  Q.   Could you explain to the jury how that came about.

6  A.   Mr. Arthur was concerned that his wife may be taken into

7  custody as well at which point he explained to me that they had

8  numerous animals on the property, to include a diabetic cat

9  that needed injections at certain times of the day and would

10 die if it didn't get those injections.

11 Q.   When mention was made of the diabetic cat, did you ask the

12 defendant about whether or not he knew any of his neighbors?

13 A.   I asked him if he had anyone that could administer that

14 injection and at which point in time he said he did not.

15 Q.   How did the defendant describe he and his wife?

16 A.   Solitude, kind of isolated from the neighbors.

17         MS. MORRISON:  Your Honor, at this time the

18 government would move for admission of Government's

19 Exhibit 26C.

20         THE COURT:  Mr. Bennett.

21         MR. BENNETT:  Your Honor, I do have an objection.

22         THE COURT:  Yes, sir.

23         MR. BENNETT:  The government's -- we haven't seen the

24 transcription attached to these records.  They haven't been

25 produced to us in discovery.

Derek Pearson - Direct Examination - January 20, 2021

1          THE COURT:  Okay.  But the video was; right?

2          MR. BENNETT:  The video was but the transcription was

3    not.  So we would object to the offer of the transcript based

4    on surprise.

5          THE COURT:  Objection is overruled.  You're welcome

6    to submit your own transcription should it differ from theirs

7    for the jury's consideration.

8          MR. BENNETT:  Thank you, Your Honor.

9          THE COURT:  26C is admitted without -- over

10   objection, excuse me.

11         MS. MORRISON:  Your Honor, we would seek to

12   publish -- and just before we begin playing, this portion of

13   the interview comes from 28 minutes, 50 seconds through

14   28 minutes, 59 seconds.

15         THE COURT:  Thank you.

16         MS. MORRISON:  26C.

17         (Video played)

18   Q.   (BY MS. MORRISON)  Lieutenant Pearson, have you had the

19   opportunity to watch this video both with and without the

20   transcription?

21   A.   Yes, ma'am, I have.

22   Q.   When you watched the video with the transcription, did you

23   make sure that it accurately reflected all of the dialogue that

24   was taking place?

25   A.   Yes, ma'am, I did.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.   Do you have any doubts about the accuracy of the
2  transcript or the audio?
3  A.   This transcription, no.  The original transcription that
4  was transcribed, the entire interview, when it initially came
5  out, it had myself and FBI Agent Tran reversed but the words
6  were exactly the same.
7  Q.   And because of that reversal, you then had to review the
8  entire video again to make sure that it, in fact, was correct.
9  A.   Absolutely.
10 Q.   And then after the transcripts were corrected, you had the
11 opportunity to watch it again with the corrected transcript.
12 A.   Yes, ma'am.
13 Q.   So as it is being played here for the jury today, is the
14 transcript accurate against the video?
15 A.   It certainly is.
16 Q.   During the course of your interview, did you ask the
17 defendant about how the Web site got started?
18 A.   Yes, ma'am, I did.
19 Q.   What did he tell you?
20 A.   Mr. Arthur told me that in the early days of the Internet,
21 the early '90s, that authors would post to a news site.  They
22 would post erotic stories and things like that.  He also told
23 me that they were -- these authors were being harassed over
24 some of the stories and that Mr. Arthur would publish the
25 stories in order for these authors to maintain anonymity.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.   During the course of that interview, did you ask the

2  defendant about charging a subscription fee?

3  A.   Yes, ma'am, I did.  Mr. Arthur explained that when he

4  first started publishing these stories, he did not charge a

5  subscription fee and only began charging a subscription fee

6  when the Internet Service Provider, or ISP, began charging a

7  fee for content.

8  Q.   At some point did the defendant characterize his services?

9  A.   Yes, ma'am, he did.

10  Q.   How did he characterize his services?

11  A.   As a service provider.

12         MS. MORRISON:  Your Honor, at this time I would move

13  for the admission of Government's Exhibit 26D, which is taken

14  from the defendant's entire interview and is taken from the

15  portion 45 minutes and 27 seconds in through 51 minutes and

16  38 seconds in.

17         THE COURT:  Mr. Bennett.

18         MR. BENNETT:  Same objection, Your Honor.

19         THE COURT:  Then 26D is admitted over objection.

20         MS. MORRISON:  Your Honor, may we publish that

21  exhibit?

22         THE COURT:  Yes, ma'am.

23         (Video played)

24         MS. MORRISON:  Your Honor, I would like to go ahead

25  and publish 26C at this time because that wasn't published.

Derek Pearson - Direct Examination - January 20, 2021

1          THE COURT:  Yes, ma'am.

2          (Sotto voce discussion)

3          (Video played)

4   Q.   (BY MS. MORRISON)  Lieutenant Pearson, did you ask the

5   defendant about the content of the stories?

6   A.   I did.

7   Q.   What did he tell you?

8   A.   He just described them as erotic stories.

9   Q.   Did you press him further and ask him about what -- how

10  the stories stood out to him?

11  A.   I did.

12  Q.   What did he tell you?

13  A.   He said that some were pretty far out there and that some

14  were not, and later described some of the things in the news

15  stories as more horrible than the content of what is on -- what

16  was on the Web site.

17  Q.   What did he tell you about how long he had been using the

18  name mrdouble.com?

19  A.   Since the early '90s.  The name itself was actually -- the

20  domain name was registered in 1996.  Prior to that, '91, '92,

21  or '93 he began using the name, but it was not necessarily

22  registered at that point.

23  Q.   What did he tell you about the number of hits that his Web

24  site was getting?

25  A.   He described those as what's called a unique or it's a

 1  unique identifying hit.  During the peak hits, a hundred

 2  thousand a day and said that it was somewhere right around

 3  2,000 a day currently.

 4          MS. MORRISON:  Your Honor, at this time the

 5  government would move to admit Government's Exhibit 26E taken

 6  from the defendant's entire interview, which is 52 minutes and

 7  57 seconds through 58 minutes and 5 seconds.

 8          THE COURT:  Mr. Bennett.

 9          MR. BENNETT:  No objection, Your Honor.

10          THE COURT:  Government's Exhibit 26E is admitted

11  without objection.

12          You may publish.

13          MS. MORRISON:  Thank you, Your Honor.

14          (Video played)

15  Q.   (BY MS. MORRISON)  Lieutenant Pearson, did you ask the

16  defendant about the administration of the site?

17  A.   Yes, I did.

18  Q.   What did he tell you?

19  A.   He told me that he was the administrator of the site, but

20  he had two moderators.

21  Q.   What did those two moderators do?

22  A.   According to Mr. Arthur, they would review stories, review

23  content of the stories.  Make sure there weren't things that

24  the site would not allow like links or stories that were

25  about -- that were not about erotica.

Derek Pearson - Direct Examination - January 20, 2021

1   Q.   Did these moderators monitor the stories or the forum?

2   A.   I believe the stories and possibly the forum on that.  I

3   could not be a hundred percent, but for sure the stories.

4   Q.   Okay.  Did he tell you where these two moderators were

5   located?

6   A.   One of them goes by the name of Kelly AUS, A-U-S, and that

7   moderator was in Australia.  The other moderator went by the

8   name of Candyman; and if I remember right, that was in Canada.

9            MS. MORRISON:  Your Honor, at this time the

10  government would move for admission of government's 26R.  From

11  the defendant's entire interview, this is taken from two hours,

12  58 minutes and 40 seconds in to 2 hours, 49 minutes and

13  53 seconds in.

14           THE COURT:  Thank you.

15           Mr. Bennett.

16           MR. BENNETT:  We have no objection, Your Honor.

17           THE COURT:  Government's Exhibit 26R is admitted

18  without objection.

19           And you may publish.

20           MS. MORRISON:  Thank you, Your Honor.

21           (Video played)

22  Q.   (BY MS. MORRISON)  Lieutenant Pearson, I'm going to ask

23  you this question again.  Did the defendant tell you in this

24  clip that the two moderators approve stories?

25  A.   No, I don't believe it was this one.

Derek Pearson - Direct Examination - January 20, 2021

1    Q.    Based on the clip that you heard today --

2    A.    Yes, ma'am.

3    Q.    -- the defendant told you that these two moderators were

4    on the forum itself?

5    A.    I believe so, yes.

6    Q.    Lieutenant Pearson, have you had the opportunity to look

7    at the Web site?

8    A.    No, ma'am.  I looked at a copy of it in the early days of

9    the investigation, but I haven't since.

10   Q.    To be clear, what has been your role in the investigation?

11   A.    Initially, I was contacted in this investigation by HSI.

12   They had explained to me that they had looked into it -- HSI

13   being Homeland Security Investigations -- and did not get

14   anywhere with the investigation and asked if I could take over

15   the investigation.

16          I looked at the content that I was given by HSI and

17   realized that the Texas Department of Public Safety did not

18   have the resources to conduct this large of an investigation,

19   at which point I referred it to the FBI.

20   Q.    Did you then partner with Agent Ewan on the investigation?

21   A.    Yes, ma'am, I did.

22   Q.    But from that point in time, essentially the FBI took over

23   the investigation?

24   A.    Yes.  The FBI didn't order the investigation until the

25   execution of the search warrant, at which time I was asked to

Derek Pearson - Direct Examination - January 20, 2021

1  conduct the interview.

2  Q.   During your interview, did you ask the defendant about the

3  Mr. Double e-mail server?

4  A.   Yes, ma'am, I did.

5  Q.   What did the defendant tell you about the server?

6  A.   He told me that the e-mail was kind of a benefit of being

7  an author and that authors were given an e-mail address at

8  mrdouble.com where they could communicate back and forth with

9  each other.

10 Q.   Could the readers communicate with the authors?

11 A.   In a way, yes, but not necessarily through the e-mail.

12 Q.   Was it your understanding based on the information

13 provided by the defendant that the readers were assigned e-mail

14 addresses?

15 A.   No, ma'am, I don't remember that.  I do remember that

16 there was a button per se described by Mr. Arthur on the story

17 where a reader could click the button and it would send a short

18 response to the author.

19        MS. MORRISON:  Your Honor, at this time I would move

20 for the admission of Government's Exhibit 26Q.  From the entire

21 interview, this particular portion covers two hours, 57

22 minutes, and 5 seconds through two hours, 57 minutes, and

23 32 seconds.

24        THE COURT:  Mr. Bennett.

25        MR. BENNETT:  No objection, Your Honor.

Derek Pearson - Direct Examination - January 20, 2021

1          THE COURT:  Government's Exhibit 26Q is admitted

2   without objection.   You may publish.

3          (Video played)

4   Q.   (BY MS. MORRISON)  During your interview, did you ask the

5   defendant how much time he spent working on the Web site?

6   A.   Yes, ma'am, I did.

7   Q.   What did he tell you?

8   A.   Roughly three hours a day.

9   Q.   What other work did he perform on the Web site throughout

10  the day?

11  A.   He would do things like program.  He described certain

12  programs that he had written and pretty much said that he would

13  go over stories.

14  Q.   What did he tell you about managing the account?

15  A.   Could you expand that question, please?

16  Q.   What did he tell you about how he was able to manage the

17  Web site?

18  A.   That he was able to manage it as the administrator with

19  obviously the help of his moderators.

20  Q.   Did he have certain programs or -- and forgive me.  I'm

21  not a computer expert -- certain programs or codes that allowed

22  him to do things more routinely?

23  A.   Yes, he did.

24          MS. MORRISON:  Your Honor, at this time I move for

25  the admission of Government's Exhibit 26P from the defendant's

Derek Pearson - Direct Examination - January 20, 2021

1  interview.  This clip is two hours, 51 minutes, and 38 seconds

2  through two hours, 52 minutes, and 59 seconds.

3              THE COURT:  Mr. Bennett.

4              MR. BENNETT:  No objection, Your Honor.

5              THE COURT:  Government's 26P is admitted without

6  objection.  You may publish.

7              (Video played)

8  Q.  (BY MS. MORRISON)  At some point did you ask the defendant

9  about whether or not individuals posted stories that originally

10 appeared on his Web site on other Web sites?

11 A.   Yes, ma'am, he did.

12 Q.   Did he use a particular phrase when responding to that

13 question?

14 A.   If I remember right, like content stealing or content

15 sharing, something like that, yes, ma'am.

16 Q.   Was he asked about whether or not he had concerns about

17 people sharing the log-ins for the Mr. Double Web site?

18 A.   Yes, he did.  In fact, it was such a concern that he even

19 wrote programs to determine how many times and how many

20 different ISPs -- sorry, not -- IP addresses, Internet Protocol

21 addresses, logged on to Mr. Double with the same sign in

22 information.

23 Q.   Was the defendant asked whether or not the sharing of

24 log-ins was a problem?

25 A.   It was a concern for sure, yes, ma'am.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.   But was that concern alleviated through the program he had

2  written to detect whether or not the same log-in was being

3  accessed by multiple IP addresses?

4  A.   Yes, ma'am.  Mr. Arthur also had stated that he purchased

5  some additional software that he did not write himself to do a

6  similar job.

7            MS. MORRISON:  Your Honor, at this time the

8  government would move for admission of Government's

9  Exhibit 260.  This comes from two hours, ten minutes and

10 15 seconds into the defendant's entire interview and lasts up

11 through two hours, 11 minutes, and 54 1seconds.

12            THE COURT:  Mr. Bennett.

13            MR. BENNETT:  No objections, Your Honor.

14            THE COURT:  260 is admitted without objection.  You

15 may publish.

16            (Video played)

17 Q.   (BY MS. MORRISON)  Did you ask the defendant about his

18 oldest paying member?

19 A.   Yes, ma'am, I did.

20 Q.   What did he tell you?

21 A.   He told me that there were older members on the forum,

22 some as far back as the early days, which I would assume would

23 be the early '90s.

24 Q.   Did you also ask him about how he -- excuse me -- how the

25 readers paid for their subscription?

Derek Pearson - Direct Examination - January 20, 2021

1   A.    Yes, ma'am, I did.

2   Q.    What did he tell you?

3   A.    By credit card or they can mail a payment.

4           MS. MORRISON:  Your Honor, at this time the

5   government would move for admission of Government's

6   Exhibit 26N.  From the defendant's entire interview, this is

7   taken from one hour, 56 minutes, three seconds through one

8   hour, 56 minutes, and 41 seconds.

9           THE COURT:  Mr. Bennett.

10           MR. BENNETT:  No objection, Your Honor.

11           THE COURT:  Thank you.

12           Government's Exhibit 26N is admitted without

13   objection.  You may publish.

14           (Video played)

15   Q.    (BY MS. MORRISON)  Lieutenant Pearson, did you ask the

16   defendant about how his Web site was hosted?

17   A.    Yes, ma'am, I did.

18   Q.    What did he tell you?

19   A.    He told me that the Web site was hosted through a server

20   in Amsterdam.

21   Q.    Did he tell you why he chose that particular server?

22   A.    Said that it was cheaper to use.

23   Q.    Did you ask the defendant about requiring the authors to

24   use the mrdouble.com e-mail addresses?

25   A.    I don't remember asking him that.

Ann M. Record, RMR, CRR, CMRS, CRI

Derek Pearson - Direct Examination - January 20, 2021

1   Q.   At a particular point in time during the interview, was he

2   asked about attachments that were submitted to e-mails?

3   A.   Yes, ma'am.

4   Q.   What did he tell you about those attachments?

5   A.   He told me that the mrdouble.com e-mail address was

6   unable.   That users were unable -- and by "users," I mean the

7   authors -- were unable to send attachments to one another,

8   pictures or videos.

9   Q.   Was he also asked about who owned the e-mail server?

10  A.   Yes, ma'am, I believe he was.

11  Q.   Who did he tell you owned that e-mail server?

12  A.   If I remember right, the same company in Amsterdam.

13  Q.   Now, with respect to the e-mails with attachments, was it

14  simply that they couldn't be sent or they couldn't be sent

15  directly to the end user?

16  A.   As far as I remember, and if I'm understanding Mr. Arthur

17  correctly, was that programs were written into the e-mail

18  service that would not allow attachments to be even attached to

19  the e-mail.

20  Q.   Did you also ask him about whether or not he had had to

21  remove any sort of authors in the past?

22  A.   I did.

23  Q.   What did he tell you?

24  A.   I remember that he would -- he told me he would remove

25  stories, but I don't specifically remember if he removed an

1  author or not removed.

2  Q.    Okay.

3          MS. MORRISON:  Your Honor, at this time the

4  government would move to admit Government's Exhibit 26M.  From

5  the defendant's entire interview, this is from one hour,

6  43 minutes in and 5 seconds through one hour, 47 minutes, and

7  16 seconds in.

