

# United States Court of Appeals
## for the Fifth Circuit

**Certified as a true copy and issued
as the mandate on Nov 03, 2022**

**Attest:** *Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

No. 21-50607

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2022

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

THOMAS ALAN ARTHUR,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:19-CR-774-1

Before DAVIS, DENNIS, and HIGGINSON, *Circuit Judges.*

JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART, REVERSED IN PART and REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

No. 21-50607

James L. Dennis, *Circuit Judge*, concurring in part, dissenting in part.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2022

Lyle W. Cayce
Clerk

No. 21-50607

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

THOMAS ALAN ARTHUR,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:19-CR-774-1

Before DAVIS, DENNIS, and HIGGINSON, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

A jury convicted Thomas Alan Arthur of three counts of producing, distributing, receiving, and possessing an obscene visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(a)(1); five counts of using an interactive computer service to transport obscene matters, in violation of 18 U.S.C. § 1462(a); and one count of engaging in the business of selling or transferring obscene matters, in violation of 18 U.S.C. § 1466(a).  On appeal, Arthur challenges his conviction and sentence.  We AFFIRM in part and REVERSE in part.

No. 21-50607

I.

From the 1990s through 2019, Thomas Alan Arthur operated a website called "Mr. Double." At the time of the FBI investigation into Arthur, the website contained over 25,000 erotic stories, written by several thousand authors who contributed to the site. Many of the stories on the site included graphic depictions of rape, murder, and sexual abuse of children. Authors submitted stories to the site through a form or by email, and Arthur then uploaded the stories to the site. Authors could maintain a profile on the site that included a picture or avatar. While some content on the site was available to anyone for free, full access required a paid subscription.

In November 2019, FBI agents executed a search warrant at Arthur's home in Terlingua, Texas. That same month, Arthur was indicted by a federal grand jury in the Western District of Texas. A nine-count second superseding indictment was filed in October 2020. The second superseding indictment charged Arthur with three counts of producing, distributing, receiving, and possessing an obscene visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 1466A(a)(1) (Counts 1, 8, and 9); five counts of using an interactive computer service to transport obscene matters, in violation of 18 U.S.C. § 1462(a) (Counts 2, 3, 4, 5, and 6); and one count of engaging in the business of selling or transferring obscene matters, in violation of 18 U.S.C. § 1466(a) (Count 7). Counts 1, 8, and 9 were premised on drawings used as profile pictures by three authors on Arthur's website, while Counts 2-6 were premised on five separate stories posted on the site, though not written by Arthur. The Government also introduced two stories at trial written by Arthur, which formed part of the basis for the allegation in Count 7.

On the day of trial, the district court held a *Daubert* hearing on Arthur's proffered expert, Dr. David Ley. At the close of the hearing, the

district court excluded Dr. Ley's testimony. The district court supplemented its oral ruling with a written order issued approximately three weeks after the trial. In the written order, the district court based its decision to exclude Dr. Ley's testimony on his lack of qualifications and the lack of reliability in Dr. Ley's methodology.

After the *Daubert* hearing, the case proceeded immediately to trial. The Government called several federal and state agents and Arthur's wife as witnesses. At the close of the Government's case, Arthur moved for judgment of acquittal, arguing that the Government had proven neither that the stories and drawings lacked "political, scientific, artistic, or literary value," *see Miller v. California*, 413 U.S. 15, 24 (1973), nor that the drawings charged depicted minors. The district court denied the motion. Arthur did not present a defense. The jury returned a guilty verdict on all nine counts.

The PSR calculated a Guidelines range of 360 to 1080 months. The maximum term of imprisonment was twenty years on Counts 1, 8, and 9, and five years on Counts 2-7. The district court sentenced Arthur to 240 months' imprisonment on Count 1 and 60 months' imprisonment on Counts 2, 3, 4, and 5, all to run consecutively to each other, as well as 60 months' imprisonment on Counts 6, 7, 8, and 9, to run concurrently, for a total of 480 months' imprisonment and three years' supervised release. Arthur timely appealed.

## II.

Arthur argues that the district court erred in denying his request to copy the charged materials. The district court denied Arthur's motion on the ground that the charged materials constituted child pornography. *See* 18 U.S.C. § 3509(m).

A district court's discovery orders are reviewed for an abuse of discretion. *United States v. Dailey*, 868 F.3d 322, 327 (5th Cir. 2017). This

court "will not reverse on that basis unless a defendant establishes prejudice to his substantial rights." *Id.* (quoting *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991)).