8          THE COURT:  Mr. Bennett.

9          MR. BENNETT:  No objection, Your Honor.

10         THE COURT:  Government's Exhibit 26M is admitted

11  without objection and you may publish.

12         (Video played)

13  Q.   (BY MS. MORRISON)  Lieutenant Pearson, did you ask the

14  defendant about accepting or rejecting stories for publication

15  on the Web site?

16  A.    Yes, ma'am, I did.

17  Q.    What did he tell you about rejecting stories?

18  A.    Mr. Arthur told me that his criteria for rejecting a story

19  would be if the story, number one, was not considered erotic in

20  nature, the story would be rejected.  Or if the story did not

21  make sense, nonsense, I believe.

22  Q.    Was he asked about whether or not he had rejected any

23  stories in the recent past?

24  A.    Yes, ma'am, and he stated that he had in the last month

25  rejected one story.

Derek Pearson - Direct Examination - January 20, 2021

1  Q.   What was that story about?

2  A.   It was a story from a Dutch author in the Netherlands who

3  had written a story about environmental activist Greta

4  Thunberg.   And when asked why that story was deleted,

5  Mr. Arthur stated that the story contained so many spelling

6  errors and grammatical errors that it was almost illegible.

7  Q.   Was that the only reason it was rejected?

8  A.   I believe so, yes, ma'am.

9  Q.   Was it rejected because it didn't contain any erotic

10  material?

11  A.   I didn't read the story, ma'am, I don't know.

12  Q.   Fair enough.

13        Did you ask the defendant about what was required to

14  access full versions of the story?

15  A.   Yes, ma'am, I did.

16  Q.   What was required?

17  A.   A monthly membership fee was required.   Basically -- any

18  user could get on mrdouble.com and read a portion of the story,

19  or as Mr. Arthur described it as a teaser, at which point the

20  story would be cut off.   A subscription to mrdouble.com would

21  allow a user to view the story in its entirety.

22  Q.   Was the defendant asked about the operation of another Web

23  site?

24  A.   Yes, ma'am, he was.

25  Q.   Was that an adult Web site?

Derek Pearson - Direct Examination - January 20, 2021

1   A.   Yes, ma'am.

2   Q.   There was no illegal content on that Web site?

3   A.   As far as I know there was not any.

4   Q.   And that's not the basis of the charges here today?

5   A.   Yes, ma'am, that's correct.

6          MS. MORRISON:  Your Honor, at this time I would move

7   for the admission of Government's Exhibit 26F, which is taken

8   from one hour, 33 seconds through one hour, seven minutes and

9   42 seconds of the defendant's entire interview.

10         THE COURT:  Mr. Bennett?

11         MR. BENNETT:  No objection, Your Honor.

12         THE COURT:  So Government's Exhibit 26F is admitted

13  without objection.  You may publish.

14         (Video played)

15  Q.   (BY MS. MORRISON)  Did you ask the defendant what sort of

16  information he collected about the authors?

17  A.   Yes, ma'am, I did.

18  Q.   What did he tell you?

19  A.   Told me that he collects an e-mail address and age.

20  Q.   Okay.  Now I believe earlier we heard a clip where the

21  defendant referred to the images.  Did he use a specific term

22  with respect to those images?

23  A.   When asked about the images -- and just to clarify, that's

24  images of the avatars, he did.  He called them art.

25         MS. MORRISON:  Your Honor, at this time I would move

Derek Pearson - Direct Examination - January 20, 2021

 1  for the admission of Government's 26G.  This is taken from one

 2  minute -- excuse me -- one hour, 11 minutes, and 21 seconds and

 3  up through one hour, 12 minutes, and 23 seconds of the

 4  defendant's entire interview.

 5            THE COURT:  Mr. Bennett?

 6            MR. BENNETT:  No objection, Your Honor.

 7            THE COURT:  Government's 26G is admitted without

 8  objection.  You may publish.

 9            (Video played)

10  Q.   (BY MS. MORRISON)  When the defendant was asked about the

11  drawing associated with Netman169, what did he tell you?

12  A.   If I remember right, he claimed not to remember exactly

13  what that art was of.

14            MS. MORRISON:  Your Honor, at this time the

15  government would move to admit Government's Exhibit 26H.  And

16  this is taken from one hour, 13 minutes, and 6 seconds up

17  through one hour, 13 minutes, and 60 seconds of the defendant's

18  entire interview.

19            THE COURT:  So it will be like one hour and

20  14 minutes?

21            MS. MORRISON:  Four seconds short.

22            THE COURT:  56 seconds.  I thought you said 60.  I'm

23  sorry.

24            Mr. Bennett, then, 26H?

25            MR. BENNETT:  This is the one that's offered right

Ann M. Record, RMR, CRR, CMRS, CRI

Derek Pearson - Direct Examination - January 20, 2021

1  now?

2         THE COURT:  Yes, sir.

3         MR. BENNETT:  No objection.

4         THE COURT:  You said H; right?

5         MS. MORRISON:  Yes, sir.

6         THE COURT:  All right.  26H is admitted without

7  objection.  You may publish.

8         (Video played)

9  Q.   (BY MS. MORRISON)  Lieutenant Pearson, if you know, what

10 was taking place as you were doing the interview with the

11 defendant?

12 A.   While we were conducting the interview of the defendant,

13 the other agents were conducting the search warrant.

14 Q.   So this interview took place prior to the seizing and

15 downloading of the defendant's devices.

16 A.   Yes, ma'am.

17 Q.   How did the defendant describe what he did by operating a

18 Web site?

19 A.   He claimed that he was a service provider.

20 Q.   Was he asked whether or not he wrote stories?

21 A.   Yes, I believe he was.

22 Q.   What did he tell you?

23 A.   No, he said that he does not write stories.  That he's not

24 a very good writer.  But I think he used the word "illiterate"

25 in there, maybe borderline illiterate, something like that.

Derek Pearson - Direct Examination - January 20, 2021

1          MS. MORRISON:  Your Honor, at this time the

2  government would move for the admission of 26L.  From the

3  defendant's entire interview, this is one hour, 36 minutes and

4  38 seconds up through one hour, 36 minutes, and 44 seconds.

5          THE COURT:  Mr. Bennett?

6          MR. BENNETT:  No objection, Your Honor.

7          THE COURT:  Government's Exhibit 26L is admitted

8  without objection.  You may publish.

9          (Video played)

10  Q.   (BY MS. MORRISON)  At any point during your interview of

11  the defendant, did he ever tell you that he had written any

12  stories?

13  A.   No, ma'am.

14          MS. MORRISON:  Your Honor, at this time I would move

15  for the admission of Government's 26I.  From the defendant's

16  entire interview, this clip comes from one hour, 20 minutes,

17  and 34 seconds up through one hour, 20 minutes, and 52 seconds.

18          THE COURT:  Mr. Bennett?

19          MR. BENNETT:  No objection, Your Honor.

20          THE COURT:  Government's 26I is admitted without

21  objection.  You may publish.

22          (Video played)

23  Q.   (BY MS. MORRISON)  During the interview, did the defendant

24  ever make reference to the possibility of taking the Web site

25  down?

1  A.   Yes, ma'am, he did.  He said he thought about it several

2  times.

3  Q.   What did he say about why he thought about taking it down?

4  A.   I don't remember the reason why he thought about taking it

5  down.  I do remember him stating that income from the Web site

6  paid mortgages, but I don't remember a specific reason why.

7          MS. MORRISON:  Your Honor, at this time I would move

8  for the admission of Government's Exhibit 26K.  From the

9  defendant's entire interview, this clip comes from one hour,

10  27 minutes in up through one hour, 27 minutes, and 57 seconds.

11  So only 57 seconds, Your Honor.

12          THE COURT:  Mr. Bennett, 26K?

13          MR. BENNETT:  We have no objection, Your Honor.

14          THE COURT:  Government's Exhibit 26K is admitted

15  without objection.  You may publish.

16          (Video played)

17  Q.   (BY MS. MORRISON)  During the interview, was the defendant

18  asked about the role of his wife, Sandra Arthur, in the Web

19  site?

20  A.   Yes, he was.

21  Q.   And what did he tell you?

22  A.   He said that Sandra -- Sandra's name was put -- tied to

23  the Web site, whether it's put on the corporation or LLC or

24  whatever it was, to provide Sandra with an income in case

25  something were to happen to Mr. Arthur.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Q.   What did he tell you about when he started the Web site in

2  relation to his marriage?

3  A.   He stated that he had started the Web site before the

4  marriage.

5  Q.   What did he tell you about Sandra's knowledge of his

6  operation of the Web site?

7  A.   He spoke with her about the Web site.  She knew what the

8  Web site was about.  But as far as running the Web site, I

9  don't believe that he mentioned her knowledge in the business

10 part of it.

11        MS. MORRISON:  Your Honor, at this time I would move

12 for the admission of Government's Exhibit 26J from the

13 defendant's entire interview .  This clip comes from one hour,

14 21 minutes in and 35 seconds up through one hour, 22 minutes,

15 and 51 seconds.

16        THE COURT:  Mr. Bennett, 26J?

17        MR. BENNETT:  No objection to 26J, Your Honor.

18        THE COURT:  Government's Exhibit 26J is admitted

19 without objection.  You may publish.

20        (Video played)

21        (Sotto voce discussion)

22        MS. MORRISON:  Your Honor, I have no further

23 questions for this witness.

24        THE COURT:  Thank you.

25        Ladies and gentlemen of the jury, what you just

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  watched with the Exhibits 26A through R are video and audio

2  recordings.  Those exhibits include typewritten transcripts of

3  the oral conversations which can be heard on the recording in

4  each of the clips received in evidence.  The transcripts also

5  purport to identify the speakers engaged in those

6  conversations.  I've admitted the transcript along with the

7  exhibits for the limited and secondary purpose of aiding you in

8  following the content of the conversation as you watch and

9  listen to the recordings and also to aid you in identifying the

10  speakers.

11          You're specifically instructed that whether the

12  transcript correctly or incorrectly reflects the contents of

13  the conversation or the identity of the speakers is entirely

14  for you to determine based upon your own evaluation of the

15  testimony you have heard concerning the preparation of the

16  transcript and from your own examination of the transcript in

17  relation to your hearing of the recording itself as the primary

18  evidence of its own contents.  And if you should determine that

19  the transcript in any respect is incorrect or unreliable, you

20  should disregard it to that extent.  It is what you hear on the

21  recording that is evidence, not the transcripts.

22          Mr. Bennett, your witness.

23          MR. BENNETT:  Thank you, Your Honor.  May I have

24  five seconds with my co-counsel, please?

25          (Sotto voce discussion)

Derek Pearson - Cross-Examination - January 20, 2021

1                          **CROSS-EXAMINATION**

2    BY MR. BENNETT:

3    Q.   Hi, Lieutenant Pearson.   I'm Mark Bennett.   I don't

4    believe we've met.

5    A.   No, sir.

6    Q.   Good afternoon to you.

7    A.   Good afternoon to you.

8    Q.   Would you agree with me that what was presented in audio

9    and video snippets was not the entire questioning of

10   Mr. Arthur?

11   A.   That's correct.   It was portions.

12   Q.   And while the exhibits are labeled in order -- that is, A,

13   B, C, D, E, and so forth -- go in time order, they weren't

14   presented to the jury in that order just then.   That is -- bad

15   question.   I'm sorry.

16          The government presented to the jury, for example,

17   Government's Exhibit 26H and then 26L and then 26J.

18   A.   Yes, that's correct.

19   Q.   Whereas the natural chronological order of the exhibits

20   when the jury goes back to the jury room if they want to watch

21   them is H, I, J, K, L.

22   A.   That's correct.

23   Q.   And would you agree with me that in several of these

24   exhibits we can see from the transcript that the audio portion

25   is cut off mid-sentence -- when Mr. Arthur is mid-sentence.

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  A.   Yes, sir.

2  Q.   All right.

3           MR. BENNETT:  I'll pass the witness, Your Honor.

4           THE COURT:  Redirect?

5           MS. MORRISON:  I have nothing further, Your Honor.

6           THE COURT:  Thank you, sir.  Remember the rule, not

7  to speak with anyone except the lawyers until the case is

8  resolved.  Thank you so much.

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Your next witness?

11          MR. BERRY:  United States calls Sandra Arthur.

12          THE COURT:  Everybody okay?  Ready for a break now or

13  do you want to wait?  You're ready for a break.  All right.

14  Very good.  I appreciate your honesty.  That was a pretty heavy

15  headshake yes.

16          Remember your instructions.  You're going to leave

17  your notebooks here.  If you're like me, I drink too much iced

18  tea usually for lunch, and so I take a break anyway.  But we're

19  going to take a little bit longer break, not much, but we'll go

20  till 3:15.  We'll come back no later than 3:15.  We're going to

21  stay here and do some work while you're out.

22          You notebooks will stay here.  Remember your

23  instructions.  You've not received the case for deliberation.

24  I know you're getting tired of hearing me say that, but it's

25  critically important.  That's why I say it.  You're not to

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  discuss the case yet or express any opinion or seek anything

2  like that.

3          So with that, let's rise for the jury.

4          Y'all have a nice break.  See you at 3:15.

5          (Jury leaves at 2:54 p.m.)

6          THE COURT:  All right.  Please be seated.

7          Ms. Morrison, Mr. Berry, anything y'all want to take

8  up outside the presence?

9          MR. BERRY:  No.

10         THE COURT:  Mr. Bennett?

11         MR. BENNETT:  I think I've formulated what it is that

12 I'm looking for; I did it inartfully before.

13         THE COURT:  Okay.

14         MR. BENNETT:  Is there a way that the defense can get

15 digital copies of the admitted exhibits that are not

16 contraband, admitted -- already admitted digital exhibits that

17 are not contraband?

18         THE COURT:  Of 26A through R?

19         MR. BENNETT:  As well as some other earlier video

20 exhibits, but 26A through R, yes.

21         THE COURT:  So my first question is:  Has all this

22 been given to the defense?

23         MR. BERRY:  Yes, Your Honor.

24         THE COURT:  All right.  So you've got it.  The

25 question you're wanting to know is:  Can you get the individual

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  clips?

2          MR. BENNETT:  In the same form that the jury has

3  them, yes, Your Honor.

4          THE COURT:  And I think that would be between the

5  parties.  That's what I was inartfully trying to say.  That's

6  between the parties.  I'm not going to order you to give them

7  specific exhibits or them to give you specific exhibits

8  especially since you already have the exhibits.  So if you-all

9  can work out -- I'm not sure why -- I mean, you can use the

10  exhibits that are in evidence because they're in evidence.  I

11  guess I'm lost as to what you need.

12          MR. BENNETT:  And there is a disconnect here because

13  I'm lost as to why I can't have a copy of the exhibits that are

14  in evidence.  They're in the court's --

15          THE COURT:  Sure they are.

16          MR. BENNETT:  I suppose they're in the court's

17  possession.

18          THE COURT:  And you have access to them, but I'm not

19  going to make copies for everyone of the exhibits.  The

20  exhibits are in evidence.  You have access to those.  So if you

21  want to play those, you're welcome to play those.

22          MR. BENNETT:  Okay.

23          THE COURT:  What am I missing, Mr. Bennett?  I'm

24  sorry I'm not communicating.

25          MR. BENNETT:  We're just not gelling here, Your

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  Honor.  So that I'm clear, what I'm looking for is I have a

2  flash drive in my hand.  What I would like is copies from the

3  clerk or from the government of the non-contraband exhibits

4  that are digital that have been admitted into evidence.

5          THE COURT:  Mr. Berry, Ms. Morrison.

6          MR. BERRY:  I guess I don't understand why we have to

7  provide -- we provided the exhibit list.  We provided all of

8  the content that is coming into trial has been provided in

9  spades for a year now, especially this exhibit has been

10 provided.  In 2019, it was given to him.  We specifically

11 designated the portions.  At any point he could have gone back

12 and clipped those portions himself if he wanted them spliced up

13 the way we were going to do that.  We gave that notice when we

14 didn't have to do that.

15         We said the reason that we did that was for the rule

16 of completeness.  What we anticipated was kind of what he was

17 alluding to there but didn't actually do and will probably do

18 in closing argument is say, Well, what did they not show you?

19 What didn't they play for you?  What about that?  What about

20 this?  And so the opportunity was for him to come in and say,

21 You know what?  I think the government spliced it too narrow.

22 I think you need to expand this clip.  And he would have to

23 explain -- the burden is on him at that point to explain,

24 qualify, or place into context under Rule 106 why it needs to

25 be expanded.  He didn't do that.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1    We gave that.  We didn't have to do that.  But we did

2 that in our trial brief to try to make things smoother at trial

3 so that he would know, Hey, this is the way we're going to chop

4 this up.  If you don't think that's appropriate, then tell us

5 and tell the Court, Hey, you need to expand that clip.