Under the Federal Rules of Criminal Procedure, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items" that are "material to preparing the defense," that the Government "intends to use . . . in its case-in-chief," or that were "obtained from or belong[] to the defendant." Fᴇᴅ. R. Cʀɪᴍ. P. 16(a)(1)(E). However, 18 U.S.C. § 3509(m)(2)(A) prohibits courts from granting defendants' requests to copy any "material that constitutes child pornography," as defined in 18 U.S.C. § 2256.[1]

Before us, the parties rightfully agree that none of the charged materials meets the definition of child pornography. *See* § 2256(8). Though the district court's contrary conclusion was error, Arthur has not met his burden to demonstrate that the error affected his substantial rights. *Dailey*, 868 F.3d at 327. The Government made the charged materials available to

---

[1] Section 2256(8) defines child pornography as:

any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where--

(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

(B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or

(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

defense counsel and defense experts at the FBI offices in Midland and Alpine, Texas. Arthur makes general assertions that limiting the availability of the charged materials to an in-person visit to a West Texas FBI office during the COVID-19 pandemic prevented him from retaining experts to assist in the preparation of his defense. However, Arthur has not specified any particular expert who he wished to retain but was unable to due to the limited availability of the charged material. *See United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) ("His conclusory assertion that the amount of material seized and the time it took the Government agents to review the material demonstrates he was precluded from having an adequate opportunity to review the material and obtain an expert for trial is simply insufficient."). In addition, three defense experts did view the materials at the FBI office. Therefore, Arthur has failed to show that he was prejudiced by the district court's error.

## III.

Arthur challenges two sentences in the district court's jury instructions, which he argues impermissibly shifted the burden of proof and could have caused the jury to conflate the first two prongs of the *Miller* test.[2] At trial, Arthur objected to the district court's proposed instructions on these same grounds.

"The district court's decision to give or exclude a jury instruction is reviewed for abuse of discretion." *United States v. Ragsdale*, 426 F.3d 765,

---

[2] In *Miller*, the Supreme Court articulated the current test for whether a work is obscene: "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24 (citations omitted).

779 (5th Cir. 2005). "Failing to give a defendant's suggested instruction is an abuse of discretion if the proposal is (1) substantively correct, (2) not 'substantially covered' in the jury charge, and (3) concerns 'an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense.'" *United States v. Spalding*, 894 F.3d 173, 188 (5th Cir. 2018) (citation omitted). A district court does not err, however, if the jury charge "tracks the Fifth Circuit Pattern Instructions and correctly states the law." *Id.* Further, "[a]ny error is subject to harmless-error review." *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015). Even "erroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016) (cleaned up); *see also Pope v. Illinois*, 481 U.S. 497, 501-02 (1987).

Arthur challenges two sentences in the district court's charge, drawn directly from the Fifth Circuit Pattern Jury Instructions, explaining the third prong of the *Miller* test: "An item may have serious value in one or more of these areas even if it portrays sexually oriented conduct. It is for you to say whether the material in this case has such value."[3]

Arthur argues that the first challenged sentence collapsed the first and second prongs of the *Miller* test—whether the material appealed to the prurient interest and whether it portrayed sexual conduct in a patently offensive way—into one inquiry into whether the charged materials

---

[3] Arthur proposed instead that the district court instruct: "An item may have serious value in one or more of these areas even if it portrays sexually oriented conduct in a patently offensive manner and appeals predominantly to the prurient interest. It is for you to say whether the material in this case lacks such value." The district court denied Arthur's request on the basis that the court's proposed language was drawn directly from the Fifth Circuit Pattern Jury Instructions.

"portray[ed] sexually oriented conduct." However, he has not shown that the full sentence is a misstatement of the law. *Spalding*, 894 F.3d at 188. Moreover, the instructions that immediately followed emphasized the distinction between *Miller*'s three prongs and the requirement that all three be met in order for the jury to find the materials obscene. There was no error in the district court's instruction.

As for the second challenged sentence, Arthur argues that it shifted the burden of proof by instructing the jury to determine whether the charged material "has such value," rather than whether it "lacks" such value. *See Miller*, 413 U.S. at 24. Even if this instruction were an incorrect statement of the law, any error was harmless. *Cessa*, 785 F.3d at 185. Taken as a whole, the instructions here clarified the burden of proof for the jury. *See Francis v. Franklin*, 471 U.S. 307, 318-19 (1985) ("The jury charge taken as a whole might have explained the proper allocation of burdens with sufficient clarity that any ambiguity in the particular language challenged could not have been understood by a reasonable juror as shifting the burden of persuasion."). The district court repeatedly explained that the third prong of *Miller* requires a finding that the charged material "lacks" the requisite value and that it is the Government's burden to prove that lack of value beyond a reasonable doubt. Thus, we are confident that if there was any error in the challenged sentence, it did not affect the jury's understanding of the burden of proof or its verdict.