6    THE COURT:  And that was given in the trial brief a

7 couple of weeks ago; right?

8    MS. MORRISON:  Yes, Your Honor, the same trial

9 memorandum that we attached the stipulation that we had all

10 signed.

11    THE COURT:  Which I think I've read.

12    MS. MORRISON:  Yes, Your Honor.

13    THE COURT:  So, Mr. Bennett, how does this not assist

14 you?  What do you need to assist you?

15    MR. BENNETT:  I'm trying to understand what the legal

16 obstacle is to me having a digital copy of something that is

17 part of the official record in the case, which is the exhibits

18 edited and transcribed the way that the government has edited

19 and described them.

20    THE COURT:  And I'm telling you you have access to

21 these that are in the record, that are in evidence.  I'm not

22 making copies for anybody of the exhibits.  Those are the

23 exhibits of the trial.  You have everything you're asking for,

24 everything.  And so I don't understand why we're arguing about

25 it.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1         MR. BENNETT:  I think we're not arguing, you and I,

2   Your Honor.  We're trying to get on the same page and thank you

3   for that.  I think Mr. Berry is trying to read my mind about

4   what I intend to do.

5         THE COURT:  Sure.

6         MR. BENNETT:  I have access to them here in the

7   courtroom; correct?

8         THE COURT:  Certainly.

9         MR. BENNETT:  Yes, while the jury is out.  I would

10  like broader access to them so that I can consider and think

11  about them and how they incorporate into my closing argument

12  this evening, for example, when I'm back at my hotel.

13        MR. BERRY:  He has the recording and the designated

14  clips.

15        THE COURT:  And you had those.  All you had to do was

16  cut them up yourself the way that the government cut them up

17  and the way they told you they're going to cut them up before

18  they did it even -- or I don't know if it was before you did

19  it.  Before -- two weeks before trial or so.

20        MR. BENNETT:  Except, Your Honor, that I can't do

21  that and -- and this is looking at it now in hindsight because

22  the government specified their time by seconds.  And in less

23  than a second, a witness can say -- a person on the recording

24  can say more words.  So I can't tell from what they gave me in

25  the trial memorandum whether it cuts off at the beginning of

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the 57th second of the 28th minute or at the end, which makes a

2  difference because in that second --

3          THE COURT:  All right.  Because the Court -- I'll

4  deny anything you want me to deny.  If you're trying to get an

5  adverse ruling, you got it.  I just don't see anything that you

6  need that you don't already have without the Court or the

7  government or someone doing this for you.  This is something

8  the defense easily could have done well before trial.

9          The answer is, no, we're not going to go any further

10 on this.  I would like you-all to be able to take a break and

11 refresh as well.  So if you're looking for the adverse ruling,

12 Mr. Bennett, you've got it, I guess, although I still don't

13 really believe you've made it clear as to what you need and

14 why.

15         MR. BENNETT:  Okay.  I've done my best.  Thank you.

16         THE COURT:  Let's take a break.  Thank you.

17         (Recess from 3:01 p.m. to 3:17 p.m.)

18         THE COURT:  Mr. Berry, anything you want to take up

19 before we bring the jury in?

20         MR. BERRY:  No, Your Honor.  Just for the Court's

21 tracking purposes, next up is Sandra Arthur, and then the only

22 other witness after that is the new case agent, Special

23 Agent Alice Downie and then the United States will rest.

24         THE COURT:  Okay.  And I assume Ms. Arthur is not

25 going to be real, real, real long.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1          MR. BERRY:  I do not believe so.

 2          THE COURT:  Okay.

 3          Mr. Bennett or Mr. Haygood, anything you-all would

 4 like to take up before we bring the jury in?

 5          MR. HAYGOOD:  I don't believe so, Your Honor.

 6          MR. BENNETT:  No, Your Honor.  Thank you.

 7          THE COURT:  Thank you.

 8          All right.  Let's bring the jury in, please.

 9          (Jury enters at 3:18 p.m.)

10          THE COURT:  Please be seated.  Thank you.

11          Next witness, Mr. Berry, is Sandra Arthur, I think

12 you said.

13          MR. BERRY:  Yes, sir.  The United States calls Sandra

14 Arthur.

15          THE COURT:  Has she been instructed on how she comes

16 in?

17          MR. BERRY:  She has not.

18          THE COURT:  Let's just make sure she knows how to do

19 that.

20          Ma'am, if you would just come on up and towards

21 Mr. Berry and walk by him.  Yeah, go ahead and walk by him.

22 And before you settle in, go ahead and come on up to the stand,

23 put your bottle down, and if you would raise your right hand

24 and be sworn, please.

25          (Witness sworn by the clerk at 3:20 p.m.)

Sandra Arthur - Direct Examination - January 20, 2021

1          THE COURT:  Thank you.  You may have a seat.  And if

2    you feel comfortable you're welcome to take off your face

3    covering.

4          THE WITNESS:  Okay.

5          THE COURT:  I'll tell you also as you're sitting down

6    that the rule has been invoked.  All that means is you're now

7    under what they call the rule -- what we call the rule.  It

8    means you're unable to be in here unless you're testifying.

9          THE WITNESS:  What?

10         THE COURT:  You're unable to be in the courtroom

11   unless you're testifying, which is like right now.  You can't

12   hear other people testify.  But also you're to speak with only

13   the attorneys about the case until the case is over --

14         THE WITNESS:  Okay.

15         THE COURT:  -- the trial.  Thank you very much.

16         Mr. Berry, you may proceed.

17                        **SANDRA ARTHUR,**

18         **GOVERNMENT'S WITNESS SWORN AT 3:20 p.m.**

19                      **DIRECT EXAMINATION**

20   BY MR. BERRY:

21   Q.   Good morning, Sandra.  How are you?

22         THE COURT:  Afternoon.

23   Q.   (BY MR. BERRY)  Good afternoon.

24   A.   Good afternoon.

25         (Laughter)

Ann M. Record, RMR, CRR, CMRS, CRI

1          MR. BERRY:  Is it already afternoon?  I thought we

2   just started.

3   Q.   (BY MR. BERRY)  If you would -- you have a very soft

4   voice.  I've talked to you a few times.  If you'll lean into

5   that mic but just don't touch it.

6   A.   Okay.

7   Q.   And it will be good for everyone in the courtroom if you

8   would do that.

9          Thank you for being here.  You came a long way.

10  Where did you come from?

11  A.   Hawaii.

12  Q.   Hawaii.  That's where you're living now?

13  A.   Yes.

14  Q.   Okay.  A couple of things I want to get out of the way

15  first.  What is your relation to the defendant?

16  A.   I am his wife.

17  Q.   And how long were y'all married?

18  A.   Around 16 years.

19  Q.   Or currently married; correct?

20  A.   Yes.

21  Q.   Do you have an attorney appointed in this case?

22  A.   Yes.

23  Q.   And why did you get an attorney in this case?

24  A.   To protect myself and to know what my rights are.

25  Q.   And have you testified before the grand jury in this case

Sandra Arthur - Direct Examination - January 20, 2021

1  already?

2  A.    Yes.

3  Q.    And at that time did you invoke your Fifth Amendment right

4  to remain silent?

5  A.    Yes.

6  Q.    And did this Court issue an order ordering you to testify

7  under a grant of immunity?

8  A.    Yes.

9  Q.    And did you, in fact, testify before the grand jury?

10  A.    Yes.

11  Q.    And are you prepared to do so here today?

12  A.    Yes.

13  Q.    All right.  You said that you married Tom Arthur how many

14  years ago, roughly?

15  A.    16.

16  Q.    Okay.  And you're still currently married; correct?

17  A.    Yes.

18  Q.    Have you filed for a legal separation, a type of divorce

19  from the defendant?

20  A.    Yes.

21  Q.    And has that been since this case began at some point?

22  A.    Yes.

23  Q.    If you would please describe the property that you and the

24  defendant were living on during the entirety of your marriage?

25  A.    It's -- originally, I think it was -- I'm not sure exactly

Sandra Arthur - Direct Examination - January 20, 2021

1  how many acres, between 250 and 325 acres.  Not all of it is

2  touching each other.  It's 65 miles south of Alpine.  Do you

3  want like me to describe the house?

4  Q.   Well, you said 65 miles south of Alpine.  And is it north

5  of another small community out there?

6  A.   Yes.  It's north of Study Butte about, I think, 15 miles.

7  Q.   Okay.  And approximately how close is your closest

8  neighbor out there?

9  A.   I used this last time.  It's approximately, I'm going to

10 say, about from the main house, let's say the circumference is

11 about a mile.  So you know what a circumference is versus a

12 radius?

13 Q.   Sure.

14 A.   So it's about a mile.

15 Q.   Across the circle as opposed to half a circle?

16 A.   Correct.  Circumference -- about a mile circumference.

17 Q.   So I can remember my geometry.

18        So about a mile by the crow flies basically to the

19 next house or what?

20 A.   There are some buildings, but there's nobody in them.

21 Some of them -- our neighbor passed away, one of the neighbors.

22 And some aren't -- some are snowbirds.  They don't come but

23 once a year.

24 Q.   Okay.  And does the property have any kind of security

25 features for any -- any type of security features?

Sandra Arthur - Direct Examination - January 20, 2021

1   A.   We have gates and we have cameras.

2   Q.   And do you know how many security cameras are on the

3   outside of the property?

4   A.   Outside of the house?

5   Q.   Yes.

6   A.   At the gate, there's -- I think there's one at the gate.

7   There might have been two.  And then there are a lot around the

8   house on the outside.

9   Q.   Just around the outside of the house?

10  A.   Outside.  And as well as the inside of the house as well.

11  Q.   Okay.  And the gate, did it remain locked most of the time

12  when you were there?

13  A.   Yes.

14  Q.   Did you permit UPS or FedEx to come up to the house, or

15  did they leave packages out at the gate?

16  A.    In the beginning, they would come in.  Our original UPS

17  guy would drive in and drop it off.  When he retired, the UPS

18  driver that took over preferred to just drop it off so he -- it

19  would save him time for driving a mile in and then driving out.

20  So I think that's what he did.  He would drop them off, you

21  know, at gates instead of driving all the way into properties.

22  Q.   Okay.  If you would please describe the interior of the

23  house in terms of the work space that the defendant utilized.

24  A.    It was his office.  He had cameras in there.  He had

25  computers, and he had -- I guess they call them towers, tower

Sandra Arthur - Direct Examination - January 20, 2021

1  computers.  I think there were several of them in there.  A
2  couple towers which had several drivers and...
3  Q.   I'm showing what's already in evidence as Government's
4  Exhibit 16K.  Do you see that?
5  A.   Yes.  Yes.
6  Q.   Do you recognize it?
7  A.   Yes.
8  Q.   What is it?
9  A.   It's Tom's office.
10 Q.   Can you tell the ladies and gentlemen of the jury anything
11 about this office, anything that stands out to you as
12 significant for his work or anything like that for running the
13 Web site?
14 A.   You mean like the computers?
15 Q.   Yes.
16 A.   There's computers on his desk.  There's several monitors.
17 He had -- monitors are not the same as computers because you
18 can have several monitors with using one computer.  You can
19 switch back and forth to different programs.  It's a little
20 confusing.
21 Q.   Got it.  All right.  Let's look at another one.  16 -- oh,
22 this is just a wider shot of the same room; is that correct?
23 A.   Yes.
24 Q.   And this was basically his office, is that what you said?
25 A.   Yes.

Ann M. Record, RMR, CRR, CMRS, CRI

Sandra Arthur - Direct Examination - January 20, 2021

1   Q.   Did you ever work in this space?

2   A.   No.

3   Q.   Is this -- what is this picture here, 16N, now I'm showing

4   you?

5   A.   It looks like his desk.

6   Q.   Okay.  What is this up here?

7   A.   What, the monitor?

8   Q.   Yes.  What is that monitor displaying?

9   A.   I can't see it from here.

10  Q.   Do you know if that's where he had the security cameras

11  coming into?

12  A.   Oh.  He had -- on the right, he had -- the security

13  cameras were coming on the monitor on the right.

14  Q.   Okay.

15  A.   Move over to the right.

16  Q.   This one?

17  A.   Yeah, that one, I think.  That's the one I believe it was

18  on.  And I don't remember what that monitor was for.

19  Q.   That's fine.

20       Do you know what this room or space was?  I'm showing

21  16L, for the record.

22  A.   Is that the kitchen?  It looks like the kitchen.

23  Q.   Do you see some like office-type equipment over here?

24  A.   It's hard for me to see from here.

25  Q.   Would it be helpful if you came -- well, let's see.

Sandra Arthur - Direct Examination - January 20, 2021

1  Actually, if you'll open your exhibit binder, there's --

2           MR. BERRY:  Can I go up there, Your Honor?

3           THE COURT:  Yes, sir.

4           You have several binders.  Let him come help you.

5  Q.   (BY MR. BERRY)  All right.  If you would turn to 16L --

6  A.   Okay.

7  Q.   -- in that binder we just opened up.

8  A.   Okay.  I see it.

9  Q.   Do you recognize that now?

10 A.   Yes.

11 Q.   What is it?

12 A.   That is the space I worked in.

13 Q.   Okay.  So tell us a little bit about that space.

14 A.   The space there is one computer there, and there is a

15 laptop.  The laptop wasn't always there.  It was there shortly

16 before the FBI came.  There's printers over there.  And the

17 main computer that was mine, it had gotten a Trojan horse on it

18 and it -- Tom had to use some programming or some equipment,

19 and he had to -- the Trojan locked it up where I was unable to

20 get in there.  So he did this where it could never be locked.

21 So if you would go online, it's very dangerous.  I think that's

22 what this equipment he used did.

23 Q.   Okay.

24 A.   But I did -- I had Photoshop on it.

25 Q.   And we'll get to some of that in a second.

Sandra Arthur - Direct Examination - January 20, 2021

1           Tell the ladies and gentlemen of the jury a little

2 bit about the Mr. Double Web site, what you knew about it, and

3 what your involvement was?

4 A.   Mr. Double Web site was an adult story site, and I did

5 banners for him as well as -- I think I mainly did banners on

6 that Web site for him.

7 Q.   When you say "an adult story Web site," what do you mean

8 by that?

9 A.   Stories are sexual in content.

10 Q.   They're not stories about adults?  They're stories for

11 adults?  What do you mean?

12 A.   Yeah, they're stories for adults.

13 Q.   Okay.  And do you know what the stories were about,

14 generally speaking?

15 A.   Sex.  Sexual encounters with underage characters and

16 children in the story.

17 Q.   Did the Mr. Double Web site make money for you two?

18 A.   Yes.

19 Q.   And was it your primary source of income?

20 A.   Yes.

21 Q.   Is that -- was the income from the Mr. Double Web site

22 over the course of your marriage, is that what funded the

23 purchase of a lot of the property and assets that you have

24 there?

25 A.   Yes.

Sandra Arthur - Direct Examination - January 20, 2021

1  Q.   From the money from that, were you able to buy additional

2  acres?

3  A.   Yes.

4  Q.   And items for the house and the house itself.

5  A.   Yes.

6  Q.   In fact, the main house is a manufactured housing; right?

7  A.   Correct.

8  Q.   Okay.

9  A.   But Tom, you know, he did all of the finances and so he,

10  you know, knows everything about that better than I do --

11  Q.   Sure.

12  A.   -- because did he all that.

13  Q.   Sure.  But is it your understanding that that's where all

14  the money came from --

15  A.   Yes.

16  Q.   -- the income from that Web site?

17  A.   Yes.

18  Q.   Okay.  How was the money received on the Web site?  Do you

19  know how it came in?

20  A.   It came in through credit cards, also mail-in checks.

21  Q.   Some people would mail you checks.  Was there a

22  subscription?

23  A.   Yeah.

24  Q.   Would it come to the house or somewhere else?

25  A.   It would go to a mailbox.  A company that forwards mail to

Sandra Arthur - Direct Examination - January 20, 2021

1  their customers.

2  Q.    And where was that mailbox located?

3  A.    He had -- he had a couple.  One was -- I don't remember

4  where it was, but it was an Indian guy.  And then another one

5  was in Midland, and then the third one was -- I think was in

6  Michigan.

7  Q.    Okay.  So people -- you would give that address out on the

8  site.  People would submit a check there.

9  A.    Yes.

10  Q.    When it's not coming -- you don't have random people

11  sending checks to your house.

12  A.    Correct.

13  Q.    Okay.  Where was that money deposited once it came in

14  either through mail or the Internet?