## IV.

As he did in his motion for post-verdict judgment of acquittal, Arthur raises an as-applied constitutional challenge to his convictions on Counts 1, 8, and 9, arguing that to survive scrutiny under the First Amendment, 18 U.S.C. § 1466A(a)(1) must require that the charged images depict "real" minors.

This court reviews questions of statutory interpretation and the constitutionality of federal statutes de novo. *United States v. Arrieta*, 862 F.3d 512, 514 (5th Cir. 2017); *United States v. Rasco*, 123 F.3d 222, 226 (5th Cir. 1997). A person violates § 1466A(a)(1) by "knowingly produc[ing], distribut[ing], receiv[ing], or possess[ing] with intent to distribute a visual depiction of any kind, including a drawing, cartoon, sculpture or painting that . . . depicts a minor engaging in sexually explicit conduct; and . . . is obscene."

The statute is explicit that, unlike in the context of child pornography, the minor depicted need not be a real minor. *See* § 1466A(c) ("It is not a required element of any offense under this section that the minor depicted actually exist."). "When interpreting a statute, we are bound to 'follow the plain and unambiguous meaning of the statutory language.'" *United States v. Shabazz*, 633 F.3d 342, 345 (5th Cir. 2011) (citation omitted). Section 1466A(c) is plain and unambiguous. We conclude, therefore, that the statute does not require that the image depict a real minor.

The fact that the statute does not require depiction of a real minor does not create a constitutional infirmity. Arthur argues that "[c]riminalizing depictions of fictitious characters of indeterminate age [would act] as an end-run around the Supreme Court's decision in *Ashcroft v. Free Speech Coalition*." In *Free Speech Coalition*, the Supreme Court struck down, as a violation of the First Amendment, a statute criminalizing *any* visual depiction of what "appears to be" a minor engaging in sexually explicit conduct, even if the image did not depict a real minor and was not obscene. 535 U.S. 234, 241, 246, 258 (2002). The statute at issue here is distinguishable from the statute struck down in *Free Speech Coalition* for the simple reason that §1466A(a)(1) requires that the visual depiction be obscene. And *Free Speech Coalition* did not change the longstanding rule that obscene speech is not protected by the First Amendment. *See* 535 U.S. at 245-46 ("The freedom of speech has its limits; it does not embrace certain

categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."); *United States v. Williams*, 553 U.S. 285, 293 (2008) (distinguishing the statute at issue in *Free Speech Coalition* from one that involves "obscene material depicting (actual or virtual) children engaged in sexually explicit conduct," which is "constitutionally proscribable [under] *Ferber* and *Miller*").

Therefore, the fact that the charged drawings here do not depict real minors does not render Arthur's convictions on Counts 1, 8, and 9 unconstitutional.

## V.

Because obscenity cases implicate rights protected by the First Amendment, we must "make an independent constitutional judgment as to the obscenity of the materials in question." *Ragsdale*, 426 F.3d at 779; *see also Jacobellis v. Ohio*, 378 U.S. 184, 190 (1964); *Miller v. California*, 413 U.S. 15, 25 (1973).[4]  The parties agree that we must conduct this independent review of both the charged stories and images.

Under the test articulated in *Miller*, a work is obscene if: (1) "'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest," (2) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law," and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S.

---

[4] The Government reiterated at oral argument that our independent review is the only principle limiting the reach of the statutes charged here.  Making our obligation to exercise this "independent constitutional judgment" all the more weighty, the Government stated its position at oral argument that all users of Arthur's website—thousands, if not millions, of people—face felony exposure for possession of obscene material.

at 24. The Supreme Court has held that "words alone can be legally 'obscene,'" while noting that that Court "has always rigorously scrutinized judgments involving books for possible violation of First Amendment rights." *Kaplan v. California*, 413 U.S. 115, 118 & n.3 (1973).