15  A.    Into a bank account.

16  Q.    And where was that bank account for part of the time?

17  A.    Fort Davis.

18  Q.    Did you end up having trouble with banks that caused you

19  to have to -- lose certain bank accounts?

20  A.    Yes.

21  Q.    Tell the jury about that.

22  A.    He received a letter from Fort Davis asking him to come

23  in.  They wanted to talk to him.  And he said he wasn't going

24  to go.  And so they closed the account.

25  Q.    So then did you have to do banking somewhere else?

Ann M. Record, RMR, CRR, CMRS, CRI

1  A.   Yes.

2  Q.   Okay.  Were there any d/b/a's created over the course of

3  the marriage related to the businesses?

4  A.   Yes, I believe so.  I do know of at least one, maybe two.

5  Q.   Could you explain to the jury what a d/b/a is?

6  A.   It's doing business as.

7  Q.   And what were those d/b/a's?

8  A.   Okay.  I think Mr. Double was the main one.  And then he

9  had AOK Contractors was a d/b/a of Mr. Double.  And then there

10 is a change.  And I don't know if he closed Mr. Double and then

11 he started the Spring Branch.  And then whether Spring Branch

12 is now the main one and not a d/b/a.  So I think there is

13 only -- I think AOK was the only d/b/a.

14 Q.   When you say "Spring Branch," did you mean Spring Creek?

15 A.   Yeah, I mean Spring Creek.

16 Q.   And did that ultimately get changed to SC Prod?

17 A.   Yes.

18 Q.   And why were those individuals -- the various entities,

19 why were they created?

20 A.   To do business.  So he could do business.

21 Q.   Was there a reason that they needed to be in those names

22 as opposed to the Mr. Double name?

23 A.   I don't know.  I do know that he did have the AOK Contract

24 d/b/a because a lot of the mail members, they could -- their

25 wives wouldn't know what they were members of.  It was to give

Sandra Arthur - Direct Examination - January 20, 2021

1  them a little -- I don't know what you would call that, but
2  give them a little secrecy of what they're spending their money
3  on so their wives aren't aware -- if they see AOK, then it's
4  not a question for the wife.
5  Q.   And is that because of the content of the Web site?
6  A.   Yeah, I think so.
7  Q.   About how much money did the Web site make for you guys,
8  roughly speaking, per year or per month?
9  A.   For the last year?
10 Q.   However.  However, you want to define it.
11 A.   When he first started, he did very well.  He made 50,000
12 his first month.  Then it slowed down.  And then it -- it began
13 to slow down.  And because of what's going on politically and
14 with laws, he lost a lot of members.  And then members started
15 coming back again.  And I would say the average is about 12,000
16 a month.
17 Q.   About 12,000 a month?
18 A.   Uh-huh.
19 Q.   And, again, the contents of the Mr. Double site were text
20 stories, generally speaking?
21 A.   They're all text stories, I believe.
22 Q.   And they involved sexually explicit conduct?
23 A.   Yes.
24 Q.   And did they all, to your knowledge, include children?
25 A.   Yes.

Sandra Arthur - Direct Examination - January 20, 2021

1  Q.  Do you know how young some of the kids were that were

2  depicted in these stories?

3  A.  He told me there were some stories that -- you know,

4  two years old, I think babies.  Some were babies.

5  Q.  Did you like any of these stories?

6  A.  No.

7  Q.  Did you spend any time reading them?

8  A.  No, I didn't.  I did read one, and it was because one of

9  the authors wrote it for me, and he wanted me to read it and

10  to -- authors are -- was one of the most important things for

11  that site because it's your content.  So he wanted me to read

12  it and to comment to the author, and I read some of it.  I

13  didn't read the whole thing because I don't like that kind of

14  stories.

15       And it's hard -- you know, authors know when you

16  don't read their stories.  It's hard to, you know, give a

17  compliment on something that you really don't like, you know.

18       And I think there's one other story I read a partial

19  of.

20  Q.  And did that story involve sex with children?

21  A.  It was underage, but I don't think it was like -- I don't

22  remember.  I think it was like a 17-year-old.  I just read a

23  part -- you know, I didn't really read any of those stories.

24  He maybe mentioned it to me or showed, Oh, look at this.  You

25  know, this is a good story.  And he would -- he did that once

1   or twice but not very often.

2   Q.   Okay.  And did you know if your -- if the defendant ever

3   wrote any stories?

4   A.   Yes.

5   Q.   Do you know roughly how many?

6   A.   I don't know.  He said he had written a couple.

7   Q.   Do you know much about those stories at all?

8   A.   No, he didn't really get into it.  He just mentioned

9   early, early on that he tried his hand at writing, he said, and

10  wrote a couple stories.

11  Q.   Okay.  And was it your understanding that the majority of

12  the Mr. Double site was dedicated to these underage sex

13  stories?

14  A.   That's what I believe is true.

15  Q.   At some point did he start changing the paperwork to be in

16  your name?

17  A.   Yes, we did.

18  Q.   Explain that to the jury.

19  A.   I think it was -- it had all to do with having a

20  processor.  And so we had lost the processor, and we were

21  having difficulties getting a processor.  So we put it in my

22  name, and I was given a merchant account and was able to start

23  processing again.

24  Q.   So go ahead and explain the way that works for those on

25  the jury who may not be familiar with how a site -- a Web site

Sandra Arthur - Direct Examination - January 20, 2021

1  makes money, how does the financial part of it work?  You

2  referenced some technical terms there.

3  A.    Okay.  A merchant account is -- okay.  You have the Web

4  site.  Someone wants to buy something.  They want to use their

5  credit card.  They click on to pay with a credit card.  That

6  information goes through a processor first which has filters.

7  Like it can stop certain cards from going through if they're

8  reported stolen, if they're from certain countries that have

9  high fraud, and there is a bunch of filters that the processor

10 runs these cards through.

11         Then once it passes this, it goes into a merchant

12 account where the money is deposited.  Then the merchant

13 account will -- I don't know, weekly, or there's some agreement

14 will deposit into your business account.

15 Q.    When you say "your business account," is that like your

16 bank account at Fort Davis State Bank?

17 A.    When it was there.

18 Q.    So that's the way that processor worked.

19 A.    Right.

20 Q.    The merchant account, the payment processor, and then it

21 ultimately ends up in a bank account that you can access?

22 A.    Yes, that you can access.

23 Q.    And that's where you go to the ATM and take money out, if

24 you wanted.

25 A.    Yeah.

Sandra Arthur - Direct Examination - January 20, 2021

1  Q.   Okay.  Whereas the merchant account and payment process,
2  that's not something you can access personally; correct?
3  A.   You can access the payment processing but not the merchant
4  account.
5  Q.   Okay.
6  A.   So you have a dashboard and you can add more filters, and
7  I never saw the dashboard.  He would -- did he all that on the
8  dashboard.  So I don't know exactly what was on the dashboard.
9  All I know is that there's information there, and there is --
10  you can access the processor and make adjustments.  But once it
11  goes to the merchant account, you can't -- that's the bank -- a
12  solid bank, and you can't access it until they deposit it into
13  your bank account.
14  Q.   And then at some point -- and you mentioned this earlier
15  so we're coming back to it.  Explain to the jury what you meant
16  when you said something about you lost the merchant bank or the
17  merchant account or the processor.  Explain what happened
18  there.
19  A.   They would see that the site had underage stories, and
20  they would give him sometimes two weeks to find a new account
21  or the last one they just stopped it.  They didn't give him
22  two weeks to find a new account.  So they would see what the
23  content was, and then they would give him usually two weeks to
24  find a new account.
25  Q.   When you say "the content," again, what do you mean?

Sandra Arthur - Direct Examination - January 20, 2021

1  A.    The stories, underage stories.

2  Q.    About sex with children?

3  A.    Yes.

4  Q.    Did the defendant have any limit to the type of content he

5  would post?

6  A.    No.

7  Q.    Did he say, well, if it's a certain kind of violence, he

8  won't post it?

9  A.    He said he --

10         MR. BENNETT:  I'm sorry, Your Honor.  I have to

11  object.  This is the matter of a Motion in Limine that hasn't

12  yet been fully addressed.

13         THE COURT:  All right.  Let's approach.

14         (On-the-record sidebar conference)

15         THE COURT:  Outside the presence of the jury.  Go

16  ahead.

17         MR. BENNETT:  Yes, Your Honor.  We're getting into

18  explicit spousal communications now.  It was the subject of a

19  Motion in Limine.  In our Motion in Limine hearing, we

20  discussed the marital privilege, which is Ms. Arthur's which

21  she has waived, I believe.  We haven't yet determined whether

22  the predicate has been laid for spousal communication -- for

23  Mr. Arthur's spousal communications to come in, and he would

24  invoke that privilege as far as he can.

25         THE COURT:  Mr. Berry.

Sandra Arthur - Direct Examination - January 20, 2021

1        MR. BERRY:  Yes, Your Honor.  I think the predicate
2   has been laid -- the predicate has been laid now in the sense
3   that she's talked about her involvement with working on the Web
4   site.  Her knowledge, her making banners for the home page, and
5   her general involvement with the Web site and what she knew
6   about her knowledge of the merchant bank accounts and the
7   payment processes shows a level of involvement that would
8   certainly make her culpable and, therefore, would come within
9   the exception to the crime exception such that she should be
10  permitted to testify.
11       THE COURT:  I agree.  So the Motion in Limine is well
12  taken, but at this time it's obviously overruled, and you're
13  welcome to go into that.
14       MR. BENNETT:  Thank you.
15       THE COURT:  Yes, sir.
16       (On-the-record sidebar conference concluded)
17  Q.  (BY MR. BERRY)  Okay.  Ms. Arthur, we were talking about
18  whether he had any limits to the type of content that he would
19  include on the Web site.  And you started to say, He told me or
20  he said something.  Go ahead.  What were you going to say?
21  A.  He would say that he would not reject any story.  That he
22  never censored or edited stories, and he accepted all stories.
23  Q.  So no matter how degrading or humiliating to the child,
24  that's fine with him.
25  A.  He would post it.

1  Q.   If -- as for all the stories, were you involved in saying

2  yes or no whether the stories would go on the Web site?

3  A.   No, I never was -- had anything to do with that.

4  Q.   Who had the authority to grant or deny an author's

5  submission?

6  A.   Tom Arthur.

7  Q.   Was he the only one that worked for Mr. Double that could

8  do that?

9  A.   I believe so.

10  Q.   And so if a story comes in, the author -- does the author

11  post it to the site themselves or do they have to submit it to

12  Tom to review?

13  A.   They submit it to him.  Then he has to upload it.

14  Q.   So he controls everything.

15  A.   Yes.

16  Q.   Same with on an author page if there was like a little

17  drawing or a picture of some kind on there, would he have

18  approved that?

19  A.   He would have had to upload it and posted it.

20  Q.   Again, the authors don't have the ability to put things on

21  their own pages.

22  A.   No, they can only submit things.  But that's that I know

23  of.

24  Q.   Sure.  And that's all you can testify to.

25         When it comes to these authors, did he have a certain

1  level of trust with some of them?

2  A.    I think he did.

3  Q.    Explain that to the jury.

4  A.    Certain trust, that might not be an accurate word.  If --

5  he spoke with some of them and he liked some of the -- some

6  authors that he communicated with that were more intelligent, I

7  would say.

8  Q.    Did he ever have any of them house-sit for you?

9  A.    Yes.

10  Q.    Explain that to the jury.

11  A.    We left -- we did -- we went to San Francisco.  And one of

12  his authors, she came and house-sitted because of the property

13  being so desolate someone has to watch it.  We have pets and

14  his computers are there.  So she -- we went to -- this is in

15  the beginning when we -- I had surgery in -- I think

16  San Francisco, and it was part of like -- we never had a

17  honeymoon so it was a combination honeymoon and surgery.

18  Q.    Did you take another trip to Florida?

19  A.    Yes.  Yes.  And he had another male author who sat -- and

20  he was a friend of Tom's, I would say, because he had come to

21  the house and visited us before.  And I think he was the only

22  author that did that.

23  Q.    Okay.

24  A.    So he sat for us.

25  Q.    So two authors or only one.

Sandra Arthur - Direct Examination - January 20, 2021

1  A.    Two.  At two different times.

2  Q.    Right.  And they were both authors on the Web site?

3  A.    Yes.

4  Q.    And did they live near you guys in Terlingua, or did they

5  come from a distance away?

6  A.    They came from a distance away.

7  Q.    Like out of Texas, or do you know?

8  A.    One I think is in Texas, and I don't remember where Red

9  Rose is from.

10  Q.    Okay.  Red Rose is the author name?

11  A.    The female one.  I don't remember her real name.

12  Q.    Okay.  Why do you think that he only had authors from his

13  Web site house sit when y'all went on vacation?

14  A.    I think he trusted them to an extent.

15  Q.    So then maybe "trust" is the right word.

16  A.    Yeah, I'm sorry, maybe.

17  Q.    Okay.  No, if I use the wrong word, tell me.  I appreciate

18  it.

19          Was your husband's computer password protected?

20  A.    Yes.

21  Q.    Did he give you the password?

22  A.    Never.

23  Q.    Do you remember where the Web site was hosted?

24  A.    Yes.  It was in Europe.  It's either in Belgium or

25  Netherlands.

Sandra Arthur - Direct Examination - January 20, 2021

1  Q.   Okay.  You're not sure whether Belgium or the Netherlands.

2  A.   Well, the man that owned the server, he lived in one and

3  then traveled to the other to work.  So --

4  Q.   Okay.

5  A.   -- I don't remember which one.

6  Q.   Sure.  And did you have -- did the Web site have authors

7  and paid members from lots of foreign countries?

8  A.   I believe so.

9  Q.   Do you know about how many members there were?

10  A.   Towards the end, I would say 850 members.

11  Q.   Okay.  And about how much was the membership?

12  A.   I think it was $20 for a month.  And then if you get

13  three months, it's different.  And then he had different

14  months.  But I would see -- a lot of checks that came in were

15  $20 checks.

16  Q.   Okay.

17  A.   $20.  Three months maybe $50.  I don't recall exactly.

18  Q.   So that room that we were looking at in 16L, K, or J or

19  whatever it was, is that generally where he would do his work

20  on the Web site, at that desk?

21  A.   Yes.  Always.

22  Q.   And how often did he work on the Web site?

23  A.   Toward the end, it was about two hours a day.

24  Q.   Okay.  And about how often would he leave the residence?

25  A.   We didn't really leave it.  We were -- only to go shopping

Ann M. Record, RMR, CRR, CMRS, CRI

Sandra Arthur - Direct Examination - January 20, 2021

1  usually, to either Alpine or Walmart.  So sometimes once a

2  week.  Sometimes once every two weeks.

3  Q.   Going back to the issue of security, do you remember him

4  doing anything with hard drives or talking about doing anything

5  with hard drives that he wanted to get rid of?

6  A.   He didn't really talk about getting rid of hard drives.

7  He mentioned that he had burned a hard drive and shot it.

8  Q.   And shot it?

9  A.   Yes.

10  Q.   What can you tell the jury about that?

11  A.   He shot it with a shotgun.

12  Q.   Do you have any idea why he did that?

13  A.   No, he never told me.

14  Q.   Do you remember whether he admired any particular authors?

15  A.   Yes.  He had a couple that he spoke about.

16  Q.   Do you remember the names of any of them?

17  A.   One was God Spit.

18  Q.   God Spit?

19  A.   Yes.

20  Q.   G-O-D-S-P-I-T?

21  A.   Correct.

22  Q.   Okay.  Any others?

23  A.   That was like his favorite one.  I don't know if it's

24  because everybody liked him.  He had a lot of followers.  Made

25  him money.  There is a couple others I kind of remember there

Sandra Arthur - Direct Examination - January 20, 2021

1  that he spoke about that he was -- I remember some of the

2  names, but I know he like God Spit.  The other ones, I don't

3  know how he felt about them, but I know he spoke with a few of

4  the other authors.  Little Panty Girl I think was one maybe.

5  Q.   What was that one again?

6  A.   Little Panty Girl or something.  Little Panty Girl or

7  something, like little panties.

8  Q.   Okay.

9  A.   And I heard that name or that -- he had -- I heard him,

10  you know, talk about that -- I think a guy, but I don't recall

11  if he liked him or not or he just had conversations with this

12  person.

13          MR. BERRY:  Can I have a second, Your Honor?

14          THE COURT:  Yes, sir.

15          (Sotto voce discussion)

16  Q.   (BY MR. BERRY)  You started talking about -- and I think

17  maybe we got sidetracked.  You started talking about making

18  banners for the page.  Explain to the ladies and gentlemen of

19  the jury what your actual work on the Mr. Double site was.