After reviewing the charged materials—albeit with virtually no adversarial development at trial or on appeal on the first two prongs of *Miller*, as well as no expert opinion on any of the *Miller* prongs, and minimal district court effort at the Rule 29 stage to particularize the trial proof to the *Miller* prongs—we conclude that for Counts 2 through 9, the *Miller* test is satisfied.[5] The stories and images, which graphically depict violent sexual acts and almost nothing else, are clearly intended to and do appeal to the prurient interest. *See Ragsdale*, 426 F.3d at 780. Given that the images in Counts 8 and 9 depict the sexual abuse of prepubescent children and all of the charged stories describe in detail the repeated and protracted rape and torture of babies, infants, and adolescents, we can easily say that they describe sexual conduct "in a patently offensive way." *Miller*, 413 U.S. at 24; *Ragsdale*, 426 F.3d at 781; *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1366 (5th Cir. 1980). Finally, the charged materials lack "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. Unlike the works Arthur attempts to compare to, including *The Color Purple* and *Lolita*, the charged stories have "only the most tenuous 'plot.'" *Kaplan*, 413 U.S. at 117. And neither the charged stories nor the images charged in Counts 8 and 9 attempt to be anything other than the "portrayal of hard-core sexual conduct *for its own*

---

[5] Scholars have questioned whether the *Miller* standard, articulated in 1973, needs updating in the age of internet pornography, given that "[m]aterial that would certainly have been suppressed a few decades ago, and that would offend nearly every community, is now available in vast quantities." Andrew Koppelman, *Does Obscenity Cause Moral Harm?*, 105 Colum. L. Rev. 1635, 1658 (2005); *see also* Amy Adler, *All Porn All the Time*, 31 N.Y.U. Rev. L. & Soc. Change 695, 701-06 (2007).

sake." *Miller*, 413 U.S. at 35 (emphasis added); *see also United States v. Bagnell*, 679 F.2d 826, 837 (11th Cir. 1982) ("None of the films has a plot or any dialogue, nothing, in fact, save continual intercourse."). Therefore, we affirm the jury's findings on Counts 2 through 9 that the stories and images in question, extreme and violent depictions of sexual attacks on children, are obscene.

However, as to Count 1, on our independent, de novo review, we are not satisfied that the charged image, which was admitted at trial as Government's Exhibit 10A, is "patently offensive." *Miller*, 413 U.S. at 24. While the charged images in Counts 8 and 9 are both detailed, color, cartoon-like drawings depicting pre-adolescent girls being forced to perform fellatio on disembodied and engorged male genitalia, the charged image in Count 1 is a simple black and white pencil or charcoal drawing with minimal detail depicting an adolescent girl alone, reclining and apparently masturbating.[6] Importantly, unlike the children depicted in the images in Counts 8 and 9, there is no indication that the subject of the image in Count 1 is being forced to perform a sexual act. The drawing is simple and utterly lacking in violent depictions. Our independent constitutional review of the image charged in Count 1 leads us to the conclusion that it is not obscene under *Miller*. We therefore reverse Arthur's conviction on Count 1.

## VI.

Finally, Arthur argues that the district court erred in excluding his expert witness, Dr. David Ley, a licensed clinical psychologist and sex

---

[6] The Government's position at oral argument that *any* drawing, fully fictional, of an adolescent masturbating constitutes felony obscenity is untenable in light of the fact-specific nature of the *Miller* test.

therapist, who intended to testify about the literary, artistic, and scientific value of the charged stories and images. *Miller*, 413 U.S. at 24.

### A.

This court reviews "the admission or exclusion of expert testimony for an abuse of discretion." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009); *see also United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994). The district court's "ruling will be upheld unless it was 'manifestly erroneous.'" *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010)). Even if the district court abused its discretion, "we will still affirm if the error did not affect the substantial rights of the complaining party." *Carlson*, 822 F.3d at 202. "When assessing whether an error affected a substantial right of a defendant, the necessary inquiry is whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted." *United States v. Wen Chyu Liu*, 716 F.3d 159, 169 (5th Cir. 2013) (cleaned up). "We must, though, be 'sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict.'" *Id.* (quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir.1995)).

Although "[e]xpert testimony is not necessary to enable the jury to judge the obscenity of material which, as here, has been placed into evidence," *Hamling v. United States*, 418 U.S. 87, 100 (1974), the Supreme Court has also said that in an obscenity case, "[t]he defense should be free to introduce appropriate expert testimony," *Kaplan v. California*, 413 U.S. 115, 121 (1973).

Federal Rule of Evidence 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience, training, or education" if the proponent shows by a preponderance that the testimony

No. 21-50607

(1) "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *United States v. Kuhrt*, 788 F.3d 403, 419-20 (5th Cir. 2015).

B.

Minutes before trial began, the district court excluded Arthur's only witness, Dr. Ley,[7] based on two conclusions: (1) that he was not qualified to testify as an expert, and (2) that the methodology he used to form his opinion was not reliable. The district court's exclusion of Dr. Ley's testimony on these grounds was an abuse of discretion.