20  A.   I would make banners which are like GIFs, but they're just

21  longer.  They're long, rectangular.  They go on the top of the

22  Web site.  Some of the banners were, you know, ten-year

23  anniversary thing.  Some of the banners was to Mr. Double sex

24  stories, and it would be other Web sites that would -- you

25  know, he paid for them to advertise on their Web site.  And

Sandra Arthur - Direct Examination - January 20, 2021

1  then some people would click on it and it would come to his Web
2  site.  So it would be banners for his Web site, and then I made
3  a couple banners advertising type of thing.
4  Q.   Okay.  And how would you create these banners, as you call
5  them?
6  A.   Using Photoshop software, you make it, and it's pretty
7  automatic.  You know, you type the words in.  You can use
8  little icons or you can use images and you just type in fonts,
9  you know, sex stories, and it animates it.  It will animate it
10 and it will show like Mr. Double and then it will say sex
11 stories.
12 Q.   And when you created these, were you sitting at his desk,
13 that big workstation that we saw there where you created it?
14 Is that where you created it?
15 A.   No, I created it at that other desk.
16 Q.   That smaller desk?
17 A.   Yes, 16L.
18 Q.   16L.  Okay.  Thank you.  That's helpful.
19          And once you created it, did you then go over and put
20 it on his computer or how did you get it to him?
21 A.   I would e-mail it to him and then he would say he doesn't
22 like it or don't use that word, use this.  Or he would say
23 okay.
24 Q.   And so --
25 A.   If he didn't like it, he would just e-mail it back to me

Sandra Arthur - Direct Examination - January 20, 2021

1   what changes he wanted.

2   Q.   And then you would redo it and re-e-mail it to him.

3   A.   Yes.

4   Q.   But you generally never used his workstation; is that

5   correct?

6   A.   I never used his work -- well, I did only one time.

7   Q.   Oh, okay.   So there was one time.

8   A.   Yes.

9   Q.   Tell us about that.

10  A.   He went to Arizona to pick up a car, and he wanted me

11  to -- he set up the -- what window I needed and people would

12  send checks.   And when you find -- I don't remember how I found

13  out, but you get some kind of alert, and then you have to

14  transfer the name onto the little window thing.   And then

15  the -- they give their name and their password.   So you check

16  that they paid their check.   Then you put that information so

17  they can start looking at the Web site, and then just click it.

18  So I just transferred the name and the password and then

19  clicked the button and then it opened up an account for them.

20  Q.   But you said his computer was password protected.   How

21  were you able to do that while he was out of town?

22  A.   When he went to Arizona, he left it unlocked for that one

23  day.

24  Q.   Oh, for just that one day?

25  A.   Yes.

Ann M. Record, RMR, CRR, CMRS, CRI

Sandra Arthur - Direct Examination - January 20, 2021

1  Q.   And then when he came back, what did he do?

2  A.   He locked it.

3  Q.   So you couldn't access it again.

4  A.   Yes.

5  Q.   And you didn't know his password.

6  A.   No.  He didn't tell me the password.  He just had it

7  unlocked.  Showed me what to do.  He came back, and he locked

8  it back up.

9  Q.   Okay.  And, again, was there any other source of income

10  during the marriage?  Did you work or did y'all have any other

11  source of income?

12  A.   I didn't work, but my father had given me some land before

13  I was married.  And we had held on to it.  And we sold it -- I

14  think it was 2018 it was sold for $30,000.

15  Q.   Back in 2018.

16  A.   Yes, I believe it was in 2018.

17  Q.   Before this case got started.

18  A.   Yeah.

19  Q.   Okay.

20          (Sotto voce discussion)

21          MR. BERRY:  Pass the witness, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Bennett, your witness.

24          MR. BENNETT:  Thank you, Your Honor.

25

1                           **CROSS-EXAMINATION**

2    BY MR. BENNETT:

3    Q.   Hi, Ms. Arthur.

4    A.   Hello.

5    Q.   How are you?

6    A.   I'm okay.

7    Q.   Do you have any agreement with the government about the

8    disposition of your share in the ranch, about what's going to

9    happen to that when this case is done?

10           MR. BERRY:  Objection, Your Honor.  The issue of any

11   other disposition is not relevant to this proceeding.  It would

12   be like talking about evidence that's not before this jury.

13   There is no basis for discussing that.

14           THE COURT:  Mr. Bennett?

15           MR. BENNETT:  It goes to bias, Your Honor, motivation

16   testifying.

17           THE COURT:  Overruled.

18   Q.   (BY MR. BENNETT)  Do you have an agreement with the

19   government about what happens to your share of the ranch when

20   this is over?

21   A.   No.  We haven't -- they just spoke to me I think it was

22   yesterday.  They -- my lawyer --

23           THE WITNESS:  Am I supposed to tell them what my

24   lawyer said?

25           THE COURT:  Just answer the question, ma'am.

Sandra Arthur - Cross-Examination - January 20, 2021

1  A.   My lawyer said to just give them --

2           MR. BERRY:  Objection, Your Honor, now we're getting

3  into hearsay.

4           THE COURT:  Yeah, I'll sustain that objection.

5           The question is:  Do you have an agreement?

6           THE WITNESS:  There is no agreement.

7  Q.   (BY MR. BENNETT)  Do you personally have an understanding

8  about what's going to happen, without talking about what

9  anybody told you?

10  A.   Sort of.

11  Q.   What is that understanding?

12  A.   That they're going to get everything.

13  Q.   The government is going to get everything?

14  A.   Yeah.

15  Q.   There is nothing being held back.

16           You talked about the government asked you about

17  Tom's -- about authors that Tom particularly admired.

18  A.   Yes.

19  Q.   And you said God Spit was one, but you don't know if it

20  was because he made Tom money or because Tom admired the

21  stories; right?

22  A.   Correct.

23  Q.   And it's like that with the authors.  That's sort of

24  information you lack; right?  You don't have that information

25  about what stores Tom particularly liked?

 1  A.    Yes, I don't know.  I don't know which stories he

 2  particularly liked.

 3  Q.    Okay.  All right.  And when you sold the property that

 4  your father had given you before you were married, was that

 5  property then reinvested in the ranch?

 6  A.    No.

 7  Q.    Was anything other than -- the money that you talked about

 8  with the government, was anything else used to pay for the

 9  ranch property?

10  A.    As far as I know, no.

11  Q.    Thank you, ma'am.

12          MR. BENNETT:  I pass the witness, Your Honor.

13          THE COURT:  Thank you, Mr. Bennett.

14          Redirect?

15                    **REDIRECT EXAMINATION**

16  BY MR. BERRY:

17  Q.    Very briefly, Ms. Arthur.

18          We don't have any agreement about what's going to

19  happen with the property; is that correct?

20  A.    Correct.

21  Q.    To the extent that your attorney has told you something

22  and you have some understanding, have we had any communications

23  about that?

24  A.    No.

25  Q.    Do you know whether you have a right to contest and try to

Sandra Arthur - Redirect Examination - January 20, 2021

1  keep your part of the property?

2  A.   I don't really understand that.

3  Q.   Okay.  But the bottom line is we haven't agreed to

4  anything; is that correct?

5  A.   Correct.

6  Q.   So it's possible you could still get your part of the

7  property.

8  A.   Possibly, I guess.

9  Q.   Do you know the probabilities one way or the other?

10 A.   Probably not very good.

11 Q.   Why is that?

12 A.   Because -- I don't really -- I just don't understand

13 what -- the whole thing about the property, and I know that the

14 government has put a forfeiture -- intent of forfeiture on the

15 land.  I read a little bit about it, and I know a husband and

16 wife get 50/50.  But because I never made any money to pay for

17 it, you know -- I just don't understand the financial part of

18 it.

19 Q.   So it's still up in the air.

20 A.   I'm just going to do what my lawyer says.

21 Q.   Okay.

22          MR. BERRY:  Nothing further, Your Honor.

23          THE COURT:  Mr. Bennett?

24

25

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1                        **RECROSS-EXAMINATION**

2  BY MR. BENNETT:

3  Q.   You don't have any belief that your testimony here is

4  going to affect that, is going to affect the disposition of

5  your share in the ranch?

6  A.   I don't think so.  It's not.

7  Q.   All right.  Thank you, ma'am.

8            MR. BENNETT:  I pass the witness, Your Honor.

9            THE COURT:  Any redirect on that one question?

10           MR. BERRY:  No, Your Honor.

11           THE COURT:  Ma'am, you're excused.  Remember you're

12  under the rule.  So you'll only talk to the lawyers for either

13  side or your lawyer until the case is done.

14           THE WITNESS:  Am I excused for the day?

15           THE COURT:  I believe she -- can she be excused for

16  the day?

17           MR. BERRY:  Yes, Your Honor, and we would also like

18  to excuse her altogether with the defense's permission.  She's

19  got a long way to go home.

20           THE COURT:  Mr. Bennett?

21           MR. BENNETT:  That's fine, Your Honor.

22           THE COURT:  All right.

23           So you're excused from the trial, all right?  Safe

24  travels to you.

25           THE WITNESS:  Thank you.

Alice Downie - Direct Examination - January 20, 2021

1          THE COURT:  Your next witness, Mr. Berry -- I'm

2   sorry, Ms. Morrison.

3          MS. MORRISON:  Your Honor, the United States calls

4   Special Agent Alice Downie to the stand.

5          THE COURT:  Agent Downie, if you could come on up.

6   And you have already been sworn, as I recall.

7          Ms. Morrison, you may proceed.

8          MS. MORRISON:  Thank you, Your Honor.

9                         **ALICE DOWNIE,**

10              **GOVERNMENT'S WITNESS SWORN AT 8:59 a.m.**

11                       **DIRECT EXAMINATION**

12   BY MS. MORRISON:

13   Q.   Could you please state your name for the record, spelling

14   your last name.

15   A.   Alice Downie, D-O-W-N-I-E.

16   Q.   Special Agent Downie, where are you currently employed?

17   A.   I'm a special agent with the FBI.

18   Q.   How long have you been employed by the FBI?

19   A.   Over 18 years.

20   Q.   Prior to joining the FBI, where did you work?

21   A.   I worked at the Mayo Clinic as an internal auditor.

22   Q.   Could you describe what you did as an internal auditor?

23   A.   I reviewed financial statements and I also audited their

24   computer system, their health care systems.

25   Q.   Do you have any specialized training or experience that

Alice Downie - Direct Examination - January 20, 2021

1  allowed you to serve as an internal auditor?

2  A.   During that time, I got my degree in accounting, and I

3  became a certified public accountant.

4  Q.   How long have you been assigned to the Alpine office for

5  the FBI?

6  A.   For three years.

7  Q.   Could you describe for the jury how you became involved in

8  this case?

9  A.   The case was referred to my coworker, Special Agent Ewan;

10  and it's a small office.  So we all just pitch in and help each

11  other.  So when he was planning to do the search warrant on the

12  property, then I, of course, was available to assist.

13  Q.   Did you, in fact, participate in the search of the

14  property?

15  A.   I was present at the property, but my primary role was to

16  talk to Mrs. Arthur.

17  Q.   After Special Agent Ewan departed from the Alpine office,

18  did you take the case over?

19  A.   Yes.

20  Q.   After you took the case over, could you describe your

21  involvement for the jury?

22  A.   We -- I -- it's kind of complicated, but we ended up --

23  the El Paso Division needed assistance from the Albuquerque

24  Division with doing the forensic analysis of the computers.

25  And so that's where I got more involved reviewing those -- the

Alice Downie - Direct Examination - January 20, 2021

1  computers and looking for different files that might be

2  relevant to this case.

3          We also used a Mutual Legal Assistance Treaty, an

4  MLAT, request with the government of the Netherlands; and we

5  requested their assistance in providing the server that was

6  used for the Mr. Double Web site over there.  And so that

7  server was also received by the FBI after I took over the case.

8  Q.   Okay.  Let go back for a second.  You testified that the

9  evidence -- the El Paso office needed assistance and FBI

10 Albuquerque stepped in.  When you were reviewing evidence that

11 had been seized from the defendant's residence, were you

12 reviewing it after the forensic examination had been done by

13 Special Agent Brian Nishida and his team in Albuquerque?

14 A.   Correct.

15 Q.   Could you describe what you were looking for during those

16 points in time when you were reviewing the material?

17 A.   We looked for a variety of documents and files that would

18 illustrate and support the different violations.  So different

19 elements of the violations include, you know, that it's an

20 Internet company.  That it's a business.  That they're, you

21 know, selling the subscriptions.  That there is interstate

22 commerce and things like that.  And so we were looking for

23 documents that would support that narrative.

24 Q.   Would you and Special Agent Ewan be required to do that

25 because you had knowledge of the case itself?

Alice Downie - Direct Examination - January 20, 2021

1  A.    Correct.

2  Q.    Would Special Agent Nishida or members of his team

3  necessarily know anything about the underlying facts of the

4  case?

5  A.    No, they would not necessarily know.  During the process,

6  they would learn more and more just reviewing the material.

7  But because of Special Agent Ewan and my involvement, more in

8  the case and talking to the different subjects, then we would

9  have more knowledge in order to go through those computers.

10  Q.    Now, you mentioned that material was obtained pursuant to

11  an MLAT; and that as a result of that, materials were obtained

12  from the Netherlands.

13  A.    Correct.

14  Q.    Now, were the materials from the Netherlands analyzed by

15  Special Agent Nishida and his team in Albuquerque?

16  A.    No, they weren't.

17  Q.    Who conducted the forensic analysis of the materials

18  received from the Netherlands?

19  A.    Our Quantico forensic analysts did that.

20  Q.    Do you know why the Quantico office did the analysis of

21  that particular material?

22  A.    Yes.  The server was received fairly recently, and so we

23  were trying to expedite the process in order to have it

24  available to the defense and to be able to have an

25  understanding of what was on that server in time for this

1   trial.  And so our Quantico office had more resources available

2   to it, and so they were able to go to work right on it, and

3   they were able to process the server and get it into the format

4   that Special Agent Nishida talked about where we could then

5   review the files and the material that was on the server.

6   Q.   So both you and Special Agent Ewan had the opportunity to

7   review the materials received from the Netherlands much like

8   you did the material that was received by the Albuquerque

9   office?

10  A.   Correct.  The process was the same.  It was just done at

11  Quantico versus in Albuquerque.

12  Q.   Special Agent Downie, are you familiar with the drawing

13  that appeared on author page Netman169?

14  A.   I am.

15  Q.   If you would turn to -- and it's going to be in the

16  smaller red binder, I believe -- Government's Exhibit 10A.

17  A.   I see it.

18  Q.   Is Netman169, the drawing that appeared on that author's

19  Web page, is that Government's Exhibit 10A?

20  A.   Yes, it is.

21  Q.   Are you aware of whether or not the Netman169 drawing was

22  located in the materials received from the Netherlands?

23  A.   The image was in the materials from the Netherlands but

24  not the text that's with it in this exhibit.

25  Q.   Now, the text that you're referring to, is that the story

Alice Downie - Direct Examination - January 20, 2021

1  or is there another portion of text that you're referring to,

2  Special Agent Downie?

3  A.    I'm referring to like the bio for the author.  On the MLAT

4  server that we received from the Netherlands, it did not have

5  that biography information included with the image.  It was

6  just solely the image.

7  Q.    But you've had the opportunity to compare what's been

8  admitted as Government's Exhibit 10A versus the material that

9  was found on the server from the Netherlands?

10  A.    Correct.

11  Q.    Special Agent Downie, during the course of your

12  participation in the investigation, have you had the

13  opportunity to review financial documents associated with the

14  Mr. Double Web site and the associated businesses?

15  A.    I have.

16  Q.    Could you describe the documents that you had the

17  opportunity to review?

18  A.    I reviewed some of the processing invoices and the billing

19  invoice, but primarily I looked at their federal tax returns.

20  Q.    How were those federal tax returns attained?

21  A.    They're from various methods.  We found a lot of the paper

22  copies of it during the search of the actual property.  We also

23  found electronic copies in the hard drives at the residence,

24  and then there were also electronic copies found on the server

25  from the Netherlands.  And then lastly, Mrs. Arthur provided

Alice Downie - Direct Examination - January 20, 2021

1  the tax returns for 2017 and 2018.

2  Q.   What did you create after having the opportunity to review

3  all of those materials that you described?

4  A.   Since there were so many different years, in order to

5  facilitate reviewing it, I put some of the -- I put it into a

6  spreadsheet and just pulled out -- I transcribed certain values

7  just so that you could see it at a glance and see trends

8  between each tax return.

9  Q.   Did you create a summary using that information?

10 A.   Yes, a spreadsheet summary.

11      MS. MORRISON:  Your Honor, at this time I would move

12 for the admission of Government's Exhibit 19 into evidence.