1.

The district court concluded that Dr. Ley was not qualified to testify about the artistic or literary value of the charged material because he did not have a degree in art or literature. The district court concluded that Dr. Ley was not qualified to testify about the scientific value of the charged materials because his expertise was not specifically in "depictions of the sexual abuse of babies and/or children," but rather in pornography and erotic drawings more generally.

---

[7] Even though defense counsel objected that "Dr. Ley was . . . our entire case," Arthur has not argued to us that he was denied his constitutional right to present a complete defense, *see California v. Trombetta*, 467 U.S. 479, 485 (1984), and thus we do not consider that question.

No. 21-50607

First, Dr. Ley was not required to have a degree in art or literature to testify about the artistic or literary value of the charged materials, so long as he was qualified based on one or more of the other bases in Rule 702. *See* FED. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, *or* education may testify in the form of an opinion . . . ." (emphasis added)); *see also Wen Chyu Liu*, 716 F.3d at 168 ("A lack of personal experience—the district court's concern here—should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702 . . . ."); *Carlson*, 822 F.3d at 200 ("A medical degree is not a prerequisite for expert testimony relating to medicine. For example, we have held that scientists with PhDs were qualified to testify about fields of medicine ancillary to their field of research. ").

Dr. Ley was qualified to testify about the artistic and literary value of the charged materials based on his knowledge and experience. He testified that he had experience giving presentations about "the history of eroticism in literature and art" as part of his media appearances and work training other sex therapists. He also testified that he had written a book about pornography, which contributed to his knowledge of the "role of art with erotic literature." In his expert report, Dr. Ley stated that as part of his "clinical and research" work, he had reviewed "media related to sexuality," including "photographs, videos, drawings, and textual accounts in both fictional and non-fictional formats." Dr. Ley's experience and familiarity with erotic art and literature, which stemmed from his decades of work as a clinical psychologist and sex therapist, rendered him qualified to testify about the literary and artistic value of the charged stories and images. And "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss*, 571

F.3d at 452.  As such, Dr. Ley's lack of degree in art or literature bears on the weight of the evidence, "not its admissibility." *Id.*

Second, the district court required a degree of specificity in Dr. Ley's expertise that finds no support in our precedent.  The district court concluded that Dr. Ley was not qualified to testify about the scientific value of the charged materials because his expertise was not specifically in "depictions of the sexual abuse of babies and/or children," but rather in pornography and erotic drawings more generally.  However, "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Wen Chyu Liu*, 716 F.3d at 168-69 (citation omitted).  For that reason, we have repeatedly found error in district court rulings that exclude experts on the basis of lack of specialization.  For example, in *Huss*, we rejected a district court's conclusion that an internal medicine doctor was not qualified to testify about the relationship between a particular drug and the plaintiff's heart condition.  *Id.* at 454-55.  The physician's "education and knowledge"—he had medical and public health degrees and testified that he had experience with the subject heart condition—qualified him to testify, despite his lack of specialization in cardiology or toxicology and his lack of experience with the particular drug at issue.  *Id.* at 453, 455; *see also Wen Chyu Liu*, 716 F.3d at 166, 168-69 (finding error in the exclusion of "an expert in chemical engineering, process design, and project engineering," based on a lack of experience with the specific type of chemical plant at issue); *Dixon v. International Harvester Co.*, 754 F.2d 573, 579-80 (5th Cir. 1985) (holding that an engineer who "had experience in investigating crane, tractor, and automobile accidents" was qualified to testify about a "crawler tractor" accident despite not having specific experience with crawler tractors).

Here, Dr. Ley was a licensed clinical psychologist and board-certified sex therapist with a master's degree in psychology, a PhD in clinical psychology, and twenty years of experience, including in the clinical treatment of people with "sexual attraction to children" and "a history of sex offending" as well as in pornography and its use in clinical treatment. As such, Dr. Ley was not required to be an expert in "depictions of the sexual abuse of babies and/or children" specifically because his testimony regarding those materials, and the scientific literature about them, is clearly a "related application" of his expertise. *Wen Chyu Liu*, 716 F.3d at 169. It is also notable that in one of the few obscenity cases this court has decided in recent decades, the district court did allow the defendant to introduce the expert testimony of a sex therapist. *Ragsdale*, 426 F.3d at 771-72. To the extent Dr. Ley lacked experience with the specific type of material charged in this case, that "lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.*

Dr. Ley was qualified to testify as an expert about the literary, artistic, and scientific value of the charged materials in this case, *Miller*, 413 U.S. at 24, and the district court's exclusion of the testimony on that ground was an abuse of discretion.