13      THE COURT:  Mr. Haygood?

14      MR. HAYGOOD:  No objection.

15      MS. MORRISON:  Your Honor, at this time we would seek

16 to publish Exhibit 19.

17      THE COURT:  The Court admits Government's Exhibit 19

18 without objection and you may publish.

19 Q.   (BY MS. MORRISON)  Special Agent Downie, you should also

20 have a copy of this in the binder in front of you.  Could you

21 describe for the jury what's depicted in Government's

22 Exhibit 19 on the page that we're referring to?  I believe it's

23 the first page of this document.

24 A.   Okay.  So there is a series of years, and each year an

25 individual tax return would be filed as well as a business tax

Alice Downie - Direct Examination - January 20, 2021

1  return.  And for each of the years, I would pull out different

2  information, and I tried to make it consistent from year to

3  year so that you would be comparing apples to apples as each

4  year went along, and I just focused on a few key numbers.

5          So, for example, the gross sales.  So that would be

6  just the total sales of the Web site, and then the cost of

7  goods sold which would include some of the expenses that were

8  involved in the sales.  So that would include fees like the

9  Internet fees.  And they also had to hire a contract

10 programmer.  And so those sorts of expenses would go into the

11 cost of goods sold, and that would result in a gross profit.

12         I also pulled out the wages for the officers of the

13 company, and then the income -- just the ordinary income that

14 was generated from that, also payments from S Corporations.

15 And then on the tax returns, they would also need to list who

16 the shareholder was.  So I pulled that information.  And then

17 the total income and then the adjusted gross income.

18 Q.   Special Agent Downie, based on the documents you reviewed,

19 who were the officers?

20 A.   Consistently over the years, the only officer that was

21 listed was Thomas Arthur.

22 Q.   Go ahead.  I'm sorry to interrupt you.

23 A.   Sorry.  Until the end, which let's see in 2017, they

24 started utilizing the SC Prod company, and Sandra Arthur was

25 the shareholder for that company.  So in 2017, you started

Alice Downie - Direct Examination - January 20, 2021

1  seeing it switch over.  And then in 2018, the switchover is

2  complete.  And there is no income attributed to Mr. Double and

3  Tom Arthur, and it's all attributed to SC Prod with Sandra

4  Arthur.

5  Q.    Now, you indicated in your summary -- that is, the

6  compilation of the records you reviewed -- that some of the

7  documents were missing.  How did you determine that some of the

8  documents were missing?

9  A.    After going through, you know, all the paper documents

10 from the search warrant and the electronic records and things,

11 there were certain years that I just couldn't find records for.

12 And then sometimes the records that I had, it might have only

13 been one page of the tax return and not the entire tax return

14 with all the schedules.  So I wasn't able to pull all of the

15 numbers for all of the different years just because we couldn't

16 find all the records, and we didn't attempt to try to get them

17 from the IRS.

18 Q.    If we could go to Page 2 of Exhibit 19.  Special

19 Agent Downie, what was the total income for Thomas Arthur for

20 the year 2003?

21 A.    The gross sales were $431,172.

22 Q.    And then as to Mr. Arthur individually, what was his total

23 income?

24 A.    His total income was $224,003.

25 Q.    How did that compare to his total income as an individual

1  for the year 2002?

2  A.   It was similar.  His income in 2002 was $216,922.

3  Q.   Okay.  If we could go to Page 5.  And if you would direct

4  your attention to the year 2012.  Special Agent Downie, what

5  was the income for Thomas and Sandra Arthur individually in the

6  year 2012?

7  A.   The total income was $126,691.

8  Q.   Special Agent Downie, did you also have the opportunity to

9  review correspondence between the defendant and his accountant?

10 A.   I did.

11 Q.   Okay.  And if you would take a look in the binder at

12 Government's Exhibit 20, 21A and B, 22, and 23.

13 A.   Okay.

14 Q.   Special Agent Downie, what are Government's Exhibit 21,

15 22, and 23, and 20?

16 A.   They are letters from Tom Arthur to his accountant.

17 They're annual letters.

18 Q.   Excuse me.  I couldn't understand what you said.

19 A.   They were annual letters that Tom Arthur would write to

20 his accountant.

21         MS. MORRISON:  Your Honor, at this time the

22 government would move for admission of Government's Exhibit 20,

23 21A and B, 22, and 23.

24         THE COURT:  Mr. Haygood?

25         MR. HAYGOOD:  No objection, Judge.

 1            THE COURT:  Government's 20, 21A, 21B, 22, and 23 are

 2   admitted without objection.

 3   Q.   (BY MS. MORRISON)  Special Agent Downie, in those

 4   correspondence between the defendant and his accountant, are

 5   there any references to the security system?

 6   A.   There are.

 7   Q.   What specifically was the reference to the security

 8   system?

 9   A.   So in Exhibit 20, it is dated February 6, 2003, but it's

10   in reference to his 2002 tax return.  He indicates that one of

11   his notable purchases for the year is a security system.

12   Another notable purchase are two computers.

13   Q.   In that exhibit, does he elaborate why a security system

14   was necessary?

15   A.   No.

16   Q.   Okay.  In another one of the exhibits that we just

17   admitted, is there reference to a generator?

18   A.   Yes.

19   Q.   Why was the generator referenced in that particular piece

20   of correspondence?  And if you would identify the exhibit.

21   A.   In Exhibit 21A, he indicates that his major purchases for

22   the year -- and this would be for the year 2003 -- was $3,200

23   for a computer and $9,000 for a backup generator because the

24   electricity goes out there often -- goes out here often.

25   And -- oh, and in the next exhibit, 21B, there is also a

1  reference to the generator; and it indicates that it's a
2  hundred percent required to keep my computers running 24/7 with
3  air conditioning.  Overheating happens here when the electric
4  goes out.  Happens monthly for three to 12 hours.
5  Q.   Special Agent Downie, were any W-2s and W-9s located
6  either on the defendant's devices or during the search of the
7  property?
8  A.   Yes.
9  Q.   Could you tell the jury where the W-2s were located, if
10  you recall?
11  A.   So there were W-2s for the defendant and then there were
12  also W-2s for the authors.  And I'm not sure where in the house
13  they were located, but they were found during the physical
14  search of the residence.
15  Q.   So you had the opportunity to physically review the W-2s
16  that you've testified about.
17  A.   Yes.
18  Q.   What is your understanding of why there would be W-2s for
19  other individuals besides the defendant?
20  A.   My understanding is that the -- that Mr. Arthur paid his
21  authors.  And when the payments would reach more than $600
22  annually, then each author would receive a W-2 in order to
23  claim it on their taxes.
24  Q.   Did you locate any W-9s or requests for W-9s?
25  A.   There were e-mails indicating that W-9s were going out.

Alice Downie - Cross-Examination - January 20, 2021

1  And a W-9 is a tax document where you request tax information.

2  So you would request the individual's Social Security number.

3  Q.   These requests would have been located on the devices

4  seized from the defendant either from his residence or the

5  Netherlands?

6  A.   Correct.

7        MS. MORRISON:  Your Honor, I don't have any further

8  questions for this witness.

9        THE COURT:  Thank you.

10        Mr. Haygood, your witness.

11                    **CROSS-EXAMINATION**

12  BY MR. HAYGOOD:

13  Q.   Good afternoon, Agent Downie.

14  A.   Good afternoon.

15  Q.   I've got just a few questions for you here.  With regard

16  to the financial documents of my client that you reviewed in

17  preparation of the spreadsheets that we've seen published here

18  to the jury today, did it appear that my client was paying the

19  federal taxes on the income that he was getting from the

20  Mr. Double Web site?

21        MR. BERRY:  Objection.  Relevance.

22        THE COURT:  Yeah.  What is the relevance,

23  Mr. Haygood?

24        MR. HAYGOOD:  I'm just going into the basis for why

25  these documents are -- have been admitted and why they're

Ann M. Record, RMR, CRR, CMRS, CRI

Alice Downie - Cross-Examination - January 20, 2021

1  presented to the jury?

2          MR. BERRY:  Then he could ask that question.

3          THE COURT:  Yeah, I think that would be the

4  appropriate question.

5          MR. HAYGOOD:  Okay.

6          THE COURT:  So I'll sustain the objection.

7  Q.  (BY MR. HAYGOOD)  You're not here claiming my client

8  failed to pay taxes or anything like that.

9          MR. BERRY:  Objection, again, to relevance.

10          MR. HAYGOOD:  Same answer, Judge.

11          THE COURT:  Overruled.

12  Q.  (BY MR. HAYGOOD)  You're not claiming my client failed to

13  pay his taxes, are you?

14  A.   No, I'm not making an assessment on whether he paid the

15  correct amount or not.

16  Q.   Okay.  And you're not here to testify about any alleged

17  tax fraud or tax crimes or anything like that.

18  A.   I did not audit his tax records.

19  Q.   But did you review them to present them to the jury here

20  today?

21  A.   I reviewed what Mr. Arthur documented on his tax returns,

22  but I did not have access to any of the supporting

23  documentation that led to the numbers that were on those

24  records.

25  Q.   But as far as you know, those numbers are correct.

Ann M. Record, RMR, CRR, CMRS, CRI

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 253 of 286

253

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  A.    I don't know.

2  Q.    With regard to the drawing that has been admitted here as

3  Exhibit 10A, I believe you said that the drawing itself was

4  received from the Netherlands but the text was not on the

5  server.

6  A.    Right.

7  Q.    Okay.  And so when y'all recreated that for Government's

8  Exhibit 24, where did that text come from?

9  A.    Oh, so that was screenshot of when S.A. Ewan went online,

10 and he saw the page when he went and looked at it realtime.

11 Q.    Okay.  And the picture was there realtime?

12 A.    Correct.

13            MR. HAYGOOD:  No further questions, Judge.

14            THE COURT:  Thank you.

15            Redirect?

16                    **REDIRECT EXAMINATION**

17 BY MS. MORRISON:

18 Q.    Special Agent Downie, so the screenshot of Government's

19 Exhibit 10A, that would have been done before the search

20 warrant was executed on November 7, 2019?

21 A.    Correct.

22 Q.    That photo was, in fact, part of the basis for the

23 issuance of the search warrant.

24 A.    Correct.

25            MS. MORRISON:  I have no further questions, Your

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   Honor.

2           THE COURT:  Mr. Haygood?

3           MR. HAYGOOD:  No recross, Your Honor.

4           THE COURT:  Thank you.

5           You may step down, ma'am.  Thank you.

6           Mr. Berry, your next witness.

7           MR. BERRY:  At this time, Your Honor, the United

8   States rests.

9           THE COURT:  Thank you.

10          So, ladies and gentlemen of the jury, I'm going to

11  ask you to take a short break.  I need to do some work with the

12  attorneys for really five minutes or so, ten minutes at the

13  most.

14          If you'll go back to the jury room.  Remember you'll

15  leave your notebooks here.  You've not received the case for

16  deliberation.  We still have more to go.  And so no discussion

17  among yourselves or with anyone else about the trial.

18          And with that, we'll let you know as soon as we're

19  ready, and it will be a short, quick, brief break.

20          Let's rise for the jury, please.

21          (Jury leaves at 4:38 p.m.)

22          THE COURT:  All right.  Outside the presence of the

23  jury.

24          The government having rested, Mr. Bennett,

25  Mr. Haygood, is there a motion?

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1        MR. HAYGOOD:  We do have a motion, Your Honor.  At
2  this point in time, we would like to make a motion for a
3  judgment of acquittal.  Specifically all of the counts have to
4  do with obscenity, and we do not believe the government has
5  provided sufficient evidence of lack of political, scientific,
6  artistic, or literary value for the five challenge stories and
7  three challenge drawings.

8        Furthermore, with regards to the drawing -- to the
9  three drawings, I don't believe that the government has put on
10 evidence that establishes beyond a reasonable doubt that they
11 depict children or minors.  I believe that the drawings are at
12 best ambiguous as to the age of the subjects depicted therein.
13 Certainly there has been no expert testimony from any
14 government witness based on the purported development or lack
15 thereof that these depict minors; and, therefore, we would
16 argue that with regard to the drawings, the government has not
17 proven beyond a reasonable doubt that they depict minors
18 engaging in sexually explicit conduct.  And for those reasons,
19 we would ask the Court to direct the jury to enter a judgment
20 of acquittal.

21        THE COURT:  Thank you.

22        Any response?  Not necessary, but if you would like
23 to.

24        MR. BERRY:  No, Your Honor.

25        THE COURT:  The Court, in reviewing the evidence in a

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1  light most favorable to the government, taking all inferences

 2  in favor of the government, resolving all issues of credibility

 3  in favor of the government, which is the standard of proof

 4  required on a Rule 29 motion, at this time finds that a

 5  reasonable and rational juror could find the defendant guilty

 6  beyond a reasonable doubt of each of the elements of each count

 7  of the nine counts set forth in the indictment and respectfully

 8  denies the motion.

 9          Mr. Arthur, if you would move on up to that

10  microphone.  You can stay seated.  But let's get him closer to

11  the microphone please.

12          And you're Thomas Arthur, the defendant, in this

13  case; correct?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Mr. Arthur, every criminal defendant is

16  privileged to testify in his own defense.  Even though you have

17  competent -- and I'll say very competent counsel in Mr. Bennett

18  and Mr. Haygood, I advise you that the law provides that you as

19  the accused in this case do not have to testify.  If you choose

20  not to testify, no one can or will hold it against you.

21  Likewise, you have the right to testify and no one can keep you

22  from testifying if you want to.

23          Do you understand?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  If you choose to testify, the government

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 257 of 286

257

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  is allowed to cross-examine you just the same as these other

2  witnesses you've seen.  As your attorneys have cross-examined

3  them, the government would be able to cross-examine you.

4           Do you understand that?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  If you have previous convictions in the

7  nature of a felony or misdemeanor involving moral turpitude

8  that is not remote, then the government would be entitled to

9  ask you about those convictions and in effect disclose those

10  convictions to the jury.

11           Do you understand?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  In the event that you choose to testify

14  and you have previous convictions that are made known to the

15  jury, I'll instruct the jury that they are not to consider

16  those convictions for any purpose except as they may bear on

17  your credibility as a witness.

18           Do you understand?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  And likewise, you also have a right to

21  remain silent.  In other words, you do not have to testify if

22  you don't want to testify.  And if you choose to remain silent,

23  the government cannot make you testify.  They cannot call you

24  as a witness or in any way force you to bear witness against

25  yourself nor can they do anything to call upon you to account

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  for your failure to testify.

2           Do you understand that?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  Mr. Arthur, if you choose not to testify,

5  I'll instruct the jury they cannot use that against you in any

6  way and that they cannot speculate as to why you did not

7  testify or what you might have said had you chosen to testify.

8           Do you understand that?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Now, having gone over this right with

11 you, do you have any questions concerning your right to testify

12 or your right to remain silent?

13          THE DEFENDANT:  I do not, Your Honor.

14          THE COURT:  Thank you very much.  Mr. Bennett,

15 Mr. Haygood, do you have witnesses to call, evidence to put on?

16          MR. HAYGOOD:  I do not believe we have any witnesses

17 that we're going to call, Your Honor.

18          THE COURT:  All right.  So I'll bring the jury back

19 in, the defense will rest.  And I assume once I ask you for

20 your first witness -- I'll recognize you -- would you rather me

21 recognize Mr. Bennett or Mr. Haygood?  Does it matter?

22          MR. HAYGOOD:  I'll do it, Your Honor.

23          MR. BENNETT:  He's sitting in the hot seat.

24          THE COURT:  And then I'll ask the government if they

25 close and then we'll -- and I'll ask, of course, if you close

1  for the defense.

2          And I plan to -- Ms. Salas is going to boogie right

3  now -- pretty quick right now and get our charge.  All we have

4  to change really -- she's got everything done, and we've been

5  working on it -- well "we."  She has been working on it as I've

6  been discussing it with her.  And so she's really only got a

7  few of the italicized things to change that you-all saw ahead

8  of time.

9          It going to be very similar to what you have already

10  seen, and then we'll do that.  She'll bring that in.  Once I've

11  discharged the jury for the evening, we'll -- and certainly

12  admonish them.  We'll stick around, maybe take a five-minute

13  comfort break ourselves, and then argue the charge so that we

14  can be ready to go in the morning.

15          Any issues with that?

16          MR. HAYGOOD:  No, Your Honor.

17          THE COURT:  As far as argument?

18          MR. BERRY:  No, sir.

19          THE COURT:  Okay.  So and I also want to talk to

20  y'all a little bit about the forfeiture tonight.  Not a lot,

21  just a little bit of informative information for me should

22  we -- should there be a conviction.  And then if there is not,

23  we won't have to worry about it.