2.

Likewise, the district court's conclusion that Dr. Ley's methodology was unreliable was manifestly erroneous. *Carlson*, 822 F.3d at 199.[8]

First, as to the artistic and literary value of the charged materials, Dr. Ley's expert report compared the charged stories and drawings, including

---

[8] To the extent that the district court relied on Dr. Ley's lack of qualifications to conclude that his opinion was unreliable, that reliance was manifestly erroneous because, as discussed above, Dr. Ley, a PhD and licensed clinical psychologist, was qualified.

specific elements in each, to literature and art that is generally accepted as having serious artistic or literary value.[9]  The district court faulted Dr. Ley for failing to "explain how measuring the material against other work led him to conclude that the material charged has serious artistic value." Determining whether a work has serious literary or artistic value is not a strictly scientific inquiry.  *See Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 150 (1999) (explaining that the factors to consider in determining reliability of expert testimony "depend[] upon the particular circumstances of the particular case at issue").  Neither the district court nor the Government has explained why this comparative method is unreliable, and, as a matter of common sense, comparing the content, as well as the literary and artistic devices used, in the charged materials with works a reasonable person would understand as having literary or artistic value is a logical method for determining whether a reasonable person would also interpret the charged materials as having such value.  *See Pope v. Illinois*, 481 U.S. 497, 500-01 (1987) (holding that *Miller*'s third prong is a "reasonable person" standard); *see also* Amy Adler, *The Shifting Law of Sexual Speech: Rethinking Robert Mapplethorpe*, 2020 U. Chi. Legal F. 1, 10-11, 20-21, 24-25 (arguing that Robert Mapplethorpe's photographs presented an easy case of "serious artistic value" by comparing his work to classical Greek sculpture and Caravaggio).

---

[9] Whether the defense's expert could have used comparison between the charged materials and other works of literature and art as a method to show that the charged materials had literary or artistic value (*Miller* prong three) is a separate question from whether the defense can introduce "comparable material" as evidence of "community standards" (*Miller* prongs one and two).  *See Hamling v. United States*, 418 U.S. 87, 125-27 (1974) (upholding exclusion of "comparable materials" used as evidence of "community standards"); *Ragsdale*, 426 F.3d at 776 (same).

Second, the district court found that Dr. Ley's opinion on the scientific value of the charged materials was unreliable because Dr. Ley testified that (1) he would have been better able to assess their full value if he had viewed the materials in the context of the entire website, and (2) he knew of no clinician who had prescribed similar materials as treatment for any patient. Neither of these statements establishes that Dr. Ley's methodology was unreliable. First, Dr. Ley's testimony that he would have been better able to assess the value of the material if he had viewed it in the context of the entire website was based not on any scientific concern but rather on his understanding of the *Miller* test, which requires consideration of whether the work "taken as a whole" lacks the requisite value. 413 U.S. at 24. Second, whether Dr. Ley knew of any clinician who had prescribed similar material as treatment does nothing to undermine the reliability of the studies that Dr. Ley cited in his report or the admissibility of his testimony about those studies. The district court's reasoning does not support the conclusion that Dr. Ley's methodology—analyzing published studies in his field that discuss the scientific value of materials similar to those charged here—was unreliable.

Dr. Ley's expert report cited numerous published studies examining the scientific and clinical uses of narrative accounts of sexual abuse, and Dr. Ley testified that these studies used methods commonly accepted in the fields of sex therapy and clinical psychology. *See United States v. Hodge*, 933 F.3d 468, 477 (5th Cir. 2019) ("Factors that might inform whether testimony is reliable 'include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community.'"). In the absence of any evidence that the studies Dr. Ley discussed in his expert report were, for example, irrelevant, *see Pipitone v. Biomatrix, Inc.*, 288 F.3d

239, 244 (5th Cir. 2002) ("[E]xpert testimony is admissible only if it is both relevant and reliable."), not "generally accepted in the relevant scientific community," *Hodge*, 933 F.3d at 477, or methodologically flawed, *see Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380-81 (5th Cir. 2010) (holding that expert opinion was unreliable in part because it was "not backed by studies meeting requisite scientific standards"), there is no support for the conclusion that Dr. Ley's opinion—formed based on analysis of the relevant scientific literature—was unreliable.   Thus, the district court abused its discretion in excluding Dr. Ley's testimony on the scientific value of the charged materials.