24          But I'm thinking right now at least that I'll have

25  you-all come back in the morning at 8:30 just in case there is

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 260 of 286

260

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  anything out of line or that you want to change or argue, and

2  then we'll begin arguments at 9:00, is what I'm thinking we'll

3  do.

4          MR. HAYGOOD:  Okay.

5          THE COURT:  And we'll discuss that.

6          Ms. Salas, do you need anything from these fine

7  attorneys before you -- you're good?

8          LAW CLERK:  No.

9          THE COURT:  She's asking --

10         LAW CLERK:  Unless they filed anything.

11         THE COURT:  Yeah, there is nothing else filed or any

12 issues?

13         MR. BERRY:  No, sir, not to do with the trial.  I do

14 have to relay some information that I just received, Your

15 Honor.  D.J. Pearson, Derek Pearson, the agent who testified

16 about the interview, he just notified us, he said:  Just for

17 full transparency, I just at approximately 3:45 p.m. received

18 notification that I was exposed to COVID -- to a COVID positive

19 patient last Thursday on January 14th and, again, on Friday

20 January 15th.

21         THE COURT:  Okay.

22         MR. BERRY:  He said:  I will be leaving the

23 courthouse immediately as a precaution, and I am currently

24 exhibiting no symptoms.  If my status changes, I will notify

25 you immediately.  Sorry to spring this on you right now.  I

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 261 of 286

261

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

 1  want you to know that had I known that I had been exposed, I

 2  wouldn't have come to the courthouse.  If you have any

 3  questions, please feel free to call me.  So hold on.

 4           (Sotto voce discussion)

 5           MR. BERRY:  And we're trying to find out whether he's

 6  going to get tested so we know for sure.

 7           THE COURT:  Yeah, that was my next question.

 8           MR. BERRY:  Right now, he's not positive, but he was

 9  near someone who was positive five and six days ago.  I don't

10  know the extent of that exposure or when that person tested

11  positive, but I just wanted to give that as full disclosures to

12  the Court because he let me know.

13           THE COURT:  Thank you.

14           All right.  With that then, I'm going to bring the

15  jury in, and I'll ask the defense what they want to do, all

16  right?

17           MR. HAYGOOD:  Very good, Your Honor.

18           (Jury enters at 4:46 p.m.)

19           THE COURT:  Thank you.  Please be seated.

20           The government having rested, Mr. Haygood.

21           MR. HAYGOOD:  Yes, Your Honor.

22           THE COURT:  Who is your first witness?

23           MR. HAYGOOD:  We rest at this time, Your Honor.

24           THE COURT:  Defense having rested, Mr. Berry?

25           MR. BERRY:  The United States closes.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. HAYGOOD:  The defense closes as well, Your Honor.

2          THE COURT:  Very well.  Thank you-all.  Thank you

3   both.

4          So, ladies and gentlemen of the jury, the parties

5   have rested and closed.  That means you've received all the

6   evidence you're going to receive, all the testimony, the

7   evidence, the stipulation that we talked about; and so I'm

8   going to release you for the evening.  We'll come back in the

9   morning for the jury arguments.

10          Now, keep in mind that you're going to leave your

11   notebooks here still, of course.  You're eventually going to

12   get to take those notebooks with you when you go to deliberate,

13   I assure you, whether you want to or not or you can leave them

14   here.  But keep in mind your instructions.

15          In the morning I will begin.  We're going to begin at

16   nine o'clock.  So I need you here at five till 9:00.  We'll be

17   ready to go.  I need all 14 of you here or we can't start if

18   one of you is trying to get here or not quite here or forgotten

19   about it or whatever.  So, nine o'clock, is that going to be

20   okay with everybody?  Does any have a problem with that?

21          I typically start at 8:30.  I usually start a little

22   earlier, but we're going to make sure we've got everything

23   ready for you so that you're not waiting on us.  And we're

24   going to stay and work tonight so that we are prepared as well

25   for you in the morning.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          I will -- when you come in for the argument, in your
2   seat is going to be, in your chair, will be a copy of the
3   charge.  That's your copy for the duration of the trial.  You
4   can take it back to the jury room with you.  So that means if
5   you want to make notes on it, you're welcome to.  You don't
6   have to.

7          I am required to read it to you -- to read it out
8   loud, which is a good reading test for me.  I know that all of
9   you know how to read, but I am required to do that.  You can
10  read along with me.  You can set it aside and not -- and just
11  listen to me, whichever you prefer to do.  Some people would
12  rather just listen.  Some people would rather read along.  It
13  doesn't matter to me.

14         When we're done with everything and everything is
15  over with, we'll take everything back from you, including those
16  charges, those copies, as well as the notebooks and we'll shred
17  all that stuff just so no sensitive information gets out.  We
18  do that in every trial.

19         After I read the charge to you, which will take a
20  little bit of time.  It will be 20 or 25 minutes or so, I
21  suspect, 30, the attorneys have an opportunity to argue.  They
22  each get the same amount of time.  The government by virtue of
23  having the burden of proof is allowed to open the closing
24  arguments but also allow to rebut because they have the burden
25  of proof.  So they're allowed to rebut the defense counsel, who

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  will argue in the middle.

2          They all -- I don't know how they're going to do it.

3  They can split it up or one person can do it all.  But they

4  each have -- what's important to remember, I think, is each has

5  the same amount of time, each side does.  Just because one

6  splits it up doesn't mean they get more time.

7          So before we recess for the night, I remind you again

8  that you must decide this case based solely on the evidence

9  presented here within the four walls of this courtroom.  That

10  means you must not discuss this case in any manner among

11  yourselves or with anyone else until you retire to deliberate.

12          You may inform your family, friends, and employer

13  that you are serving jury duty but you must not go into detail

14  about the case.  And, of course, typically most people know not

15  to talk to you if you're still serving on a jury.  We all know

16  not to drill somebody about what's going on.  And you're

17  welcome to tell them that you're going to give them a full

18  download when you're finished, tell them all about it, or you

19  don't have to tell them anything.

20          Do not conduct any independent research into the case

21  or the people involved.  Do not post about this case.  Please

22  don't text about it.  Additionally, avoid reading any articles

23  and watching or listening to any local broadcasts in the event

24  this case may be mentioned.  You're not to have any discussion

25  whatsoever -- any discussions whatsoever with the lawyers or

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 265 of 286

265

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  any other persons connected with the case.

2        And I will want to mention about that as well.  You

3  likely have run into some of us.  Typically we'll say "hi" as a

4  reaction.  We try not to even do that.  We try to just look

5  away from you or stare ahead.  It's not because anybody is

6  being rude to you.  It's just because if you and I are having a

7  conversation that's just maybe, "Hi.  How are you doing?

8  Beautiful day," whatever it may be and we're at the end of one

9  hallway, somebody at the other end of the hallway can't hear

10  what we're saying, but they can see that we're talking.  So

11  that creates an appearance of an impropriety, and there is no

12  reason for it.  So that's just simply the way pretty much every

13  court operates.

14        Again, the reason for all these cautions lies in the

15  fact that it will be your duty to decide this case solely on

16  the basis of the testimony and the evidence presented during

17  trial without consideration of any other matters whatsoever.

18  Any issues?  Concerns?  Questions?

19        All right.  If you'll leave your notebooks, then

20  we're going to rise as you retire for the evening.  We'll see

21  you back here in the morning.  Have a great evening.

22        (Jury leaves at 4:52 p.m.)

23        THE COURT:  All right.  Let's be seated, please.

24        So what you're being handed is a copy of the Court's

25  proposed charge.  If you would, take a few minutes, just over

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the next ten or 15 at the most.  Again, it's the same thing

2  that's been sent to you with a few changes, and we can discuss

3  those.

4          So on page -- and we'll take a short break if anybody

5  needs to -- or if anybody needs to go, you're welcome to.  On

6  Page 2, you've got the mention of the law does not require the

7  defendant to prove his innocence or produce any evidence at all

8  and no inference whatever may be drawn from the election of the

9  defendant not to testify.

10          So we have changed that from the either or to that.

11          We've added, on Page 4, the Similar Acts language

12  from the Circuit.  Page 5, Transcript of Recorded Conversation.

13  Expert Opinion Testimony is on -- begins at the bottom of

14  Page 6 for Brian Nishida.  Single Defendant - Multiple Counts

15  on Page 8.  And then we go through the Indictment and the

16  Explanation of the Counts, it starts on Page 14, as well as the

17  statutory requirement of the elements.

18          We have an aiding and abetting charge; right?  So

19  there is Aiding and Abetting on Page 23 that we've added -- or

20  I think it may have already been in there because that's the

21  way it was charged; right?  Okay.

22          And so I get to repeat a lot of that same stuff.

23          And then the only other thing of import I think is

24  that we need to at least look at is the nine counts with not

25  guilty or guilty, very simply, as to Counts One through Nine, a

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  two-page verdict sheet.

2          So with that, we think they're gone probably?

3          U.S. MARSHAL:  Yes, sir.

4          THE COURT:  Okay.  Thank you.

5          With that, do y'all want to take ten minutes to

6  reread this and take a break if you need one.

7          Mr. Bennett is saying no.

8          MR. HAYGOOD:  I'm good with continuing to read the

9  charge right now, Your Honor.

10          THE COURT:  Okay.  Well, let me give y'all five or

11  ten minutes.  I'll take a short break just so you-all can make

12  sure that we haven't missed something, and I'll be right back.

13  Thank you.

14          (Recess from 4:56 p.m. to 5:03 p.m.)

15          THE COURT:  Okay.  All right.  Then we're here

16  outside the presence of the jury.

17          We're on?

18          THE REPORTER:  Yes, sir.

19          THE COURT:  All right.  And we're going to discuss

20  the charge.

21          Mr. Berry.

22          MR. BERRY:  Your Honor, the only thing that we want

23  to propose at this point is a change to the Verdict Form.

24          THE COURT:  Okay.

25          MR. BERRY:  With regards to Count Seven, we're

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 268 of 286

268

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  proposing there be a question.  If they find the defendant

2  guilty of Count Seven, that's the engaging in a business

3  account.  If you find him guilty of Count Seven, please list

4  the stories and/or drawings you found to be obscene to support

5  that.

6          THE COURT:  Okay.

7          MR. BERRY:  And the reason that we think that that is

8  a good idea is because, as you're aware, the defense raised

9  some concerns last week that we were going outside of the five

10 stories and drawings; and then we said the whole Web site is

11 game.  And then that prompted the Bill of Particulars Your

12 Honor ordered.  We responded and gave them Exhibit 35.

13          To the extent that they might rely on something

14 beyond that in concluding that that's the business that these

15 are obscene things, like, we get this all wrong and they don't

16 buy these five stories and drawings or Exhibit 35 obscene but

17 they find something else obscene, it would preserve that record

18 and make it really clear for the Fifth Circuit as to what this

19 jury found to be obscene for purposes of Count Seven that is

20 otherwise vague according to the defense.

21          So they think that shores up that conviction a little

22 bit better if that's the way it goes down and just give them a

23 line and page and say, If you find the defendant guilty of

24 Count Seven, please list the stories and drawings you found to

25 be obscene on the following page, and then just give them a

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  blank page and let them list the stories and drawings.

2       THE COURT:  I suppose the government would argue then

3  that -- inform them that they would put story No. 1, story

4  No. 2, story No. 3.  Otherwise, I'm just not sure there is

5  another direction there.

6       MR. BERRY:  Yes, absolutely.  So what I would suggest

7  is obviously on Count Seven, ladies and gentlemen of the jury,

8  if you find him guilty, there is going to be a question or

9  you've seen there is a question on the verdict form that says:

10  If you find him guilty, list the stories and drawings.  We

11  submit to you that the charge drawings in Counts Two through

12  Six -- and the stories are Two through Six and the drawings are

13  One, Eight, and Nine are obscene.  And if you find him guilty

14  on those, you can list those very easily.

15       In addition to that, we think the stories in

16  Exhibit 35 are also obscene, and you can list it by all stories

17  in Exhibit 35 or specific ones only.  There is not a set number

18  that you need to list but list something there to articulate

19  what it was that you-all agree was obscene.

20       So, in other words, it's basically a unanimity idea

21  to ensure what they find -- that it's not half the jury finds

22  this story bad and another -- the other half of the jury finds

23  this other story bad and then they come to the conclusion on

24  Count Seven.

25       THE COURT:  Mr. Bennett?

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BENNETT:  I'm the sixth smartest lawyer in the

2   courtroom, Judge, and that sounds good to me.

3          THE COURT:  Who is seven and eight?

4          (Laughter)

5          THE COURT:  All right.  Then there being no objection

6   we'll do that as proposed.

7          You got it, Ms. Salas?

8          LAW CLERK:  Yes.  The only question is what kind of

9   space do you want to give the jury so that they --

10         THE COURT:  A whole page.

11         LAW CLERK:  Do we want lines?

12         MR. BERRY:  Just one page.

13         THE COURT:  One page.

14         MR. BERRY:  One page on -- just say:  On the

15  following page, list them.  If they run out of room on that

16  page doing it that way, it's fine.  If they come back and say,

17  We need another sheet of paper or we need more paper then --

18         THE COURT:  They can use a jury note.

19         MR. BERRY:  A roll of toilet paper.  I don't care.

20  So one page is fine.

21         THE COURT:  Do you have any other suggestions or

22  requests?

23         MR. BERRY:  I don't believe so.  I think we're fine,

24  Judge.

25         THE COURT:  Any objections?

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BERRY:  No, sir.

2          THE COURT:  Mr. Bennett?

3          MR. BENNETT:  Yes, Your Honor.  We would reurge our

4  filed requested jury instructions, and I think as far as the

5  first, second, and fourth, nothing has changed.  The fourth, of

6  course, is for the accomplice witness instruction which I think

7  is appropriate since the government contends that Ms. Arthur is

8  an accomplice.

9          The third if the Court accepts the parties' proposed

10  solution to that issue, then the third would be moot.

11          MR. BERRY:  What's the third?

12          MR. BENNETT:  The third was where I suggested that

13  the Court specify for the jury that in Count Seven, they would

14  have to find that stories or drawings that are charged are

15  obscene.  But if we're going to give them a list of things to

16  describe then, that's not necessary.

17          THE COURT:  I see.

18          MR. BENNETT:  If, however, we weren't going to do

19  that, I have a different request.

20          THE COURT:  Okay.

21          So, Mr. Berry, your response to the accomplice

22  witness instruction?

23          MR. BERRY:  I think we should go ahead and give that.

24          THE COURT:  I agree.

25          MR. BERRY:  That's fine.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          THE COURT:  Okay.  Very good.  So I'll grant that

2   request.  With that then -- and we'll add it.

3          And, Mr. Bennett, does that moot out everything else?

4          MR. BENNETT:  No.  Our first and second request, I

5   filed the document when we got our first draft.  But

6   defendant's requested jury instructions, if the Court would

7   prefer me to read it into the record, I can.

8          THE COURT:  No, that's fine.

9          MR. BENNETT:  The first request is that the jury be

10  informed that an item may have serious value even if it

11  portrays sexually oriented conduct in a patently offensive

12  manner and appeals to prurient interest.

13         MR. BERRY:  It says that.

14         THE COURT:  I'm sorry.  I think it says that; right?

15  So I'm trying to figure out now what's different from what --

16         MR. BENNETT:  Yeah, no, let's --

17         THE COURT:  -- us proposing.

18         LAW CLERK:  That's a modification of the Fifth

19  Circuit pattern instruction.

20         THE COURT:  Okay.  So let me back up then.  So,

21  Mr. Bennett, the Court believes it's in the charge, but it's

22  the Fifth Circuit language.  You're proposing a modification to

23  the Fifth Circuit language.

24         MR. BENNETT:  Yes, Your Honor.

25         THE COURT:  That's denied.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BENNETT:  Okay.  Thank you, Your Honor.

2          THE COURT:  You've preserved that.  Is there another

3  one, though, another request you had?

4          MR. BENNETT:  Yes, Your Honor.  My second request was

5  following that, which is now on Page 17.  I don't know where it

6  was before.

7          THE COURT:  Page 17.  Of yours or mine?

8          MR. BENNETT:  Of yours, Your Honor.

9          THE COURT:  Okay.  I'm there.

10          MR. BENNETT:  It says:  It is for you to say whether

11  the material in this case has such value.  Again, from the

12  Fifth Circuit charge, we believe that that shifts the burden to

13  Mr. Arthur because the question is whether the material lacks

14  such value.  And if you ask the jury the question:  Does it

15  have such value, they're going to come in with a presumption

16  that it doesn't and look for proof that it does.  Whereas if we

17  ask them if it lacks such value, they're going to come in with

18  the presumption that it has such value and look for evidence

19  that it does not.