## C.

Although the district court's exclusion of Arthur's "entire case"— opinion testimony about the artistic, literary, and scientific value of the charged materials, which was necessarily counterintuitive—was an abuse of discretion, "we will not vacate a conviction based on an error committed by the district court unless the error was harmful, affecting a substantial right of the complaining party." *Wen Chyu Liu*, 716 F.3d at 169; *see also United States v. Kuhrt*, 788 F.3d 403, 420-22 (5th Cir. 2015).   As discussed above, the charged materials in Counts 2 through 9 are so easily distinguishable from well-known works of art and literature depicting rape, child abuse, and incest that we are certain Dr. Ley's proposed testimony comparing the charged materials to these works would not have convinced the jury that the charged materials have serious literary or artistic value.   Similarly, Dr. Ley's testimony about the scientific value of the charged materials would not have altered the verdict.   The fact that researchers have studied similar materials does not mean the materials themselves, taken as a whole, have serious scientific value, even if the resulting studies, published in scientific journals, do.   We are sure, after reviewing the entire record, that the district court's exclusion of Dr. Ley's testimony "did not influence the jury or had but a very

No. 21-50607

slight effect on its verdict." *Carlson*, 822 F.3d at 202; *see also United States v. Roberts*, 887 F.2d 534, 537 (5th Cir. 1989) ("[I]t is clear that even if the district court had admitted the proffered testimony, it would not have changed [the] determination of Roberts' guilt.").

## VII.

For the foregoing reasons, we AFFIRM the convictions on Counts 2 through 9, REVERSE the conviction on Count 1, and REMAND for resentencing.

No. 21-50607

James L. Dennis, *Circuit Judge*, concurring in part, dissenting in part:

I concur in my learned colleague's thorough and careful opinion except for Section V's independent judgment with respect to the obscene nature of the charged material in Counts 2 through 9,[1] and Section VI.C, from which I respectfully dissent. I am not persuaded that the Government has carried its burden of demonstrating that the erroneous exclusion of Arthur's sole witness was harmless. In particular, two aspects of the excluded evidence combine to leave me "in grave doubt" that the district court's error did not have a substantial influence on the jury's decision-making. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).[2] The first is the special role of expert testimony in establishing a defense on the third prong of the *Miller* test. The second is that Dr. Ley's testimony was the only evidence supporting Arthur's theory of defense—it was his "entire case." Maj. Op. at 20. Our court has held that this combination—the exclusion of expert evidence on specialized issues of facts and the total absence of other evidence on those

---

[1] I agree with the majority that the charged material in Count 1, a charcoal drawing of a reclining female apparently masturbating, is not obscene under independent judicial review. Because the district court excluded expert testimony that, as I explain below, is central to the *Miller* issue in this case, the record is insufficiently developed to conduct a de novo review of Arthur's *Miller* challenge to the charged material in the remaining counts. I would therefore deny Arthur's constitutional claims without prejudice, preferring to pretermit our independent judicial review until the record is sufficiently developed. *United States v. Cervantes*, 706 F.3d 603, 621 (5th Cir. 2013).

[2] I also have doubts as to whether the *Kotteakos* or *Chapman* harmless error standard should apply here. The latter, of course, is reserved for cases where error affects a defendant's constitutional rights, and it requires that the Government prove the error to be harmless "beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). Depriving a defendant of his sole witness and entire defense arguably is an error of "constitutional magnitude," implicating both Sixth Amendment and Due Process rights. *United States v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000) (en banc). However, even under *Kotteakos*'s standard for non-constitutional errors, I believe the Government has failed to carry its burden of proof.

issues—constitutes reversible error. *See United States v. Alexander*, 816 F.2d 164, 167 (5th Cir. 1987). Accordingly, I would deem the district court's error not harmless, and reverse and remand for a new trial.