20          THE COURT:  And we followed -- this tracks the Fifth

21  Circuit language.  So I deny that question as well.  Are there

22  other requests?

23          MR. BENNETT:  I believe that is it, Your Honor.

24  Thank you.

25          THE COURT:  So other than those two requests, are

Ann M. Record, RMR, CRR, CMRS, CRI

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  there objections then to the --

2          MR. BENNETT:  Oh, do you care --

3          THE COURT:  Actually, you made three requests.  The

4  first one I granted, the accomplice witness.  I denied the next

5  two.  And then did you have another?

6          MR. BENNETT:  Does the Court care about commas?

7          THE COURT:  Commas?

8          MR. BERRY:  Commas.  Page 6, Expert Opinion

9  Testimony, after Brian Nishida, there should probably be a

10  comma.

11          THE COURT:  Oh, thank you.

12          MR. BENNETT:  But that's all I noticed.

13          THE COURT:  Very good.  Okay.  So with those being

14  preserved, any objection then to what we've got?

15          MR. BENNETT:  No, Your Honor.  Thank you.

16          THE COURT:  All right.

17          Mr. Haygood, did you have something?

18          MR. HAYGOOD:  Your Honor, I did find one other

19  typographical error.  On Page 5, right at the top there is a

20  "she" in brackets that I think is just left over from the --

21          THE COURT:  Ah, from the charge, the pattern?

22          MR. HAYGOOD:  Yes.

23          THE COURT:  Very good.  Thank you.

24          MR. HAYGOOD:  Other than that, I didn't find any

25  other typos or anything, Your Honor.

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 275 of 286

275

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          THE COURT:  Thank y'all very much.

2          All right.  So if you'll be here at 8:30, we'll go on

3    the record like that at 8:30, just briefly, to make sure y'all

4    haven't had an epiphany overnight and there is something else

5    we want to talk about with the charge.  And then that gives

6    Ms. Salas probably more time than she's ever had to make those

7    copies if we're done by 8:35.  And those of you who have

8    been -- I believe Mr. Berry has been a clerk before.

9          Ms. Morrison, were you?

10         MS. MORRISON:  No, Your Honor.

11         THE COURT:  Mr. Haygood, were you a law clerk?

12         MR. HAYGOOD:  I was not a law clerk, Your Honor.

13         THE COURT:  Mr. Bennett?

14         MR. BENNETT:  (Shaking head.)

15         THE COURT:  I wouldn't even have pretended to apply.

16   I was a law clerk for a firm, but that was it.  Mr. Berry

17   chuckles because he knows how under the gun the law clerk is to

18   get that stuff done.  And that's when the copier breaks and the

19   printer jams and all that stuff.

20         But let me ask you this:  Is there -- as to the

21   forfeiture, assuming that we have a conviction as to any of the

22   counts, as to forfeiture, Mr. Bennett, what is going to be the

23   defense -- is defense going to challenge the entire change?

24         MR. BENNETT:  Your Honor, in candor, I think the

25   testimony today took away our legs on the forfeiture if we lose

 1  the criminal case.  And so with my client's consent, I would

 2  waive a jury on the forfeiture and allow the Court to decide

 3  that.

 4          THE COURT:  Okay.

 5          Mr. Esparza, would that work?  If we do get a

 6  conviction, if we -- the jury comes back with a conviction, is

 7  that going to work for the government?

 8          MR. ESPARZA:  Yes, Your Honor, it works.  My only

 9  question is, so Rule 32.2 regarding forfeiture just simply

10  states that the hearing happen as practical as possible.  I'm

11  not sure if Mr. Bennett, if by what you're saying now, are you

12  just going to wait for me to file my preliminary order and then

13  you would object at that time or are you requesting a full

14  hearing before the judge that would take place once the jury is

15  done --

16          THE COURT:  Tomorrow?

17          MR. ESPARZA:  -- and we deal with it tomorrow.

18          MR. BENNETT:  That's what I was envisioning, but

19  you're the expert.

20          MR. ESPARZA:  Having a physical hearing?

21          MR. BENNETT:  Tomorrow is what I was imagining.  If

22  we were going to do it by Zoom somewhere, you know, two weeks

23  down the road.

24          THE COURT:  No, we'll do it tomorrow.

25          MR. ESPARZA:  The only other thing -- or I don't know

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 277 of 286

277

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1   if you've done one of these before so just a little bit of

2   information.  I know Mr. Bennett hasn't.  I don't know if you

3   plan on calling -- it's essentially another trial except in

4   this case now we wouldn't have a jury.

5           So normally there is an opening.  I don't have any

6   evidence to present because I'll be resting on the record.  I

7   don't know if you do.  And then closing is very similar to the

8   way it is now.  Since we carry the burden, we go first and

9   last.  If you don't anticipate calling any witnesses, we can

10  just jump straight to argument and that would shorten it even

11  more.  You could just give us our time limits and we go.

12          THE COURT:  Is that okay?

13          MR. BENNETT:  Candor to the tribunal, Judge, I may

14  come up with an epiphany in the next 24 hours, but at this

15  point I think that's the process to take.

16          THE COURT:  Okay.  So we won't worry about a jury

17  charge then on the case law.  The forfeiture will stand or fall

18  on the criminal case acquittal.

19          MR. ESPARZA:  There was one more issue.  Sorry to

20  interject, Judge.

21          Mr. Bennett, that other hard drive that I told you

22  that was discovered that was -- it's technically included in

23  the catchall, but I told you and you were going to ask your

24  client if that was fine or if you wanted something extra for

25  that.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BENNETT:  I object on that.  Do you have a

2   description on that?

3          MR. ESPARZA:  I sent it to you.  I don't have it on

4   me right now.

5          MR. BENNETT:  Okay.  Let me check that out right now,

6   and I'll get with him.  Thanks for reminding me.

7          MR. ESPARZA:  That way -- we do have a catchall that

8   would cover it, Your Honor, but I did provide notice so that he

9   wouldn't be surprised come the motion for preliminary order

10  that, why is this other hard drive popping up?  Even though we

11  stipulated that the catchall was there, I wanted to make sure

12  he was fully aware and fully transparent that we just

13  discovered it.

14         THE COURT:  Yeah, the last one of these I tried, I

15  think, was 2009 or 2010 with Jody Charles Thomas Capone.

16         MR. BERRY:  Conspiracy?

17         THE COURT:  Yeah.  So -- I think.

18         Cristina, did we do another one since then?

19         THE CLERK:  No, I can't recall.

20         THE COURT:  And that was just Judge Junell had other

21  stuff to do and so he was done with that trial and so I got to

22  try it with Diana Cruz-Zapata.

23         But we did it with a jury and, you know, all I've

24  done is been able to pull out some of my old notes on that, but

25  that's all I've been able to do, but I appreciate the input.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          So it sounds like the forfeiture kind of stands or

2    falls on the criminal case on the conviction or acquittal and

3    we'll go from there.  But I do plan to take care of it tomorrow

4    after we get the jury out.  I may go visit with the jury

5    briefly and you-all can sort of prepare, put your heads

6    together, if you want, and I'll be back within ten minutes and

7    we'll knock it out.  So that would be my hope anyway.

8          Mr. Berry, anything further you want to take up

9    tonight before we knock off?

10         MR. BERRY:  The only other thing, Judge, is I'm still

11   twixt in between about whether I should be filing something

12   regarding admonishment of defense counsel regarding the First

13   Amendment, wrap myself in the First Amendment idea that we were

14   discussing this morning.

15         THE COURT:  I think we're past that.

16         Right, Mr. Bennett?

17         MR. BENNETT:  Well, so this was my concern yesterday

18   evening that figured in an ill-considered motion, Your Honor.

19   There is the First Amendment.  It's mentioned in the jury

20   charge.

21         THE COURT:  Yes, sir.

22         MR. BENNETT:  It creates one of these elements of the

23   offense and a fundamental right to expression --

24         MR. BERRY:  It doesn't say First Amendment.

25         MR. BENNETT:  Okay.  The fundamental right to

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  expression is expressly mentioned in jury charge, and that's

2  where these elements of the offense come from.  And I believe

3  that I should be able to argue to the jury that that's where

4  these elements come from.  I'm certainly not going to argue

5  jury nullification.  I'm not going to argue:  Even if you find

6  this beyond a reasonable doubt, you should acquit because of

7  the Constitution.

8           So I heard Mr. Berry's concern about that.  I want to

9  assure the Court I'm not going to argue jury nullification.

10  It's not my style.  I know the rules.  And I do my best to

11  agree to them, Your Honor.

12           If Mr. Berry has some other concern, I'm happy to

13  take it into account because I don't want him to be in a

14  position of having to object to my argument.

15           THE COURT:  Mr. Berry.

16           MR. BERRY:  Well, I definitely will be objecting to

17  his argument if he goes down that road.  What I was suggesting

18  is some briefing on the nullification issue and what qualifies

19  because what is still unclear to me from Mr. Bennett's

20  exposition right now is whether he's not going to argue

21  explicitly for nullification.  What he's going to do I think in

22  the terms that he mentioned here such as this case has

23  reverberations and in the freedom of expression area, that sort

24  of thing.

25           So not once did he mention in his filing yesterday

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  that the jury should be allowed to nullify.  He's not using

2  that terminology as a concept that we're discussing, and it

3  concerns me because it's still unclear to me whether

4  Mr. Bennett understands what the contours of arguing for

5  nullification are and saying that these principles or this law

6  comes from, you know, from the fundamental principles of

7  freedom of expression.

8         The Court has language in there that says freedom of

9  expression is a great thing, but the First Amendment doesn't

10 protect obscenity; right?  So that's the law and that's what

11 the jury should be instructed on, and any argument outside of

12 that I am going to object to to the extent that it suggests

13 that freedom of expression should be exalted above the law here

14 specifically.

15        Because that concept is something that can be

16 dangerously injected into the jury for the mere purpose of

17 exposing or appealing to that bias or sympathy or some other

18 emotional appeal about, by God, I believe in the First

19 Amendment and somehow if you don't convict here or if you do

20 convict here, you're somehow against the First Amendment.

21 That's not the case.  The First Amendment says this stuff is

22 illegal, and I don't hear him saying that that's what he's

23 going to tell the jury at all.

24        THE COURT:  So you're going to argue the charge --

25        MR. BENNETT:  Yes.

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

```
 1              THE COURT:  -- and the law as it stands in the
 2   charge; correct?
 3              MR. BENNETT:  Yes.
 4              THE COURT:  Anything more?
 5              MR. BENNETT:  Reasonable inferences from the
 6   evidence.  Common sense.
 7              THE COURT:  Sure.
 8              MR. BENNETT:  The government's spaghetti theory for
 9   everything that hits the walls --
10              THE COURT:  Anything more on the First Amendment,
11   upholding the First Amendment even over the stated law?
12              MR. BENNETT:  No, nothing about upholding the First
13   Amendment over the stated law.  The First Amendment reads the
14   stated law.  The reason for the stated law is the First
15   Amendment.  By following the stated law, you honor the First
16   Amendment.
17              THE COURT:  All right.  How much time do y'all want?
18              MR. BERRY:  I would like 30 minutes, but I would like
19   to divide.
20              THE COURT:  Of course.  30 minutes then.  That's as
21   much as I was going to give you-all.  I'll give you that 30.
22   You don't have to use it all.
23              Mr. Berry, you're required -- of course, you may
24   remember -- to use at least half of it.  If you don't, I'll
25   take that off the other end.
```

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1          MR. BERRY:  Yes, Your Honor.

2          THE COURT:  I want to have him fully open so you-all

3   can have something to argue about, respond to some things, and

4   be probably the majority of it.

5          Do you know what you want me to give you a warning

6   on, Mr. Berry, as far as the first one?

7          MR. BERRY:  I think, if I recall correctly, if I say

8   20 and ten and I go over on the 20, I can just have seven or

9   whatever.

10          THE COURT:  Yeah, it just comes off your ten.

11          MR. BERRY:  But if I say 25 and five and I don't use

12   my 25, I don't get the time back on the --

13          THE COURT:  Yes, sir, as long as you use at least 15.

14          MR. BERRY:  Okay.

15          THE COURT:  And I'll give you -- on the first one,

16   it's usually the longer one, so I give you a two-minute warning

17   or if you would rather I give you a one minute, I will.

18          MR. BERRY:  Yeah, let's do 20 and ten with a

19   two-minute warning.

20          THE COURT:  And on the ten, I'll give you a one.

21          MR. BERRY:  That's fine.

22          THE COURT:  And are you-all going to split or are you

23   just going to do it, Mr. Bennett?

24          MR. BENNETT:  I'm just going to do it.  Yeah, I'm

25   just going to do it.  Does the Court require the government to

1  close fully?

2          THE COURT:  I'm sorry?

3          MR. BENNETT:  Does the Court require the government

4  to close fully and then to use rebuttal for actual rebuttal?

5          THE COURT:  No, I always got confused by that as a

6  litigator when I was told to fully open, I'm like, yeah, of

7  course I'm going to fully open.  But, again, my way of doing

8  that is he's got to use at least half or more of his time.

9  He'll use more than that, I suspect, unless his rebuttal is

10 going to be very short, you know, and so -- but are you going

11 to want a two-minute warning at 28?

12         MR. BENNETT:  Yeah, I don't think that I'll need it,

13 but, yes, please.

14         THE COURT:  Okay.  I'll give you a two-minute warning

15 there.  And I'll also count down -- now, Mr. Berry is

16 familiar -- I think he's tried one case before me.

17         Mr. Bennett, what I do --

18         And are you going to split it with Ms. Morrison?

19         MR. BERRY:  No, I'm going to do it.

20         THE COURT:  Okay.  So what I do is, I'll -- okay.

21 I've given you that one minute or two minutes or whatever it

22 is, I'll give you a notice at about 15 seconds, and then I'll

23 tell you when it's time.  And a few weeks ago I think in

24 Midland maybe -- Mr. Fedock, I think it was -- I had to say

25 "stop."  That's -- I mean, when it's time, it's time.  That's

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  the only way I know how to be fair.

2          And so we all know.  So if you've got 15 seconds and

3  you've got some flourish that you're planning, I'm going to cut

4  you off, and I will drag you out because it's just not fair to

5  the other side.

6          MR. BENNETT:  Yes, sir.

7          THE COURT:  That's plenty of time for a one-day

8  trial.

9          MR. ESPARZA:  Your Honor, would you give us a time

10 limit so I know what to prepare for the forfeiture.

11         THE COURT:  On the forfeiture?

12         MR. ESPARZA:  Yes.

13         THE COURT:  25 seconds.

14         (Laughter)

15         THE COURT:  If it's an agreed forfeiture or something

16 like that, that's awesome.  If it's -- I'm thinking --

17         MR. ESPARZA:  I don't suspect to need any more --

18         THE COURT:  -- seven or eight minutes.

19         MR. ESPARZA:  -- than -- closer to ten would be --

20         THE COURT:  Ten?  Okay.  I was going to say ten and I

21 backed off of that because I knew you wanted ten.  Ten minutes

22 at most just to argue it.  And, of course, any time if you want

23 to admit stuff, that's -- we'll do that quickly and wholesale

24 and move it.  Okay.  All right.  Great.

25         Now, one last thing.  If you think of something

Case 4:19-cr-00774-DC   Document 146   Filed 09/14/21   Page 286 of 286

286

USA vs. Arthur - Jury Trial - Vol. 2 - January 20, 2021

1  tonight that you think, I'm going to bring that up at 8:30,

2  e-mail Ms. Salas so that we have a little heads-up.  That

3  really does helps.  That doesn't always happen, and it's not

4  critical, but it's helpful so that we're not trying to figure

5  out a couple of things.  And then she'll text me in the middle

6  of the night like she likes to do, and so we'll -- or she likes

7  to receive them from me.  That's what it is.  Reminding her to

8  do stuff.  So we'll do that.

9            Y'all have a great night.  I'll see you in the

10  morning no later than 8:30.  Thank y'all.

11            (Proceedings adjourned at 5:25 p.m.)

12                         * * * * * *

13                    **C E R T I F I C A T E**

14

15            I, ANN M. RECORD, Former United States Court

16  Reporter for the United States District Court in and for the

17  Western District of Texas, hereby certify that the above and

18  foregoing contains a true and correct transcript of the

19  proceedings in the above-entitled and numbered cause.

20            WITNESS MY HAND on this 14th day of September,

21  2021.

22

23            _____
                */s/Ann M. Record*
            Ann M. Record, RMR, CRR, CMRS, CRI
24          Former United States Court Reporter
            P.O. Box 2357
25          Midland, Texas  79702