It is well-settled that the Government need not present expert testimony to establish that charged material lacks serious literary, artistic, political, or scientific value. *Kaplan v. California*, 413 U.S. 115, 121 (1973). But it is equally well-settled that a defendant "should be free to introduce appropriate expert testimony" in order to prove the opposite, that the material possesses this redeeming value. *Id.* (citing *Smith v. California*, 361 U.S. 147, 164–65 (1959) (Frankfurter, J., concurring)). This is because, though the jury is the ultimate finder of fact, determining whether certain material has literary, social, or scientific value may require a specialized kind of knowledge that a layperson does not have. Scientific consensus, especially, often runs counter to conventional wisdom on many issues. *See, e.g.*, *Alexander*, 816 F.2d at 167 (expert testimony necessary for jury to assess accuracy of photographic identification because lay identification unreliable). This very well may have been the case here, where Arthur sought to introduce evidence through Dr. Ley that the charged material—erotica describing child rape, abuse, and torture—has been shown to have therapeutic benefits for some individuals suffering pedophilic disorder and can reduce the likelihood of offending against children. The social benefit of otherwise shockingly depraved material is hardly apparent, I would venture, to the average person unacquainted with the latest clinical psychiatric research. *See United States v. Soler-Montalvo*, 44 F.4th 1, 19 (1st Cir. 2022) (exclusion of expert testimony that charged conduct was fantasy role-playing behavior, not child sexual predation, was not harmless). Dr. Ley's testimony would have provided precisely this information to the jury, thus aiding them in answering the question posed by *Miller* as to whether the charged material lacks serious literary, social or scientific value. I cannot say that this evidence

would not "have had 'substantial influence' on the outcome" of the trial. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *Kotteakos*, 328 U.S., at 765).

Nor can I say that the total absence of any evidence from the defense on this issue did not substantially affect the jury's decision-making. Arthur's defense—indeed, his only defense—was that the charged material failed *Miller*'s third prong. By excluding Dr. Ley's testimony, the district court eliminated Arthur's only chance to challenge the Government on an issue central to his guilt. At trial, the Government presented no evidence other than the charged material itself to prove *Miller*'s third prong. Thus, Arthur could not challenge the Government's case through cross-examination or confrontation; the only means he had to defend himself against the charges was introducing evidence establishing the First Amendment values of the charged material. Though our court has never ruled on the question of whether the erroneous exclusion of evidence that is central to the defense is harmless, there is robust agreement among many of our sister circuits that such an error cannot be harmless. *See United States v. Peak*, 856 F.2d 825, 834 (7th Cir. 1988) ("When erroneously excluded evidence would have been the only or primary evidence in support of or in opposition to a claim or defense, its exclusion is deemed to have had a substantial effect on the jury."); *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) ("[T]he excluded evidence is probative on the trial's central issue, and lends support to the theory of the defense."); *United States v. Forrester*, 60 F.3d 52, 64–65 (2d Cir.1995) ("Error going 'to the heart' of a critical issue is less likely to be harmless.") (citing *United States v. Tussa*, 816 F.2d 58, 67 (2d Cir.1987)); *Rhynes*, 218 F.3d at 323. This position strikes me as obviously correct. The harmless error standard requires that we reverse unless we are "sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361

(5th Cir.1995). I fail to see how one could be sure on any record—let alone this one—that excluding the entirety of the defense's case did not influence the jury.

Were there any doubt as to the magnitude of the harm of excluding a defendant's *Miller* expert or of excluding the entirety of his defense taken individually, there should be none when a district court's error results in both. In *United States v. Alexander*, our court confronted a similar kind of erroneous evidentiary ruling and deemed it reversible. There, the defendant was charged with bank robbery. The sole evidence linking him to the crime was a photographic still of security camera footage of the robber, which three bank employees identified as being of the defendant. 816 F.2d at 166. The defendant sought to introduce two experts in sciences related to photographic comparison, but the district court excluded them, reasoning that the jury did not need expert assistance in evaluating the photograph in evidence. *Id.* at 167. This was in error, our court held, because "the entire case . . . turned on the photographic identification." *Id.* at 169. And although the opinion did not conduct a harmless error analysis, "because of the specific nature of the [excluded expert testimony] in this case, together with the complete lack of any evidence other than the eyewitness identification," it held that the district court's error warranted reversal. *Id.* at 167. Arthur's case presents the same concerns. The entire case turned on whether the charged material lacked serious literary, artistic, political, or scientific value. The specific nature of the excluded testimony could have significantly swayed a jury's determination of this issue. And aside from the charged material itself, whose allegedly obscene nature Dr. Ley's testimony would undermine, there was no other evidence to satisfy *Miller*'s third prong. I would thus follow *Alexander* and conclude that the district court's error was not harmless.

I respectfully dissent.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

November 03, 2022

Mr. Philip Devlin
Western District of Texas, Pecos
United States District Court
410 S. Cedar Street
U. S. Post Office & Courthouse
Room 203
Pecos, TX 79772-0000

          No. 21-50607    USA v. Arthur
                          USDC No. 4:19-CR-774-1

Dear Mr. Devlin,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         By: _____
                         Casey A. Sullivan, Deputy Clerk
                         504-310-7642

cc:
     Ms. Ann Adams
     Mr. Joseph H. Gay Jr.
     Mr. Lane Andrew Haygood